Natalie A. Landreth (*pro hac vice* pending)
Wesley James Furlong (MT Bar No. 42771409)
NATIVE AMERICAN RIGHTS FUND
745 West 4th Ave, Suite 502
Anchorage, AK 99501
Ph. (907) 276-0680
Fax (907) 276-2466
landreth@narf.org
wfurlong@narf.org

*Counsel for all Plaintiffs*
*Additional Council Listed on Signature Page*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| ROSEBUD SIOUX TRIBE and FORT BELKNAP INDIAN COMMUNITY, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF STATE; MICHAEL R. POMPEO, in his official capacity; and THOMAS J. SHANNON, JR., in his official capacity, <br><br> Defendants. | Case No. _____ <br><br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.     For more than six years, TransCanada, a Canadian corporation, had attempted to secure a presidential permit to build the Keystone XL Pipeline ("the Pipeline"). Intended for the international market, the highly toxic "tar sands" crude oil sludge would pass more than 1,000 miles through the United States, connecting the tar sands mining fields of Alberta, Canada, to the Gulf Coast of the United States. In its proposed path are the homelands of the Great Sioux Nation and the Gros Ventre and Assiniboine Tribes, to which Plaintiffs Rosebud Sioux Tribe and Fort Belknap Indian Community, respectively, maintain physical, cultural, and religious ties.

2.     TransCanada's permit applications had been denied two previous times, but on January 24, 2017, President Donald J. Trump signed a memorandum "invit[ing] TransCanada . . . to promptly re-submit its application to the Department of State for a Presidential permit for the construction and operation of the Keystone XL Pipeline." Memorandum: Construction of the Keystone XL Pipeline, 82 Fed. Reg. 8,663, § 2 (Jan. 24, 2017) ("the Memorandum"). Unlike in the two previous permit applications, Defendants initiated no public process or environmental review of any kind for the third permit application.

3.     Despite the lack of any public process and review, on March 23, 2017, the Department of State published its Record of Decision and National Interest Determination ("2017 Decision"). Plaintiffs' Exhibit A; *see* 82 Fed. Reg. 16,467

(Apr. 4, 2017). Under Secretary of State for Political Affairs Thomas A. Shannon, Jr., granted TransCanada's permit application and issued it a presidential permit ("the Permit"). Plaintiffs' Exhibit B.

4.    In granting this third application, Defendants reached the exact opposite conclusion as the previous administration on the very same record, in violation of the Administrative Procedures Act.

5.    In granting this third application, there was no analysis of the trust obligation the federal government owes to the Rosebud Sioux Tribe and their unique water system, no analysis of the potential impact of the Pipeline on treaty rights, no analysis of the subpar leak detection system and the potential impact of spills on Rosebud Sioux Tribe's members, and no analysis of the potential impact on the Rosebud Sioux Tribe's cultural resources and historic properties in the path of the Pipeline, in violation of the National Environmental Policy Act and the National Historic Preservation Act.

6.    In granting this third application, there was no analysis of the trust obligation the federal government owes to the Fort Belknap Indian Community, no analysis or engagement with the Fort Belknap Indian Community under the government's obligation to consult with the Tribes, no analysis of the potential impact of the Pipeline on treaty rights, no analysis of the subpar leak detection system and the potential impact of spills on Fort Belknap's Tribal members, and no

analysis of the potential impact on Fort Belknap's cultural resources and historic properties in the path of the Pipeline, in violation of the National Environmental Policy Act and the National Historic Preservation Act.

7.    Because of the many procedural and substantive failings, the Permit must be set aside.

**JURISDICTION AND VENUE**

8.    This action arises under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, the National Historic Preservation Act ("NHPA"), 54 U.S.C. §§ 300101 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. The APA waives Defendants' sovereign immunity. 5 U.S.C. § 702. Jurisdiction is therefore proper pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).

9.    Jurisdiction also is proper pursuant to 28 U.S.C. § 1362, which provides that "district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States."

10.    This Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202 and its inherent authority to issue equitable

relief. Injunctive relief also is authorized for APA claims pursuant to 5 U.S.C. §§ 705-706.

11. Venue is proper pursuant to 28 U.S.C. § 1391 because the actions challenged herein took place in this judicial district. The Permit challenged herein authorizes TransCanada to construct, connect, operate, and maintain the Pipeline and its related facilities at and across the United States-Canada border in Montana. Without the Permit, the Pipeline cannot be constructed.

12. Venue is also proper because one of the Plaintiffs, Fort Belknap Indian Community, resides in the District of Montana.

13. Assignment is proper in the Great Falls Division because the Permit authorizes TransCanada to construct, connect, operate, and maintain the Pipeline and its related facilities at and across the United States-Canada border near Morgan, Montana. Morgan is located within Philips County, which is within the Great Falls Division. In addition, Plaintiff Fort Belknap Indian Community is located in Blaine County, which is also located in the Great Falls Division.

## THE PARTIES

14. Plaintiff ROSEBUD SIOUX TRIBE ("Rosebud") is a federally recognized Indian tribe located on the Rosebud Indian Reservation in South Dakota. 83 Fed. Reg. 4,235, 4,238 (Jan. 30, 2018). Rosebud provides for the health, safety, and welfare of its members. Also known as the Sicangu Oyate, Rosebud is a branch

of the Lakota people. Rosebud has almost 35,000 members, many of whom reside in the area that will be crossed by the Pipeline, including in Tripp County, South Dakota. The Rosebud Indian Reservation was established in 1889 after the United States' partition of the Great Sioux Reservation. Created in 1868 by the Treaty of Fort Laramie, the Great Sioux Reservation originally covered all of West River, South Dakota (the area west of the Missouri River), as well as part of northern Nebraska and eastern Montana. Currently, Rosebud's reservation includes all of Todd County and parts of Tripp, Lyman, Gregory and Mellette Counties in South Dakota.

15.    Plaintiff FORT BELKNAP INDIAN COMMUNITY of the Fort Belknap Reservation of Montana ("Fort Belknap") is a federally recognized Indian tribe. 83 Fed. Reg. at 4,237. The Fort Belknap Indian Reservation is homeland to the Gros Ventre (Aaniiih) and the Assiniboine (Nakoda) Tribes, the two tribes which form the government of Fort Belknap. Under Fort Belknap's constitution and charter, the Fort Belknap Indian Community Council is recognized as the governing body on the Fort Belknap Reservation and is charged with the duty of protecting the health, security, and general welfare of its tribal members. Fort Belknap has nearly 8,000 members who reside throughout the Fort Belknap Indian Reservation, the State of Montana, and the United States. The proposed Pipeline will cross the ancestral lands, sacred sites, and historic sites of the tribes of Fort Belknap.

16.     Collectively, Rosebud and Fort Belknap are referred to as "Plaintiffs" or "the Tribes."

17.     Defendant UNITED STATES DEPARTMENT OF STATE ("the Department") is a federal agency. The President of the United States has delegated his authority to issue presidential permits to the Secretary of State ("the Secretary"), and thus the Department. The Department receives, reviews, and approves or denies applications for presidential permits for, *inter alia¸* cross border crude oil pipelines. TransCanada submitted three applications for a presidential permit. The Department reviewed the first two applications and twice denied the applications after two separate environmental and national interest review processes. The Department approved TransCanada's third application without substantive review. As a federal agency, the Department is obligated to act in accordance with all federal laws and regulations, and to uphold its fiduciary duties to the Tribes pursuant to the United States' trust responsibility.

18.     Defendant MICHAEL R. POMPEO ("Secretary Pompeo") is sued in his official capacity as the Secretary of State. The President has delegated his authority to receive, review, and approve or deny applications for presidential permits to the Secretary. In his official capacity, Secretary Pompeo is ultimately responsible for the issuance of presidential permits, including the Permit challenged herein. He also is responsible for ensuring that the Department complies with all

federal laws and regulations, and upholds its fiduciary duties to the Tribes pursuant to the United States' trust responsibility.

19.    Defendant THOMAS A. SHANNON, JR., ("Under Secretary Shannon") is sued in his official capacity as the Under Secretary of State for Political Affairs. In his official capacity, Under Secretary Shannon signed the Record of Decision and National Interest Determination, as well as the Permit challenged herein. In signing the 2017 Decision and issuing the Permit, Under Secretary Shannon was required to ensure that the Department complied with all federal laws and regulations, and upheld its fiduciary duties to the Tribes pursuant to the United States' trust responsibility.

20.    Collectively, the Department, Secretary Pompeo, and Under Secretary Shannon are referred to as "Defendants."

## FACTUAL BACKGROUND

### I.    The Keystone XL Pipeline

21.    TransCanada submitted its first presidential permit application for the Pipeline in 2008. In 2012, after an environmental impact statement ("EIS") was completed, the Department denied that application. Just a few months later, TransCanada submitted its second permit application for the Pipeline. In 2015, after producing a supplemental EIS, the Department again denied TransCanada's application.

22.     Then, in 2017, President Trump "invite[d] TransCanada Keystone Pipeline, L.P. (TransCanada), to promptly re-submit its application to the Department of State for a Presidential permit for the construction and operation of the Keystone XL Pipeline." 82 Fed. Reg. at 8,663, § 2.

23.     During the signing ceremony, President Trump stated: "[I]f [TransCanada would] like, we'll see if we can get that pipeline built." *Trump Signs Dakota Pipeline Order*, at 0:16 (Associated Press video Jan 24, 2017), *available at* https://www.nytimes.com/video/us/politics/100000004891031/trump-signs-dakota-pipeline-orders.html?action=click&gtype=vhs&version=vhs-heading&module=vhs&region=title-area.

24.     Just two days later, TransCanada submitted its third permit application.

25.     Only fifty-six days later and without any public environmental review process, the Department granted TransCanada's permit application. In comparison, the Department spent 1,216 days reviewing TransCanada's first permit application and 1,280 days reviewing its second.

26.     The White House touts the fact that "President Trump called for TransCanada to resubmit its application to build the Keystone XL Pipeline, and [that] *he fast tracked its approval*." *President Donald J. Trump Unleashes America's Energy    Potential*,    WHITE    HOUSE    (June    27,    2017),

https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-unleashes-americas-energy-potential/ (emphasis added).

27.     President Trump's statements and Defendants' fast-tracked approval of the Permit are consistent with the President's 2016 campaign promises, where he promised to approve the Pipeline if elected. Canadian Press, *Trump Says If Elected, He'd Ask TransCanada to Reapply for Keystone XL Pipeline*, CALGARY HEROLD (Aug. 8, 2016), *available at* http://calgaryherald.com/business/energy/trump-says-if-elected-hed-ask-transcanada-to-reapply-for-keystone-xl-pipeline.

28.     The promises and approval come as no surprise. According to a 2015 personal public financial disclosure report filed with the Federal Election Commission, then-candidate Trump held between $250,000 to $500,000 worth of stock in TransCanada Pipelines, Ltd. *Executive Branch Personnel Public Financial Disclosure Report: Donald J. Trump* 42 (Jul. 15, 2015), *available at* http://online.wsj.com/public/resources/documents/TrumpFinancialDisclosure20150722.pdf.

29.     If built, the Pipeline would run 1,204 miles from the tar sands mining fields near Hardisty, Alberta, to Steele City, Nebraska.

30.     It would transport up to 830,000 barrels (35,700,000 gallons) per day of bitumen, or Western Canadian Sedimentary Basin crude oil, colloquially known as "tar sands," a highly toxic and carcinogenic crude oil sludge.

31.     In Nebraska, the Pipeline would connect with existing infrastructure and transport the tar sands to Gulf Coast refineries for refining.

32.     Snaking its way from Alberta to Nebraska, the Pipeline would cross the United States-Canada border in Philips County, Montana, directly adjacent to Blaine County and the Fort Belknap Indian Reservation.

33.     The Pipeline will cross less than 100 miles from the headquarters at the Fort Belknap Indian Reservation and will run directly through the sacred sites, historic sites, and ancestral lands of the Gros Ventre and Assiniboine Tribes of Fort Belknap.

34.     From there, it would head south-southeast across eastern Montana, through west and central South Dakota.

35.     The Pipeline would transect the Great Sioux Reservation and cross directly through Rosebud's historic reservation.

36.     The Pipeline would cross through Tripp County, South Dakota, just miles from the boundaries of the Rosebud Indian Reservation and within yards of Rosebud's trust lands and tribal members' allotments.

37.     The pipeline would then pass through north and central Nebraska to Steele City.

38.     The Pipeline would be TransCanada's second pipeline that would deliver tar sands from Alberta to refineries along the Gulf Coast. The original

Keystone Pipeline already runs from near Hardisty, Alberta, south and then east across Saskatchewan and Manitoba, and then south to Steele City, through eastern North Dakota, South Dakota, and Nebraska.

39.   The Keystone Pipeline ruptured in November 2017, spilling roughly 407,000 gallons of tar sands near Amherst, South Dakota. TransCanada originally claimed that the rupture spilled only about 210,000 gallons. Associated Press, *Keystone Pipeline Spill in South Dakota Twice as Big as First Thought*, GREAT FALLS TRIBUNE (Apr. 7, 2018), https://www.greatfallstribune.com/story/news/2018/04/07/keystone-pipeline-spill-south-dakota-twice-big-first-thought/496679002/ (last visited May 27, 2018).

40.   Below is a photograph depicting contamination from the November 2017 rupture and spill:



POLITICO (Nov. 20, 2017), https://www.politico.com/story/2017/11/20/nebraska-approves-keystone-xl-pipeline-250341.

41.     This spill was not the first time that the Keystone Pipeline ruptured. In 2011, the Keystone Pipeline ruptured in North Dakota, spilling roughly 16,800 gallons of tar sands, and in 2016, the Keystone Pipeline ruptured in South Dakota, spilling another roughly 16,800 gallons of tar sands. Valerie Volcovici & Richard Valdmanis, *Keystone's Existing Pipeline Spills Far More Often than Predicted to Regulators*, REUTERS (Nov. 27, 2017), https://www.reuters.com/article/us-usa-pipeline-keystone-spills/keystones-existing-pipeline-spills-far-more-than-predicted-to-regulators-idUSKBN1DR1CS.

## II.     Traditional Homelands of Rosebud Sioux

### A.     Rosebud maintains historical, cultural, traditional, and spiritual ties to the region that the Pipeline will cross.

42.     Historically, Rosebud's reservation extended into what is now Tripp County, and Tripp County is part of the historical territory of the Great Sioux Nation.

43.     Below is an approximate map of the Great Sioux Nation and the Great Sioux Reservation.



ND STUDIES, https://www.ndstudies.gov/sites/default/file/styles/large/public/great-sioux-reservation_fortlaramie.jpg (last accessed Aug. 9, 2018).

44.    Below is an approximate map of Rosebud's reservation boundaries.



Legend

▭ Rosebud Reservation Boundary Established in the Act of March 2, 1889
�as Rosebud Sioux Reservation and Tribal Land within the Five County Reservation Area
— Proposed Keystone XL Pipeline
— Proposed Keystone XL Transmission Line

45.     Rosebud's physical, cultural, and spiritual ties extend into Tripp County and beyond, and there are still many cultural and historical places and sacred sites important to Rosebud within Tripp County.

46.     During one of the earlier rounds of review for the Permit, Rosebud requested GPS coordinates in order to determine the location of the Pipeline and its potential impact, but the request was denied.

47.     The map above is the only indication Rosebud has about where the Pipeline may be located. That map was created by the Rosebud Historic Preservation Office with the limited information it has.

48.     As a result, Rosebud still is not certain about where the Pipeline will be located relative to its reservation, its member communities, and its historical homelands.

49.     What is known is that the proposed route stretches diagonally through Tripp County, South Dakota.

50.     This means that the Pipeline will certainly traverse through the Rosebud's 1889 reservation boundary and the Great Sioux Nation, part of Rosebud's traditional homeland.

51.     The purported location of the Pipeline has not been adequately surveyed for tribal cultural resources as required by the NHPA.

52.     All historical, cultural, and spiritual places and sites of significance in the path of the Pipeline are at risk of destruction, both by the Pipeline's construction and by the threat inevitable ruptures and spills when the Pipeline is operational.

**B.     Rosebud has members and maintains both fee and trust lands in the region that the Pipeline will cross.**

53.     The purported location of the Pipeline also abuts or crosses land either owned by Rosebud, held in trust by the United States for the benefit of Rosebud, or held in trust by the United States for the benefit of Rosebud tribal members.

16

54.     These lands are well within the area of impact for even a small rupture and spill, as defined in the Final Supplemental EIS.

55.     Additionally, Rosebud communities are still located in Tripp County.

56.     One of those, Ideal Community, is in Winner, South Dakota, and its representative holds a seat on the Rosebud Tribal Council.

57.     Below is a map showing approximately the Ideal Community, and others, for the Rosebud.



**Proposed Keystone XL Pipeline Route Crossing Three Rosebud Reservation Communities: Butte Creek Community, Ideal Community, and Bull Creek Community.**

58.     The impact on tribal lands has not been adequately analyzed pursuant to the NEPA and the United States' trust responsibility to Rosebud, nor has anyone sought Rosebud's permission for these impacts.

59.     These tribal lands and allotments are under threat of irreparable harm by pipeline construction, rupture, and spill.

60.     Indeed, Rosebud's Game, and Fish and Parks Department issues hunting and fishing permits for tribal members and non-members who hunt, fish, and recreate on Rosebud's lands, some of which are in Tripp County.

61.     The Defendants failed to analyze the impacts of Pipeline construction and operation, including the inevitable ruptures and spills after the Pipeline is operational, on Rosebud's hunting and fishing rights. This includes, but is not limited to, the impacts on tribal members who practice subsistence hunting and fishing, and the impacts on the tribal economy if the availability of game and fish is (or is perceived to be) affected by the Pipeline.

62.     Such analyses were required by the NEPA and by the United States' trust obligation to Rosebud.

### C.     Rosebud operates its own water system, part of which is in the region the Pipeline will cross.

63.     Rosebud operates its own water delivery system called the Rosebud Sioux Rural Water Supply System ("Rosebud Water System"), which is part of the larger Mni Wiconi Rural Water Supply Project ("Mni Wiconi Project"). The Mni

Wiconi Project serves more than 51,000 people—Indian and non-Indian—on the Rosebud, Pine Ridge, and Lower Brule Indian Reservations and West River/Lyman-Jones, South Dakota, and provides one sixth of all water in South Dakota.

64.     A portion of the drinking water for the Mni Wiconi Project derives from the Ogallala Aquifer and the remainder derives from the Missouri River.

65.     The Pipeline would cross both sources of water for the Mni Wiconi system.

66.     The Mni Wiconi Project and the Rosebud Water System intake from the Missouri River is at Fort Pierre, South Dakota.

67.     The Pipeline would cross the Cheyenne River upstream from the Mni Wiconi Project intake plant, meaning a spill in or near the Cheyenne River could disburse into the Mni Wiconi Project and Rosebud Water System through the intake plant.

68.     The Pipeline would also cross the Ogalalla Aquifer in the area surrounding Colome, South Dakota.

69.     In establishing these water projects, Congress stated: "[T]he United States has a trust responsibility to ensure that adequate and safe water supplies are available to meet the economic, environmental, water supply, and public health needs of the . . . Rosebud Indian Reservation." Mni Wiconi Project Act of 1988, Pub

L. No. 100-516, § 2(a)(5), 102 Stat. 2566 (Oct. 24, 1988), *amended by* Pub. L. No. 103-434, § 803(a)(3), 108 Stat. 4526 (Oct. 31, 1994).

70.     The federal government holds the Rosebud Water System in trust for the benefit of Rosebud. Pub. L. No. 103-434, § 806, *amending* Pub. L. No. 100-516, § 3A(e).

71.     In 1992, Congress commissioned a needs assessment to determine whether the Mni Wiconi Project should be extended to include Rosebud, its reservation, and its members. Pub. L. No. 102-757, § 1001, 106 Stat. 4600 (Jan. 3, 1992).

72.     Pursuant to this congressional mandate, the Bureau of Reclamation produced the Rosebud Sioux Tribe Municipal, Rural and Industrial Water Needs Assessment (July 1993) ("Needs Assessment"). The Needs Assessment recommended the creation of the Rosebud Water System that would service a "Primary Service Area" and a "Secondary Service Area." Needs Assessment, *supra* at 1-1.

73.     The Needs Assessment identified the Primary Service Area as Todd and Mellette Counties. *Id*.

74.     Rosebud's reservation encompasses Todd County.

75.     Today, the Rosebud Water System (and the Mni Wiconi Project) provides water for the Primary Service Area (Todd County) for Rosebud.

76.     The Needs Assessment identified the Secondary Service Area as areas and communities within Gregory, Tripp, and Lyman Counties. *Id*. At 10-1.

77.     In order for the United States to fulfill its trust obligation to provide clean water to tribal members living in Gregory, Tripp, and Lyman Counties, the Needs Assessments recommended the "utilization of the [Tripp County Water Users District] system, with the federal government paying the water service contract." *Id*. At 10-1.

78.     Congress adopted the recommendations outlined in the Needs Assessment when it established the Rosebud Water System, stating: "The service area . . . shall extend to all of Todd County, South Dakota, *and to all other territory and lands generally described in the* [*Needs Assessment*]." Pub. L. No. 103-434, § 806, *amending* Pub. L. No. 100-516, § 3A(c) (emphasis added).

79.     The impacts on the Mni Wiconi Project, the Rosebud Water System, and their users have not been adequately analyzed pursuant to the NEPA and the United States' trust responsibility to Rosebud.

80.     The Tribal communities of Winner, Ideal, Dixon, Bull Creek, Milk's Camp, and Wood are all served by the Tripp County Water Users District ("Tripp County District"). Rosebud provided half a million dollars to the Tripp County District to upgrade its water system and provide safe drinking water to these communities.

81.    The Pipeline would cross the Tripp County District's pipelines and infrastructure approximately twenty-three times.

82.    Rosebud has members who receive their water through this system, and Rosebud pays the water bills for these persons.

83.    The impact on this system and the many Tribal communities has not been adequately analyzed pursuant to the NEPA and the United States' trust responsibility to Rosebud.

84.    The Tripp County District derives its water from the Ogalalla Aquifer.

85.    The Tripp County District production wells for the Ogalalla Aquifer water are located about eight miles south of Winner, South Dakota.

86.    The Tripp County District's production wells are directly in the path of the Pipeline.

87.    The impact on these wells and the Rosebud Tribal communities served by these wells has not been adequately analyzed pursuant to the NEPA and the United States' trust responsibility to the Tribe.

88.    Construction of the Pipeline will irreparably harm historical, cultural, and religious sites and places important to Rosebud, as well as natural resources, water resources, and hunting and fishing rights secured to Rosebud.

89.    These sites, places, resources, and rights will remain under threat from ruptures and spills when the Pipeline is operational.

90.    The failure to analyze any of these impacts was unlawful.

## III.    Fort Belknap Indian Community

### A.    Fort Belknap maintains historical, cultural, and religious ties to the region that the Pipeline will cross.

91.    The Fort Belknap Reservation was established in 1888, comprising a small portion of the ancestral territory of the Blackfoot Confederacy, of which the Gros Ventre and Assiniboine Tribes formerly occupied as nomadic hunters and warriors along with the Plains Tribes.

92.    The lands of the Gros Ventre and Assiniboine Tribes, including the lands of the former Blackfoot Confederacy, comprise significant portions of the northern and eastern portions of Montana, including areas of eastern Montana that will be impacted by the proposed Pipeline.

93.    The Gros Ventre and Assiniboine Tribes' physical, cultural, and religious ties extend into these areas throughout eastern Montana, and the lands there still contain the Gros Ventre and Assiniboine Tribes' ancestors, cultural and historical places, and sacred sites important to the Fort Belknap Tribes.

94.    Below is a map illustrating the original lands reserved by the Gros Ventre and Assiniboine Tribes through treaties, and the subsequent reduction of those lands.



Map 3. Reduction of reservation lands assigned to the Gros Ventres, 1855–95

95.    As recently as Spring 2018, Fort Belknap requested that the Department produce mapping that would provide specific information regarding the location and impacts of the proposed Pipeline in relation to their original treaty lands which includes its ancestral lands that encompass historic, sacred sites, and places that

continue to be used by the Gros Ventre and Assiniboine Tribes as they were by their ancestors.

96.    Below is the one-page map Fort Belknap received, in response to its request.



97.    Due to the lack of detail provided by the Department, Fort Belknap is not certain where the Pipeline will be located relative to its reservation, its ancestral lands, historic and sacred sites, and its communities.

98.    The Department never consulted with, or provided information to, Fort Belknap prior to the publication of both the Final and Final Supplemental EISs about the potential Pipeline path and its impacts.

99.    In spring 2018, Fort Belknap received two site descriptions from the Department and Bureau of Land Management detailing ancestral lands and historic and sacred sites that will be desecrated, destroyed, and damaged by the proposed Pipeline construction.

100.   Fort Belknap was never provided opportunity to consult regarding the impacts to sites described in the site descriptions and it is clear from the inquiries that the proposed Pipeline will desecrate, destroy, and damage Fort Belknap's ancestral sites including historic and sacred sites. It is also clear from the inquiries that significant damage to other sites will take place.

101.   Upon receiving the two site descriptions, Fort Belknap provided comments to the Department stating that the Department had not adequately consulted with Fort Belknap during the prior Section 106 process, as required by the NHPA.

102.   To date, Fort Belknap has never received a true or complete map, as requested, of the Pipeline path that would allow for review of the impact from TransCanada clearing and construction activities.

103.   All of Fort Belknap's historical, cultural, and religious places and sacred sites in the path of the Pipeline are at risk of destruction, both by the Pipeline's construction and by the threat of inevitable ruptures and spills when the Pipeline is operational.

## IV.   TransCanada's First Permit Application

104.   On September 19, 2008, TransCanada submitted its first presidential permit application to the Department for the construction, connection, operation, and maintenance of the Pipeline and related facilities across the United States-Canada border in Philips County, Montana.

105.   On January 28, 2009, the Department published in the Federal Register a notice of intent to prepare an environmental impact statement ("EIS"). 74 Fed. Reg. 5,019 (Jan. 28, 2009). The Department recognized that the potential issuance of a presidential permit for the proposed Pipeline would be a "major federal action," mandating environmental review pursuant to the NEPA, *see* 40 C.F.R. §§ 1502.4 & 1508.18, and an "undertaking," mandating tribal consultation pursuant to Section 106 of the NHPA. *See* 36 C.F.R. §§ 800.3(a) & 800.16(y).

27

106.   The Department initiated the scoping period for the EIS from January 28 through March 16, 2009, to determine the scope of the necessary review of impacts from the Pipeline.

107.   On April 20, 2010, the Department published in the Federal Register a notice that it had completed a Draft EIS and opened a public comment period. 75 Fed. Reg. 20,653 (Apr. 20, 2010). The Department twice extended the public comment period of the Draft EIS. *See* 75 Fed. Reg. 22,890 (Apr. 30, 2010); 75 Fed. Reg. 33,883 (June 15, 2010).

108.   In response to the comments it received on the Draft EIS, the Department produced a Supplemental Draft EIS.

109.   On April 22, 2011, the Department published its Supplemental Draft EIS and opened a public comment period. 76 Fed. Reg. 22,744 (Apr. 22, 2011).

110.   On September 6, 2011, the Department published a notice in the Federal Register that it had produced a Final EIS. 76 Fed. Reg. 55,155 (Sept. 9, 2011). With the publication of the Final EIS, the Department entered the final phase of the permitting process: the national interest determination. *See* 76 Fed. Reg. 53,525 (Aug. 26, 2011). From September 26 through October 7, 2011, the Department held nine hearings to solicit testimony on its national interest determination and received written comments.

111.   On November 10, 2011, the Department announced that it could not make a national interest determination. The Department stated that it would need to prepare a supplemental EIS to evaluate alternative routes through Nebraska that avoided the environmentally sensitive Sandhills region of the state.

112.   On December 23, 2011, President Barack H. Obama signed into law the Temporary Payroll Cut Continuation Act of 2011. *See* Pub. L. No. 112-78, 125 Stat. 1280 (Dec. 23, 2011). The Act, *inter alia*, "provide[d] for the consideration of the Keystone XL pipeline." *Id*. Through the Act, Congress directed the President to grant a presidential permit to TransCanada for the Pipeline within sixty days. *Id*. § 501(a) ("[N]ot later than sixty days after the date of enactment of this Act, the President, acting through the Secretary of State, shall grant a permit under Executive Order No. 13337 . . . for the Keystone XL pipeline project."). The Act, also allowed the President to deny a presidential permit "if the President determines that the Keystone XL pipeline would not serve the national interest." *Id*. § 501(b)(1).

113.   On January 18, 2012, Secretary of State John F. Kerry ("Secretary Kerry") denied TransCanada's permit application. The Department's record of decision noted that the arbitrary timeline imposed by Congress did not allow for sufficient time to prepare a rigorous, transparent, and objective review of an alternative route through Nebraska.

## V.  TransCanada's Second Permit Application

114.  On May 2, 2012, only 113 days after the Department denied its first permit application, TransCanada submitted its second permit application for the construction, connection, operation, and maintenance of the Pipeline and related facilities across the United States-Canada border.

115.  TransCanada's first permit application ended with the publication of a record of decision.

116.  The Department's record of decision denying TransCanada's first permit application was a final agency action, because it "'mark[ed] the consummation of the agency's decision-making process.'" *Indigenous Envtl. Network v. U.S. Dep't of State*, No. CV-17-29-GF-BMM, 2017 WL 5632435, at *4 (D. Mont. Nov. 22, 2017) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)).

117.  When TransCanada submitted its second permit application, the Department was required to initiate new permit review processes pursuant to both the NEPA and the NHPA.

118.  Upon receiving TransCanada's second permit application, the Department consulted with the United States Environmental Protection Agency ("EPA") and the Council on Environmental Quality ("CEQ") and determined, again, that the potential issuance of a presidential permit to TransCanada would constitute a "major federal action" pursuant to the NEPA.

119.   The Department recognized that TransCanada's new permit application triggered an entirely new environmental review process.

120.   In consultation with the EPA and the CEQ, the Department determined that producing a supplement to its 2012 Final EIS would satisfy its obligation to review TransCanada's new permit application pursuant to the NEPA.

121.   In addition, the Department consulted with the Advisory Council on Historic Preservation ("ACHP") and determined, again, that the potential issuance of a presidential permit would constitute an "undertaking" pursuant to the NHPA.

122.   The Department recognized that TransCanada's second permit application triggered an entirely new Section 106 consultation process.

123.   On June 15, 2012, the Department published in the Federal Register a notice of intent to prepare a supplemental EIS. 77 Fed. Reg. 36,032 (June 15, 2012). The Department opened the scoping period for the Supplemental EIS from June 15 to July 30, 2012. *Id.*

124.   On March 1, 2013, the Department published a Draft Supplemental EIS. *See* 78 Fed. Reg. 18,665 (Mar. 27, 2013). The Draft Supplemental EIS built upon work completed in the 2011 Final EIS, incorporated new analyses, and addressed comments received during scoping.

125.   The Department opened public comment on the Draft Supplemental EIS. The Department also held an additional public hearing in Grand Island,

Nebraska, on April 18, 2013. Finally, the Department also received substantive inter-agency comments from the EPA, the Department of Homeland Security, the Department of the Interior, and the Department of Energy.

126.   On January 31, 2014, the Department published its Final Supplemental EIS. *See* 79 Fed. Reg. 6,984 (Feb. 5, 2014).

127.   On February 5, 2014, the Department published in the Federal Register a notice of a thirty-day public comment period on its national interest determination. *Id.*

128.   During the EIS and national interest determination processes, Rosebud submitted comments raising its concerns regarding the Pipeline's impacts on its cultural resources; its land and its tribal members' lands; it water resources, including surface water and groundwater; its treaty rights; and the economic security, health, and welfare of the Tribe and its members.

129.   On November 3, 2015, the Department published its Record of Decision and National Interest Determination ("2015 Decision"). Plaintiffs' Exhibit C; *see* 80 Fed. Reg. 76,611 (Dec. 9, 2015). Secretary Kerry again denied TransCanada's permit application because it was not in the national interest.

130.   One of the factors that Secretary Kerry considered in determining that the Pipeline was not in the national interest was "the concerns of some Indian tribes raised in the context of the proposed Project regarding sacred cultural sites and

avoidance of adverse impacts to the environment, including to surface and groundwater resources."

## VI.    TransCanada's Third Permit Application

131.   On January 24, 2017, President Trump signed a Memorandum "invit[ing] TransCanada . . . to promptly re-submit its application to the Department of State for a Presidential permit for the construction and operation of the Keystone XL Pipeline." 82 Fed. Reg. at 8,663, § 2.

132.   The Memorandum also "waived . . . any authority [the President] retained to make the final decision regarding the issuance of the Presidential Permit," *Indigenous Envtl. Network*, 2017 WL 5632435, *5, ensuring that the Department's issuance of the Permit to TransCanada was an agency action. *Id*. at *12 ("[T]he State Department's publication of the [record of decision and national interest determination] and its issuance of the accompanying Presidential Permit constitute agency action.").

133.   On January 26, 2017, just two days later, TransCanada submitted to the Department its third permit application for the construction, connection, operation, and maintenance of the Pipeline and its related cross-border facilities.

134.   On February 10, 2017, the Department acknowledged that it had received TransCanada's third permit application and announced that it would review

the application in accordance with the Memorandum. 82 Fed. Reg. 10,429 (Feb. 10, 2017).

135. "The State Department further announced that it would seek no further public comment on the national interest determination because it already had taken public comment in February 2014"—three years earlier. *Indigenous Envtl. Network*, 2017 WL 5632435, at *3 (citing 82 Fed. Reg. at 10,429).

136. "The State Department did not supplement or revise" the 2014 Final Supplemental EIS, nor did it receive or solicit any comments, either from the public, federal or state agencies, or tribes. *Id.* at *2.

137. The Department also did not initiate a new Section 106 process, including tribal consultation pursuant to the NHPA.

138. Unlike with the previous permit application, the Department did not consult with the EPA, the CEQ, or the ACHP about how it should fulfill its obligations under the NEPA and the NHPA.

139. Unlike with the two previous permit applications, the Defendants initiated no public process of any kind under the NEPA, the NHPA, or any other statute.

140. Unlike with the two previous permit applications, the Department initiated no consultation with the Tribes pursuant to the NHPA or its trust responsibility.

141.   On March 23, 2017, just fifty-six days after TransCanada's third permit application was submitted, the Department published the 2017 Decision. *See* 82 Fed. Reg. at 16,467. Under Secretary Shannon granted TransCanada's permit application.

142.   Under Secretary Shannon based the 2017 Decision on the *exact same* record on which Secretary Kerry based his contrary 2015 Decision.

143.   No new or additional information was introduced into the record that could have further informed Under Secretary Shannon's 2017 Decision.

## VII.   Changed Route Through Nebraska

144.   On February 16, 2017, TransCanada submitted an application to the Nebraska Public Service Commission ("Nebraska PSC") requesting approval for a new route through the state. *Indigenous Envtl. Network v. U.S. Dep't of State*, 317 F. Supp. 3d 1118 (D. Mont. 2018). This application was submitted twenty-one days after TransCanada submitted its third permit application to the Department and thirty-five days before the Department issued the Permit.

145.   On November 20, 2017, the Nebraska PSC approved a new route for the Pipeline through the state called the "Mainline Alternative" route. *Id.*

146.   On May 25, 2018, the Department published a notice in the Federal Register that it intended to prepare an environmental assessment for the Mainline Alternative route. 83 Fed. Reg. 24,383 (May 25, 2018).

147.   On July 30, 2018, the Department published the Draft EA for the Mainline Alternative route and opened a thirty-day public comment period. 83 Fed. Reg. 36,659 (July 30, 2018).

148.   The Department has never evaluated the Mainline Alternative route. *See Indigenous Envtl. Network*, 317 F. Supp. 3d at 1118.

149.   On August 15, 2018, the United States District Court for the District of Montana ordered the Department to prepare a supplemental EIS for the Mainline Alternative route. *Id*.

150.   The Mainline Alternative Rout runs through territory of the Great Sioux Nation and through the historic and traditional territory of Rosebud.

## VIII.  Contrary National Interest Determinations

151.   Secretary Kerry based his 2015 Decision that the Pipeline was not in the national interest on nine distinct factors and assessments.

152.   Secretary Kerry made a number of specific findings that are ignored or countermanded in the 2017 Decision without any reasoned explanation.

153.   The 2017 Decision is copied and pasted from the 2015 Decision with only minor alternations.

154.   The Department, in its haste to grant TransCanada's permit application, did not provide reasoned explanations for why it ignored or countermanded its own

previous factual findings, circumstances, and analyses that led to the opposite conclusion.

155.   In fact, the 2017 Decision ignores entire sections of analysis and factual findings that are inconsistent with and inconvenient for its new conclusion and provides no explanation for doing so.

156.   Furthermore, the 2017 Decision provides factual findings and conclusions that directly contradict those in the 2015 Decision—factual findings made without relying on any new evidence.

157.   Finally, the Department's failure to provide any reasoned explanations for ignoring and contradicting its own previous factual findings, circumstances, and analyses is exacerbated by its refusal to reopen the administrative record and supplement the 2014 Final Supplemental EIS.

158.   Therefore, even the scant new information cited in the 2017 Decision as the basis for the new decision is not contained in the administrative record.

### A.   First Factor: Climate Change

159.   The first factor analyzed in the 2015 Decision that informed Secretary Kerry's determination that the Pipeline was not in the national interest was the Pipeline's impact on climate change.

160.   The 2015 Decision relied heavily on the United States' role, both domestically and internationally, as a leader in combatting climate change. Secretary

Kerry repeatedly referenced the United States' role in making hard decisions about reducing greenhouse gas emissions, prioritizing investment in and development of the green economy and clean energy, as well as acting as an international leader on these issues.

161.   For example, the 2015 Decision found that "the *negligible-to-limited benefit to energy security* potentially provided by the proposed Project is outweighed by the Secretary's assessment of the importance of the United States leading where it can by making difficult choices on issues of climate change at this time." (emphasis added).

162.   The 2015 Decision further found that permitting the Pipeline would fundamentally undermine the United States' international credibility and role in combatting climate change; that it would undermine the United States' efforts to invest in and develop a robust green economy and catalyze the transition to non-fossil fuel energy production; that investment in the energy sector was better directed towards ensuring that the United States possessed a skilled manufacturing workforce that could meet the increasingly high demand for green technology; that it would fundamentally undercut the United States' credibility and influence on the world state; undermine the United States' effectiveness and power in negotiated and influencing bilateral and multilateral agreements and relationships; and increase threats to national security.

163.   The Department's 2015 Decision was characterized by a detailed, thorough, and exhaustive analysis of the impacts permitting the Pipeline would have on climate change, foreign policy, national security, and the economy.

164.   The Department's 2017 Decision, in comparison, contained no analysis of these issues, and lacks any through or exhaustive evaluation of its early determinations. Indeed, the 2017 Decision's analysis is woefully deficient when compared to the exhaustive analysis proffered by the Department in 2015.

165.   The 2017 Decision states only:

In the 2015 Decision, the Department determined that approval of the proposed Project at that time would have undercut the credibility and influence of the United States in urging other countries to address climate change. Since then there have been numerous developments related to global action to address climate change, including announcements by many countries of their plans to do so. In this changed global context, a decision to approve the proposed Project at this time would not undermine [United States'] objectives in this area. Moreover, a decision to approve this proposed Project would support [United States'] priorities relating to energy security, economic development, and infrastructure.

166.   The 2017 Decision ignores and contradicts specific factual findings, conditions, and analyses that informed the Department's 2015 Decision.

167.   This sole paragraph in the 2017 Decision does not provide a reasoned explanation for how or why the Department, in 2017, arbitrarily ignored the previous policy and factual finding without taking any new evidence.

### B.   Second Factor: Energy Security

168.   The second factor analyzed in the 2015 Decision that informed Secretary Kerry's determination that the Pipeline was not in the national interest was the Pipeline's potential impact (or lack thereof) on domestic energy security.

169.   The 2015 Decision found that the Pipeline would not meaningfully support United States energy security from a dependable foreign source; *i.e.* Canada.

170.   The 2015 Decision stated: "[T]he absence of the Project will not prevent Canada from continuing to serve as a secure source of energy supply. Nor is it likely to significantly increase demand for crude imports from other, less reliable sources in most circumstances."

171.   The 2015 Decision further described the Pipeline as having a "*negligible-to-limited benefit* [for] energy security potential." (emphasis added).

172.   Furthermore, the 2015 Decision concluded that:

> [*T*]*he significance of the pipeline for* [*United States*] *energy security is limited*. The Supplemental EIS indicates that in most scenarios the proposed Project is unlikely to change significantly the pattern of [United States] crude oil consumption. . . . In so far as [United States] demand continues to be met in part by foreign crude oil imports, domestic refineries capable of processing heavy crude *will likely maintain access to Canadian crude oil*.

(emphasis added).

173.   Directly contradicting these findings, the 2017 Decision states only: "The Department finds that the proposed Project will meaningfully support [United

States] energy security by providing additional infrastructure for the dependable supply of crude oil."

174.    The Department provided no explanation in the 2017 Decision for this contradictory factual finding; instead, the Department simply disregarded its previous factual finding and replaced it with a new one.

175.    The 2015 Decision also included two pages painstakingly detailing and analyzing the energy security implications of approving or denying a presidential permit for the Pipeline. This detailed analysis served as part of the basis for Secretary Kerry's 2015 Decision.

176.    In contrast, the 2017 Decision contains no analysis or discussion refuting the Department's previous analysis and factual findings or explaining why the Department arbitrarily came to the opposite conclusion in 2017. Instead, the 2017 Decision contains only two bullet-pointed paragraphs stating the Department's new and contradictory assertion.

177.    The 2017 Decision also attempts to cast doubt on the reliability of Canadian crude oil imports by suggesting that the approval of the Trans Mountain Pipeline and the denial of a Presidential permit to TransCanada "may redirect this course of reliable supply to Asian markets."

178.    The 2017 Decision makes this assertion without any factual support whatsoever.

179.   The Trans Mountain Pipeline is an already existing crude oil pipeline built in 1953 that runs from Alberta to the coast of British Columbia, Canada. Over the past sixty years, construction on the pipeline has increased its capacity significantly.

180.   In 2013, Kinder Morgan (the pipeline owner) applied to the Canadian National Energy Board ("NEB") to construct a second pipeline (the Trans Mountain Pipeline Extension Project) along a similar route that would carry tar sands. In 2016, the NEB granted conditional approval of the project to Kinder Morgan.

181.   The 2015 Decision was published two years after Kinder Morgan began its own permitting process for the Trans Mountain Pipeline Extension Project.

182.   The Department was well aware of the proposed Trans Mountain Pipeline Expansion Project in 2015. Indeed, the 2014 Final Supplemental EIS mentions the Trans Mountain Pipeline Extension Project and Kinder Morgan scores of times.

183.   The 2017 Decision does not provide a reasoned explanation for why the Trans Mountain Pipeline Expansion Project posed a threat to United States energy security in 2017, but did not in 2015.

184.   The Trans Mountain Pipeline Expansion Project was of such insignificance to the Department in 2015, it did not merit even a mention in the 2015 Decision.

185.   On August 30, 2018, the Canadian Federal Court of Appeals quashed the NEB's approval of the Trans Mountain Pipeline Extension Project, citing, *inter alia*, Canada's failure to meaningfully consult with indigenous First Nations. Associated Press, *Court Quashes Canada's Approval of Pipeline Expansion*, MSN (Aug. 30, 2018), *available at* https://www.msn.com/en-us/money/markets/court-quashes-canadas-approval-of-pipeline-expansion/ar-BBMEKnG?li=BBnbfcN.

## C.   Third Factor: Long-Term Market Trends

186.   The third factor analyzed in the 2015 Decision that informed Secretary Kerry's determination that the Pipeline was not in the national interest was the Pipeline's potential impact (or lack thereof) on long-term crude oil market trends.

187.   The 2015 Decision found that the "long-term trends that drive the investment decisions of oil-sands producers are difficult to predict. Since production remains uncertain post 2018, the corresponding amount of transportation infrastructure required also remains uncertain."

188.   Directly contradicting its 2015 Decision, the Department's 2017 Decision states:

> [T]he long-term price and technological trends that drive [Western Canadian Sedimentary Basin] crude oil production and subsequently the amount of new transportation capacity needed to meet them, coupled with the documented ability of Canadian upstream producers to sustain production during a brief period of lower oil prices, leads the Department to have confidence in the forecasts presented by markers experts at the [U.S. Energy Information Administration ("EIA")] and [the International Energy Agency ("IEA")], and affirms the

Department's conclusion that such infrastructure is supported by mid-
and long-term market outlooks.

189.   This factual finding directly contradicts the DOS's previous factual
findings and market analysis without any analysis or explanation.

190.   The 2017 Decision does not provide any explanation as to why it can
now predict with "confidence" the long-term market forecasts of tar sands in 2017,
when it could not do so in 2015.

191.   Although the 2017 Decision purportedly relies on "forecasts presented
by market experts at the EIA and IEA," the Department fails to identify or cite any
actual analysis, reports, or forecasts.

192.   There are no citations to these forecasts in the 2017 Decision, no url
links (even though the EIA publishes much of its analysis on the internet), and the
Department fails to provide the public with the titles and dates of these forecasts.

193.   The failure to provide the actual data it relied on to make this decision
is exacerbated by the Department's refusal to reopen the 2015 Final Supplemental
EIS.

194.   The Department cannot simply make up facts that it finds convenient
to support its new determination while ignoring its own previous and inconvenient
factual findings.

195.   The Department provides no explanation for why the 2017 Decision's
factual finding is the exact opposite of the 2015 Decision's finding.

**D.     National Interest Determination: Missing Section of Analysis**

196.   One of the most striking examples of the 2017 Decision's failure to provide reasoned explanations for why it ignored and contradicted its own previous factual findings, circumstances, and analyses is the Department's glaring omission of an entire section from its 2015 Decision.

197.   The 2015 Decision contains eight sections. The sixth is "Foreign Affairs and Energy Security."

198.   Within this Section, the Department spends over five pages analyzing "North American Energy Security," the United States' "Relationship with Canada," and the "Climate Change-Related Foreign Policy Considerations" of issuing a presidential permit to TransCanada.

199.   This section of the 2015 Decision contains detailed analysis and makes numerous factual findings regarding the proposed Pipeline. Secretary Kerry based, in a large part, his 2015 Decision denying TransCanada's second permit application on the analysis and findings found in this section.

200.   The Department's 2017 Decision excludes this entire section of its previous decision from its analysis.

201.   The 2017 Decision omits any in-depth analysis on the foreign relations and national security implications and consequences of issuing (or denying) a

presidential permit to TransCanada or the United States' international role in combatting climate change.

202.   Instead, the 2017 Decision analyses the commercial viability of the Pipeline. The Department failed to provide any additional information or reasoned explanations for its glaring omission of this section of analysis.

## LEGAL BACKGROUND

### I.     The Presidential Permitting Scheme

203.   The Department alleges its authority to issue presidential permits stems from two executive orders: Providing for the Performance of Certain Functions Heretofore Performed by the President with Respect to Certain Facilities Constructed and Maintained on the Borders of the United States, Exec. Order No. 11,423, 33 Fed. Reg. 11,741 (Aug. 16, 1968) ("EO 11423"); and Issuance of Permits with Respect to Certain Energy-Related Facilities and Land Transportation Crossings on the International Boundaries of the United States, Exec. Order No. 13,337, 69 Fed. Reg. 25,299 (Apr. 30, 2004) ("EO 13337").

204.  EO 11423 requires "executive permission be obtained for the construction and maintenance at borders of the United States of facilities connecting the United States with a foreign country." 33 Fed. Reg. at 11,741.

205.   EO 11423 designates and empowers the Secretary "to receive all applications for permits for construction, connection, operation, or maintenance, at

the borders of the United States, of . . . pipelines . . . to or from a foreign country."
*Id.* § 1(a)-(a)(i). EO 11423 requires the Secretary to request the views of certain other department and agency officials with regard to whether the issuance of such a permit would serve the national interest. *Id*. § 1(b). After considering these views, if the Secretary determines that issuing the permit would or would not be in the national interest, the Secretary must inform these officials of the determination before issuing the permit. *Id*. § 1(d), (e).

206.   The agency and department officials with whom the Secretary must consult have fifteen days to review the Secretary's national interest determination. *Id.* § 1(f). If any officials disagree with the Secretary's national interest determination, they may request that the Secretary refer the application to the President. *Id*. If such a request is made, the Secretary "shall refer the application . . . to the President for his consideration and final decision." *Id*.

207.   The process outlined in EO 11423 delegates the President's alleged authority to receive, review, and issue presidential permits to the Secretary. Nonetheless, in this process the President retains the ultimate authority to issue presidential permits should a conflict arise between the Secretary and other officials concerning the national interest determination.

208.   President George W. Bush affirmed the presidential permitting process established by EO 11423 in 2004. EO 13337 outlines the same authority and process established in EO 11423. 69 Fed. Reg. at 25,299, § 1(a).

209.   EO 13337 reaffirms the Secretary's obligation to consider the views of certain agency officials and notify those same officials of its final national interest determination regarding any presidential permit. *Id.* at 25,300, § 1(h). EO 13337 further reaffirms that, should any of those officials disagree with the Secretary's national interest determination, they may request that the Secretary refer the application to the President. *Id*. §1(i). Pursuant to EO 13337, the Secretary "shall consult with any such requesting official and, if necessary, shall refer the application . . . to the President for consideration and final decision." *Id*.

210.   EO 13337 largely reaffirms the permitting process established by EO 11423. Like EO 11423, EO 13337 delegates the President's authority to receive, review, and grant or deny presidential permit applications to the Secretary. And like EO 11423, with EO 13337, the President retains the ultimate authority to issue a permit.

211.   In 2017, President Trump issued the Memorandum, which diverges from the presidential permitting process established by EO 11423 and EO 13337 and establishes an *entirely new* permitting process specifically for the Pipeline. *See* 82 Fed. Reg. at 8,663-65.

212.   The Memorandum states: "The Secretary of State shall reach a final permitting decision, including a final decision as to any conditions on issuance of the permit that are necessary or appropriate to serve the national interest." *Id*. § 3(a)(i).

213.   Most important, the Memorandum states: "The agency notification and fifteen-day delay requirements of section 1(g), 1(h), and 1(i) of executive Order 13337 *are hereby waived* on the basis that, under the circumstances, observance of these requirements would be unnecessary, unwarranted, and a waste of resources." *Id*. 3(a)(iv) (emphasis added).

214.   The Memorandum waives the requirement of the Secretary to refer TransCanada's permit application to the President if any other agency official disagrees with the Secretary's national interest determination. The Memorandum also waives the President's alleged authority to make any final determination regarding the issuance of the Presidential permit for the Pipeline. *See Indigenous Envtl. Network*, 2017 WL 5632435, *5 ("President Trump specifically waived, in his Memorandum, any authority he retained to make the final a decision regarding the issuance of the Presidential Permit.").

215.   Under Secretary Shannon's issuance of the Permit to TransCanada was therefore an agency action, not a presidential action. *Id*. at *11 ("Federal Defendants again argue that the State Department's publication of the [2017 Decision] and its

issuance of the accompanying Presidential Permit qualify as presidential action. They do not. They represent agency actions by the State Department.").

216.   The Memorandum also directs the Secretary to conclude that the 2014 Final Supplemental EIS satisfies "all applicable requirements of the National Environmental Policy Act," 82 Fed. Reg. at 8,663, § 3(a)(ii)(A), as well as "any other provisions of law that requires executive department consultation or review," particularly under the Endangered Species Act. *Id.* § 3(a)(ii)(B).

217.   The Memorandum makes no mention of the Department's obligations under the NHPA.

218.   The Memorandum recognizes that the Department's possible approval of a potential third permit application from TransCanada would constitute a "major federal action" pursuant to NEPA. *See Indigenous Envtl. Network*, 2017 WL 5632435, *8-11 ("Federal Defendants not attempt to recast the State Department's original Decision to comply with NEPA, as required for a major federal action, into a policy choice, or 'act of grace,' to avoid judicial review. . . . [T]he President conceded in his Memorandum that the State Department should consider the FESIS as part of its obligation to satisfy all applicable requirements of NEPA.").

219.   Any approval of a potential third permit application from TransCanada would also constitute an "undertaking" by the Department pursuant to the NHPA.

220. Ultimately, the Department's issuance of the Permit to TransCanada was an agency action, not a presidential action. Therefore, the Court has jurisdiction under the APA to review it.

## II.   The Administrative Procedure Act

221. Pursuant to the APA, courts must

> compel agency action unlawfully withheld . . . and . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. . . [or] without observance of procedure required by law.

5 U.S.C. § 706(1)-(2).

222. When an agency changes policy or reverses a prior decision, and the new policy or decision rests upon factual findings that contradict those that underlay its prior policy or decision, the agency must provide "'a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy.'" *Organized Vill. of Kake v. U.S. Dep't og Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (quoting *Fed. Comm. Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009)).

223. An agency's failure to provide such a reasoned explanation makes the policy or decision change arbitrary and capricious. *Id*. (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)).

224.   The Department's failure to provide a reasoned explanation for why, without any additional information and without initiating any new process, it ignored and contradicted its previous factual findings, circumstances, and analyses that underlay its 2015 Decision and reached the opposite conclusion in its 2017 Decision violates the APA.

225.   Furthermore, an agency's violations of the NEPA and the NHPA can be challenged under the APA. A final agency action predicated on violations of the NEPA and the NHPA violate the APA. *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800 (9th Cir. 1999).

226.   Additionally, an agency can be compelled to comply with the procedural requirements of the NHPA under the APA. *Grand Canyon Trust v. Williams*, 38 F. Supp. 3d 1073, 1083 (D. Ariz. 2014) (citing 5 U.S.C. § 706(1)).

227.   Therefore, as detailed below, the Department's violations of the NEPA and the NHPA render its issuance of the Permit unlawful and in violation of the APA.

## III.   The National Environmental Policy Act

228.   NEPA provides: "It is the continuing responsibility of the Federal Government to use all practicable means . . . to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may . . . preserve important historic, cultural, and natural aspects of our national heritage." 42 U.S.C. § 4331(b).

229.   NEPA requires that for "major Federal actions significantly affecting the quality of the human environment," federal agencies must consider environmental effects, prepare an environmental impact statement (EIS) that addresses any adverse effects, and discuss alternatives to the proposed action. *Id*. § 4332(C).

230.   "NEPA 'does not mandate particular results,' but 'simply provides the necessary process' to ensure that federal agencies take a '*hard look*' at the environmental consequences of their actions.'" *Muckleshoot Indian Tribe*, 177 F.3d at 814 (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)) (emphasis added).

231.   An EIS "shall provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

232.   An EIS "shall include discussions of . . . [p]ossible conflicts between the proposed action and the objectives of Federal, regional, State, and local (and in the case of a reservation, Indian tribe) land use plans, policies and controls for the area concerned." *Id*. § 1502.16(c).

233.   The Final Supplemental EIS fails to examine the impacts the Pipeline would have on the Plaintiffs' treaty and other rights.

234.   The trust responsibility owed by the United States to federally recognized tribes requires that the United States ensure that Indian treaty rights are given full effect. *See Nw. Sea Farms, Inc. v. U.S. Army Corps of Eng'rs*, 931 F. Supp. 1515, 1520 (W.D. Wash. 1996). The United States has a fiduciary duty to ensure that tribal treaty rights are neither abrogated nor impinged. *Id.* This fiduciary duty mandates that federal agencies take treaty rights into consideration during the NEPA review of proposed agency action. *Id*.

235.   Rosebud is a signatory of the 1851 Treaty of Fort Laramie, 11 Stat. 749, and the 1868 Treaty of Fort Laramie. 15 Stat. 635. The 1851 Treaty of Fort Laramie demarcated the respective territories of the Sioux, Cheyenne, and Crow Nations.

236.   The 1868 Treaty of Fort Laramie established the Great Sioux Reservation, covering vast swaths of Montana, North Dakota, South Dakota, and Wyoming, including the present-day Rosebud Indian Reservation. In 1889, Congress established five separate, smaller reservations, including the Rosebud Indian Reservation. *See* 25 Stat. 888, ch. 405 (Mar. 2, 1889).

237.   Nevertheless, Rosebud has retained important treaty rights reserved by it in the 1851 Treaty of Fort Laramie and the 1868 Treaty of Fort Laramie.

238.   Rosebud's Game, Fish & Parks Department issues hunting and fishing permits for tribal members and non-members who wish to hunt on the Tribe's lands, some of which are in Tripp County.

239.   The proposed route of the Pipeline as identified *supra* at Paragraph 44 passes directly through the heart of the Great Sioux Nation, the former Great Sioux Reservation, as well as Rosebud's historic reservation. The proposed route also passes within close proximity to four reservations including the Fort Belknap Indian Reservation, the Fort Peck Indian Reservation, the Cheyenne River Reservation, and the Rosebud Indian Reservation.

240.   The proposed route of the Pipeline as identified *supra* at Paragraph 96 also passes directly through the ancestral lands of the Gros Ventre and Assiniboine Tribes.

241.   The Assiniboine Tribe, as a member of the Assiniboine Nation, is a signatory of the 1851 Treaty of Fort Laramie.

242.   The Gros Ventre Tribe, as a member of the Blackfeet Confederacy, is also a signatory of treaties with the United States.

243.   The Fort Belknap Reservation is part of what remains of the Gros Ventre and Assiniboine Tribes' ancestral territory that included all of central and eastern Montana and portions of western North Dakota. The current Blackfeet and Fort Peck Indian Reservations are also part of these territorial boundaries.

244.   Pursuant to these treaties, the Gros Ventre and Assiniboine Tribes retain the right to hunt on treaty lands. The treaties demonstrate the clear connection the

Gros Ventre and Assiniboine Tribes retain to their ancestral lands under the Treaties and beyond the Great Sioux Nation.

245.   These treaties protect the Gros Ventre and Assiniboine Tribes' continued rights to their respective territories including hunting and other subsistence rights and access to engage in rituals and ceremonies around sacred sites in efforts to protect ties to their ancestral lands.

246.   The scoping report for the Final Supplemental EIS stated that as part of the alternatives analysis, "[t]he Supplemental EIS should evaluate an alternative route to avoid the sovereign Lakota territory encompassed by the boundaries of the Great Sioux Reservation as identified in the 1851 and 1868 Fort Laramie Treaties."

247.   The Final Supplemental EIS acknowledges the scoping report's recommendation to evaluate an alternative route that avoids the territory encompassed by the Great Sioux Reservation and indicates that its analysis of this alternative is contained in Chapters 2.2 Description of Reasonable Alternatives and 5.0 Alternatives.

248.   Chapter 2.2 does not contain any mention of any of the Fort Laramie Treaties or any other treaties signed by the Tribes or any other tribes, nor does it contain any analysis of how alternative routes can avoid the Great Sioux Reservation or the ancestral lands of the Gros Ventre and Assiniboine Tribes outside the Great Sioux Nation.

249.   Similarly, Chapter 5.0 does not contain a single mention of either of the Fort Laramie Treaties, nor does it contain any analysis of how alternative routes can avoid the Great Sioux Reservation or the ancestral lands of the Gros Ventre and Assiniboine Tribes outside the Great Sioux Nation.

250.   The Final Supplemental EIS mentions the Fort Laramie Treaties only one other time in the summary of comments and responses chapter. There the Final Supplemental EIS describes a broad theme of public comments it received "assert[ing] that the Draft Supplemental EIS is deficient because it is in violation of laws, treaties, conventions, and international agreements, such as . . . the Fort Laramie Treaties."

251.   In response, the Final Supplemental EIS states:

As described in Section 1.1 Background, the Final Supplemental EIS has been prepared consistent with NEPA and all other relevant laws and regulations. The scope of the NEPA evaluation is defined by the proposed Project area and those resources and receptors that may be impacted by the proposed Project, including consistency with statutes such as the ESA and NHPA, EOs on environmental justice, and other federal, state, tribal, and local laws and regulations.

252.   Chapter 1.1 does not contain any analysis or mention of either of the Fort Laramie Treaties.

253.   The closest the Final Supplemental EIS comes to analyzing the Fort Laramie Treaties and the Tribes' treaty rights is four sentences in the Socioeconomic section of the impacts chapter of the Final Supplemental EIS:

During consultation to date, some Indian tribes expressed concerns about the proposed Project's possible impacts on the environment, specifically water resources, wildlife, climate change, and on cultural resources. . . . For many Indian residents of the general proposed Project area, hunting, fishing, trapping, and gathering activities are a significant activity. Individuals participate in these activities for numerous reasons, including food supply, personal income, and the continuance of cultural customs and traditions. Indian tribes could be disproportionately negatively impacted by the proposed Project because they could have a greater dependence on natural resources; therefore, a potential spill could more heavily impact their way of life.

254. These few sentences do not constitute adequate analysis of the Fort Laramie Treaties and the Pipeline's potential impacts on treaty rights and resources.

255. This is despite the fact that Rosebud raised concerns about the Pipeline's impacts on its cultural resources, including impacts on medicinal and nutritional plants; its lands and its tribal members' lands; its water resources, including surface water and groundwater; its treaty rights; and its economic security, health, and welfare of the Tribe and its members.

256. The Fort Laramie Treaties were specifically identified in public comments at least eighteen times, and Indian treaties generally were identified at least thirty-three times.

257. Additionally, the Department received comments from other tribes, many of which were part of the Great Sioux Nation, identifying the Department's need to analyze the Pipeline's impacts on treaty rights.

258.   The Final Supplemental EIS fails to identify and analyze the Pipeline's impacts on the Tribes' treaties, treaty rights, and treaty resources.

259.   The Final Supplemental EIS also fails to identify and analyze the Pipeline's impacts on the ancestral, traditional, and historic territories of Rosebud and Fort Belknap.

260.   The Final Supplemental EIS identifies several sites within the ancestral lands of the Fort Belknap that will be damaged, destroyed, and desecrated by the Pipeline.

261.   At the same time, the Department has failed to disclose all affected sites, has failed to properly identify land ownerships related to affected sites, has failed to provide acceptable mapping and detail of the Pipeline project, and has failed to fulfill the trust responsibilities to the Tribes.

262.   The Final Supplemental EIS spends more time analyzing the Pipeline's impacts on Canadian First Nations' treaty rights than it does on impacts to Native American treaty rights:

> Relative to impacts to Aboriginal people, the NEB carried out Enhanced Aboriginal Engagement activities. Five aboriginal communities participated in proceedings as interveners, and one Aboriginal community and one organization filed letters of comment. The Blood Tribe and Federation of Saskatchewan Indian Nations filed letters of comments, and the interveners included the following communities:
>
> • Neekaneet First Nation No. 380;
> • Red Pheasant Band No. 108:

59

• Alaxander First Nation;
• Sweetgrass First Nation; and
• Moosomin First Nation.

Potential impacts of the proposed Keystone XL pipeline on Aboriginal people identified through this engagement process and considered by the NEB include potential environmental, spiritual, cultural, and historical impacts, as well as *impacts on treaty and Aboriginal rights*. Specific concerns identified included impacts to traditional territories and traditional uses and the proximity of the proposed pipeline to important cultural sites, including the Canadian Great Sand Hills, tipi circles, and medicine wheels.

(emphasis added).

263. The Final Supplemental EIS's failure to take a hard look at the Pipeline's impacts on the Tribe's treaty rights, despite its fiduciary duty to take them into consideration and ensure that they are not abrogated and infringed upon, renders its review of the impacts under the NEPA inadequate.

264. The Final Supplemental EIS also fails to analyze reasonable route alternatives identified in the scoping report that would avoid lands identified in the Fort Laramie Treaties.

265. The Final Supplemental EIS also fails to take a hard look at the Pipeline's spill detection and prevention measures and fails to adequately analyze the impacts from a potential rupture and spill.

266. For example, the Pipeline's spill detection system will only detect a leak at the rate of 1.5 to 2% of the Pipeline's daily flow.

267.   The Pipeline is estimated to transport 850,000 barrels, or 35,700,000 gallons, of crude oil per day.

268.   The Pipeline's leak detection system would then only identify a leak if more than 535,500 to 754,000 gallons of crude oil spilled per day.

269.   Thus, the spill detection system will not detect any spill that is 535,499 gallons of crude per day or less.

270.   However, TransCanada and the Department identifies a "large" spill event scenario as being a spill greater than or equal to 1,000 barrels per day, or 42,000 gallons.

271.   This is twelve to eighteen times smaller than what TransCanada's own leak detection system can detect.

272.   The Final Supplemental EIS analyzes the impacts of a potential spill based on TransCanada's large spill event scenario.

273.   Given that the Pipeline's leak detection system cannot detect a leak unless is it twelve to eighteen time larger than this "large" spill scenario, the Final Supplemental EIS is fundamentally flawed and fails to adequately analyze the potential impacts from inevitable ruptures and spills.

274.   The Final Supplemental EIS should have analyzed a large spill event scenario at a much greater size given this fundamental flaw. The failure to analyze spills at this greater size means that the Final Supplemental EIS did not properly

analyze impacts to the human environment, including impacts to Rosebud and Fort Belknap communities, tribal lands, tribal water resources, historic properties, cultural and religious sites, hunting and fishing rights, or treaty rights.

275.   Indeed, the 2017 rupture of the Keystone Pipeline resulted in the spill of 407,000 gallons of crude oil.

276.   This spill was nine and a half times larger than the large spill event scenario evaluated in the Final Supplemental EIS for the Pipeline, and 128,000 to 347,000 gallons less than what the Pipeline's leak detection system can detect.

277.   The Final Supplemental EIS fails to take a hard look at the environmental impacts of the Pipeline. Therefore, the Final Supplemental EIS is inadequate and the decision to issue the Permit, based on the inadequate Final Supplemental EIS, violates the NEPA and the APA.

## IV.   The National Historic Preservation Act

278.   Congress enacted the NHPA "to foster conditions under which our modern society and our historic property can exist in productive harmony and fulfill the social, economic, and other requirements of present and future generations." 54 U.S.C. § 300101(1).

279.   In relevant part, the NHPA requires that "the head of any Federal department or independent agency having authority to license any undertaking, . . .

prior to the issuance of any license, shall take into account the effects of the undertaking on any historic property." 54 U.S.C. § 306108.

280.   Congress authorized the ACHP to "promulgate regulations as it considers necessary to govern the implementation of [Section 106] in its entirety." *Id.* § 304108(a). Pursuant to this authority, the ACHP has promulgated such regulations at 36 C.F.R. Part 800.

281.   "It is the statutory obligation of the Federal agency to fulfill the requirements of section 106 and to ensure that an agency official with jurisdiction over an undertaking takes legal and financial responsibility for section 106 compliance." 36 C.F.R. § 800.2(a).

282.   The ACHP's regulations establish a four-step process that federal agencies must follow in order to satisfy their Section 106 obligations.

283.   Federal agencies, including the Department, must comply with the ACHP's regulations. *See Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 607 (9th Cir. 2010) (citing *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 787 (9th Cir. 2006); *Muckleshoot Indian Tribe*, 117 F.3d at 805) ("We have previously determined that federal agencies must comply with these requirements.").

284.   First, federal agencies are required to "determine whether the proposed Federal action is an undertaking . . . and, if so, whether it is the type of activity that has the potential to cause effects on historic properties." *Id*. § 800.3(a).

285.   Second, the federal agencies must identify historic properties within the undertaking's area of potential effects. *Id*. § 800.4.

286.   Third, federal agencies must assess the undertaking's effects on those historic properties. *Id*. § 800.5.

287.   Finally, federal agencies must seek to resolve any adverse effects through avoidance, minimization, or mitigation. *Id*. § 800.6.

288.   An "undertaking" is defined as any "project, activity, or program . . . requiring a Federal permit, license or approval." *Id*. § 800.16(y).

289.   A "historic property" is defined as "any prehistoric or historic district, site, building, structure, or object included on, or determined eligible for inclusion on, the National Register [of Historic Places]" ("National Register"). 36 C.F.R. § 800.16(l)(1); 54 U.S.C. § 300308.

290.   Historic properties include places "of traditional religious and cultural importance to an Indian tribe . . . that meet the National Register criteria." 36 C.F.R. § 800.16(l)(1); 54 U.S.C. § 320706(a).

291.   Throughout this process, federal agencies must consult with "any Indian tribe . . . that might attach religious and cultural significance to properties

within the area of potential effects," 36 C.F.R. § 800.4(b); 54 U.S.C. § 302706(b), whether or not those historic properties are located on tribal lands. 36 C.F.R § 800.2(c)(2).

292.   Federal agencies shall ensure that such consultation provides tribes "a reasonable opportunity to identity [their] concerns about historic properties, advise on the identification and evaluation of historic properties, . . . articulate [their] views on the undertaking's effects on such properties, and participate in the resolution of effects." *Id*. § 800.2(c)(2)(ii)(A).

293.   The ACHP defines consultation as "the process of seeking, discussing, and considering the views of other participants, and, where feasible, seeking agreement with them regarding matters arising in the section 106 process." *Id.* § 800.16(f).

294.   Federal agencies must "make a reasonable and good faith effort to carry out appropriate identification efforts" or historic properties during the Section 106 process. *Id*. § 800.4(b)(1). Only through adequate consultation can federal agencies "take the steps necessary to identify historic properties within the area of potential effects." *Id*. § 800.4(b).

295.   The failure of a federal agency to adhere to the procedures established by the ACHP's regulations renders any final issuance of a permit unlawful pursuant

to the APA. *See Muckleshoot Indian Tribe*, 177 F.3d at 815; 5 U.S.C. §§ 706(1), 706(2)(A), (C) & (D).

296.    Defendants violated the NHPA and its implementing regulations during the review of TransCanada's third permit application by failing to initiate the Section 106 process, including Section 106 consolation with the Tribes.

297.    When the Department received TransCanada's third permit application in 2017, it was required to initiate a new Section 106 process because the construction of the Pipeline is an undertaking.

298.    When the Department received TransCanada's first permit application, it correctly determined that the construction of the Pipeline was an undertaking triggering Section 106 and initiated the Section 106 process.

299.    The Department nevertheless violated the NHPA by failing to conduct adequate consultation with the Tribes and failed to make reasonable and good faith efforts to identify historic properties.

300.    When the Department received TransCanada's second permit application it again correctly determined that the construction of the Pipeline would be an undertaking triggering Section 106 and, in consultation with the ACHP, initiated a new Section 106 processes.

301.   Again, the Department nevertheless violated the NHPA by failing to conduct adequate consultation with the Tribes and failed to make reasonable and good faith efforts to identify historic properties.

302.   In contrast, when the Department received TransCanada's third permit application, it did not initiate the Section 106 process, nor did it consult with the Tribes.

303.   The Department's failure to initiate the Section 106 process when it received TransCanada's third permit application is accentuated by the Nebraska Public Service Commission's approval of the new Mainline Alternative route.

304.   The Section 106 process, including Section 106 consultation with the Tribes, has never evaluated the Mainline Alterative route's effects on historic properties.

305.   The Department knew that the Nebraska PSC could approve the Mainline Alternative route before it issued the Permit in 2017. *Indigenous Envtl. Network*, 317 F. Supp. 3d at 1118.

306.   The Department "possess[es] the obligation to analyze new information relevant to the [effects to historic properties] of its decision." *Id.*

307.   The Department's failure to initiate the Section 106 process after receiving TransCanada's third permit application violates the NHPA and the APA, therefore rendering its decision to issue the Permit unlawful.

67

308.   The Department also violated the NHPA and its implementing regulations because it failed to make a reasonable and good faith effort to identify historic properties and failed to adequately consult with the Tribes during the Section 106 processes it initiated when it received TransCanada's first two permit applications.

309.   During the first two Section 106 processes, the Department's identification efforts were not appropriate for identifying historic properties of traditional religious and cultural significance to the Tribes.

310.   For example, the Department's archaeological efforts to identify and evaluate historic properties of significance to the Tribes were inadequate.

311.   The Department's failure to make a reasonable and good faith effort to identify such historic properties was compounded by its failure to adequately consult with the Tribes

312.   The Department's consultation with the Tribes did not seek, discuss, and consider the views, issues, or concerns of the Tribes, nor did the Department attempt, where feasible, to seek agreement with the Tribes. Instead, the Department's "consultation" ignored the comments and concerns of the Tribes and implemented their existing plan.

313.   The Department's issuance of the Permit to TransCanada is unlawful because the Department failed to initiate the Section 106 process when it received TransCanada's third permit application in 2017.

314.   The Department's issuance of the Permit to TransCanada is also unlawful because the Department failed to make a reasonable and good faith effort to identify historic properties and failed to adequately consult with the Tribes during the Section 106 processes it initiated when it received TransCanada's first and second permit applications.

## FIRST CLAIM FOR RELIEF

### Administrative Procedures Act, 5 U.S.C. §§ 701 *et seq.*

315.   Plaintiffs re-allege and reincorporate by reference all the allegations set forth in this Complaint as if set forth in full.

316.    The APA requires the Court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id*. § 706(2)-(2)(A).

317.    For an agency's change in policy or reversal of a previous decision to comply with the APA, it must, *inter alia*, "provide good reasons for the new policy, which, if the new policy rests upon factual findings that contradict those which underlay its prior policy, must include a reasoned explanation for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Organized*

*Vill. of Kake*, 795 F.3d at 966 (quotation marks, ellipses, and internal citations omitted).

318.   In issuing the Presidential permit to TransCanada in 2017, the DOS ignored and countermanded its earlier factual findings and circumstances that underlay and were engendered to its 2015 Decision without providing a reasoned explanation. The Department's 2017 Decision was made on the *exact same* record as its 2015 Decision; the Department received no new information to support its contrary decision.

319.   The Department therefore violated the APA. The Court must hold unlawful and set aside the Presidential permit because the DOS's action was "arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with law." *Id.* § 706(2)(A).

## SECOND CLAIM FOR RELIEF

**National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*
Administrative Procedures Act, 5 U.S.C. §§ 701 *et seq.***

320.   Plaintiffs re-allege and reincorporate by reference all the allegations set forth in this Complaint as if set forth in full.

321.   The NEPA requires agencies to take a hard look at the impacts that major federal actions will have on the human environment.

322. The federal trust responsibility requires that agencies take into consideration tribal treaty and other rights during the NEPA process. *Nw. Sea Farms*, 931 F. Supp. at 1520.

323. The Final Supplemental EIS fails to analyze the impacts on take into consideration the Fort Laramie Treaties and the Tribes' treaty rights and resources.

324. The Final Supplemental EIS fails to analyze the impacts on the Tribes' ancestral, traditional, historic, and treaty lands.

325. The Final Supplemental EIS also fails to adequately analyze the impacts of a potential spill because it is based on flawed assumptions regarding the size of large spills and TransCanada's ability to detect them.

326. The Final Supplemental EIS also failed to adequately analyze reasonable alternatives because it fails to consider route alternatives that avoid the Great Sioux Reservation, lands described in the Fort Laramie Treaties, and the ancestral, traditional, and historic lands of the Tribes.

327. Defendants' failure to take a hard look at these issues in the Final Supplemental EIS violates the NEPA and its implementing regulations.

328. Therefore, Defendants' issuance of the Permit to TransCanada is "arbitrary, capricious, an abuse of discretion, [and] not in accordance with law," 5 U.S.C. § 706(2)(A), and "without observance of procedure required by law." *Id*. § 706(2)(D)

## THIRD CLAIM FOR RELIEF

**National Historic Preservation Act, 54 U.S.C. §§ 300101 *et seq*.**
**Administrative Procedures Act, 5 U.S.C. §§ 701 *et seq*.**

329.   Plaintiffs re-allege and reincorporate by reference all the allegations set forth in this Complaint as if set forth in full.

330.   Section 106 of the NHPA requires agencies to take into account the effects of a proposed undertaking on any historic properties within the area of potential effects.

331.   In order to fulfill this obligation, agencies must consult with any Indian tribes that may attach religious and cultural significance to historic properties within the area of potential effects.

332.   Defendants failed to initiate the Section 106 process when the Department received and reviewed TransCanada's third permit application in 2017 and failed to consult with the Tribes pursuant to its obligations under Section 106 the NHPA and its implementing regulations.

333.   Therefore, Defendants' issuance of the Permit to TransCanada is "arbitrary, capricious, an abuse of discretion, [and] not in accordance with law," 5 U.S.C. 706(2)(A), and "without observance of procedure required by law," *Id*. § 706(2)(D), and the Court must "compel agency action unlawfully withheld." *Id*. § 706(1).

## FOURTH CLAIM FOR RELIEF

### National Historic Preservation Act, 54 U.S.C. §§ 300101 *et seq.*
### Administrative Procedures Act, 5 U.S.C. §§ 701 *et seq.*

334.   Plaintiffs re-allege and reincorporate by reference all the allegations set forth in this Complaint as if set forth in full.

335.   Section 106 of the NHPA requires Defendants to take into account the effects of a proposed undertaking on any historic properties within the area of potential effects.

336.   In order to fulfill this obligation, Defendants must consult with any Indian tribes that may attach religious and cultural significance to historic properties within the area of potential effects. Defendants must also make a reasonable and good faith effort in identifying historic properties.

337.   Defendants failed to adequately consult with the Tribes during the Section 106 processes initiated for TransCanada's first two permit applications in 2008 and 2012.

338.   Defendants failed to make reasonable and good faith efforts to identify historic properties during the Section 106 processes initiated for TransCanada's first two permit applications in 2008 and 2012.

339.   Defendants' failure to adequately consult with the Tribes and to make a reasonable and good faith effort to identify historic properties violates Section 106 of the NHPA and its implementing regulations.

340.   Therefore, Defendants' issuance of the Permit to TransCanada is "arbitrary, capricious, an abuse of discretion, [and] not in accordance with law," and "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (2)(D).

## RELIEF REQUESTED

WHEREFORE, Plaintiffs request that the Court:

1.   Declare that Defendants violated the APA by failing to provide a reasoned explanation for why the 2017 Decision ignored, contradicted, and countermanded the factual findings, circumstances, and analyses that underlay and were engendered to its 2015 Decision;

2.   Declare that Defendants violated the NEPA and the APA by failing to take a hard look in the Final Supplemental EIS at the Pipeline's impacts on the Tribes' treaty and other rights, failing to take a hard look at the impacts from potential spills; and failing to analyze reasonable alternatives;

3.   Declare that Defendants violated the NHPA and the APA by failing to initiate the Section 106 process when the Department received and reviewed TransCanada's third permit application;

4.     Declare that Defendants violated the NHPA and the APA by failing to conduct adequate Section 106 consultation with the Tribes and failing to make reasonable and good faith efforts to identify historic properties when the Department received and reviewed TransCanada's first and second permit applications;

5.     Issue injunctive relief rescinding, setting aside, and holding unlawful Defendants' issuance of the Permit, requiring Defendants to fully comply with the APA, NEPA, and NHPA, and prohibiting any activity in furtherance of the construction, connection, operation, and maintenance of the Pipeline and related facilities;

6.     Award Plaintiffs fees and costs pursuant to 28 U.S.C. § 2412, 54 U.S.C. § 307105, and otherwise authorized by law; and

7.     Grant such other relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED, this 10th day of September, 2018

/s/ *Wesley James Furlong*
Natalie A. Landreth (*pro hac vice* pending)
Wesley James Furlong (MT Bar. No. 42771409)
NATIVE AMERICAN RIGHTS FUND

Matthew L. Campbell (*pro hac vice* pending)
NATIVE AMERICAN RIGHTS FUND
1506 Broadway
Boulder, CO 80302
Ph. (303) 447-8760
Fax (303) 443-7776
mcampbell@narf.org

Daniel D. Lewerenz (*pro hac vice* pending)

NATIVE AMERICAN RIGHTS FUND
1514 P Street, N.W. (rear), Suite D
Washington, D.C. 20005
Ph. (202) 785-4166
Fax (202) 822-0068
lewerenz@narf.org

*Counsel for all Plaintiffs*

Daniel D. Belcourt (MT Bar No. 3914)
BELCOURT LAW P.C.
120 Woodworth Avenue
Missoula, MT 59801
Ph. (406) 265-0934
Fax (406) 926-1041
danbelcourt@aol.com

David A. Bell (MT Bar No. 39604394)
GEISZLER STEELE, PC
619 Southwest Higgins Avenue, Suite K
Missoula, MT 59803
Ph. (406) 541-4940
Fax (406) 541-4943
dbell@lawmissoula.com

*Counsel for Fort Belknap Indian Community*

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of September, 2018, I filed the above **Complaint for Declaratory and Injunctive Relief** with the Court's CM/ECF system, which provided notice of this filing by e-mail to all counsel of record.


*/s/ Wesley James Furlong*
Wesley James Furlong