Natalie A. Landreth (*pro hac vice*)
Wesley James Furlong (MT Bar No. 42771409)
Native American Rights Fund
745 West 4th Ave, Suite 502
Anchorage, AK 99501
Ph. (907) 276-0680
Fax (907) 276-2466
landreth@narf.org
wfurlong@narf.org

*Counsel for all Plaintiffs*
*Additional Counsel Listed on Signature Page*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| ROSEBUD SIOUX TRIBE and FORT BELKNAP INDIAN COMMUNITY, | Case No. 4:18-cv-00118-BMM |
| Plaintiffs, | |
| v. | **[PROPOSED] FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| DONALD J. TRUMP, in his official capacity; UNITED STATES DEPARTMENT OF STATE; MICHAEL R. POMPEO, in his official capacity; and DAVID HALE, in his official capacity, UNITED STATES DEPARTMENT OF INTERIOR; DAVID L. BERNHARDT, in his official capacity; TRANSCANADA CORPORATION, and TRANSCANADA KEYSTONE PIPELINE, LP, | |
| Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION ................................................................1

JURISDICTION AND VENUE ...........................................6

THE PARTIES ..................................................................8

BACKGROUND ...............................................................13

I.      Tribal Nations ......................................................13

II.     1851 Fort Laramie Treaty.....................................14

        A.      History, Purpose, and Negotiation of the 1851 Fort Laramie Treaty .14

        B.      Language of the Treaty ...............................16

III.    1855 Lame Bull Treaty..........................................17

        A.      History, Purpose, and Negotiation of the 1855 Lame Bull Treaty .....17

        B.      Language of the Treaty ...............................18

IV.     1868 Fort Laramie Treaty......................................18

        A.      History, Purpose, and Negotiation of the 1868 Fort Laramie Treaty .18

        B.      Language of the Treaty ...............................21

V.      The Rosebud Sioux Tribe (Sicangue Oyate) .............22

        A.      Rosebud Spirituality...................................22

        B.      Rosebud Maintains Historical, Cultural, Governmental, Traditional, and Spiritual Ties to the Region that the Pipeline Will Cross ...........27

        C.      The Pipeline's Potential Impacts to Rosebud Members, Particularly Women and Children...........................30

D.    Rosebud has Members and Maintains Both Fee and Trust Lands in the Region and the Pipeline will Cross ....................................................34

E.    Rosebud Operates its Own Water System, Part of Which is in the Region the Pipeline will Cross ............................................................37

VI.    Fort Belknap Maintains Historical, Cultural, Governmental, Traditional, and Spiritual Ties to the Region that the Pipeline Will Cross..............................41

VII.    The Keystone XL Pipeline .........................................................................45

A.    The South Dakota Permit Process Approved the Pipeline Across Rosebud Surface and Mineral Estates Held in Trust ..........................48

B.    State Department Maps Show the Pipeline Corridor Crossing Rosebud Surface and Mineral Estates Held in Trust .........................................55

C.    TransCanada has not Obtained a Federal Right of Way to Cross Rosebud Lands, nor Obtained Rosebud Consent ................................56

D.    The Federal Permit Process....................................................................56

1.    TransCanada's First Permit Application...................................59

2.    TransCanada's Second Permit Application ..............................61

3.    TransCanada's Third Permit Application .................................63

4.    Changed Route Through Nebraska...........................................65

5.    Litigation Challenging the 2017 Presidential Permit...............65

6.    President Trump's Unilateral Action ........................................67

VIII.    Significant New Circumstances or Information Relevant to Environmental Concerns that Bear on the Pipeline and Require a Supplemental EIS ..........67

LEGAL BACKGROUND .......................................................................................73

I.    Treaty Principles ...........................................................................................73

II.     Congress's Constitutional Authority to Regulate Foreign Commerce..........75

III.    Rights-of-Way Statutes.....................................................................76

IV.     Mineral Rights ..............................................................................77

V.      Tribal Jurisdiction..........................................................................78

VI.     The Presidential Permitting Scheme ...................................................80

VII.    The Administrative Procedure Act .....................................................85

VIII.   The National Environmental Policy Act ..............................................86

IX.     The National Historic Preservation Act ..............................................96

FIRST CLAIM FOR RELIEF .........................................................................101

SECOND CLAIM FOR RELIEF .....................................................................103

THIRD CLAIM FOR RELIEF ........................................................................104

FOURTH CLAIM FOR RELIEF .....................................................................107

FIFTH CLAIM FOR RELIEF .........................................................................109

SIXTH CLAIM FOR RELIEF.........................................................................111

SEVENTH CLAIM FOR RELIEF ...................................................................112

EIGHTH CLAIM FOR RELIEF ......................................................................114

NINTH CLAIM FOR RELIEF........................................................................115

TENTH CLAIM FOR RELIEF .......................................................................116

ELEVENTH CLAIM FOR RELIEF .................................................................119

RELIEF REQUESTED..................................................................................120

Plaintiffs, by and through their undersigned attorneys, allege on information and belief as follows:

## INTRODUCTION

1.      This case arises from President Donald J. Trump's March 29, 2019, unilateral issuance of a presidential permit to TransCanada Keystone Pipeline, LP, for the construction, connection, operation, and maintenance of the Keystone XL Pipeline ("Pipeline"), which will cross the United States-Canada border in Phillips County, Montana. Prior to issuing the permit, the President failed to comply with the 1851 Fort Laramie Treaty and the 1855 Lame Bull Treaty.

2.      Equally as important, this case arises from TransCanada Keystone Pipeline, L.P.'s failure to secure Rosebud Sioux Tribe's consent to construct the Pipeline across Rosebud's land.

3.      This case also arises from the United States Department of State's 2017 unlawful issuance of a presidential permit to Keystone XL Pipeline, LP, for the construction, connection, operation, and maintenance of the Pipeline.

4.       The highly toxic "tar sands" crude oil sludge would pass more than 1,000 miles through the United States, connecting the tar sands mining fields of Alberta, Canada, to the Gulf Coast of the United States.

1

5. Between 2007-2013 TransCanada Keystone Pipeline, PL, a wholly-owned subsidiary of a Canadian corporation, TransCanada Corporation, (together, "TransCanada") attempted to secure a presidential permit to build the Pipeline.

6. Twice, the United States Department of State ("State Department") denied TransCanada a presidential permit for the Pipeline, finding that it was *not* in the national interest.

7. In 2017, President Trump issued a Memorandum "invit[ing] TransCanada . . . to promptly re-submit its application to the Department of State for a Presidential permit for the construction and operation of the Keystone XL Pipeline." Memorandum: Construction of the Keystone XL Pipeline, 82 Fed. Reg. 8,663, § 2 (Jan. 24, 2017) ("the Memorandum"). Acting on President Trump's invitation, TransCanada sought, yet again, the State Department's approval to construct the Pipeline. Within months, the State Department granted TransCanada a presidential permit ("the 2017 Permit"). *See* Plaintiffs' Exhibit A.

8. The Trump State Department's issuance of the presidential permit to TransCanada was unlawful, and in November 2018, the United States District Court for the District of Montana vacated the 2017 Permit. *See Indigenous Envtl. Network v. U.S. Dep't of State*, 347 F. Supp. 3d 561, 580-81 (D. Mont. 2018).

9. On March 29, 2019, while the State Department appealed this decision to the Ninth Circuit Court of Appeals (where it remains pending), President Trump

took extraordinary action to circumvent the judicial branch and purported to unilaterally revoke the 2017 Permit and grant a new presidential permit to TransCanada ("2019 Permit"). 84 Fed. Reg. 13,101 (Apr. 3, 2019).

10.  The 2019 Permit provides that "[t]he construction, connection, operation, and maintenance of the Facilities (not including the route) shall be, in all material respects and as consistent with applicable law, as described in the permittee's application for a Presidential permit filed on May 4, 2012, and resubmitted on January 26, 2017." This provision acknowledges the continued obligation of TransCanada and the United States to comply with the National Environmental Policy Act ("NEPA"), the National Historic Preservation Act ("NHPA"), and the Administrative Procedures Act ("APA"), as well other federal law, including treaties with the Plaintiff Tribes, and tribal law.

11.  While the 2019 Permit recognizes the Pipeline must be consistent with the law, the President, Agency Defendants, and TransCanada have an independent obligation to comply with federal law, including treaties with the Tribes, and the Tribes' laws. By issuing the 2019 Permit, President Trump is attempting to circumvent the Constitution, the rule of law, and to evade judicial review.

12.  The effort to evade judicial review is unavailing. As set forth more fully herein, Plaintiffs have a right to declaratory and injunctive relief in connection with:

a)      Non-statutory review of President Trump's illegal and ultra vires action in issuing a presidential permit to TransCanada for the Pipeline, in violation of treaty obligations owed to Plaintiffs, and in contravention of federal law constituting the *minimum* requirements for fulfillment of those treaty obligations;

b)      Non-statutory review of President Trump's issuance of the Permit in violation of the Constitution's separation of powers;

c)      APA review of agency action and failure to act in connection with agency defendants' failure to comply with federal treaty, statutory, and regulatory obligations in connection with the Pipeline; and

d)      Failure of TransCanada to comply with federal and tribal law in connection with the Pipeline.

13.     In the Pipeline's proposed path are the homelands of the Oceti Sakowin (otherwise known as the Great Sioux Nation) and the Gros Ventre and Assiniboine Tribes, to which Plaintiffs Rosebud Sioux Tribe ("Rosebud") and Fort Belknap Indian Community ("Fort Belknap") (together, "the Tribes"), respectively, maintain historical, cultural, governmental, traditional, and spiritual ties.

14.     The Pipeline would cross Rosebud territory, some of which is held in trust by the United States, and the territory of Fort Belknap.  Yet, TransCanada has not obtained Rosebud consent to cross Rosebud territory as required by the Fort

Laramie Treaty of 1868, federal right-of-way and mineral statutes, and Rosebud's regulatory and inherent authority over its territory.

15.   Likewise, the United States has ignored its obligations to protect Rosebud and Fort Belknap in violation of the 1851 Fort Laramie Treaty, 1855 Lame Bull Treaty, federal rights-of-way and mineral statutes, and basic principles of federal Indian law.  The issuance of a presidential permit that purports to authorize the entire Pipeline cannot avoid these obligations, nor the obligations of the NEPA and the NHPA, that are the *minimum* basis for fulfilling treaty obligations.

16.   Because the Pipeline crosses Rosebud territory, Rosebud has jurisdiction over its territory, the Pipeline, and TransCanada, and TransCanada must obtain Rosebud's consent before crossing its territory. Additionally, TransCanada has agreed to abide by and follow all tribal laws and regulations with respect to the construction and operation of the Pipeline. As such, TransCanada must comply with Rosebud's Land Use, Environmental Protection, Utilities, and other relevant laws, and Fort Belknap's Cultural Property Act and other relevant laws, but it has failed to do so.

17.   In issuing the 2019 Permit, President Trump failed to analyze the United States' treaty obligations to protect the Tribes. President Trump also failed to analyze the Pipeline's potential impacts on Rosebud's unique water systems (which are also held in trust); potential impacts on Tribal treaty rights and territory; the

Pipeline's subpar leak detection system; the potential impact of spills on tribal members and natural resources; or the potential impact of the Pipeline on the people, cultural resources, spiritual and religious beliefs, and historic properties in the path of the Pipeline. This violates the 1851 Treaty of Fort Laramie and the 1855 Lame Bull Treaty, and the obligations that those treaties impose. *See e.g., Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 788 (9th Cir. 2006) (which adds that violations of the NEPA and the NHPA also violate the "minimum fiduciary duty to the [Tribes]").

18.     Because of the many procedural and substantive failings, the 2019 Permit must be vacated.

19.     As sovereign nations, the Tribes' claims are grounded on treaty obligations undertaken by the United States in government-to-government negotiations with the Tribes.   The independent authority and the substantive obligations imposed on the United States by these treaties, as the "supreme law of the land," U.S. Const. art. IV, cl. 2, are informed by the United States' other statutory obligations under the APA, NEPA, NHPA, and federal right-of-way and mineral statutes.

## JURISDICTION AND VENUE

20.     This action arises under the 1851 Fort Laramie Treaty, the 1855 Lame Bull Treaty, 1868 Fort Laramie Treaty, tribal law, federal right-of-way statutes and regulations, 25 U.S.C. §§ 323, 324; 25 C.F.R. pt. 169, Indian mineral leasing statutes

6

and regulations, 25 U.S.C. § 396d; 25 C.F.R. pt. 211, NEPA and its implementing regulations, 42 U.S.C. §§ 4321 *et seq.*; 40 C.F.R. pt. 1500, NHPA and its implementing regulations, 54 U.S.C. §§ 300101 *et seq.*; 36 C.F.R. pt. 800, and the APA, 5 U.S.C. §§ 701-706 (as to all federal agencies except President Trump).

21.    Jurisdiction is therefore proper pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1362 (federal question raised by Tribes wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States).

22.    This Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202, the APA, and its inherent authority to issue equitable relief for statutory and non-statutory claims. Injunctive relief also is authorized for APA claims pursuant to 5 U.S.C. §§ 705-706.

23.    This Court also has authority to require TransCanada and the United States to comply with Rosebud and Fort Belknap law. *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 852 (1985); *Alto v. Black*, 738 F.3d 1111, 1124-25 (9th Cir. 2013).

24.    Venue is proper pursuant to 28 U.S.C. § 1391 because many of the actions challenged herein took place in this judicial district. The 2019 Permit challenged herein authorizes TransCanada to construct, connect, operate, and

maintain the Pipeline and its related facilities, and to cross the United States-Canada border in Montana. Without the permit, the Pipeline cannot be constructed.

25.     Venue is also proper because one of the Plaintiffs, Fort Belknap Indian Community, resides in the District of Montana.

26.     Assignment is proper in the Great Falls Division because the Permit authorizes TransCanada to construct, connect, operate, and maintain the Pipeline and its related facilities at and across the United States-Canada border near Morgan, Montana. Morgan is located within Philips County, which is within the Great Falls Division. In addition, Plaintiff Fort Belknap Indian Community is located in Blaine County, which is also located in the Great Falls Division.

## THE PARTIES

27.     Plaintiff ROSEBUD SIOUX TRIBE is a federally recognized Indian tribe located on the Rosebud Indian Reservation in South Dakota. 84 Fed. Reg. 1,200, 1,203 (Feb. 1, 2019). Rosebud is responsible for the health, safety, and welfare of its members. Also known as the Sicangu Oyate, Rosebud is a branch of the Lakota people and is part of the Oceti Sakowin (Sioux Nation).[1] Rosebud has almost 35,000 members, many of whom reside in the territory that will be crossed by the Pipeline,

---

[1] The Oceti Sakowin consists of the Seven Council Fires, the Thítȟuŋwaŋ (Teton or Lakota), Bdewákaŋthuŋwaŋ (Mdewakanton), Waȟpéthuŋwaŋ (Wahpeton), Waȟpékhute (Wahpekute), Sisíthuŋwaŋ (Sisseton), Iháŋkthuŋwaŋ (Yankton), and Iháŋkthuŋwaŋna (Yanktonai).

including in Tripp County, South Dakota. The Rosebud Indian Reservation was established in 1889 after the United States' partition of the Great Sioux Reservation. Created in 1868 by the Treaty of Fort Laramie, the Great Sioux Reservation covers all of West River, South Dakota (the area west of the Missouri River), as well as part of North Dakota, northern Nebraska, and eastern Montana.

28.     Plaintiff FORT BELKNAP INDIAN COMMUNITY of the Fort Belknap Reservation of Montana is a federally recognized Indian tribe. 84 Fed. Reg. at 1,200. The Fort Belknap Indian Reservation is homeland to the Gros Ventre (Aaniiih) and the Assiniboine (Nakoda) Tribes, the two tribes that form the government of Fort Belknap. Under Fort Belknap's constitution and charter, the Fort Belknap Indian Community Council is recognized as the governing body on the Fort Belknap Reservation and is charged with the duty of protecting the health, security, and general welfare of its tribal members. Fort Belknap has nearly 8,000 members who reside throughout the Fort Belknap Indian Reservation, the State of Montana, and the United States. The proposed Pipeline will cross the territory, sacred sites, and cultural sites of the tribes of Fort Belknap.

29.     Plaintiffs Rosebud and Fort Belknap are referred to collectively as "Plaintiffs" or "the Tribes."

30.     Defendant DONALD J. TRUMP is sued in his official capacity as the President of the United States. In his official capacity, President Trump issued the

2019 Permit challenged herein. President Trump issued the 2019 Permit pursuant to the alleged "authority vested in me as President of the United States of America." 84 Fed. Reg. at 13,101. President Trump cites no other authority for issuing the 2019 Permit. In his official capacity, President Trump is obligated to act in accordance with all federal treaties, laws, and regulations, and to uphold the United States' duties to the Tribes pursuant to the treaties. The issuance of the presidential permit does not relieve the President and the other defendants of their obligation to comply with all applicable law. Indeed, the 2019 Permit explicitly requires that all laws be followed.

31.     Defendant UNITED STATES DEPARTMENT OF STATE is a federal agency. Prior to 2019, the President had delegated his purported authority to issue presidential permits to the Secretary of State, and thus the State Department. Therefore, prior to 2019, the State Department received, reviewed, and approved or denied applications for presidential permits for, *inter alia*, cross border crude oil pipelines, including all previous presidential permit applications by TransCanada. The State Department also conducted the environmental impact statement (EIS) that is still relied upon in the 2019 permit. As a federal agency, the State Department is obligated to act in accordance with all federal treaties, laws, and regulations, and to uphold its duties to the Tribes pursuant to the treaties.

32.     Defendant MICHAEL R. POMPEO ("Secretary Pompeo") is sued in his official capacity as the Secretary of State. Prior to 2019, the President had

delegated his purported authority to receive, review, and approve or deny applications for presidential permits to the Secretary. Prior to 2019, in his official capacity, Secretary Pompeo is ultimately responsible for the issuance of presidential permits, including the 2017 Permit challenged herein. He is responsible for ensuring that the State Department complies with all federal treaties, laws, and regulations, and upholds its duties to the Tribes pursuant to the treaties.

33.    Defendant DAVID HALE[2] ("Under Secretary Hale") is sued in his official capacity as the Under Secretary of State for Political Affairs. In his official capacity, the previous Under Secretary signed the 2017 Record of Decision and National Interest Determination ("2017 Decision") (*see* Plaintiffs' Exhibit B), as well as the 2017 Permit challenged herein. In signing the 2017 Decision and issuing the 2017 Permit, the Under Secretary is responsible for ensuring that the State Department complies with all federal treaties, laws, and regulations, and upholds its duties to the Tribes pursuant to the treaties.

34.    Defendant DEPARTMENT OF INTERIOR ("Interior Department") is a federal agency. The Interior Department is charged with implementing Indian right of way and Indian mineral statutes. The Interior Department receives, reviews, and approves or denies rights-of-way applications and mineral lease applications, and is

---

[2] Former Under Secretary of State Thomas A. Shannon, Jr., is terminated as a party in these consolidated cases because he has retired from the U.S. Department of State. He should be replaced by Under Secretary Hale, pursuant to Fed. R. Civ. P. 25(d).

responsible for enforcing those provisions. As a federal agency, the Interior Department is obligated to act in accordance with all federal treaties, laws, and regulations, and to uphold its duties to the Tribes pursuant to the treaties.

35. Defendant DAVID L. BERNHARDT ("Secretary Bernhardt") is sued in his official capacity as the Acting Secretary of the Interior. The Secretary of Interior is required to ensure that the Interior Department complies with all federal treaties, laws, and regulations, and upholds its duties to the Tribes pursuant to the treaties.

36. Defendant TRANSCANADA KEYSTONE PIPELINE, LP, is a Delaware limited partnership wholly owned by TransCanada Keystone Pipeline LLC, and TransCanada Keystone Pipeline, GP, LLP, which are wholly owned subsidiaries of TransCanada Corporation, a Canadian public company organized under the laws of Canada. TransCanada Keystone Pipeline, LP, operates as an oil transportation company. It transports crude oil from Canada to the United States. TransCanada Keystone Pipeline, LP is the entity that is seeking to build, own, and operate the Pipeline that will cross Rosebud and Fort Belknap territories.

37. Defendant TRANSCANADA CORPORATION is a Canadian public company organized under the laws of Canada, which owns TransCanada Keystone Pipeline, LP.

38.     Defendants State Department, Secretary Pompeo, and Under Secretary Hale are collectively referred to as "State Department Defendants."

39.     State Department Defendants and Defendants Interior Department and Secretary Bernhardt are collectively referred to as "Agency Defendants."

40.     Defendant President Trump and Agency Defendants are collectively referred to as "Federal Defendants."

41.     Defendants TransCanada Keystone Pipeline, LP, and TransCanada Corporation are collectively referred to as "TransCanada."

42.     Federal Defendants and TransCanada are collectively referred to as "Defendants."

## BACKGROUND

### I.     Tribal Nations.

43.     Tribal Nations are sovereign governments that precede the United States and are recognized as such by federal and international law. *Santa Clara Pueblo v. Marinez*, 436 U.S. 49, 56 (1978) (Tribes are "separate sovereigns pre-existing the Constitution."); *Worcester v. Georgia*, 31 U.S. 515, 520 (1832) ("These articles are associated with others, [recognizing] their title to self-government. The very fact of repeated treaties with them [recognizes] it; and the settled doctrine of the law of nations (international law) is, that a weaker power does not surrender its independence—its right to self-government, by associating with a stronger, and

taking its protection."); *Bodi v. Shingle Springs Band of Miwok Indians*, 832 F.3d 1011, 1016 (9th Cir. 2016); G.A. Res. 61/295, art. 3, Declaration on the Rights of Indigenous Peoples[3] (Dec. 13, 2007) ("UN Declaration") ("Indigenous peoples have the right to self-determination.").

44.    As sovereign governments, Rosebud and Fort Belknap have entered into treaties with the United States on a government-to-government basis and maintain jurisdiction over their territory. Treaty of Fort Laramie, 11 Stat. 749 (1851) ("1851 Fort Laramie Treaty"); Lame Bull Treaty of 1855, 11 Stat. 657, Second Treaty of Fort Laramie, 15 Stat. 635 (1868) ("1868 Fort Laramie Treaty"); *Water Wheel Camp Recreational Area, Inc. v. LaRance*, 642 F.3d 802, 808-09 (9th Cir. 2011) (Tribal Nations have jurisdiction over their territory).

45.    In common with indigenous peoples around the world, Rosebud and Fort Belknap have the right to uphold their responsibilities to their future generations regarding their lands and resources.  *See* UN Declaration, art. 25.

## II.    1851 Fort Laramie Treaty.

### A.    History, Purpose, and Negotiation of the 1851 Fort Laramie Treaty.

---

[3] The UN Declaration was endorsed by the United States and 147 other nation states, with no dissenters.  *See United Nations Declaration on the Rights of Indigenous Peoples*, United Nations – Indigenous Peoples, https://www.un.org/development/desa/indigenouspeoples/declaration-on-the-rights-of-indigenous-peoples.html (last visited Mar. 19, 2019); *Pueblo of Jemez v. United States*, 350 F.Supp.3d 1052, 1095 n. 15, 1103 n. 28 (D. N.M. 2018) (referencing the UN Declaration as international law applicable to tribal land issues).

46.     The discovery of gold in California in the late 1840s prompted a massive influx of emigrants through Indian Country. *Crow Tribe of Indians v. United States*, 284 F.2d 361, 364-66 (Ct. Cl. 1960); *Indians of Fort Berthold Indian Reservation v. United States*, 71 Ct. Cl. 308, 330 (1930). This influx led to the destruction of timber, buffalo, and other natural resources Indian Tribes relied on for subsistence. *Crow Tribe*, 284 F.2d at 364-66.

47.     "The United States recognized that the serious losses of supplies which were vital to [the Indians'] subsistence gave the Indians cause for dissatisfaction, and the government was anxious to make the way safe for the travelers." *Crow Tribe*, 284 F.2d at 365.

48.     The Indians looked "upon the intrusion of the large bodies of emigrants into their country, and particularly the consequent great destruction of buffalo, which is their almost sole reliance for subsistence, with great jealousy and discontent." *Id*.

49.     Thus, the 1851 Treaty of Fort Laramie "was precipitated by the depletion of game, timber, and forage by the constantly increasing number of settlers who crossed the lands of the Plains Indians on their way to California. Aggrieved by these depredations, the Indians had opposed that passage, sometimes by force." *Montana v. United States*, 450 U.S. 544, 571 (1981) (Blackmun, J., dissenting).

50.     To the tribal nations, the protection of their natural resources from destruction was a central issue they wished to address in the 1851 Treaty of Fort

Laramie.  Burton S. Hill, *The Great Indian Treaty Council of 1851*, 47 NEB. HIST. SOC'Y 85, 92 (1966). They were concerned about the vanishing buffalo, deer, and antelope, as well as the forage on which the wild game depended being rapidly depleted by non-Indians' livestock. *Id.*; *see* U.S. Office of Indian Affairs, *Annual Report of the Commissioner of Indian Affairs*, 21st Cong., 1st Sess., at 16, 24 (1850).

51.    Several tribal individuals attending the 1851 Fort Laramie Treaty Council spoke to the disastrous impact of the emigrant trails through tribal lands.

52.    Thus, protection of natural resources was a fundamental and pressing concern for the tribes going into the 1851 treaty negotiations.

### B.    Language of the 1851 Treaty

53.    Rosebud, Assiniboine, and Gros Ventre were signatories to the 1851 Fort Laramie Treaty.

54.    Article 1 of the 1851 Fort Laramie Treaty recognizes the United States' primary goal to make peace with and end hostilities between resident tribes and whites traveling west through tribal territory. 2 Charles J. Kappler, *Indian Affairs: Laws and Treaties* 594 (1904).

55.    To assist in the goal of peace on the frontier, Articles 3 and 7, taken together, provide the United States with the legal obligation to protect the tribes from future harms to their natural resources as well as permit the tribes to pursue claims after harms occurred.

16

56.     Thus, these two provisions set forth two separate obligations that were geared towards pacifying the tribes against the massive destruction of their natural resources by the emigrants—an affirmative promise to protect against future harms, and a promise to pay for harms that had occurred or may occur at some future date.

57.     Article 3 frames the United States' affirmative obligation to protect tribal resources:

> In consideration of the rights and privileges acknowledged in the preceding article, the United States bind themselves to protect the aforesaid Indian nations against the commission of *all* depredations by the people of the said United States, after the ratification of this treaty.

2 Kappler, *supra* at 594 (emphasis added).

## III.     1855 Lame Bull Treaty.

### A.     History, Purpose, and Negotiation of the 1855 Lame Bull Treaty.

58.     Four years after the signing of the 1851 Treaty of Fort Laramie, the United States government entered into the Lame Bull Treaty on October 17, 1855. 11 Stat. 657 (1855). The parties promised peaceful relations among the tribes, between the signatory tribes and other tribes, and between the tribes and the United States. *Id.* at art. 1, 2. Gros Ventre was a signatory to the 1855 Lame Bull Treaty.

59.     To secure safe passage for the railroad, Governor Isaac Stevens was charged with negotiating a peace between the tribes.

60.     Ensuring peace and safe travel for the railroad, in the view of the government, rested on similar grounds that were solidified in the 1851 Fort Laramie Treaty. *See* William E. Farr, *When We Were First Paid: The Blackfoot Treaty, The Western Tribes, And The Creation of The Common Hunting Ground, 1855,* 21 GREAT PLAINS QUARTERLY 131, 137 (2001).

61.     Just as in the 1851 Fort Laramie Treaty, one of the fundamental aspects of the 1855 Lame Bull Treaty was compensation for loss of game, grass, wood, and other natural resources occasioned by white expansion. *See id*. at 138 ("Again, as at Laramie, the Indian Office held out the reward of government compensation. Indemnification would make up for the Indian losses of large amounts of grass and timber for the ever-declining game populations occasioned by white expansion.").

### B.      Language of the 1855 Treaty

62.     In return for the promise of peace and for safe passage for rail roads, the United States promised:

> And the United States is hereby bound to protect said Indians against depredations and other unlawful acts which white men residing in or passing through their country may commit.

11 Stat. at 657, art. 7.

## IV.    1868 Fort Laramie Treaty.

### A.      History, Purpose, and Negotiation of the 1868 Fort Laramie Treaty.

18

63.    The 1868 Fort Laramie Treaty "was concluded at the culmination of the Powder River War of 1866-1867, a series of military engagements in which the Sioux tribes, led by their great Chief Red Cloud, fought to protect the integrity of earlier-recognized treaty lands from the incursion of white settlers." *United States v. Sioux Nation of Indians*, 448 U.S. 371, 374 (1980).

64.    Soon thereafter, the Doolittle Commission Report, authorized by a Joint Special Senate Committee, documented many egregious incidents of damages, at the hands of military soldiers and settlers, to both the person and property of tribal individuals. S. Rep. No. 39-156, at 5, 9 (1867) (finding that a "large majority of cases [of] Indian wars are to be traced to the aggressions of lawless white men" and urging that various steps be taken "to preserve amity" and "save the government from unnecessary and expensive Indian wars.").

65.    This study and report by the Committee led to an act to establish an Indian Peace Commission to end the wars and prevent future Indian conflicts. *See* 1868 Commissioner of Indian Affairs Ann. Rep. 26-50 (containing the Indian Peace Commission Report).

66.    The Chiefs present for the negotiations of the 1868 Fort Laramie Treaty were fairly unanimous in their demands. *Treaties & Agreements, and the Proceedings of the Treaties and Agreements of the Tribes and Bands of the Sioux Nation* 74-91 (Melvin White Eagle ed., 1973) ("Compilation of Treaties") (on file

with the National Indian Law Library). The Chiefs present for negotiations explained to the commission that there would be no treaty, and therefore no peace, if the military forts in the Powder River area were not removed. *Id.* at 82. They also demanded closure of the Bozeman Trail (also known as the Powder River road) and for their homeland and hunting grounds to be undisturbed by whites thereafter. *Id.* at 86-87. The Chiefs spoke of their concern for the future of their people, particularly their ability to continue to hunt and live off of the game that their people had relied on since time immemorial. *Id.* at 76-85.

67.    The Commission promised to close the Bozeman trail and withdraw military troops from the territory in exchange for the Tribes' agreement to move onto two reservations, encapsulating what is now South Dakota west of the Missouri River. Kerry R. Oman, *The Beginning of the End: The Indian Peace Commission of 1867−1868*, 22 GREAT PLAINS QUARTERLY 35, 43 (2002).

68.    The tribes retained their access to traditional hunting grounds off-reservation and were provided the right to exclude all whites from Sioux lands. Remi Nardeau, *Fort Laramie and the Sioux* 242 (1967).

69.    The promise by the Commission, that the tribes would be given the power to exclude whites from lands reserved for the permanent homeland was a key component of the negotiations and resulting agreement. Swift Bear (Brule), in speaking to the Commission, stated "We want that land respected by the Whites.

20

Protect us and keep the whites off it." Compilation of Treaties, *supra* at 84. The power to exclude whites from Sioux lands was also the reason Red Cloud eventually signed the 1868 Fort Laramie Treaty. *Id*. at 90. Red Cloud was the last remaining signatory, and arguably the most desired by the Commission, signing the 1868 Fort Laramie Treaty nearly seven months after the first council of Sioux Bands agreed to its terms, in part because he was waiting for the white soldiers to begin abandoning the forts in Powder River. *Id.*; Nadeau, *supra* at 243.

70.    Thus, the Fort Laramie Treaty of 1868 created the Great Reservation for the Sioux.

### B.    Language of the 1868 Treaty

71.    With these goals in mind, Article 2 of the 1868 Treaty of Fort Laramie provides that Sioux Nation lands are

> set apart for the absolute and undisturbed use and occupation of the Indians" . . . ; "and the United States now solemnly agrees that no persons except those herein designated and authorized so to do, and except such officers, agents, and employees of the Government as may be authorized to enter upon Indian reservations in discharge of duties enjoined by law, shall ever be permitted to pass over, settle upon, or reside in the territory described in this article, or in such territory as may be added to this reservation for the use of said Indians.

2 Kappler, *supra*, at 998.

72.    Article 16, which guaranteed that no persons would be allowed to pass over or settle upon the reserved lands without Tribal Nation consent, states:

The United States hereby agrees and stipulates that the country north of the North Platte River and east of the summits of the Big Horn mountains shall be held and considered to be unceded Indian territory, and also stipulates and agrees that no white person or persons shall be permitted to settle upon or occupy any portion of the same; or without the consent of the Indians, first had and obtained, to pass through the same.

*Id.* at 1002-03.

73.    Article 17 of the 1868 Fort Laramie Treaty abrogated the 1851 Fort Laramie Treaty only to the extent that it provided for appropriations for damages. Thus, the effect of the 1868 Fort Laramie Treaty was to create a new process—the "Bad Man Clause" process—to compensate tribes for damages claims, and to repeal the old damages provision under Article 7 of the 1851 Fort Laramie Treaty.   The 1868 Fort Laramie Treaty did not abrogate the United States' distinct obligation to "protect" the tribes under Article 3 of the 1851 Fort Laramie Treaty.

**V.    The Rosebud Sioux Tribe (Sicangu Oyate).**

**A.    Rosebud Spirituality.**

74.    Rosebud (Sicangu Oyate) is a Lakota member of the Oceti Sakowin. The Oceti Sakowin is also known as the Great Sioux Nation, which includes the Lakota, Dakota, and Nakota.

75.    Rosebud and the Oceti Sakowin have an inherent obligation to protect the health and wellbeing of their members as well as the health and welfare of Unci Maka (Mother Earth). To the Oceti Sakowin, the land, the water, the air, and the

22

people are considered one in the same. They are and always have been relatives to one another.

76.     Non-Indian anthropologists have long been interested in the religion of the Lakota people and produced many early studies based upon the writings and first-hand accounts of Lakota people.   *Sioux Indian Religion: Tradition and Innovation* 25 (Raymond J. DeMallie & Douglas R. Parks eds., 1987). The traditional Lakota religious perspective is based upon a concept of oneness, balance, and unity with nature. *See id*. at 27-28. Lakota people believe as a part of their religious worldview that human beings are a part of nature, not separate from it. *Id*. at 28. Lakota religious practice, like Catholicism or Judaism, requires an adherent to participate in a number of sacred rites or sacraments, including the Inipi (sweatlodge ceremony), sundance, hanbleceya (vision questing), and coming of age ceremonies. Lakota religious beliefs are powerfully dependent upon the practice of these rituals and sacraments. *Id.* at 33.

77.     The Lakota people acknowledge that because theirs is an oral tradition, there may be more than one version of a religious teaching or belief. *See* Cheyenne River Sioux Tribe's Mot. for Prelim. Inj. 6, *Standing Rock Sioux v. U.S. Army Corps of Eng'rs*, No. 1:16-cv-01534 (D.D.C. Feb. 9, 2017), Dkt. 98. One important Lakota religious tradition is that in the beginning there was only mni (water). Water was the world's life source, which is echoed in human birth from the water in our mother's

womb. Along with the water that comprised the beginnings of creation, was a single energy called Inyan. Inyan gave everything of itself to bring forth the earth from the water and was left completely depleted. Inyan means "rock" in Lakota, and the people believe that the rock is Inyan, who gave everything of itself until it was devoid of energy and hard and unyielding.

78.    The Lakota believe they first lived below the present world and ultimately emerged from a site in the Black Hills and suffered greatly as they had nothing; but Creator or God caused the sacred buffalo to lead the people to food and to water, which saved them. Because of this, the Lakota believe that mni kiŋpejuta tokaheya (water is our first medicine). To the Lakota, pejuta (medicine) is something that heals, both natural and supernatural. William K. Powers, *Oglala Religion* 56 (1977).

79.    As a corollary of these beliefs and the Lakota notion of unity and wholeness of the world and nature, the Lakota believe generally that water is sacred and that clean, pure water is an essential part of the Lakota way of life.

80.    Significantly, water does not just have a generalized sanctity in the Lakota religion, but it has a very specific, critical role in the practice of Lakota sacred rites. The Lakota religion is characterized by several essential ceremonies. Although there are numerous sacred rites of the Lakota, some of which may not be discussed

in public, the Lakota consider the following sacraments to be among their most important:

- Hanbleceya: A ceremony where participants fast and pray for a vision in a solitary place. Some refer to Hanbleceya as vision-questing;

- Wiwanyan Wacipi: The Sundance ceremony of renewal and rebirth where Lakota adherents gather and dance, pray, and sacrifice to enhance the welfare of relatives and loved ones in the next year;

- Isnati Awiciliwanpi: A coming of age ceremony for young women;

- Wiping of the tears: A ceremony that is held one year after a loved one has passed way, which signifies the end of a mourning period; and

- Inipi: A ceremony of prayer and purification inside a sweat lodge.

81.    The Rosebud people cannot practice their religion without their ceremonies. Sacred water figures prominently in all of these ceremonies, including Hanbleceya and Wiwanyan Wacipi where participants purposely deprive themselves of life-giving water, a deprivation intended to remind Lakota people why water is essential to life and to instill a deep respect for it.

82.    Water figures most centrally and explicitly in the Inipi or sweat lodge ceremony. Inipi is understood to be the oldest sacrament known to the Lakota people. Stephen E. Feraca, *Wakinyan: Lakota Religion in the Twentieth Century* 32 (1998). Inipi is, moreover, arguably the most important of all Lakota ceremonies because

25

Lakota people cannot perform other ceremonies without first performing Inipi, a purification rite intended to cleanse one's spirit. To perform Inipi, religious adherents heat a number of inyan (rocks) in a fire and gather in an enclosed dome-shaped lodge. Inside the lodge, sacred mni (water) is poured on the hot stones creating burning hot steam. The participants offer prayers, make offerings, and observe various rituals associated with Inipi. At the conclusion of the ceremony, which is long, difficult, and involved, the adherent is purified in spirit and body.

83.     The water of the Inipi ceremony is known as mni wiconi, or the water of life. Significantly, Lakota adherents are taught that anything that they use for their sacred ceremonies, especially water, must be ritually pure. This is a critical consideration for the mni wiconi (water of life) used in the sweat lodge. It must be collected from nature. Adherents cannot use bottled water, which is surrounded by plastic and hence contaminated. Adherents cannot use impure water of any kind. The use of unnatural waters is not a substitute that practitioners of the Lakota religion can accept.

84.     Over the years, within Rosebud territory the people have camped, hunted, gathered foods and medicines, performed religious ceremonies, convened for social and political occasions, buried their dead, and made use of their waters for religious and consumptive purposes since time immemorial.

85.    The United States had an obligation to take a hard look at the impact of the Pipeline on Rosebud's spiritual beliefs before issuing the permit, and failed to do so.

**B.    Rosebud Maintains Historical, Cultural, Governmental, Traditional, and Spiritual Ties to the Region that the Pipeline will Cross.**

86.    Rosebud's territory extends into what is now Tripp County, and Tripp County is part of the territory of the Great Sioux Nation.

87.    Below is an approximate map of the Great Sioux Reservation.



27

*Section 3: The Treaties of Fort Laramie, 1851 & 1868*, N.D. STUDIES,

https://www.ndstudies.gov/gr8/content/unit-iii-waves-development-1861-

1920/lesson-4-alliances-and-conflicts/topic-2-sitting-bulls-people/section-3-

treaties-fort-laramie-1851-1868 (last visited Mar. 21, 2019).

88.    Below is an approximate map of Rosebud's reservation boundaries.



89.    Rosebud's physical, cultural, and spiritual ties extend into Tripp County

and far beyond, and there are still many cultural and historical places and sacred sites

important to Rosebud within Tripp County.

90.    Rosebud has the right to maintain and strengthen its distinctive relationships with its traditionally owned and otherwise occupied and used lands, territories, waters, and other resources, and the right to uphold its responsibilities to future generations in this regard. *See* 42 U.S.C. § 1996; Exec. Order No. 13007 (May 24, 1996); UN Declaration, art. 25.

91.    During one of the State Department's initial reviews of TransCanada's permit application, Rosebud requested GPS coordinates in order to determine the location of the Pipeline to assess its potential impact, but the request was denied.

92.    On information and belief, the proposed route stretches diagonally through Tripp County, South Dakota.

93.    This means that the Pipeline would traverse Rosebud's 1889 reservation boundary and territory of the Great Sioux Nation.

94.    The purported location of the Pipeline has not been adequately surveyed for properties of traditional, religious, and cultural significance, traditional cultural properties, and tribal cultural resources as required by the NHPA. *See Indigenous Envtl. Network*, 347 F. Supp. 3d at 580-81.

95.    The State Department has acknowledged that cultural resources surveys have not been conducted for all parts of the project and the failure to do so is more extensive than admitted by the State Department.

96.     As discussed *infra* at Paragraphs 107-18, 166-82, maps that TransCanada submitted to the South Dakota Public Utilities Commission ("South Dakota PUC") and that the State Department has relied on show the Pipeline corridor crossing Rosebud surface and mineral estates that are held in trust by the federal government.

97.     All territory (surface and mineral), historical, cultural, and spiritual places and sites of significance in the path of the Pipeline are at risk of ruin, both by the Pipeline's construction, operation, and maintenance, and by the threat of inevitable ruptures and spills when the Pipeline is operational.

## C.     The Pipeline's Potential Impacts to the Tribes Members, Particularly Women and Children.

98.     The Federal Defendants did not properly take a hard look at the Pipeline's potential impacts on the safety and welfare of the people of Rosebud and Fort Belknap—in particular, the safety and welfare of Native women and children to whom the Federal Defendants owe a trust responsibility and who are likely to suffer increased rates of violence, sexual assault, and abuse if and when this pipeline is permitted.

99.     If the Pipeline is permitted, TransCanada will build "man camps" in Rosebud territory in Tripp County, South Dakota.  These man camps will house hundreds or thousands of transient workers. The mostly male employees will be housed in man camps exactly like those that are causing damage in other Native

communities, such as the Mandan, Hidatsa, and Arikara Nation of the Three Affiliated Tribes of the Fort Berthold Indian Reservation and Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation. *The Devastating Impact of Human Trafficking of Native Women on Indian Reservations: Hearing Before Comm. on Homeland Security*, 113 Cong., at 2 (2013) (testimony of Lisa Brunner, Program Specialist, Nat'l Indigenous Women's Res. Ctr.), *available at* https://www.hsgac.senate.gov/imo/media/doc/Testimony-Brunner-2013-09-23.pdf.

100.  In 2013, the Department of Justice's ("DOJ") Office of Violence Against Women ("OVW") explained the relationship between a rapid increase in man camps and a contemporaneous rise in crimes and violence against women and children, stating:

> Because of recent oil development, the [Bakken] region faces a massive influx of itinerant workers[,] and [consequently,] local law enforcement and victim advocates report a sharp increase in sexual assaults, domestic violence, sexual trafficking, drug use, theft, and other crimes, coupled with difficulty in providing law enforcement and emergency services in the many remote and sometimes unmapped "man camps" of workers.

DOJ OVW, *Report to Congress on the Eighth Annual Government-to-Government Violence Against Women Tribal Consultation* 3 n.2 (2013), *available at* https://www.justice.gov/ovw/file/871636/download.

101.  To house the sudden and drastic increase in population, corporations create man camps—where male workers often work twelve-hour days, are socially

isolated for weeks or months at a time, and live in trailer parks that extend for miles. While most of the workers may not be violent men, man camps in the Bakken have become centers for drugs, violence, and sex trafficking of Native women and girls. *See* Michelle Fox, *Dark Side of ND Oil Boom: Sex Trafficking*, CNBC (Mar. 12, 2015), *available at* https://www.cnbc.com/2015/03/12/dark-side-of-nd-oil-boom-sex-trafficking.html.

102.   The State Department is aware of this issue.  In its one-page report, *The Link Between Extractive Industries and Sex Trafficking* (June 2017), *available at* https://www.state.gov/documents/organization/272964.pdf, the State Department noted that the influx of industry workers creates a higher demand for the commercial sex industry. The State Department noted that near man camps in North Dakota, service providers have reported that sex traffickers have exploited women in the area, including Native American women. During the 2013 comment period on the State Department's Draft Supplemental Environmental Impact Statement ("EIS") for the Pipeline, comments were submitted to the State Department about this issue.

103.   The 2014 Final Supplemental EIS, however, fails to take a hard look at whether and how man camps and the influx of out-of-state workers related to the construction, operation, and maintenance of the Pipeline will affect the health, welfare, and safety of Rosebud members, and in particular Native women.

104.   The 2014 Final Supplemental EIS contains no meaningful analysis of these impacts. This is the closest the 2014 Final Supplemental EIS comes to "analyzing" these impacts:

> [T]he influx of construction workers into local communities has the potential to generate additional demands on local public services. . . . The need for public services would be reduced due to the eight construction camps. As described above under Housing, the camps would provide many of the necessary services to workers, thereby reducing the demand on public services in communities in the proposed Project area.

Final Supplemental EIS, at 4.10-28 to 4.10-29.

105.   In response to the comments on this issue, the State Department asserted that the impacts from man camps on missing and murdered indigenous women and tribal communities "are generally associated with boom towns, longer-term operations like oil/gas drilling operations where a largely male workforce may be residing for *months* or years." Final Supplemental EIS, at V, Comments and Responses, PC-121 to PC-122 (emphasis added). The State Department goes on to say that construction of the pipeline will take only six to eight *months* or longer and thus it didn't anticipate any impacts.  *Id*.

106.   The State Department casually dismissed the potential impacts to the health, welfare, and safety of tribal residents, as well as increased rates of sexual violence and kidnapping as overblown, and failed to include any analysis of these issues in the 2014 Final Supplemental EIS. The United States has therefore failed to

take a hard look at the health, welfare, and safety impacts the Pipeline and its related man camps and influx of out-of-state workers will have on Rosebud and Fort Belknap communities.  This violates the 1851 Fort Laramie Treaty and 1855 Lame Bull Treaty.

### D.    Rosebud has Members and Maintains Both Fee and Trust Lands in the Region that the Pipeline will Cross.

107.   The location of the Pipeline rights-of-way and what appears to be its area of effects also abuts or crosses Rosebud territory (surface and mineral estates) either owned by Rosebud, held in trust by the United States for the benefit of Rosebud, or held in trust by the United States for the benefit of Rosebud tribal members.

108.   These lands are well within the area of impact for a rupture and spill, as defined in the 2014 Final Supplemental EIS. Final Supplemental EIS, at 4.13-4 (noting that oil could spread radially on a flat surface up to at least 1,214 feet from the pipeline).

109.   Additionally, Rosebud communities are located in Tripp County. One of those, Ideal Community, is in Winner, South Dakota, and its representative holds a seat on the Rosebud Tribal Council.

110.   The Federal Defendants failed to adequately analyze the Pipeline's impacts on tribal territory pursuant to the 1851 Fort Laramie Treaty and NEPA, nor

have the United States and TransCanada sought Rosebud's permission for these impacts.

111.   The 2014 Final Supplemental EIS notes that along the Pipeline route in South Dakota, sand and gravel comprise the major mineral resources (South Dakota Geological Survey/USGS 2005). Final Supplemental EIS, at 3.1-24. In Tripp County, one gravel pit is present approximately half a mile from the proposed Pipeline route, northeast of Mile Post 554. The 2014 Final Supplemental EIS notes that the Pipeline would cross deposits of sand, gravel, clay, and stone. Final Supplemental EIS, at 4.1-3.

112.   Additionally, the 2014 Final Supplemental EIS notes that rock ripping (the break up and removal of rock material with an excavator) could be necessary where dense material, paralithic bedrock, abrupt textural change, or strongly contrasting textural stratification is present within eight feet of the ground surface. Approximately 202 miles of the proposed Pipeline route would cross areas identified as potential ripping locations, and in Tripp County, it is estimated that 15.26 miles will be subject to "ripping." Final Supplemental EIS, at 4.1-4, 4.1-5.

113.   Rosebud territory and resources (surface, mineral, and water) are under threat of irreparable harm by the Pipeline's construction, operation, maintenance, and inevitable rupture and spill.

114.   TransCanada has not obtained a permit to "explore," "drill," or "mine," Rosebud's mineral estates, and the United States has failed to require TransCanada to obtain any permit or right-of-way from Rosebud or analyze whether they must obtain such approval. *See* 25 C.F.R. § 211.48(a).

115.   The United States has an obligation to protect Rosebud's trust assets, which includes land, water, and minerals. *See, e.g.*, 1851 Treaty of Fort Laramie; 25 U.S.C. § 3504(e)(6) (United States has trust responsibility relating to mineral and other trust resources); *Winters v. United States*, 207 U.S. 564 (1908) (reserved water rights).

116.   Further, Rosebud has jurisdiction to maintain a trespass action with regard to its mineral estates.

117.   Rosebud's Game, Fish and Parks Department issues hunting and fishing permits for tribal members and non-members who hunt, fish, and recreate on Rosebud's lands, some of which are in Tripp County.

118.   The Federal Defendants failed to properly analyze the impacts of Pipeline construction, operation, and maintenance, including the inevitable ruptures and spills after the Pipeline is operational, on Rosebud's hunting, fishing, or federal water rights. These include, but are not limited to, the impacts on tribal members who practice subsistence hunting and fishing, and the impacts on the tribal economy if the availability of game and fish is (or is perceived to be) affected by the Pipeline.

119.   Such analyses were required by NEPA and by the United States' treaty obligations to Rosebud.

**E.    Rosebud Operates its Own Water System, Part of Which is in the Region the Pipeline Will Cross.**

120.   Rosebud operates its own water delivery system called the Rosebud Sioux Rural Water Supply System ("Rosebud Water System"), which is part of the larger Mni Wiconi Rural Water Supply Project ("Mni Wiconi Project"). The Mni Wiconi Project serves more than 51,000 people—Indian and non-Indian—on the Rosebud, Pine Ridge, and Lower Brule Indian Reservations and West River/Lyman-Jones, South Dakota, and provides one sixth of all water in South Dakota.

121.   A portion of the drinking water for the Mni Wiconi Project derives from the Ogallala Aquifer and the remainder derives from the Missouri River. Rosebud has federally reserved water rights to both of these sources of water. *Winters v. United States*, 207 U.S. 564, 577 (1908); *Agua Caliente Band of Cahuilla Indians v. Coachella Valley Water Dist.*, 849 F.3d 1262, 1268 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 468 (2017) (federal reserved water rights are directly applicable "to Indian reservations and other federal enclaves, encompassing water rights in navigable and nonnavigable streams.").

122.   The Pipeline would cross both sources of water for the Mni Wiconi system. The Mni Wiconi Project and the Rosebud Water System intake from the Missouri River is at Fort Pierre, South Dakota. The Pipeline would cross the

Cheyenne River upstream from the Mni Wiconi Project intake plant, meaning a spill in or near the Cheyenne River could disperse into the Mni Wiconi Project and Rosebud Water System through the intake plant. The Pipeline would also cross the Ogallala Aquifer in the area surrounding Colome, South Dakota.

123.   The Pipeline would cross directly over the Mni Wiconi Project pipeline and United States Bureau of Reclamation ("BOR") easements for the pipeline.

124.   TransCanada has not obtained Rosebud's consent to cross the Mni Wiconi water pipeline or related easements.

125.   In establishing these water projects, Congress stated: "[T]he United States has a trust responsibility to ensure that adequate and safe water supplies are available to meet the economic, environmental, water supply, and public health needs of the . . . Rosebud Indian Reservation." Mni Wiconi Project Act of 1988, Pub L. No. 100-516, § 2(a)(5), 102 Stat. 2566 (Oct. 24, 1988), *amended by* Pub. L. No. 103-434, § 803(a)(3), 108 Stat. 4526 (Oct. 31, 1994).

126.   The federal government holds the Rosebud Water System in trust for the benefit of Rosebud. Pub. L. No. 103-434, § 806, *amending* Pub. L. No. 100-516, § 3A(e).

127.   In 1992, Congress commissioned a needs assessment to determine whether the Mni Wiconi Project should be extended to include Rosebud, its

reservation, and its members. Pub. L. No. 102-757, § 1001, 106 Stat. 4600 (Jan. 3, 1992).

128.   The BOR produced the Rosebud Sioux Tribe Municipal, Rural and Industrial Water Needs Assessment (July 1993) ("Needs Assessment"). The Needs Assessment recommended the creation of the Rosebud Water System that would service a "Primary Service Area" and a "Secondary Service Area." *Id*. at 1-1.

129.   The Needs Assessment identified the Primary Service Area as Todd and Mellette Counties. *Id*. Today, the Rosebud Water System (and the Mni Wiconi Project) provides water for the Primary Service Area (Todd County) for Rosebud.

130.   The Needs Assessment identified the Secondary Service Area as areas and communities within Gregory, Tripp, and Lyman Counties. *Id*. at 10-1.

131.   In order for the United States to fulfill its trust and treaty obligation to provide clean water to tribal members living in Gregory, Tripp, and Lyman Counties, the Needs Assessments recommended the "utilization of the [Tripp County Water Users District] system, with the federal government paying the water service contract." *Id*.

132.   Congress adopted the recommendations outlined in the Needs Assessment when it established the Rosebud Water System, stating: "The service area . . . shall extend to all of Todd County, South Dakota, *and to all other territory*

39

*and lands generally described in the* [*Needs Assessment*]." Pub. L. No. 103-434, §

806, *amending* Pub. L. No. 100-516, § 3A(c) (emphasis added).

133.   The impacts of the Pipeline on the Mni Wiconi Project, the Rosebud

Water System, and their users have not been adequately analyzed pursuant to NEPA

and the United States' treaty obligations to Rosebud.

134.   The tribal communities of Winner, Ideal, Dixon, Bull Creek, Milk's

Camp, and Wood are all served by the Tripp County Water Users District ("Tripp

County District"). Rosebud provided half a million dollars to the Tripp County

District to upgrade its water system and provide safe drinking water to these

communities.

135.   The Pipeline would cross the Tripp County District's pipelines and

infrastructure approximately twenty-three times.

136.   Rosebud has members who receive their water through this system.

Rosebud pays the water bills for these persons and paid for portion of the

construction of the Trip County District water system.

137.   The impact on this system and the many tribal communities has not

been adequately analyzed pursuant to NEPA and the United States' treaty obligations

to Rosebud.

138.   The Tripp County District derives its water from the Ogallala Aquifer.

The Tripp County District production wells for Ogallala Aquifer water are located

about eight miles south of Winner, South Dakota. The Tripp County District's production wells are directly in the path of the Pipeline.

139.   The impact on these wells and the Rosebud tribal communities served by these wells has not been adequately analyzed pursuant to NEPA and the United States' treaty responsibilities to Rosebud. Nor has the impact the Pipeline will have on Rosebud's reserved water rights to the Ogallala aquifer been properly analyzed.

140.   Construction, operation, maintenance, and the inevitable rupture and spill of the Pipeline would irreparably harm the territory, historical, cultural, and religious sites and places important to Rosebud, as well as natural resources, water resources, and hunting and fishing rights secured to Rosebud.

141.   These territories, sites, places, resources, and rights would remain under threat from ruptures and spills if the Pipeline is operational. The failure to analyze any of these impacts was unlawful.

## VI.   Fort Belknap Maintains Historical, Cultural, Governmental, Traditional, and Spiritual Ties to the Region that the Pipeline Will Cross.

142.   The Fort Belknap Reservation was established in 1888, comprising a portion of the territory of the Blackfoot Confederacy, which the Gros Ventre and Assiniboine Tribes occupied along with the Plains Tribes.

143.   The lands of the Gros Ventre and Assiniboine Tribes, including the lands of the former Blackfoot Confederacy, comprise significant portions of the

northern and eastern portions of Montana, including areas of eastern Montana that will be impacted by the proposed Pipeline.

144.   The Gros Ventre and Assiniboine Tribes' physical, cultural, and religious ties extend into these areas throughout eastern Montana, and the lands there still contain the Gros Ventre and Assiniboine Tribes' ancestors, cultural and historical places, and sacred sites important to the Fort Belknap Tribes.

145.   Below is a map illustrating the original lands reserved by the Gros Ventre and Assiniboine Tribes through treaties, and the subsequent reduction of those lands.



146.   As recently as Spring 2018, Fort Belknap requested that the State Department produce mapping that would provide specific information regarding the location and impacts of the proposed Pipeline in relation to their original treaty lands, which includes its ancestral lands that encompass historic, sacred sites, and places that continue to be used by the Gros Ventre and Assiniboine Tribes as they were by their ancestors.

147.   Below is the one-page map Fort Belknap received, in response to its request.



148.   The State Department never consulted with, or provided information to, Fort Belknap prior to the publication of both the 2011 Final EIS and the 2014 Final Supplemental EIS about the potential Pipeline path and its impacts.

149.   In Spring 2018, Fort Belknap received two site descriptions from the State Department and United States Bureau of Land Management detailing ancestral lands and historic and sacred sites that will be desecrated, destroyed, and damaged by the proposed Pipeline construction.

150.   Fort Belknap was never provided the opportunity to consult regarding the impacts to sites described in the site descriptions and it is clear from the inquiries

that the proposed Pipeline will desecrate, destroy, and damage Fort Belknap's ancestral sites, including historic and sacred sites. It is also clear from the inquiries that significant damage to other sites will take place.

151.   TransCanada has not obtained a permit from Fort Belknap pursuant to its Cultural Property Act to impact these sites.

152.   Upon receiving the two site descriptions, Fort Belknap provided comments to the State Department stating that the State Department had not adequately consulted with Fort Belknap during the prior Section 106 process, as required by the NHPA.

153.   To date, Fort Belknap has never received a true or complete map, as requested, of the Pipeline path that would allow for review of the impact from TransCanada clearing and construction activities before a Permit decision could have been made.

154.   All of Fort Belknap's historical, cultural, and religious places and sacred sites in the path of the Pipeline are at risk of destruction, both by the Pipeline's construction and by the threat of inevitable ruptures and spills when the Pipeline is operational.

**VII.   The Keystone XL Pipeline.**

155.   If built, the Pipeline would transport up to 830,000 barrels (35,700,000 gallons) per day of bitumen, or Western Canadian Sedimentary Basin crude oil, colloquially known as "tar sands," a highly toxic and carcinogenic crude oil sludge.

156.   In Nebraska, the Pipeline would connect with existing infrastructure and transport the tar sands to Gulf Coast refineries for refining. Snaking its way from Alberta to Nebraska, the Pipeline would cross the United States-Canada border in Philips County, Montana, directly adjacent to Blaine County and the Fort Belknap Indian Reservation.

157.   The Pipeline will run directly through the sacred sites, historic sites, and the ancestral lands of the Gros Ventre and Assiniboine Tribes of Fort Belknap.

158.   From there, it would head south-southeast across eastern Montana, through west and central South Dakota.

159.   The Pipeline would transect the Great Sioux Reservation and cross directly through Rosebud's territory.

160.   The Pipeline would cross through Tripp County, South Dakota, and adjacent to and across Rosebud surface and mineral estates held in trust.

161.   The Pipeline would then pass through north and central Nebraska to Steele City.

162.   The Pipeline would be TransCanada's second pipeline delivering tar sands from Alberta to refineries along the Gulf Coast. The (original) Keystone

Pipeline ruptured in November 2017, spilling roughly 407,000 gallons of tar sands near Amherst, South Dakota. TransCanada originally claimed that the rupture spilled only about 210,000 gallons. *See* Associated Press, *Keystone Pipeline Spill in South Dakota Twice as Big as First Thought*, Great Falls Tribune (Apr. 7, 2018), https://www.greatfallstribune.com/story/news/2018/04/07/keystone-pipeline-spill-south-dakota-twice-big-first-thought/496679002/.

163.   Below is a photograph depicting contamination from the November 2017 rupture and spill:



Ben Lefebvre, *Keystone XL Pipeline Wins Green Light In Nebraska – But May Face New Hurdles*, Politico (Nov. 20, 2017), *available at* https://www.politico.com/story/2017/11/20/nebraska-approves-keystone-xl-pipeline-250341.

164.   This spill was not the first time the Keystone Pipeline ruptured. In 2011, the Keystone Pipeline ruptured in North Dakota, spilling roughly 16,800 gallons of tar sands, and in 2016, the Keystone Pipeline again ruptured in South Dakota, spilling another roughly 16,800 gallons of tar sands. *See* Valerie Volcovici & Richard Valdmanis, *Keystone's Existing Pipeline Spills Far More Often than Predicted to Regulators*, Reuters (Nov. 27, 2017, 5:02 AM), *available at* https://www.reuters.com/article/us-usa-pipeline-keystone-spills/keystones-existing-pipeline-spills-far-more-than-predicted-to-regulators-idUSKBN1DR1CS.

165.   In February 2019, the Keystone Pipeline again spilled, this time in St. Louis, Missouri. *See* Devika Krishna Kumar, *TransCanada's Keystone Pipeline Still Partly Shut Down After Missouri Leak*, Reuters (Feb. 11, 2019), *available at* https://www.reuters.com/article/us-usa-oil-transcanada-keystone/transcanadas-keystone-pipeline-still-partly-shut-after-missouri-leak-idUSKCN1Q01T0.

### A.   The South Dakota Permit Process Approved the Pipeline Across Rosebud Surface and Mineral Estates Held in Trust.

166.   In 2009, TransCanada submitted an application to the South Dakota PUC for a state permit to construct the South Dakota portion of the Pipeline.

167.   In its initial application to the South Dakota PUC, TransCanada asserted that the proposed route of the Pipeline would not cross any Tribal or federal lands in South Dakota. TransCanada Keystone, LP Keystone XL Project, Application to the South Dakota Public Utilities Commission for a Permit

("Application"), at 75, ¶ 5.7.1 (March 2009), *available at* https://puc.sd.gov/commission/dockets/hydrocarbonpipeline/2009/hp09-001/application.pdf.

168. On June 29, 2010, the South Dakota PUC concluded, based on TransCanada's assertion, that no tribal or federal lands are crossed by the proposed route of the Pipeline. Amended Final Decision and Order at 13 ¶ 54, *In Re Application by TransCanada Keystone Pipeline, LP for a Permit*, No. HP09-001 (S.D. PUC June 29, 2010), *available at* https://puc.sd.gov/commission/orders/hydrocarbonpipeline/2010/hp09-001c.pdf (citing Ex TC-1 , 5.7.1, p. 75).

169. After TransCanada asked for its permit to be certified in 2014, the South Dakota PUC concluded, before certifying TransCanada's state permit, that no Indian reservation or trust lands are crossed by the Pipeline route. Final Decision and Order at 19, ¶ 27, *In Re Petition of TransCanada Keystone Pipeline, LP for Certification of Permit*, No. HP14-001 (S.D. PUC Jan. 21, 2016), *available at* https://puc.sd.gov/commission/orders/hydrocarbonpipeline/2016/hp14-001final.pdf (citing TR 394; App. C, 1154).

170. The maps TransCanada submitted to the South Dakota PUC, however, show the Pipeline corridor crossing Rosebud surface and mineral estates within the exterior boundaries of the 1889 Rosebud reservation. *See* Formal Hearing, *In Re*

*Application by TransCanada*, No. HP09-001 (S.D. PUC Nov. 2, 2009), Exhibit TC-

1,         Exhibit         A,         Mapbook         1,         *available*         *at*

https://puc.sd.gov/Dockets/HydrocarbonPipeline/2009/hp09-001hearing.aspx.

171.   Below is a map (attached as Plaintiffs' Exhibit D) showing the Pipeline

running adjacent to or crossing several surface and mineral estates held in trust by

the United States for Rosebud. The most relevant parcels are circled in black.



**Land Surface and Mineral Ownership along Keystone XL Pipeline in Tripp County**

172. In December 2018, TransCanada submitted a report to the South Dakota PUC. That report notes that the most up to date maps for the Pipeline are found in Formal Hearing, *In Re Application of TransCanada*, No. HP09-001, Exhibit TC-14. Keystone XL Pipeline Project, South Dakota PUC Quarterly Report for

Quarter    Ending:    Dec.    31,    2018,    at    11    (6a),    available    at

https://puc.sd.gov/commission/dockets/hydrocarbonpipeline/2009/hp09-

001/quarterlyreport012519.pdf. The maps from Exhibit TC-14 can be found here,

https://puc.sd.gov/commission/dockets/HydrocarbonPipeline/2009/hp09-

001/hearing/part2.pdf.

173.    Below are some relevant portions of the TC-14 maps. These maps show the Pipeline corridor crossing Rosebud surface and mineral estates in Tripp County, South Dakota. Only a portion of the TransCanada maps are attached. Rosebud surface estates can be seen enclosed with black lines, whereas Rosebud mineral estates are enclosed with red lines.

174.    In this first TransCanada map (attached as Plaintiffs' Exhibit E), the Pipeline corridor can be seen running adjacent to Rosebud surface estates in Tripp County, which are in Section 28, 103 N, 78 W, and Section 33, 103 N, 78 W.  The State Department map of this location shows the access roads for the Pipeline will cross these Rosebud lands.



175.   In this second TransCanada map (attached as Plaintiffs' Exhibit F), the Pipeline corridor can be seen crossing a Rosebud surface estate in Tripp County, which is in Section 13, 102 N, 78 W.



176.   In this third TransCanada map (attached as Plaintiffs' Exhibit G), the

Pipeline corridor can be seen crossing both a Rosebud surface and mineral estate in

Tripp County, which are in Section 34, 101 N, 77W.



**B.**    **State Department Maps Show the Pipeline Corridor Crossing Rosebud Surface and Mineral Estates Held in Trust.**

177.    The State Department finally released confidential and privileged cultural resources GIS data for the Pipeline to Rosebud in February of 2019—nearly two years after the 2017 Permit was issued.

178.    The GIS data that the State Department released shows, just as the Exhibit TC-14 maps above show, that the Pipeline corridor, access roads to be built

or improved, and what appears to be the area of effect, will cross Rosebud surface and mineral estates that are held in trust.

**C.    TransCanada Has Not Obtained a Federal Right of Way to Cross Rosebud Lands, Nor Obtained Rosebud Consent.**

179.   TransCanada has failed to obtain a federal right of way to cross Rosebud surface estates nor a permit to trespass into Rosebud mineral estates.

180.   The Federal Defendants wrongly concluded in the 2014 Final Supplemental EIS that the Pipeline corridor and area of effect does not cross or come within 1 mile of any tribal lands. Final Supplemental EIS, at PC-69, PC-125. This conclusion shows the Federal Defendants failed to take a hard look at the impact the Pipeline will have on tribal lands.

181.   The Federal Defendants knew, or should have known, that the Pipeline corridor and area of effects cross Rosebud surface and mineral estates but failed to investigate TransCanada's compliance with the 1851 Fort Laramie Treaty, the 1868 Fort Laramie Treaty, or the federal rights-of-way and mineral statutes.

182.   TransCanada has not sought permission from Rosebud to cross Rosebud surface and mineral estates, utilize Rosebud surface or ground water, or cross the Mni Wiconi Water Project.

**D.    The Federal Permit Process**

183.   TransCanada submitted its first presidential permit application for the Pipeline in 2008.

184.   In 2012, after completing its 2011 Final EIS, the State Department determined that the Pipeline was not in the national interest. Just a few months later, TransCanada submitted its second permit application for the Pipeline. In 2015, after producing its 2014 Final Supplemental EIS, the State Department again denied TransCanada's application, finding it not in the national interest.

185.   Then, in 2017, President Trump "invite[d] TransCanada Keystone Pipeline, L.P. (TransCanada), to promptly re-submit its application to the Department of State for a Presidential permit for the construction and operation of the Keystone XL Pipeline." Memorandum, 82 Fed. Reg. at 8,663, § 2.

186.   During the signing ceremony, President Trump stated: "[I]f [TransCanada would] like, we'll see if we can get that pipeline built." Associated Press, *Trump Signs Dakota Pipeline Order* at 0:16, TimesVideo (Jan 24, 2017), *available at* https://www.nytimes.com/video/us/politics/100000004891031/trump-signs-dakota-pipeline-orders.html?action=click&gtype=vhs&version=vhs-heading&module=vhs&region=title-area.

187.   Just two days later, TransCanada submitted its third permit application.

188.   Only fifty-six days later and without any public, environmental, or historic review processes, the State Department granted TransCanada's permit application. In comparison, the State Department spent 1,216 days reviewing TransCanada's first permit application and 1,280 days reviewing its second.

189.   The White House touts the fact that "President Trump called for TransCanada to resubmit its application to build the Keystone XL Pipeline, and [that] *he fast tracked its approval*." *President Donald J. Trump Unleashes America's Energy Potential*, White House (June 27, 2017), https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-unleashes-americas-energy-potential/ (emphasis added). President Trump's statements and State Department's fast-tracked approval of the Permit are consistent with the President's 2016 campaign promises, where he promised to approve the Pipeline if elected. Canadian Press, *Trump Says If Elected, He'd Ask TransCanada to Reapply for Keystone XL Pipeline*, Calgary Herold (Aug. 8, 2016), *available at* http://calgaryherald.com/business/energy/trump-says-if-elected-hed-ask-transcanada-to-reapply-for-keystone-xl-pipeline.

190.   According to a 2015 personal public financial disclosure report filed with the Federal Election Commission, then-candidate Trump held between $250,000 to $500,000 worth of stock in TransCanada Pipelines, Ltd. *Executive Branch Personnel Public Financial Disclosure Report: Donald J. Trump* 42 (Jul. 15, 2015), *available at* http://online.wsj.com/public/resources/documents/TrumpFinancialDisclosure20150722.pdf.

191.   The 2017 Permit was, of course, issued unlawfully. On November 8, 2018, the Montana District Court vacated the 2017 ROD. *Indigenous Envtl. Network*, 347 F. Supp. 3d at 591.

192.   While the State Department appealed that decision, President Trump took the extraordinary and unlawful action to purportedly unilaterally revoke the 2017 Permit and granted the 2019 Permit, 84 Fed. Reg. at 13,101, in an effort to shield the Pipeline's approval from judicial review.

### 1.   TransCanada's First Permit Application

193.   On September 19, 2008, TransCanada submitted its first presidential permit application to the State Department for the construction, connection, operation, and maintenance of the Pipeline and related facilities across the United States-Canada border in Philips County, Montana.

194.   On January 28, 2009, the State Department published in the Federal Register a notice of intent to prepare an EIS for the Pipeline. 74 Fed. Reg. 5,019 (Jan. 28, 2009). The State Department recognized that the potential issuance of a presidential permit for the proposed Pipeline would be a "major federal action," mandating environmental review pursuant to the NEPA, *see* 40 C.F.R. §§ 1502.4 & 1508.18, and the construction, operation, and maintenance of the Pipeline would be an "undertaking," mandating tribal consultation pursuant to Section 106 of the NHPA. *See* 36 C.F.R. §§ 800.3(a) & 800.16(y); *see also* 1868 Fort Laramie Treaty,

arts. 2 & 16 (Tribal Nation consent required); UN Declaration, Articles 18, 19, 32 (rights of indigenous people to be involved in decisions affecting them and to give or withhold free, prior, and informed consent).

195.   In response to the comments it received on the Draft EIS, the State Department produced a Supplemental Draft EIS.

196.   On September 6, 2011, the State Department published a notice in the Federal Register that it had produced a Final EIS. 76 Fed. Reg. 55,155 (Sept. 9, 2011). With the publication of the Final EIS, the State Department entered the final phase of the permitting process: the national interest determination. *See* 76 Fed. Reg. 53,525 (Aug. 26, 2011). From September 26 through October 7, 2011, the Department held nine hearings to solicit testimony on its national interest determination and received written comments.

197.   On November 10, 2011, the State Department announced that it could not make a national interest determination. The State Department stated that it would need to prepare a supplemental EIS to evaluate alternative routes through Nebraska that avoided the environmentally sensitive Sandhills region of the state.

198.   On January 18, 2012, Secretary of State John F. Kerry ("Secretary Kerry") denied TransCanada's permit application. The State Department's record of decision noted that an arbitrary timeline imposed by Congress did not allow for sufficient time to prepare a rigorous, transparent, and objective review of an

alternative route through Nebraska. TransCanada's first permit application ended with the publication of a record of decision.

199.   The State Department's record of decision denying TransCanada's first permit application was a final agency action because it "'mark[ed] the consummation of the agency's decision-making process.'" *Indigenous Envtl. Network v. U.S. Dep't of State*, No. CV-17-29-GF-BMM, 2017 WL 5632435, at *4 (D. Mont. Nov. 22, 2017) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)).

## 2.    TransCanada's Second Permit Application.

200.   On May 2, 2012, only 113 days after the State Department denied its first permit application, TransCanada submitted its second permit application for the Pipeline.

201.   When TransCanada submitted its second permit application, the State Department recognized that TransCanada's new permit application triggered entirely new public, environmental, and historic review processes.

202.   In consultation with the United States Environmental Protection Agency ("EPA") and the Council on Environmental Quality ("CEQ"), the State Department determined that producing a supplement to its 2012 Final EIS would satisfy its obligation to review TransCanada's new permit application pursuant to NEPA.

203.   Additionally, the State Department consulted with the Advisory Council on Historic Preservation ("ACHP") and determined, again, that the construction, operation, and maintenance of the Pipeline would constitute an "undertaking" pursuant to the NHPA. The State Department recognized that TransCanada's second permit application triggered an entirely new Section 106 consultation process.

204.   On March 1, 2013, the State Department published a Draft Supplemental EIS. *See* 78 Fed. Reg. 18,665 (Mar. 27, 2013). The Draft Supplemental EIS built upon work completed in the 2011 Final EIS, incorporated new analyses, and addressed comments received during scoping.

205.   On January 31, 2014, the State Department published its Final Supplemental EIS. *See* 79 Fed. Reg. 6,984 (Feb. 5, 2014).

206.   During the EIS and national interest determination processes, Rosebud submitted comments raising its concerns regarding the Pipeline's impacts on its cultural resources; its land and its tribal members' lands; its water resources, including surface water and groundwater; its treaty rights; and the economic security, health, and welfare of the Tribe and its members.

207.   On November 3, 2015, the State Department published its Record of Decision and National Interest Determination ("2015 Decision"). *See* Plaintiffs'

Exhibit C; *see* 80 Fed. Reg. 76,611 (Dec. 9, 2015). Secretary Kerry again denied TransCanada's permit application because it was not in the national interest.

208.   One of the factors that Secretary Kerry considered in determining that the Pipeline was not in the national interest was "the concerns of some Indian tribes raised in the context of the proposed Project regarding sacred cultural sites and avoidance of adverse impacts to the environment, including to surface and groundwater resources."

### 3.   TransCanada's Third Permit Application

209.   On January 24, 2017, President Trump signed a Memorandum "invit[ing] TransCanada . . . to promptly re-submit its application to the Department of State for a Presidential permit for the construction and operation of the Keystone XL Pipeline." 82 Fed. Reg. at 8,663, § 2.

210.   The Memorandum also "waived . . . any authority [the President] retained to make the final decision regarding the issuance of the Presidential Permit," *Indigenous Envtl. Network*, 2017 WL 5632435, at *5, ensuring that the State Department's issuance of the Permit to TransCanada was an agency action. *Id.*, at *12 ("[T]he State Department's publication of the [record of decision and national interest determination] and its issuance of the accompanying Presidential Permit constitute agency action.").

211.   On January 26, 2017, just two days later, TransCanada submitted to the State Department its third permit application. On February 10, 2017, the State Department acknowledged that it had received TransCanada's third permit application and announced that it would review the application in accordance with the Memorandum. 82 Fed. Reg. 10,429 (Feb. 10, 2017).

212.   "The State Department further announced that it would seek no further public comment on the national interest determination because it already had taken public comment in February 2014"—three years earlier. *Indigenous Envtl. Network*, 2017 WL 5632435, at *3 (citing 82 Fed. Reg. at 10,429).

213.   "The State Department did not supplement or revise" the 2014 Final Supplemental EIS, nor did it receive or solicit any comments from the public, federal or state agencies, or tribes. *Id.*, at *2.

214.   The State Department also did not initiate a new Section 106 process, including tribal consultation pursuant to the NHPA.

215.   On March 23, 2017, just fifty-six days after TransCanada's third permit application was submitted, the State Department published its 2017 Decision. *See* 82 Fed. Reg. at 16,467. Under Secretary Shannon granted TransCanada's permit application.

216.   Under Secretary Shannon based the 2017 Decision on the *exact same* record on which Secretary Kerry based his contrary 2015 Decision.

217.   No new or additional information was introduced into the record that could have further informed Under Secretary Shannon's 2017 Decision.

### 4.    Changed Route Through Nebraska

218.   On February 16, 2017, TransCanada submitted an application to the Nebraska Public Service Commission ("Nebraska PSC") requesting approval for a new route through the state. *See Indigenous Envtl. Network v. U.S. Dep't of State*, 317 F. Supp. 3d 1118 (D. Mont. 2018). This application was submitted twenty-one days after TransCanada submitted its third permit application to the State Department and thirty-five days before the State Department issued the 2017 Permit.

219.   On November 20, 2017, the Nebraska PSC approved a new route for the Pipeline through the state called the "Mainline Alternative" route. *Id.*

220.   On May 25, 2018, the State Department published a notice in the Federal Register that it intended to prepare an environmental assessment ("EA") for the Mainline Alternative route. 83 Fed. Reg. 24,383 (May 25, 2018).

221.   On July 30, 2018, the State Department published the Draft EA for the Mainline Alternative route and opened a thirty-day public comment period. 83 Fed. Reg. 36,659 (July 30, 2018).

222.   The Mainline Alternative Rout runs through territory of the Great Sioux Nation and through the territory of Rosebud.

### 5.    Litigation Challenging the 2017 Presidential Permit

223.   The 2017 Permit was immediately challenged in the Montana District Court. *See Indigenous Envtl. Network v. U.S. State Dep't*, No. 4:17-029-BMM (D. Mont.); *N. Plains Res. Council v. Shannon*, No. 4:17-cv-031-BMM (D. Mont.).

224.   On November 22, 2017, the Montana District Court denied the United States' and TransCanada's motions to dismiss, finding that Under Secretary Shannon's issuance of the 2017 Permit was an agency action, not a presidential action, and thus subject to review pursuant to the APA. *Indigenous Envtl. Network*, 2017 WL 5632435, at *5.

225.   On August 15, 2018, the Montana District Court ordered the State Department to prepare a supplemental EIS for the Mainline Alternative route, not an EA. *Indigenous Envtl. Network*, 317 F. Supp. 3d 1118.

226.   On September 10, 2018, the Tribes filed their own lawsuit alleging distinct claims against the United States challenging the issuance of the 2017 Permit. *See Rosebud Sioux Tribe v. U.S. Dep't of State*, No. 4:18-cv-118-BMM (D. Mont.).

227.   On November 8, 2018, the Montana District Court vacated the 2017 Permit. *See Indigenous Envtl. Network*, 347 F. Supp. 3d at 591. The Court held that the State Department had violated the APA by failing to provide a reasoned explanation for reversing its 2015 Decision not to permit the Pipeline. *Id.* The Court also held that the State Department violated the NEPA because the 2014 Final Supplemental EIS failed to take a hard look at: (1) effects of current oil prices on the

Pipeline's viability; (2) cumulative effects of greenhouse gas emissions; (3) effects to cultural resources; (4) updated spill modeling. *Id*. at 590.

228.   The Case was appealed to the Ninth Circuit. *See generally Indigenous Envtl. Network v. U.S. Dep't of State*, No. 18-36068 (9th Cir.).

### 6.   President Trump's Unilateral Action

229.   On March 29, 2019, President Trump issued an executive order purportedly rescinding the 2017 Permit and granting TransCanada the 2019 Permit. 84 Fed. Reg. at 13,101.

230.   On information and belief, no additional review of the Pipeline's impacts was conducted prior to President Trump's issuance of the 2019 Permit.

## VIII. Significant New Circumstances or Information Relevant to Environmental Concerns that Bear on the Pipeline and Require a Supplemental EIS.

231.   In 2015, after years of negotiation, the nations of the world, including the United States, reached agreement on addressing climate change.   *See* U.N. Framework Convention on Climate Change (UNFCC), Adopting of Paris Agreement (Nov. 30-Dec.11, 2015), U.N. Doc. FCCC/ CP/ 2015/10/Add. 1., *available at* http://www.un.org/en/development/desa/population/migration/generalassembly/docs/globalcompact/FCCC_CP_2015_10_Add.1.pdf. The preamble of the Paris Agreement acknowledges "that climate change is a common concern of humankind," and that "Parties should, when taking action to address climate change,

respect, promote, and consider their respective obligations on human rights . . . [and] the rights of indigenous peoples." *Id.* at 21.

232. Article 2 of the Paris Agreement establishes the goal of "[h]olding the increase in the global average temperature to well below 2° C above pre-industrial levels and pursuing efforts to limit the temperature increase to 1.5° C above pre-industrial levels[.]"

233. Paragraph 21 of the Paris Decision, which adopted the Paris Agreement, invited "the Intergovernmental Panel on Climate Change to provide a special report in 2018 on the impacts of global warming of 1.5° C above pre-industrial levels and related global greenhouse gas emissions pathways." *Id*. at 4.

234. The Intergovernmental Panel on Climate Change ("IPCC") is the United Nations' body for assessing the science related to climate change.  It is made up of scientists from around the world. In 2007, the IPCC shared in the Nobel Peace Prize "for their efforts to build up and disseminate greater knowledge about man-made climate change, and to lay the foundations for measures that are needed to counteract such change." *Nobel Peace Prize 2007*, The Nobel Prize, https://www.nobelprize.org/prizes/peace/2007/summary/.

235. Well after the State Department published its 2014 Supplemental EIS and 2017 Decision, the IPCC issued its 1.5° C report in October 2018.  IPCC, *Global Warming of 1.5° C* (2018), *available at* https://www.ipcc.ch/sr15/.

236. The 1.5° C report contains significant new circumstances and information relevant to environmental concerns that bear on construction, development, and maintenance of the Pipeline and the Pipelines direct, indirect, and cumulative impacts.  Environmental effects from a 1.5° C change in our climate are severe, and much worse with a 2° C change.  Below is a visual of the difference in effects between 1.5° and 2° C developed by the World Resources Institute based on the IPCC report:



Kelly Levin, *Half a Degree and a World Apart: The Difference in Climate Impacts Between 1.5° C and 2 °C of Warming,* World Resources Institute (Oct. 7, 2018).

237.   According to the report, the carbon budget left to keep within 1.5° C increase will be used up by 2030.   IPCC, *Global Warming of 1.5° C* at 105-08. Emissions need to be reduced to net-zero by mid-century.   *Id.* at 95. The scale of action needed to keep within 1.5° C is unprecedented. *Id*. at 17; *see* Kelly Levin, *8 Things You Need to Know About the IPCC 1.5° C Report,* World Resources Institute Blog (Oct. 7, 2018), *available at* https://www.wri.org/blog/2018/10/8-things-you-need-know-about-ipcc-15-c-report; Kelly Levin, *According to New IPCC Report, the World Is on Track to Exceed its "Carbon Budget" in 12 Years*, World Resources Institute     Blog     (Oct.     7,     2018),     *available     at* https://www.wri.org/blog/2018/10/according-new-ipcc-report-world-track-exceed-its-carbon-budget-12-years; Allen, M.R. et al., *Technical Summary In: Global Warming     of     1.5°C*     (2018),     *available     at* https://www.ipcc.ch/site/assets/uploads/sites/2/2019/02/SR15_TS_High_Res.pdf.

238.   Additionally, in 2018, a National Climate Assessment for the United States was released.  "A team of more than 300 experts guided by a 60-member Federal Advisory Committee produced the report, which was extensively reviewed by the public and experts, including federal agencies and a panel of the National

Academy of Sciences." National Climate Assessment (NCA), *Fourth National Climate Assessment*, https://nca2018.globalchange.gov (last visited Mar. 19, 2019).

239.   The assessment made many findings in twelve areas, some of which were:

> 1.  Communities – Climate change creates new risks and exacerbates existing vulnerabilities in communities across the United States, presenting growing challenges to human health and safety, quality of life, and the rate of economic growth.
>
> 2.  Economy – Without substantial and sustained global mitigation and regional adaption efforts, climate change is expected to cause growing losses to American infrastructure and property and impede the rate of economic growth over this century. . . .
>
> 5.  Water – The quality and quantity of water available for use by people and ecosystems across the country are being affected by climate change, increasing risks and costs to agriculture, energy production, industry, recreation, and the environment. . . .
>
> 7.   Indigenous Peoples – Climate change increasingly threatens Indigenous communities' livelihoods, economies, health, and cultural identities by disrupting interconnected social, physical, and ecological systems.

*Id.*

240.   Given these significant new circumstances and information relevant to environmental concerns and bearing on the Pipeline or its impacts, and the Federal Defendants' failure to fully consider the Pipeline's effects on climate change, *see Indigenous Envtl. Network*, 347 F. Supp. 3d at 578-79, the Federal Defendants are required to produce a supplemental EIS to properly protect the Tribes. 40 C.F.R. §

1502.9(c)(1)(ii); *see Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 937 (9th Cir. 2010); *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 560 (9th Cir. 2006).

## LEGAL BACKGROUND

### I.  Treaty Principles.

241.  Treaties are "the supreme law of the land." U.S. Const. art. VI, cl. 2.

242.  A treaty with an Indian tribe is a contract and should be interpreted to give effect to the intent of the signatories. *Elk v. United States*, 87 Fed. Cl. 70, 78 (2009) (citing *Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 675 (1979)) ("A treaty . . . is essentially a contract between two sovereign nations."); *Santovincenzo v. Egan*, 284 U.S. 30, 40 (1931); *Tsosie v. United States*, 825 F.2d 393, 397 (Fed. Cir. 1987).

243.  In interpreting treaties, "courts must focus upon the historical context in which it was written and signed." *Wash. State Dep't of Licensing v. Cougar Den, Inc.*, ___ S. Ct. ___, No. 16-1498, 2019 WL 1245535, at * 6 (2019) (citing *United States v. Winans*, 198 U.S. 371, 381 (1905); *Tulee v. Washington*, 315 U.S. 681, 684 (1942) ("It is our responsibility to see that the terms of the treaty are carried out, so far as possible, in accordance with the meaning they were understood to have by the tribal representatives at the council.")); *see also United States v. Washington*, 853 F.3d 946, 963 (9th Cir. 2017); *Jones v. United States*, 846 F.3d 1343, 1351 (Fed. Cir.

2017) (quoting *Nw. Band of Shoshone Indians v. United States*, 324 U.S. 335, 353 (1945)) (courts must "attempt to determine what the parties meant by the treaty."). While principles of contract interpretation aid in discerning the intent of treaty parties, *see Air France v. Saks*, 470 U.S. 392, 397 (1985), those principles are not applied to treaties in precisely the same way they are used to construe private contracts. *See Elk*, 87 Fed. Cl. at 79.

244.   In this fashion, treaties are construed "to give effect to the terms as the Indians themselves would have understood them."  *Richard v. United States*, 677 F.3d 1141, 1154 (Fed. Cir. 2012) (quoting *Mille Lacs*, 526 U.S. at 196); *Choctaw Nation v. Oklahoma*, 397 U.S. 620, 631 (1970)); *see also Cougar Den,* 2019 WL 1245535, at *2 (Gorsuch, J., concurring) (*quoting Mille Lacs,* 526 U.S. at 196) *Jones*, 846 F.3d at 1351.

245.   When courts determine the tribal "understanding of written words," they "must be careful to avoid reasoning that holds strictly to our later-established understanding of those words." *James*, 846 F.3d at 1352 (citing *Worcester*, 31 U.S. at 552–53).

246.   Treaties with Indian Tribes cannot be rescinded, revoked, or modified by the Executive Branch. *See Mille Lacs*, 526 U.S. at 172, 193-94.

247.   Article 3 of the 1851 Fort Laramie Treaty and Article 7 of the 1855 Lame Bull Treaty create binding obligations on the United States to protect Rosebud and Fort Belknap natural resources from waste.

248.   Articles 2 and 16 of the 1868 Fort Laramie Treaty require TransCanada to obtain Rosebud's consent before crossing its territory (i.e., surface, mineral, etc.).

## II.   Congress's Constitutional Authority to Regulate Foreign Commerce

249.   The Constitution vests Congress with the exclusive power to "regulate Commerce with foreign Nations." U.S. Const. art. I, § 8, cl. 3.

250.   The transportation of crude oil through pipelines is commerce within the meaning of the Commerce Clause. *See United States v. Ohio Oil Co.*, 234 U.S. 548, 560 (1941) ("That the transportation [of crude oil through pipelines] is commerce among the sever states we think clear.").

251.   Congress's regulation of crude oil pipelines and the export (and conversely, the import) of that crude oil, thereby "operates well within the sphere of the foreign commerce clause." *Alaska v. Brown*, 850 F. Supp. 821, 827 (D. Alaska 1994) (upholding Congress's restriction on exporting crude oil from the Trans-Alaska Pipeline as a valid exercise of the Foreign Commerce Clause).

252.   The President's power is limited to only that granted to him by the Constitution or Congress. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S.

579, 585 (1952) ("The President's power, if any, to issue the order must stem either from an act of Congress or the Constitution itself.").

253.   The President possesses no independent and inherent authority to regulate foreign commerce, including the permitting of cross-border crude pipelines. *See United States v. Gyu W. Capps, Inc.*, 204 F.2d 655, 660 (4th Cir. 1953) ("[T]he power to regulate interstate and foreign commerce is not among the powers incident to the Presidential office, but is vested by the Constitution in Congress.").

## III.   Rights-of-Way Statutes.

254.   Congress unilaterally enacted laws allowing rights-of-way across reservations in the late 1800s. For example, in 1899 the Secretary of the Interior was purportedly empowered to grant, on most reservations and allotted land, rights-of-way to railroad companies not only for rail lines but also telephone and telegraph lines.  25 U.S.C. § 312.

255.   In 1904, the Secretary of Interior purportedly acquired authority to grant rights-of-way for oil and gas pipelines. 25 U.S.C.A. § 321; Cohen's Handbook on Federal Indian Law § 15.09(4), 1062-65 (Nell Jessup Newton ed., 2012, sup. 2017). This *ad hoc* rights-of-way legislation created an unwieldy legal regime that Congress sought to correct in 1948 with a general rights-of-way statute. "The purpose of the 1948 Act was to simplify and facilitate this process of granting rights-

of-way across Indian lands." *Neb. Pub. Power Dist. v. 100.95 Acres of Land in Thurston Cnty.*, 719 F.2d 956, 959 (8th Cir. 1983).

256.   Under either statute, "the consent of the Tribe is still required." *Id.* at 1058 (citing 25 U.S.C. § 324).

257.   TransCanada has not obtained Rosebud consent to cross its territory (surface estates).

258.   TransCanada has not obtained a federal right-of-way to cross Rosebud territory as required by the rights-of-way statutes.

259.   Rights-of-way violations may be addressed by Rosebud and disputes may be resolved in Rosebud court. 25 C.F.R. § 169.403.

**IV.    Mineral Rights**

260.   Subsurface minerals are considered elements of the land and are owned by the respective tribal nation. *United States v. Shoshone Tribe of Indians of Wind River Reservation in Wyo.*, 304 U.S. 111, 116 (1938).

261.   Minerals include both metalliferous and non-metalliferous minerals; all hydrocarbons, including oil and gas, coal and lignite of all ranks; geothermal resources; and includes but is not limited to, sand, gravel, pumice, cinders, granite, building stone, limestone, clay, silt, or any other energy or non-energy mineral. 25 C.F.R. § 211.3.

262.   "No exploration, drilling, or mining operations are permitted on any Indian lands before the Secretary [of Interior] has granted written approval of a mineral lease or permit pursuant to the regulations in this part." 25 C.F.R. § 211.48(a).

263.   The Secretary of Interior shall not approve a lease until the consent of the Indian mineral owner has been obtained. 25 C.F.R. §§ 211.20, 212.20.

264.   On information and belief, TransCanada will be exploring, drilling, mining, or trespassing on Rosebud's mineral estates.

265.   On information and belief, TransCanada has not obtained or sought to obtain a permit to explore, drill, mine, or trespass on Rosebud's mineral estates.

266.   TransCanada has not obtained consent of Rosebud to explore, drill, mine, or trespass on its mineral estates.

## V.   Tribal Jurisdiction.

267.   Tribal nations possess inherent sovereign powers, including the authority to exclude from their territory. *Water Wheel*, 642 F.3d at 808.

268.   From tribal nations' inherent sovereign powers flow lesser powers, including the power to regulate non-Indians on tribal land. *Id*. at 808-09; *see Window Rock Unified Sch. Dist. v. Reeves*, 861 F.3d 894, 898 (9th Cir. 2017).

269.   Tribal nations also have authority over non-Indians when the non-Indians have agreed to tribal jurisdiction, or their conduct threatens or has some

direct effect on the political integrity, the economic security, or the health or welfare of the tribe. *Montana*, 450 U.S. at 565-66 (majority).

270.   Rights-of-way violations also may be addressed by tribal nations and disputes may be resolved in tribal fora. 25 C.F.R. § 169.403.

271.   As a condition to the issuance of the federal permit challenged herein, "TransCanada Keystone Pipeline, L.P. has agreed to . . . follow all state, local, and tribal laws and regulations with respect to the construction and operation of the proposed Project[.]" 2017 Decision, at 30.

272.   Should the Pipeline spill, it could have catastrophic consequences on Rosebud's water, land, spirituality, and people and threaten the overall health and welfare of Rosebud and its members. *See Rincon Muchroom Corp. of Am. v. Mazzetti*, 490 Fed. App'x 11, 13 (9th Cir. 2012) ("We have held that both forest fires and contamination of a tribe's water quality are threats sufficient to sustain tribal jurisdiction.").

273.   To date, TransCanada has not followed any tribal laws and regulations with respect to the construction and operation of the Pipeline. For instance, Rosebud has Land Use, Environmental Protection, and Utilities codes, and Fort Belknap has a Cultural Property Act, all of which are applicable to the Pipeline.

274.   TransCanada must address these issues in tribal fora. *Window Rock,* 861 F.3d at 906 (holding that, where tribal jurisdiction is at least colorable or plausible,

exhaustion in the tribal forum is required); *Colombe v. Rosebud Sioux Tribe*, 747 F.3d 1020, 1025 (8th Cir. 2014); *see also Plains Commerce Bank v. Long Family & Cattle Co.*, 554 U.S. 316, 116 (2008) ("[T]he tribe may quite legitimately seek to protect its members from noxious uses that threaten tribal welfare or security, or from nonmember conduct on the land that does the same.").

## VI.    The Presidential Permitting Scheme

275.    President Trump alleges his unfettered authority to issue presidential permits stems from his inherent powers as President—"By virtue of the authority vested in me as President of the United States of America," 84 Fed. Reg. at 13,101— notwithstanding *Congress's* exclusive power to regulate foreign commerce. U.S. Const. art. I, § 3, cl. 8.

276.    Until President Trump, previous administrations have exercised their alleged authority to issue presidential permits pursuant to a series of executive orders. *See* Issuance of Permits with Respect to Certain Energy-Related Facilities and Land Transportation Crossings on the International Boundaries of the United States, Exec. Order No. 13,337, 69 Fed. Reg. 25,299 (Apr. 30, 2004) ("EO 13337"); Providing for the Performance of Certain Functions Heretofore Performed by the President with Respect to Certain Facilities Constructed and Maintained on the Borders of the United States, Exec. Order No. 11,423, 33 Fed. Reg. 11,741 (Aug. 16, 1968) ("EO 11423").

277.   Issued in 1968, EO 11423 requires that "executive permission be obtained for the construction and maintenance at borders of the United States of facilities connecting the United States with a foreign country." 33 Fed. Reg. at 11,741.

278.   EO 11423 designates and empowers the Secretary of State "to receive all applications for permits for construction, connection, operation, or maintenance, at the borders of the United States, of . . . pipelines . . . to or from a foreign country." *Id.* § 1(a)-(a)(i). EO 11423 requires the Secretary of State to request the views of certain other department and agency officials with regard to whether the issuance of such a permit would serve the national interest. *Id*. § 1(b). After considering these views, if the Secretary of State determines that issuing the permit would or would not be in the national interest, the Secretary must inform these officials of the determination before issuing the permit. *Id*. § 1(d), (e).

279.   The agency and department officials with whom the Secretary of State must consult have fifteen days to review the Secretary's national interest determination. *Id.* § 1(f). If any officials disagree with the Secretary's national interest determination, they may request that the Secretary of State refer the application to the President. *Id*. If such a request is made, the Secretary "shall refer the application . . . to the President for his consideration and final decision." *Id*.

280.   The process outlined in EO 11423 delegates the President's alleged authority to receive, review, and issue presidential permits to the Secretary of State.

281.   President George W. Bush affirmed the presidential permitting process established by EO 11423 in 2004. EO 13337 outlines the same authority and process established in EO 11423. 69 Fed. Reg. at 25,299, § 1(a). EO 13337 reaffirms the Secretary of State's obligations to consider the views of certain agency officials and notify those same officials of its final national interest determination regarding any presidential permit. *Id.* at 25,300, § 1(h).

282.   EO 13337 largely reaffirms the permitting process established by EO 11423. Like EO 11423, EO 13337 delegates the President's authority to receive, review, and grant or deny presidential permit applications to the Secretary of State. And like EO 11423, with EO 13337, the President retains the ultimate authority to issue a permit.

283.   In 2017, President Trump issued a Memorandum which diverged from the presidential permitting process established by EO 11423 and EO 13337 and established an *entirely new* permitting process specifically for the Pipeline. *See* 82 Fed. Reg. at 8,663-65.

284.   The Memorandum stated: "The Secretary of State shall reach a final permitting decision, including a final decision as to any conditions on issuance of

the permit that are necessary or appropriate to serve the national interest." *Id*. §
3(a)(i).

285.   Most important, the Memorandum stated: "The agency notification and
fifteen-day delay requirements of section 1(g), 1(h), and 1(i) of executive Order
13337 *are hereby waived* on the basis that, under the circumstances, observance of
these requirements would be unnecessary, unwarranted, and a waste of resources."
*Id*. 3(a)(iv) (emphasis added).

286.   The Memorandum specifically waived the requirement of the Secretary
of State to refer TransCanada's permit application to the President if any other
agency official disagreed with the Secretary of State's national interest
determination. The Memorandum also waived the President's alleged authority to
make any final determination regarding the issuance of the presidential permit for
the Pipeline. *See Indigenous Envtl. Network*, 2017 WL 5632435, *5 ("President
Trump specifically waived, in his Memorandum, any authority he retained to make
the final a decision regarding the issuance of the Presidential Permit.").

287.   Under Secretary Shannon's issuance of the 2017 Permit to
TransCanada was therefore an agency action, not a presidential action. *Id*. at *11.

288.   The Memorandum also directed the Secretary of State to conclude that
the 2014 Final Supplemental EIS satisfies "all applicable requirements of the
National Environmental Policy Act," 82 Fed. Reg. at 8,663, § 3(a)(ii)(A), as well as

"any other provisions of law that requires executive department consultation or review," pursuant to the Endangered Species Act. *Id.* § 3(a)(ii)(B).

289.   The Memorandum made no mention of the State Department's obligations under the NHPA or any of the treaties.

290.   The Memorandum recognized that the State Department's possible approval of a potential third permit application from TransCanada would constitute a "major federal action" pursuant to NEPA. *See Indigenous Envtl. Network*, 2017 WL 5632435, *8-11; 82 Fed. Reg. at 8,663, § 3(a)(ii)(A).

291.   The construction, operation, and maintenance of the Pipeline would also constitute an "undertaking" pursuant to the NHPA, as the Pipeline requires a federal permit. *See* 54 U.S.C. § 300320; 36 C.F.R. § 800.16(y). The State Department was therefore required to initiate a new Section 106 review process for TransCanada's third permit application. *See* 54 U.S.C. § 306108; 36 C.F.R. § 800.3(a).

292.   Ultimately, the State Department's issuance of the 2017 Permit to TransCanada was an agency action, not a presidential action. *Indigenous Envtl. Network*, 2017 WL 5632435.

293.   In an effort to circumvent the Judicial Branch, President Trump again upended the presidential permitting process.

294.   On March 29, 2019, President Trump purported to unilaterally revoke the 2017 Permit and grant the new 2019 Permit to TransCanada. This action was not done in accordance with the procedures established by the Memorandum, EO 13337, or EO 11423.

295.   On April 10, 2019, President Trump issued another executive order revoking EO 11423 and EO 13337, requiring the Secretary of State to develop new procedures for receiving and reviewing applications for presidential permits, and purporting to reserve the authority to issue or deny a presidential permit solely to the President. Exec. Order No. 13,867, 84 Fed. Reg. 15,491, at 15, 492 (Apr. 10, 2019)

296.   Congress has never delegated to the President the authority to regulate or permit cross boarder crude oil pipelines. As the regulation of cross-border pipelines is foreign commerce, *accord Ohio Oil*, 234 U.S. at 560; *Brown*, 850 F. Supp. at 827, the President's authority to regulate or permit such pipelines "is at its lowest ebb." *Youngstown*, 343 U.S. at 636 (Jackson, J., concurring).

## VII.   The Administrative Procedure Act

297.   Pursuant to the APA, courts must

compel agency action unlawfully withheld . . . and . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. . . [or] without observance of procedure required by law.

5 U.S.C. § 706(1)-(2).

298.    At a bare *minimum*, treaty obligations require compliance with general law such as the NEPA and the NHPA, and in this instance require the Federal Defendants to protect the Tribes treaty rights and resources from waste.  An agency's violations of the treaties, the NEPA, the NHPA, and tribal law can be challenged under the APA. A final agency action predicated on violations of treaties, the NEPA, and the NHPA violate the APA. *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800 (9th Cir. 1999). *Grand Canyon Trust v. Williams*, 38 F. Supp. 3d 1073, 1083 (D. Ariz. 2014) (citing 5 U.S.C. § 706(1)). *Alto*, 738 F.3d at 1124-25.

299.    The only manner in which the President can comply, even minimally, with obligations imposed on the United States by treaties, is through the efforts of his Executive Branch agencies. It is clear that with the issuance of the 2019 Permit, that there is no intention for any federal agency to fulfill their treaty obligations by complying with the NEPA and the NHPA.  The agencies' failure to act in accordance with the NHPA and the NEPA is therefore agency action unlawfully withheld and is the equivalent of final agency action subject to APA review.

300.    As detailed below, the Federal Department's violations of the treaties, NEPA, the NHPA, and tribal law render issuance of the 2019 Permit and the 2017 Permit unlawful.

## VIII.  The National Environmental Policy Act

86

301.   Pursuant to the NEPA: "It is the continuing responsibility of the Federal Government to use all practicable means . . . to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may . . . preserve important historic, cultural, and natural aspects of our national heritage." 42 U.S.C. § 4331(b).

302.   NEPA requires that for "major Federal actions significantly affecting the quality of the human environment," federal agencies must consider environmental effects, prepare an EIS that addresses any adverse effects, and discuss alternatives to the proposed action. *Id*. § 4332(C).

303.    "NEPA 'does not mandate particular results,' but 'simply provides the necessary process' to ensure that federal agencies take a '*hard look*' at the environmental consequences of their actions.'" *Muckleshoot Indian Tribe*, 177 F.3d at 814 (citations omitted, emphasis added).

304.   An EIS "shall provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

305.   An EIS "shall include discussions of . . . [p]ossible conflicts between the proposed action and the objectives of Federal, regional, State, and local (and in

the case of a reservation, Indian tribe) land use plans, policies and controls for the area concerned." *Id*. § 1502.16(c).

306.   The 2014 Final Supplemental EIS fails to examine the impacts the Pipeline would have on the Tribes' treaty, territorial, spiritual, water, and other resources and rights.

307.   The treaty and trust responsibility owed by the United States to federally recognized tribes requires that the United States ensure that Indian treaty rights are given full effect. *See Nw. Sea Farms, Inc. v. U.S. Army Corps of Eng'rs*, 931 F. Supp. 1515, 1520 (W.D. Wash. 1996). The United States has a fiduciary duty to ensure that tribal treaty rights are neither abrogated nor impinged. *Id.* This fiduciary duty mandates that federal agencies take treaty rights and resources into consideration during the NEPA process. *Id*.

308.   NEPA established a minimum duty of care the United States owes Tribal Nations. The United States' failure to comply with the minimum standard of the NEPA violates its fiduciary duty to Tribal Nations. *See Pit River Tribe*, 469 F.3d at 788.

309.   Rosebud is a signatory of the 1851 Fort Laramie Treaty and the 1868 Fort Laramie Treaty. The 1851 Treaty of Fort Laramie demarcated the respective territories of the Lakota (Sioux), Cheyenne, and Crow Nations.

310. The 1868 Fort Laramie Treaty established the Great Sioux Reservation, covering vast swaths of Montana, North Dakota, South Dakota, and Wyoming, including the present-day Rosebud Indian Reservation.

311. Rosebud has important treaty rights reserved by it in the 1851 Fort Laramie Treaty and the 1868 Fort Laramie Treaty.

312. Rosebud's Game, Fish & Parks Department issues hunting and fishing permits for tribal members and non-members who wish to hunt on the Tribe's lands, some of which are in Tripp County.

313. The proposed route of the Pipeline as identified *supra* at Paragraphs 107-18 & 166-82 passes directly through the heart of the Great Sioux Reservation, as well as Rosebud's territory. The proposed route also passes within close proximity to four reservations including the Fort Belknap Indian Reservation, the Fort Peck Indian Reservation, the Cheyenne River Reservation, and the Rosebud Indian Reservation.

314. The proposed route of the Pipeline as identified *supra* at Paragraph Paragraphs 107-18 & 166-82 also passes directly through the territory of the Gros Ventre and Assiniboine Tribes.

315. The Assiniboine Tribe, as a member of the Assiniboine Nation, is a signatory of the 1851 Treaty of Fort Laramie.

316.   The Gros Ventre Tribe, as a member of the Blackfeet Confederacy, is also a signatory to the 1851 Fort Laramie Treaty and 1855 Lame Bull Treaty.

317.   The treaties demonstrate the clear connection the Gros Ventre and Assiniboine Tribes retain to their ancestral lands under the Treaties.

318.   These treaties protect the Gros Ventre and Assiniboine Tribes' continued rights to their respective territories.

319.   The scoping report for the 2014 Final Supplemental EIS stated that as part of the alternatives analysis, "[t]he Supplemental EIS should evaluate an alternative route to avoid the sovereign Lakota territory encompassed by the boundaries of the Great Sioux Reservation as identified in the 1851 and 1868 Fort Laramie Treaties." Final Supplemental EIS, app. F at 9.

320.   The 2014 Final Supplemental EIS acknowledges the scoping report's recommendation to evaluate an alternative route that avoids the territory encompassed by the Great Sioux Reservation and indicates that its analysis of this alternative is contained in Chapters 2.2 Description of Reasonable Alternatives and 5.0 Alternatives.

321.   Chapter 2.2 does not contain any mention of any of the 1851 Fort Laramie Treaty, the 1855 Lame Bull Treaty, the 1868 Fort Laramie Treaty or any other treaties signed by the Tribes or any other tribes, nor does it contain any analysis

of how alternative routes can avoid the Great Sioux Reservation or the territory of the Gros Ventre and Assiniboine Tribes outside the Great Sioux Nation.

322.   Similarly, Chapter 5.0 does not contain a single mention of the 1851 Fort Laramie Treaty, the 1855 Lame Bull Treaty, the 1868 Fort Laramie Treaty, nor does it contain any analysis of how alternative routes can avoid the Great Sioux Reservation or the territory of the Gros Ventre and Assiniboine Tribes outside the Great Sioux Nation.

323.   The 2014 Final Supplemental EIS mentions the 1851 Fort Laramie Treaty and the 1868 Fort Laramie Treaty only one other time in the summary of comments and responses chapter. There, the 2014 Final Supplemental EIS describes a broad theme of public comments it received "assert[ing] that the Draft Supplemental EIS is deficient because it is in violation of laws, treaties, conventions, and international agreements, such as . . . the Fort Laramie Treaties."

324.   In response, the 2014 Final Supplemental EIS states:

As described in Section 1.1 Background, the Final Supplemental EIS has been prepared consistent with NEPA and all other relevant laws and regulations. The scope of the NEPA evaluation is defined by the proposed Project area and those resources and receptors that may be impacted by the proposed Project, including consistency with statutes such as the ESA and NHPA, EOs on environmental justice, and other *federal*, state, *tribal*, and local *laws* and *regulations*.

Final Supplemental EIS, Vol. 5, Public Comments and Responses Pt. 1, PC-175 (emphasis added).

91

325.   Chapter 1.1 does not contain any analysis or mention of the 1851 Fort Laramie Treaty, the 1855 Lame Bull Treaty, the 1868 Fort Laramie Treaty, or tribal laws and regulations.

326.   The closest the 2014 Final Supplemental EIS comes to analyzing the 1851 Fort Laramie Treaty, the 1855 Lame Bull Treaty, and the 1868 Fort Laramie Treaty and the Tribes' treaty rights is four sentences in the Socioeconomic section of the impacts chapter of the Final Supplemental EIS:

> During consultation to date, some Indian tribes expressed concerns about the proposed Project's possible impacts on the environment, specifically water resources, wildlife, climate change, and on cultural resources. . . . For many Indian residents of the general proposed Project area, hunting, fishing, trapping, and gathering activities are a significant activity. Individuals participate in these activities for numerous reasons, including food supply, personal income, and the continuance of cultural customs and traditions. Indian tribes could be disproportionately negatively impacted by the proposed Project because they could have a greater dependence on natural resources; therefore, a potential spill could more heavily impact their way of life.

327.   These few sentences do not constitute adequate analysis of these, or any, treaties and the Pipeline's potential impacts on treaty rights, water rights, spirituality, cultural resources, the Tribes' territory and other resources. Nor does it constitute adequate analysis of tribal laws and regulations.

328.   This is despite the fact that Rosebud raised concerns about the Pipeline's impacts on its cultural resources, including impacts on medicinal and nutritional plants; its lands and its tribal members' lands; its water resources,

including surface water and groundwater; its treaty rights; and its economic security, health, and welfare of Rosebud and its members.

329.   The 1851 Fort Laramie Treaty and the 1868 Fort Laramie Treaty were specifically identified in public comments at least eighteen times, and Indian treaties generally were identified at least thirty-three times.

330.   Additionally, the State Department received comments from other tribes, many of which were part of the Great Sioux Nation, identifying the State Department's need to analyze the Pipeline's impacts on treaty rights.

331.   The 2014 Final Supplemental EIS fails to identify and analyze the Pipeline's impacts on the Tribes' treaties, treaty rights, and treaty resources.

332.   The 2014 Final Supplemental EIS also fails to identify and analyze the Pipeline's impacts on the territories of Rosebud and Fort Belknap.

333.   The 2014 Final Supplemental EIS identifies several sites within the territory of the Fort Belknap that will be damaged, destroyed, and desecrated by the Pipeline.

334.   At the same time, the State Department has failed to disclose all affected sites, has failed to properly identify land ownerships related to affected sites, has failed to provide acceptable mapping and detail of the Pipeline project, and has failed to fulfill the treaty responsibilities to the Tribes in a manner that would allow

for these resources to be protected and the Pipeline route altered to avoid adverse impacts before the decision was made.

335.   The 2014 Final Supplemental EIS spends more time analyzing the Pipeline's impacts on Canadian First Nations' treaty rights than it does on impacts to Native American treaty rights.

336.   The 2014 Final Supplemental EIS's failure to take a hard look at the Pipeline's impacts on the Tribes' treaty rights, territory, spirituality, water rights, and other resources despite its fiduciary duty to take them into consideration and ensure that they are not abrogated and infringed upon, renders its review of the impacts under the NEPA and the treaties inadequate.

337.   The 2014 Final Supplemental EIS also fails to analyze reasonable route alternatives identified in the scoping report that would avoid territories identified in the Fort Laramie Treaties.

338.   The 2014 Final Supplemental EIS also fails to take a hard look at the Pipeline's spill detection and prevention measures and fails to adequately analyze the impacts from a potential rupture and spill.

339.   The 2014 Final Supplemental EIS acknowledges that subsurface spills could go undetected by the spill detection system or by visual inspections.

340.   For example, the Pipeline's spill detection system will only detect a leak that is greater than the rate of 1.5-2% of the Pipeline's daily flow.

341.   The Pipeline is estimated to transport 850,000 barrels, or 35,700,000 gallons, of crude oil per day.

342.   The Pipeline's leak detection system would only identify a leak if more than 535,500 to 754,000 gallons of crude oil spilled per day.

343.   Thus, the spill detection system will not detect any spill that is 535,499 gallons of crude per day or less.

344.   However, the 2014 Final Supplemental EIS states that the spill detection system is able to detect large volume releases, which the State Department defines as spills greater than or equal to 1,000 barrels, or 42,000 gallons, per day.

345.   This definition of large volume releases is twelve to eighteen times smaller than what the Pipeline's own leak detection system can detect.

346.   The 2014 Final Supplemental EIS analyzes the impacts of a potential spill based on this large spill event scenario, which is greater than or equal to 1,000 barrels per day.

347.   Given that the Pipeline's leak detection system cannot detect a leak unless it is greater than 1.5-2% of the Pipeline's daily flow, and given that 1.5-2% of the daily flow would be at least twelve times to eighteen times larger than a "large" spill scenario, the 2014 Final Supplemental EIS is fundamentally flawed and fails to adequately analyze the potential impacts from inevitable ruptures and spills.

348.   These impacts include impacts to the human environment, such as to Rosebud and Fort Belknap communities, tribal lands, tribal water resources, historic properties, cultural and religious sites, hunting and fishing rights, and treaty rights and resources.

349.   Indeed, the 2017 rupture of the Keystone Pipeline resulted in the spill of 407,000 gallons of crude oil.

350.   The 2014 Final Supplemental EIS fails to take a hard look at the environmental impacts of the Pipeline. Therefore, the 2014 Final Supplemental EIS is inadequate and the decision to issue the 2019 Permit, based on the inadequate 2014 Final Supplemental EIS, violates  NEPA, the treaties, and the APA.

351.   NEPA also requires agencies to prepare supplements to either draft or final EISs if there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts. 40 C.F.R. § 1502.9(c)(1)(ii).

352.   There exists significant new climate change circumstances and information that is relevant to the Pipeline's environmental impacts and concerns. Thus, the State Department is required to supplement its 2014 Final Supplemental EIS to take into consideration this new information.

## IX.   The National Historic Preservation Act.

353.   Congress enacted the NHPA "to foster conditions under which our modern society and our historic property can exist in productive harmony and fulfill the social, economic, and other requirements of present and future generations." 54 U.S.C. § 300101(1).

354.   In relevant part, the NHPA requires that "the head of any Federal department or independent agency having authority to license any undertaking, . . . prior to the issuance of any license, shall take into account the effects of the undertaking on any historic property." 54 U.S.C. § 306108.

355.   Congress authorized the ACHP to "promulgate regulations as it considers necessary to govern the implementation of [Section 106] in its entirety." *Id.* § 304108(a). Pursuant to this authority, the ACHP has promulgated such regulations at 36 C.F.R. Part 800.

356.   The ACHP's regulations establish a four-step process that must be followed in order to satisfy Section 106 obligations.

357.   Federal agencies, including the State Department, must comply with the ACHP's regulations. *See Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 607 (9th Cir. 2010); *Muckleshoot Indian Tribe*, 117 F.3d at 805).

358.   First, the United States is required to "determine whether the proposed Federal action is an undertaking . . . and, if so, whether it is the type of activity that has the potential to cause effects on historic properties." 36 C.F.R. § 800.3(a).

359.   Second, the United States must identify historic properties within the undertaking's area of potential effects. *Id*. § 800.4.

360.   Third, federal agencies must assess the undertaking's effects on those historic properties. *Id*. § 800.5.

361.   Finally, federal agencies must seek to resolve any adverse effects through avoidance, minimization, or mitigation. *Id*. § 800.6.

362.   An "undertaking" is defined as any "project, activity, or program . . . requiring a Federal permit, license or approval." *Id*. § 800.16(y).

363.   A "historic property" is defined as "any prehistoric or historic district, site, building, structure, or object included on, or determined eligible for inclusion on, the National Register" of Historic Places ("National Register"). *Id*. § 800.16(l)(1); 54 U.S.C. § 300308.

364.   Historic properties include places "of traditional religious and cultural importance to an Indian tribe . . . that meet the National Register criteria." 36 C.F.R. § 800.16(l)(1); 54 U.S.C. § 320706(a).

365.   Throughout this process, federal agencies must consult with "any Indian tribe . . . that might attach religious and cultural significance to properties

within the area of potential effects," 36 C.F.R § 800.2(c)(2); 54 U.S.C. § 320706(b); *see also* UN Declaration, arts 18, 19, & 32; ACHP, *Section 106 and the U.N. Declaration of Rights of Indigenous Peoples: General Information and Guidance* (n.d.), *available at* https://www.achp.gov/sites/default/files/guidance/2018-07/Section106andtheUNDRIPGeneralInformationandGuidance.pdf.

366.   Federal agencies shall ensure that such consultation provides tribes "a reasonable opportunity to identity [their] concerns about historic properties, advise on the identification and evaluation of historic properties, . . . articulate [their] views on the undertaking's effects on such properties, and participate in the resolution of effects." 36 C.F.R. § 800.2(c)(2)(ii)(A).

367.   The ACHP defines consultation as "the process of seeking, discussing, and considering the views of other participants, and, where feasible, seeking agreement with them regarding matters arising in the section 106 process." *Id.* § 800.16(f).

368.   Federal agencies must "make a reasonable and good faith effort to carry out appropriate identification efforts" of historic properties during the Section 106 process. *Id*. § 800.4(b)(1). Only through adequate consultation can federal agencies "take the steps necessary to identify historic properties within the area of potential effects." *Id*. § 800.4(b).

369.   The failure of a federal agency to adhere to the procedures established by the ACHP's regulations renders any final issuance of a permit unlawful pursuant to the APA. *See Muckleshoot Indian Tribe*, 177 F.3d at 815; 5 U.S.C. §§ 706(1), 706(2)(A), (C) & (D).

370.   The United States' failure to comply with the minimum standards of the NHPA violates the 1851 Fort Laramie Treaty and 1855 Lame Bull Treaty.

371.   The construction, connection, operation, and maintenance of the Pipeline is an undertaking that has the potential to effect historic properties.

372.   President Trump and the Agency Defendants violated the NHPA and its implementing regulations by failing to initiate the Section 106 process, including Section 106 consultation with the Tribes, when President Trump issued the 2019 Permit.

373.   The State Department also violated the NHPA by failing to initiate the Section 106 process, including consultation with the Tribes, when it received, reviewed, and approved TransCanada's third permit application.

374.   The State Department also violated the NHPA by failing to conduct adequate consultation with the Tribes when it received, reviewed, and denied TransCanada's first two permit applications. Inadequate consultation meant that the State Department failed to make reasonable and good faith efforts to identify historic properties, failed to assess adverse effects, and failed to resolve those adverse effects.

375. During the first two Section 106 processes, the State Department's identification efforts were not appropriate for identifying properties of traditional religious and cultural significance to the Tribes.

376. For example, the State Department's efforts to identify and evaluate historic properties, in particular properties of traditional religious and significance to the Tribes and traditional cultural properties, were inadequate.

377. The State Department's failure to make a reasonable and good faith effort to identify such historic properties was compounded by its failure to adequately consult with the Tribes.

378. The State Department's consultation with the Tribes did not seek, discuss, and consider the views, issues, or concerns of the Tribes, nor did the Department attempt, where feasible, to seek agreement with the Tribes. Instead, the State Department ignored the comments and concerns of the Tribes and implemented their pre-existing plan.

379. The 2019 Permit is unlawful and violates the 1851 Fort Laramie Treaty and the 1855 Lame Bull Treaty because its issuance did not meet the minimum fiduciary standard Federal Defendants owe the Tribes established by Section 106 of the NHPA.

## FIRST CLAIM FOR RELIEF

### Breach of 1851 Fort Laramie Treaty and 1855 Lame Bull Treaty
### U.S. Const. art. VI, cl. 2

**(All Plaintiffs against Federal Defendants)**

380. Plaintiffs re-allege and reincorporate by reference all the allegations set forth in this Amended Complaint as if set forth in full here.

381. Pursuant to the 1851 Fort Laramie Treaty and 1855 Lame Bull Treaty, the United States has an obligation to protect Rosebud and Fort Belknap from all depredations, which includes protecting their treaty rights, natural resources, land, water, and cultural places and objects from waste.

382. In issuing the 2019 Permit, President Trump and the Agency Defendants have failed to properly protect, shield, or defend Rosebud and Fort Belknap from the environmental consequences of the Pipeline by approving the Pipeline through Rosebud territory, and by failing to properly analyze the impact the Pipeline will have on the Tribes' treaty rights, territory, people, natural resources, spirituality, land, water and water rights, and cultural places and objects.

383. In issuing the 2019 Permit, President Trump and the Agency Defendants have failed to properly protect, shield, or defend Rosebud surface and mineral estates from the Pipeline by failing to properly analyze the route of the Pipeline to determine whether it crosses Rosebud surface and mineral estates.

384. In issuing the 2019 Permit, President Trump and the Agency Defendants have failed to properly protect, shield, or defend Rosebud's water system by failing to properly analyze the impact of the Pipeline on the system.

385.   As a result, the 2019 Permit is *ultra vires*, unlawful, and subject to non-statutory review as to the President.

386.   As a result, the 2019 Permit, which incorporates the earlier permit applications and relies on the same EIS, violates the APA as to the Agency Defendants.

387.   The Court must hold unlawful and set aside the 2019 Permit because of President Trump and the Agency Defendants' treaty violations.

388.   The Court must require President Trump and the Agency Defendants to properly undertake their treaty obligations to Rosebud and Fort Belknap by re-routing the Pipeline to avoid their territory and any direct and indirect impacts to their rights and resources, and then, at a bare minimum, to undertake an environmental study, or other analysis, before TransCanada can be permitted to construct the Pipeline.

389.   The Court must require President Trump and the Agency Defendants to properly protect Rosebud and Fort Belknap from all depredations, which includes protecting their treaty rights, natural resources, land, water, and cultural places and objects from waste.

390.   This Court must enjoin construction of the Pipeline until President Trump and the Agency Defendants comply with all relevant laws.

## SECOND CLAIM FOR RELIEF

**U.S. Const. art 1, § 1; U.S. Const. art. 1, § 8, cl. 3**
**(All Plaintiffs against President Trump)**

391.   Plaintiffs re-allege and reincorporate by reference all the allegations set forth in this Amended Complaint as if set forth in full here.

392.   Article 1, Section 1 of the Constitution provides: "All legislative Powers herein granted shall be vested in a Congress of the United States."

393.   Article 1, Section 8 of the Constitution provides: "Congress shall have the Power . . . To regulate Commerce with foreign Nations."

394.   The President my therefore only regulate or permit foreign commerce if Congress has authorized him to do so.

395.   The regulation and permitting of crude oil pipelines and the import of crude oil "operates will within the sphere of the foreign commerce clause." *Brown*, 850 F. Supp. at 827; *see Ohio Oil*, 234 U.S. at 560.

396.   As a result, President Trump's issuance of the 2019 Permit is *ultra vires*, unlawful, and subject to non-statutory review.

397.   The Court must therefore vacate the 2019 Permit and enjoin the construction of the Pipeline.

### THIRD CLAIM FOR RELIEF

**Breach of 1851 Fort Laramie Treaty and 1855 Lame Bull Treaty**
**U.S. Const. art. VI, cl. 2**
**(Failure to Meet the Standards set forth in NEPA)**
**(All Plaintiffs against Federal Defendants)**

398.   Plaintiffs re-allege and reincorporate by reference all the allegations set forth in this Amended Complaint as if set forth in full here.

399.   NEPA requires agencies to take a hard look at the impacts that major federal actions will have on the human environment.

400.   NEPA also requires agencies to prepare a supplement to its final environmental impact statement if there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts. 40 C.F.R. § 1502.9(c)(1)(ii).

401.   The 1851 Fort Laramie Treaty and 1855 Lame Bull Treaty requires that Federal Defendants undertake the NEPA process and take into consideration tribal treaty and other rights during that process. *Nw. Sea Farms*, 931 F. Supp. at 1520.

402.   NEPA established a minimum duty of care the United States owes Rosebud and Fort Belknap. The United States' failure to comply with the minimum standard of the NEPA violates the 1851 Fort Laramie Treaty and 1855 Lame Bull Treaty. *See Pit River Tribe*, 469 F.3d at 788.

403.   The 2014 Final Supplemental EIS fails to analyze the impacts or take into consideration the Fort Laramie Treaties, the Tribes' treaty rights and resources, and tribal law; fails to analyze the impacts on the Tribes' lands, spirituality, people, water rights, and other rights and resources; fails to adequately analyze the impacts of a potential spill because it is based on flawed assumptions regarding the size of

large spills and TransCanada's ability to detect them; fails to adequately analyze reasonable alternatives because it fails to consider route alternatives that avoid the Great Sioux Reservation, lands described in the Fort Laramie Treaties, and territories of the Tribes; fails to adequately analyze the impacts of the Pipeline's construction, operation, and maintenance on the health, safety, and welfare of the Tribes' members, particularly women and children.

404.   President Trump and the Agency Defendants failed to supplement the 2014 Final Supplemental EIS in light of significant new climate change circumstances and information relevant to the Pipeline's environmental impacts and concerns.

405.   President Trump and the Agency Defendants' failure to take a hard look at these issues and supplement the 2014 Final Supplemental EIS violates the 1851 Treaty of Fort Laramie, 1855 Lame Bull Treaty, and NEPA and its implementing regulations.

406.   As a result, the 2019 Permit is *ultra vires*, unlawful, and subject to non-statutory review as to the President.

407.   As a result, the 2019 Permit, which incorporates the earlier permit applications and relies on the same EIS, violates the APA as to the Agency Defendants.

408.    President Trump and the Agency Defendants have failed to comply with Tribal laws despite agreeing to comply with such laws.

409.    This Court must enjoin construction of the Pipeline until President Trump and the Agency Defendants have remedied their violations of the 1851 Fort Laramie Treaty and the 1855 Lame Bull Treaty by complying with the NEPA and tribal laws.

## FOURTH CLAIM FOR RELIEF

**Breach of 1851 Fort Laramie Treaty and 1855 Lame Bull Treaty
U.S. Const. art. VI, cl 2
(Failure to Meet the Standards set forth in NHPA)
(All Plaintiffs against Federal Defendants)**

410.    Plaintiffs re-allege and reincorporate by reference all the allegations set forth in this Amended Complaint as if set forth in full.

411.    Section 106 of NHPA requires agencies to take into account the effects of a proposed undertaking on any historic properties within the area of potential effects. 54 U.S.C. § 306108; 36 C.F.R. pt. 800.

412.    In order to fulfill this obligation, agencies must consult with any Indian tribes that may attach religious and cultural significance to historic properties within the area of potential effects. 54 U.S.C. § 320706(b); 36 C.F.R § 800.2(c)(2).

413.    The 1851 Fort Laramie Treaty and 1855 Lame Bull Treaty requires Federal Defendants to undertake the 106 process and take into consideration tribal treaty and other rights during that process. 36 C.F.R. § 800.2(c)(2)(ii)(B).

414.   NHPA established a minimum duty of care the United States owes to Rosebud and Fort Belknap. The United States' failure to comply with the minimum standard of the NHPA violates the 1851 Fort Laramie Treaty and 1855 Lame Bull Treaty. *See Pit River Tribe*, 469 F.3d at 788.

415.   President Trump and the Agency Defendants failed to initiate the Section 106 process before he issued the 2019 Permit. President Trump thereby failed to consult with the Tribes pursuant to its obligations under Section 106 the NHPA and its implementing regulations; failed to make a reasonable and good faith effort to identify historic properties; failed to evaluate adverse effects; and failed to resolve those adverse effects. *See* 36 C.F.R. §§ 800.2-800.6.

416.   President Trump and the Agency Defendants also failed to consult with the Tribes during the State Department's the reviews of all three of TransCanada's permit application. The Federal Defendants therefore failed to make a reasonable and good faith effort to identify historic properties; failed to evaluate adverse effects; and failed to resolve those adverse effects. *See* 36 C.F.R. §§ 800.2-800.6.

417.   President Trump and the Agency Defendants' failure to initiate the Section 106 process and consult with the Tribes violates the 1851 Treaty of Fort Laramie, 1855 Lame Bull Treaty, and the NHPA and its implementing regulations

418.   As a result, the 2019 Permit is *ultra vires*, unlawful, and subject to non-statutory review as to the President.

419.   As a result, the 2019 Permit, which incorporates the earlier permit applications and relies on the same EIS, violates the APA as to the Agency Defendants.

420.   This Court must enjoin construction of the Pipeline until President Trump and the Agency Defendants have remedied their violations of the 1851 Fort Laramie Treaty and the 1855 Lame Bull Treaty by complying with the NHPA.

## FIFTH CLAIM FOR RELIEF

### Breach of 1868 Fort Laramie Treaty
### U.S. Const. art. VI, cl. 2
### (Violations of Federal ROW and Mineral Statutes)
### (Plaintiff Rosebud against all Defendants)

421.   Plaintiffs re-allege and reincorporate by reference all the allegations set forth in this Amended Complaint as if set forth in full here.

422.   Articles 2 and 16 of the 1868 Treaty of Fort Laramie require anyone crossing, settling upon, or occupying Rosebud land to obtain Rosebud consent.

423.   Federal rights-of-way statutes provide that no rights-of-way over and across any lands belonging to Rosebud can be made without the proper consent of Rosebud. 25 U.S.C. § 324.

424.   TransCanada has not followed the process to obtain a federal rights-of-way across Rosebud surface and mineral estates nor obtained Rosebud's consent to build the Pipeline across its surface and mineral estates.

425.   President Trump and the Agency Defendants have failed to investigate TransCanada's compliance with the rights-of-way statutes or require TransCanada to obtain a federal right-of-way.

426.   Federal mineral statutes provide that no exploration, drilling, or mining operations are permitted on Rosebud lands before the Secretary has granted written approval of a mineral lease or permit. 25 C.F.R. § 211.48(a). The Secretary of Interior shall not approve a lease until the consent of Rosebud has been obtained. 25 C.F.R. §§ 211.20, 212.20.

427.   TransCanada has not followed the process to obtain a permit to explore, drill, or mine Rosebud's mineral estates.  TransCanada has not obtained Rosebud's consent to explore, drill, mine, or trespass into its mineral estates.

428.   President Trump, the Agency Defendants, and TransCanada have violated the 1868 Treaty of Fort Laramie, the federal right of way statutes, and the federal Indian mineral leasing statutes.

429.   As a result, the 2019 Permit is *ultra vires*, unlawful, and subject to non-statutory review as to the President.

430.   As a result, the 2019 Permit violates the APA as to the Agency Defendants.

431.   This Court must enjoin construction of the Pipeline until President Trump, the Agency Defendants, and TransCanada comply with the 1868 Fort Laramie Treaty and the federal rights-of-way and mineral statues.

## SIXTH CLAIM FOR RELIEF

### Tribal Jurisdiction and Exhaustion
### (All Plaintiffs against TransCanada)

432.   Plaintiffs re-allege and reincorporate by reference all the allegations set forth in this Amended Complaint as if set forth in full here.

433.   The Tribes' possess inherent sovereign powers, including the authority to exclude. *Water Wheel*, 642 F.3d at 808.

434.   From the Tribes' inherent sovereign powers flow lesser powers, including the power to regulate non-Indians on tribal land. *Id*. at 808-09; *see Window Rock*, 861 F.3d at 898.

435.   Rosebud and Fort Belknap have authority over non-Indians when the non-Indians have agreed to tribal jurisdiction or their conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of Rosebud and Fort Belknap. *Montana*, 450 U.S. at 565-66.

436.   Rights-of-way violations may be addressed by Rosebud and disputes may be resolved in Rosebud court. 25 C.F.R. §§ 169.402, 169.403.

437.   As a condition on the State Department's granting of the federal permit, "TransCanada Keystone Pipeline, L.P. has agreed to . . . follow all state, local, and

111

tribal laws and regulations with respect to the construction and operation of the proposed Project[.]" 2017 Decision, at 30.

438.   Should the Pipeline be built or spill once built, it may have catastrophic consequences on Rosebud water, land, spirituality, and people and threaten the overall health and welfare of Rosebud and its members.

439.   Rosebud has a Land Use, Environmental Protection, Utilities, and other relevant laws that govern the Pipeline, and Fort Belknap has Cultural Property Act and other relevant laws that govern the Pipeline. TransCanada has failed to follow these laws.

440.   Because Rosebud and Fort Belknap have jurisdiction over the Pipeline, TransCanada must address these issues in Rosebud and Fort Belknap fora. *Window Rock*, 861 F.3d at 906 (requiring exhaustion in tribal forum when tribal jurisdiction is at least colorable or plausible).

441.   This Court must enjoin construction of the Pipeline until TransCanada has complied with Rosebud and Fort Belknap laws because they have jurisdiction over TransCanada and the construction of the pipeline.

## SEVENTH CLAIM FOR RELIEF

**Breach of 1851 Treaty of Fort Laramie and 1855 Lame Bull Treaty
U.S. Const. art. VI, cl. 2
(Failure to Protect from Depredations as Mandated by Treaty)
(All Plaintiffs against Federal Defendants)**

442.   Plaintiffs re-allege and reincorporate by reference all the allegations set forth in this Amended Complaint as if set forth in full here.

443.   Pursuant to the 1851 Fort Laramie Treaty and the 1855 Lame Bull Treaty, the United States has an obligation to protect Rosebud and Fort Belknap from all depredations, which includes protecting their treaty rights, natural resources, land, water, and cultural places and objects from waste.

444.   In issuing the 2017 Permit, the Federal Defendants have failed to properly protect, shield, or defend Rosebud and Fort Belknap from the environmental consequences of the Pipeline by failing to property analyze the impact the Pipeline will have on their treaty rights, territory, people, natural resources, spiritually, land, water and water rights, and cultural places and objects.

445.   In issuing the 2017 Permit, the Federal Defendants have failed to properly protect, shield, or defend Rosebud surface and mineral estates from the Pipeline by failing to properly analyze the route of the Pipeline to determine whether it crosses Rosebud surface and mineral estates.

446.   In issuing the 2017 Permit, the Federal Defendants have failed to properly protect, shield, or defend Rosebud's water system by failing to properly analyze the impacts of the Pipeline on the system.

447.   As a result, the 2019 Permit is *ultra vires*, unlawful, and subject to non-statutory review as to the President.

448.   As a result, the 2019 Permit, which incorporates the earlier permit applications and relies on the same EIS, violates the APA as to the Agency Defendants.

449.   The Court must hold unlawful and set aside the 2019 Permit because of the Federal Defendants' treaty violations.

450.   The Court must require the Federal Defendants to properly protect Rosebud and Fort Belknap from all depredations, which includes re-routing the Pipeline to avoid their territory, and protecting their treaty rights, natural resources, land, water, and cultural places and objects from waste.

451.   This Court must enjoin the construction of the Pipeline until the Federal Defendants comply with all relevant laws.

## EIGHTH CLAIM FOR RELIEF

### U.S. Const. art. 1, § 1; U.S. Const. art. 1, § 8, cl. 3
### (All Plaintiffs against President Trump and State Department Defendants)

452.   Plaintiffs re-allege and reincorporate by reference all the allegations set forth in this Amended Complaint as if set forth in full here.

453.   Article 1, Section 1 of the Constitution provides: "All legislative Powers herein granted shall be vested in a Congress of the United States."

454.   Article 1, Section 8 of the Constitution provides: "Congress shall have the Power . . . To regulate Commerce with foreign Nation."

455.   The President my therefore only regulate or permit foreign commerce if Congress has authorized him to do so.

456.   The regulation and permitting of crude oil pipelines and the import such crude oil "operates will within the sphere of the foreign commerce clause." *Brown*, 850 F. Supp. at 827; *see Ohio Oil*, 234 U.S. at 560.

457.   As a result, the issuance of the 2017 Permit is *ultra vires*, unlawful, and subject to non-statutory review as to the President.

458.   As a result, the 2019 Permit, which incorporates the earlier permit applications and relies on the same EIS, violates the APA as to the State Department Defendants.

459.   The Court must therefore vacate the 2017 Permit and enjoin the construction of the Pipeline.

### NINTH CLAIM FOR RELIEF

**APA, 5 U.S.C. §§ 701-706**
**1851 Treaty of Fort Laramie; 1855 Lame Bull Treaty**
**(Failure to Support a Contrary Decision)**
**(All Plaintiffs against State Department Defendants)**

460.   Plaintiffs re-allege and reincorporate by reference all the allegations set forth in this Amended Complaint as if set forth in full here.

461.   The APA requires the Court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).

462.   For an agency's change in policy or reversal of a previous decision to comply with the APA, it must, *inter alia*, "provide good reasons for the new policy, which, if the new policy rests upon factual findings that contradict those which underlay its prior policy, must include a reasoned explanation for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Organized Vill. of Kake*, 795 F.3d at 966 (quotation marks, ellipses, and internal citations omitted).

463.   In issuing the 2017 Permit, the State Department ignored and countermanded its earlier factual findings and circumstances that underlay and were engendered to its 2015 Decision without providing a reasoned explanation. The State Department's 2017 Decision was made on the *exact same* record as its 2015 Decision; the State Department received no new information to support its contrary decision and factual findings.

464.   The State Department Defendants therefore violated the APA, the NEPA, the 1851 Treaty of Fort Laramie, and the 1855 Lame Bull Treaty. The Court must hold unlawful and set aside the 2017 Permit because its issuance was "arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with law." *Id.* § 706(2)(A).

## TENTH CLAIM FOR RELIEF

### NEPA, 42 U.S.C. §§ 4321 *et seq.*
**(Failure to take into consideration the treaties, the Tribes' treaty rights**

**and resources, and tribal law in EIS)**
**(All Plaintiffs against Agency Defendants)**

465.   Plaintiffs re-allege and reincorporate by reference all the allegations set forth in this Amended Complaint as if set forth in full here.

466.   NEPA requires agencies to take a hard look at the impacts that major federal actions will have on the human environment.

467.   The 1851 Fort Laramie Treaty, 1855 Lame Bull Treaty, and the federal trust responsibility requires that agencies take into consideration tribal treaty and other rights during the NEPA process. *Nw. Sea Farms*, 931 F. Supp. at 1520.

468.   The NEPA requires the federal agencies to prepare a supplement to its final environmental impact statement if there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts. 40 C.F.R. § 1502.9(c)(1)(ii).

469.   The 2014 Final Supplemental EIS fails to analyze the impacts or take into consideration the Fort Laramie Treaties, the Tribes' treaty rights and resources, and tribal law.

470.   The 2014 Final Supplemental EIS fails to analyze the impacts on the Tribes' lands, spirituality, people, water rights, and other rights and resources.

471.   The Final Supplemental EIS also fails to adequately analyze the impacts of a potential spill because it is based on flawed assumptions regarding the size of large spills and TransCanada's ability to detect them.

117

472.   The 2014 Final Supplemental EIS also failed to adequately analyze reasonable alternatives because it fails to consider route alternatives that avoid the Great Sioux Reservation, lands described in the Fort Laramie Treaties, and territories of the Tribes.

473.   The 2014 Final Supplemental EIS also failed to adequately analyze the impacts of the Pipeline's construction, operation, and maintenance on the health, safety, and welfare of the Tribes' members, particularly women and children.

474.   The State Department's failure to take a hard look at these issues in the Final Supplemental EIS violates the 1851 Treaty of Fort Laramie, 1855 Lame Bull Treaty, and the NEPA and its implementing regulations.

475.   The Agency Defendants have failed to comply with tribal laws despite agreeing to comply with such laws.

476.   There is significant new climate change circumstances and information that is relevant to the Pipeline's environmental impacts and concerns.  Therefore, the Agency Defendants' failure to supplement its EIS is "arbitrary, capricious, an abuse of discretion, [and] not in accordance with law," and "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (2)(D).

477.   The Agency Defendants are required to supplement its final EIS to take into consideration this climate change information.

478.   Therefore, the issuance of the 2017 Permit to TransCanada is "arbitrary, capricious, an abuse of discretion, [and] not in accordance with law," 5 U.S.C. § 706(2)(A), and "without observance of procedure required by law." *Id*. § 706(2)(D).

479.   This Court must enjoin construction of the Pipeline until the Agency Defendants have complied with the NEPA, the APA, and tribal laws.

**ELEVENTH CLAIM FOR RELIEF**

**NHPA, 54 U.S.C. §§ 300101 *et seq.*; 36 C.F.R. pt. 800
(Failure to take into consideration the Fort Laramie Treaties,
the Tribes' treaty rights and resources, and tribal law)
(All Plaintiffs against Agency Defendants)**

480.   Plaintiffs re-allege and reincorporate by reference all the allegations set forth in this Amended Complaint as if set forth in full.

481.   Section 106 of the NHPA requires agencies to take into account the effects of a proposed undertaking on any historic properties within the area of potential effects. 54 U.S.C. § 306108; 36 C.F.R. pt. 800.

482.   In order to fulfill this obligation, agencies must consult with any Indian tribes that may attach religious and cultural significance to historic properties within the area of potential effects. 54 U.S.C. § 320706(b); 36 C.F.R § 800.2(c)(2).

483.   The State Department failed to initiate the Section 106 process when the Department received and reviewed TransCanada's third permit application in 2017, thereby failing to consult with the Tribes pursuant to its obligations under Section 106 the NHPA and its implementing regulations; failing to make a

reasonable and good faith effort to identify historic properties; failing to evaluate adverse effects; and failing to resolve those adverse effects. *See* 36 C.F.R. §§ 800.2-800.6. This is a violation of the NHPA, the 1851 Treaty of Fort Laramie, and the 1855 Lame Bull Treaty.

484.    The State Department failed to adequately consult with the Tribes during the Section 106 processes initiated for TransCanada's first two permit applications in 2008 and 2012, thereby failing to make a reasonable and good faith effort to identify historic properties; failing to evaluate adverse effects; and failing to resolve those adverse effects. *See* 36 C.F.R. §§ 800.2-800.6. This is a violation of the NHPA, the 1851 Treaty of Fort Laramie, and the 1855 Lame Bull Treaty.

485.    The State Department therefore failed to make reasonable and good faith efforts to identify historic properties during the Section 106 processes initiated for TransCanada's first two permit applications in 2008 and 2012.

486.    Therefore, the issuance of the Permit to TransCanada is "arbitrary, capricious, an abuse of discretion, [and] not in accordance with law," 5 U.S.C. 706(2)(A), and "without observance of procedure required by law," *Id*. § 706(2)(D), and the Court must "compel agency action unlawfully withheld." *Id*. § 706(1).

## RELIEF REQUESTED

WHEREFORE, Plaintiffs request that the Court:

1.     Declare that the Federal Defendants violated Article 3 of the 1851 Treaty of Fort Laramie and Article 7 of the 1855 Lame Bull Treaty and that the Pipeline must be re-routed to avoid a depredation to the Tribes' permanent homelands;

2.     Declare that Defendant President Trump and State Department Defendants violated Article I, Sections 1 and 8 of the Constitution in issuing both the 2019 and 2017 Permits;

3.     Declare that all Defendants violated Article 16 of the 1868 Treaty of Fort Laramie, the federal right of way statutes, and the federal Indian mineral leasing statutes;

4.     Declare that Rosebud and Fort Belknap have jurisdiction over their territory, the Pipeline, and TransCanada, and that TransCanada must comply with Rosebud and Fort Belknap law and has failed to do so;

5.     Declare that the Federal Defendants violated Article 3 of the 1851 Treaty of Fort Laramie and Article 7 of the 1855 Lame Bull Treaty by failing to fulfill their minimum fiduciary duty to the Tribes by complying with the NEPA;

6.     Declare that Federal Defendants violated the NEPA, Article 3 of the 1851 Treaty of Fort Laramie, Article 7 of the Lame Bull Treaty, and the APA by failing to take a hard look in the 2014 Final Supplemental EIS at the Pipeline's impacts on the Tribes' treaty, environmental, spiritual, and other rights as described

herein; failing to take a hard look at the impacts from potential spills; failing to analyze reasonable alternatives; failing to supplement its climate analysis; and failing to comply with tribal law;

7.      Declare that Federal Defendants violated Article 3 of the 1851 Treaty of Fort Laramie and Article 7 of the 1855 Lame Bull Treaty by failing to fulfill their minimum fiduciary duty to the Tribes by complying with the NHPA;

8.      Declare that Federal Defendants violated the NHPA, Article 3 of the 1851 Treaty of Fort Laramie, Article 7 of the 1855 Lame Bull Treaty, and the APA, by failing to initiate the Section 106 process when the State Department issued the 2017 Permit and when President Trump issued the 2019 Permit and failed to adequately consult with the Tribes pursuant to Section 106 during the State Department's review of TransCanada's first two permit applications.

9.      Declare that the State Department Defendants violated the NEPA and the APA by failing to provide a reasoned explanation for why the 2017 Decision ignored, contradicted, and countermanded the factual findings, circumstances, and analyses that underlay its 2015 Decision;

10.      Issue injunctive relief rescinding, setting aside, and holding unlawful the 2019 Permit, requiring Federal Defendants to fully comply with the 1851 Fort Laramie Treaty, the 1855 Lame Bull Treaty, the 1868 Fort Laramie Treaty, tribal law, federal rights-of-way and mineral leasing statutes, the NEPA, and the NHPA, and

prohibiting any activity in furtherance of the construction, connection, operation, and maintenance of the Pipeline and related facilities;

11.     Issue injunctive relief rescinding, setting aside, and holding unlawful the 2017 Permit, requiring Federal Defendants to fully comply with the 1851 Fort Laramie Treaty, the 1855 Lame Bull Treaty, the 1868 Fort Laramie Treaty, tribal law, federal rights-of-way and mineral leasing statutes, the NEPA, and the NHPA, and prohibiting any activity in furtherance of the construction, connection, operation, and maintenance of the Pipeline and related facilities;

12.     Issue injunctive relief requiring TransCanada and Federal Defendants to comply with Rosebud and Fort Belknap law and prohibiting any activity in furtherance of the construction, connection, operation, and maintenance of the Pipeline and related facilities until they do so;

13.      Award Plaintiffs attorneys' fees and costs pursuant to 28 U.S.C. § 2412, 54 U.S.C. § 307105, and otherwise authorized by law; and

14.     Grant such other relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED this 23rd day of April, 2019

/s/ *Wesley James Furlong*
Natalie A. Landreth (*pro hac vice*)
Wesley James Furlong (MT Bar. No. 42771409)
NATIVE AMERICAN RIGHTS FUND

Matthew L. Campbell (*pro hac vice*)
K. Jerome Gottschalk (*pro had vice* pending)
NATIVE AMERICAN RIGHTS FUND

123

1506 Broadway
Boulder, CO 80302
Ph. (303) 447-8760
Fax (303) 443-7776
mcampbell@narf.org
jeronimo@narf.org

Daniel D. Lewerenz (*pro hac vice*)
NATIVE AMERICAN RIGHTS FUND
1514 P Street, N.W. (rear), Suite D
Washington, D.C. 20005
Ph. (202) 785-4166
Fax (202) 822-0068
lewerenz@narf.org

*Counsel for all Plaintiffs*

Daniel D. Belcourt (MT Bar No. 3914)
BELCOURT LAW P.C.
120 Woodworth Avenue
Missoula, MT 59801
Ph. (406) 265-0934
Fax (406) 926-1041
danbelcourt@aol.com

*Counsel for Plaintiff Fort Belknap Indian
Community*