Wesley James Furlong (MT Bar. No. 42771409)
NATIVE AMERICAN RIGHTS FUND
745 West 4th Ave, Suite 502
Anchorage, AK 99501
Ph. (907) 276-0680
Fax (907) 276-2466
wfurlong@narf.org

*Counsel for all Plaintiffs*
*Additional Counsel Listed on Signature Page*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| ROSEBUD SIOUX TRIBE and FORT BELKNAP INDIAN COMMUNITY, | Case No. 4:18-cv-00118-BMM |
| Plaintiffs, | |
| v. | **COMBINED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS** |
| DONALD J. TRUMP, in his official capacity; UNITED STATES DEPARTMENT OF STATE; MICHAEL R. POMPEO, in his official capacity; DAVID HALE, in his official capacity; UNITED STATES DEPARTMENT OF INTERIOR; DAVID L. BERNHARDT, in his official capacity; TC ENERGY CORPORATION; and TRANSCANADA KEYSTONE PIPELINE, LP, | |
| Defendants. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..........................................................................iv

INTRODUCTION ...................................................................................1

BACKGROUND ....................................................................................5

I.      The Tribes' Connections to Their Lands .........................................5

II.     The Tribes' Claims are Based on the Treaties ..................................6

III.    The 2019 Permit Authorized the Entire Pipeline, not Just the 1.2 Miles Near the Border Crossing ...............................................................7

IV.     The Pipeline Will Cross Rosebud's Reservation...............................8

STANDARDS OF REVIEW ....................................................................10

ARGUMENT .......................................................................................12

I.      The Tribes Have Standing ..........................................................12

        A.      President Trump Injured the Tribes by Effectively Abrogating the Treaties and Approving the Pipeline Through Their Lands...............13

        B.      President Trump's Action Endangers Tribal Territory, Sacred Lands, and Objects of Cultural and Historic Importance to the Tribes ..........14

        C.      The Tribes Have Suffered Procedural Harm .......................................16

        D.      Redressability .................................................................................16

II.     The Tribes Have Non-Statutory Review Causes of Action Against the President and the Other Federal Defendants Because Issuance of the 2019 Permit Was Either Unconstitutional or *Ultra Vires* .......................................16

        A.      The President's Issuance of the 2019 Permit Was *Ultra Vires*, Because It *De Facto* Abrogates the Tribes' Treaty Rights, Something He Has No Authority to Do .................................................................................18

                1.      Only Congress Can Abrogate an Indian Treaty .......................18

2.    In Issuing the 2019 Permit The President Acted Outside His Authority by Violating the Tribes' Treaty Right to Protection from Depredation .......................................................................18

    a.    History, Purpose, and Negotiation of the Treaties..........20

    b.    Language of the 1851 Fort Laramie and 1855 Lame Bull Treaties..................................................................................24

    c.    To Protect the Tribes, the United States must enjoin any Pipeline construction or right-of-way on the Tribes' lands without the Tribes' consent, and must, at a bare minimum, comply with NEPA and the NHPA .................................26

B.    The Issuance of the 2019 Permit Usurps Congress' Exclusive Authority Under the Foreign Commerce Clause to Control Crude Oil Pipelines ...............................................................................28

    1.    Congress Possesses the Exclusive and Plenary Constitutional Authority to Permit Cross-Border Crude Oil Pipelines............29

    2.    The President Lacks Inherent Authority to Permit the Pipeline.....................................................................................31

        a.    *Sisseton–Wahpeton Oyate*................................................31

        b.    *NRDC*................................................................................32

        c.    *Sierra Club*......................................................................39

        d.    *White Earth* ....................................................................40

        e.    Non-Pipeline Cases.........................................................41

    3.    Congress has not Acquiesced in the Issuance of the 2019 Permit ......................................................................................42

C.    The Court Should Issue a Declaratory Judgment That the Permit Is Null and Void and Enjoin TransCanada and Federal Officers from Proceeding with the Pipeline................................................................47

ii

III.    TransCanada Must Comply with Tribal Law ..................................................49

IV.    TransCanada Has Not Obtained Rosebud Consent .......................................53

      A.    Plaintiffs Have Stated a Claim Against TransCanada ........................53

            1.    Venue is Proper ..........................................................53

            2.    The Tribes' Fifth Claim Should not be Dismissed...................57

      B.    Plaintiffs Have Stated a Claim Against the Federal Defendants.........61

CONCLUSION .....................................................................................................63

CERTIFICATE OF COMPLIANCE ......................................................................66

CERTIFICATE OF SERVICE ...............................................................................67

# TABLE OF AUTHORITIES

## CASES

*Alaska v. Brown*, 850 F. Supp. 821 (D. Alaska 1994) .........................................30

*Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003) ................................................43

*Atl. Marine Const. Co. v. W. Dist. of Tex.*, 571 U.S. 49 (2013) ...........................54

*Barclays Bank PLC v. Franchise Tax Bd.*, 512 U.S. 298 (1994)............................29

*Bell v. Hood*, 327 U.S. 678 (1946)...........................................................................11

*Bennet Cnty. v. United States*, 394 F.2d 8 (8th Cir. 1968) ..................................50

*Brewer-Elliott Oil & Gas Co. v. United States*, 43 U.S. 60 (1922) .......................10

*Cataraha v. Elemental Prism, LLC*, No. CV-17-128-GF-BMM, 2018 WL 3448283 (D. Mont. July 17, 2018) ..................................................................................55

*Clinton v. City of New York*, 524 U.S. 417 (1998)..................................................47

*Clapper v. Amnesty Int'l USA*, 658 U.S. 398 (2013)..............................................14

*Crow Tribe of Indians v. United States,* 284 F.2d 361 (Ct. Cl. 1960) .......20, 21, 22

*Dames & Moore v. Regan*, 453 U.S. 654 (1981)...............................................43, 46

*Detroit Int'l Bridge Co. v. Can.*, 189 F. Supp. 3d 85 (D.D.C. 2016)..............36, 42

*E. Bay Sanctuary v. Trump*, ___ F.3d ___, 2019 WL 3337122 (9th Cir. July 25, 2019) .................................................................................................................29

*E. Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219 (9th Cir. 2018) ...............29

*Elk v. United States*, 87 Fed. Cl. 70 (Fed. Cl. 2009) ......................................19, 26

*Fed. Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99 (1960)...................1

*Franklin v. Massachusetts*, 505 U.S. 788 (1992)...................................................17

*Gatlin v. United States*, No. CV–15–92–H–BMM, 2015 WL 12780576 (D. Mont. Dec. 21, 2015) ..................................................................................................10

*Gonzalez v. Law Office of Allen Robert King*, 195 F. Supp. 3d 1118 (C.D. Cal. 2016) ................................................................................................................11

*Green Cty. Planning Bd. v. Fed. Power Comm'n*, 528 F.2d 38
    (2d Cir. 1975).........................................................................................41, 42

*Gros Ventre Tribe v. United States*, 469 F.3d 801 (2006) ...................................28

*Hawaii v. Trump*, 859 F.3d 741 (9th Cir 2017).....................................................48

*Herrera v. Wyoming*, 139 S. Ct. 1686 (2019)..................................................19, 62

*Indians of Fort Berthold Indian Reservation v. United States*, 71 Ct. Cl. 308 (Ct. Cl. 1930) ..............................................................................................................21

*Indigenous Envtl. Network v. U.S. Dep't of State*, 317 F. Supp. 3d 1118 (D. Mont. 2018) ...........................................................................................................7, 14

*Indigenous Envtl. Network v. U.S. Dep't of State*, No. CV–17–29–GF–BMM, 2017 WL 5632435 (D. Mont. Nov. 22, 2017)....................................................*passim*

*Indigenous Envtl. Network v. U.S. Dep't of State*, No. 18-36068 (9th Cir. Apr. 8, 2019) ................................................................................................................15

*In re Zappos.com, Inc.*, 888 F.3d 1020 (9th Cir. 2018).........................................14

*Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945)...............................................50

*In re. Application by TransCanada Keystone Pipeline*, HP09-001 (S.D. P.U.C. 2010) ................................................................................................................51

*Jones v. United States*, 846 F.3d 1343 (Fed. Cir. 2017) ...........................18, 19, 26

*Kaia Foods, Inc. v. Bellafiore*, 70 F. Supp. 3d 1178 (N.D. Cal. 2014) .................54

*King v. Russell*, 963 F.2d 1301 (9th Cir. 1992) .....................................................54

*Lac du Flambeau Band of Lake Super. Chippewa Indians v. Stop Treaty Abuse-Wis., Inc.*, 759 F. Supp. 1339 (W.D. Wis. 1991).....................................................57

*League of Conservation Voters v. Trump*, 303 F. Supp. 3d 985 (D. Alaska 2018) ...........................................................................................................17, 49

*Mashantucket Pequot Tribe v. Town of Ledyard*, 722 F.3d 457
(2d Cir. 2013) .............................................................................. 12, 13

*Medellin v. Texas*, 552 U.S. 491 (2008) ................................................ 43

*Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999) ...... 18, 27

*Montana v. United States*, 450 U.S. 544 (1981) ......................... 21, 50, 51

*Mont. Wilderness Ass'n v. U.S. Forest Serv.*, 496 F. Supp. 880
(D. Mont. 1980) ..................................................................................... 36

*Muckleshoot Indian Tribe v. Hall*, 698 F. Supp. 1504 (W.D. Wash. 1988) ... 13, 19

*Nance v. Envtl. Protection Agency*, 645 F.2d 701 (9th Cir. 1981) ...................... 63

*Nat. Res. Def. Council, Inc. v. U.S. Dep't of State*, 658 F. Supp. 2d 105
(D. D.C. 2009) ............................................................................... *passim*

*Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587 (D.C. Cir. 1974) .............. 48

*N. Arapaho Tribe v. LaCounte*, 215 F. Supp. 3d 987 (D. Mont. 2016) ............... 13

*Nw. Sea Farms, Inc. v. U.S. Army Corps of Eng'rs*, 931 F. Supp. 1515 (W.D.
Wash. 1996) ......................................................................................... 61, 63

*Phillips v. Rubin*, 76 F. Supp. 2d 1079 (D. Nev. 1999) ......................... 56

*Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768 (9th Cir. 2006) ..... 16, 27, 28, 48

*Price v. Akaka*, 3 F.3d 1220 (9th Cir. 1993) .......................................... 36

*Rincon Mushroom Corp. of Am. v. Mazzetti*, 490 Fed. App'x 11 (9th Cir.
2012) ..................................................................................................... 52

*Safe Air for Everyone v. Meyer*, 373 F.3d 1035 (9th Cir. 2004) ..................... 11

*Seminole Nation v. United States*, 316 U.S. 286 (1942) ............................. 63

*Serv. Women's Action Network v. Mattis*, 320 F. Supp. 3d 1082 (N.D. Cal. 2018)
....................................................................................................... 54, 57

*Sierra Club v. Clinton*, 689 F. Supp. 2d 1147 (D. Minn. 2010) .................. *passim*

vi

*Sisseton-Wahpeton Oyate v. U.S. Dep't of State*, 659 F. Supp. 2d 1071
(D.S.D. 2009)................................................................*passim*

*Susan B. Anthony List v. Dreihaus*, 573 U.S. 149 (2014) ....................................14

*Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996)........................................16, 17, 49

*Tawater v. Health Care Serv. Corp.*, CV 18-47-GF-BMM, 2018 WL 6310280
(D. Mont. Dec. 3, 2018) ............................................................12, 20

*Underberg v. Empl'rs Mut. Cas. Co.*, No. CV-15-112-BLG-CSO,
2016 WL 1466506 (D. Mont. Apr. 14, 2016) ............................................55, 56

*United States v. 12 200-Foot Reels of Super 8mm. Film*, 413 U.S. 123 (1973) .....30

*United States v. Clark*, 435 F.3d 1100 (9th Cir. 2009)....................................29, 38

*United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936) ....................32

*United States v. Eberhardt*, 789 F.2d 1354 (9th Cir. 1986)..................................63

*United States v. Jenks*, 22 F.3d 1513 (10th Cir. 1994) ..........................................58

*United States v. La Compagnie Francaise des Cables Telegraphiques*,
77 F. 495 (S.D.N.Y. 1896) ..........................................................41

*United States v. Lewis*, No. CR 05-07-H-CCL, 2018 WL 4775504
(D. Mont. Apr. 17, 2018) ..............................................................31

*United States v. Ohio Oil, Co.*, 235 U.S. 548 (1914)..............................................30

*United States v. Osage Wind, LLC*, 871 F.3d 1078 (10th Cir. 2017) ...................60

*United States v. Sioux Nation of Indians*, 448 U.S. 371 (1980). ............................5

*United States v. W. Union Tel. Co.*, 272 F. 893 (2d Cir. 1921) ................30, 34, 37

*United States v. W. Union Tel. Co.*, 272 F. 311 (S.D.N.Y. 1921) .............33, 34, 37

*United States v. Washington*, 853 F.3d 946 (9th Cir. 2017)..................................19

*U.S. Chamber of Commerce v. Reich*, 74 F. 3d 1322 (D. C. Cir. 1996)...........17, 48

*W. Org. of Res. Councils v. Bernhardt*, 362 F. Supp. 3d 900 (D. Mont. 2019)...16

*Wagner v. Summit Air Ambulance, LLC*, No. CR-17-57-BU-BMM,
2017 WL 4855391 (D. Mont. Oct. 26, 2017) ...................................................12

*Wash. State Dep't of Licensing v. Cougar Den, Inc.*, 139 S. Ct. 1000 (2019) .......18

*Water Wheel Camp Recreation Area, Inc. v. LaRance*, 642 F.3d 802
(9th Cir. 2011)...............................................................................49, 50

*White Earth Nation v. Kerry*, No. 14-4726 (MJD/LIB), 2015 WL 8483278
(D. Minn. Dec. 9, 2015) .............................................................40, 44

*Wildearth Guardians v. Chao*, No. CV-18-110-GF-BMM, 2019 WL 2232371
(D. Mont. May 23, 2019) .........................................................11, 12

*Window Rock Unified Sch. Dist. v. Reeves*, 861 F.3d 894 (9th Cir. 2017) .....49, 53

*Winters v. United States*, 207 U.S. 564 (1908) .........................................52

*Yankton Sioux Tribe v. Podhradsky*, 606 F.3d 994 (8th Cir. 2010) .......................9

*Youngstown Sheet & Tube v. Sawyer*, 343 U.S. 579 (1952)...........................*passim*

*Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076 (2015) ........................32, 33

## CONSTITUTION

U.S. Const. art. I.......................................................................29

U.S. Const. art. VI................................................................1, 6, 18

## TREATIES AND STATUTES

Treaty of Fort Laramie with Sioux, 11 Stat. 749, 1851 WL 7655 (1851) ..*passim*

Treaty with the Blackfeet, 11 Stat. 657 (1855).............................................*passim*

Treaty with the Sioux, 15 Stat. 635 (1868) .................................2, 8, 50

15 U.S.C. § 793(d) ...............................................................................42

18 U.S.C. § 1151(a) ...............................................................................9

25 U.S.C. § 232-24 ........................................................................27

25 U.S.C. § 396d ............................................................................27

28 U.S.C. § 1391(b) .......................................................................54

28 U.S.C. § 1391(c) ........................................................................54

28 U.S.C. § 1391(e) ..................................................................53, 54

33 U.S.C. § 535 ..............................................................................36

47 U.S.C. §§ 34-35 .........................................................................34

Act of Mar. 2, 1889, 25 Stat. 888 (1889) .......................................8

Administrative Procedure Act, 5 U.S.C. §§ 701-06..........................27

Kellogg Act, 47 U.S.C. §§ 34-35 (1921) ...................................*passim*

National Environmental Policy Act, 42 U.S.C. §§ 4321-47..............27

National Historic Preservation Act, 54 U.S.C. § 306108 .................27

Natural Gas Act, 15 U.S.C. § 171....................................................39

Temporary Payroll Tax Cut Continuation Act, 125 Stat. 1280 (2011) ..........45

## REGULATIONS AND RULES

25 C.F.R. § 169.403 ..................................................................50, 51

Fed. R. Civ. P. 12(b) .............................................................11, 12, 53

Fed. R. Civ. P. 12(h)......................................................................

## EXECUTIVE MATERIALS

22 U.S. Op. Att'y Gen. 13 (1898)...........................................15, 37, 39

22 U.S. Op. Att'y Gen. 408 (1899)..................................................37

22 U.S. Op. Att'y Gen. 514 (1899)..................................................37

24 U.S. Op. Att'y Gen. 100 (1902)..............................................37, 38

30 U.S. Op. Att'y Gen. 217 (1913)....................................................................38, 41

38 U.S. Op. Att'y Gen. 163 (1935)...........................................................................38

Executive Order No. 11,423, 33 Fed. Reg. 11,741 (Aug. 20, 1968).................44

Executive Order No. 13,337, 69 Fed. Reg. 25,299 (Apr. 30, 2004)...................44

Executive Order No. 13,867, 84 Fed. Reg. 15,491 (Apr. 10, 2019)..................46

Presidential Memorandum, 82 Fed. Reg. 8,663 (Jan. 24, 2017).......................45

Presidential Permit, 84 Fed. Reg. 13,101 (Apr. 3, 2019) ...........................*passim*

## OTHER AUTHORITIES

2 John Bassett Moore, *A Digest of International Law* (1906)..............................35

4 Green Haywood Hackworth, *Digest of International Law*, § 350, 247-66
    (1942) .........................................................................................................33, 34, 35

*A Dictionary of the English Language* (7th ed. 1850) ...........................................25

Adam B. Chambers, *Letters from the Editor: Treaty Ground near Ft. Laramie,
    1851*, St. Louis Missouri Republican, Oct. 26, 1851 .....................................22

*An American Dictionary of the English Language* (1857) .....................................25

*Business Services*, Mont. Sec'y of State, http://sosmt.gov/business/...........55

Burton S. Hill, *The Great Indian Treaty Council of 1851*, 47 Neb. St. Hist. Soc'y
    85 (1966) ...........................................................................................................22

Craig Howe, *Homelands: Oceti Sakowin Nation*, Native Knowledge 360◦,
    Smithsonian,   https://americanindian.si.edu/nk360/plains-belonging-
    homelands/oceti-sakowin.cshtml   (last   visited   July   22,   2019).
    https://americanindian.si.edu/nk360/plains-belonging-
    homelands/oceti-sakowin.cshtml..................................................................5

Deb Holland, *Pre-construction Work Continues for South Dakota Pipeline*,
    Brookings          Register          (July          1,          2019),
    https://brookingsregister.com/article/pre-construction-work-
    continues-for-south-dakota-Pipeline ...........................................................15

Dep't of Interior, Annual Report of the Commissioner of Indian Affairs (1850) ............................................................................................................21

Dep't of State, Record of Decision and National Interest Determination: TransCanada Keystone Pipeline, L.P. Application for Presidential Permit, Keystone XL Pipeline, at 30 (Mar. 23, 2017) (emphasis added) https://www.state.gov/wp-content/uploads/2019/02/Record-of-Decision-and-National-Interest-Determination.pdf...................................51

*History*, Fort Belknap Indian Community, https://ftbelknap.org/history (last visited July 22, 2019) ...............................................................................5

Leroy R. Hafen & Francis M. Young, *Fort Laramie and the Pageant of the West*, 1834-1890 (1938) ........................................................................................22, 23

Memorandum from U.S. Dep't of Interior Solicitor to Secretary on Reaffirmation of the United States' Unique Trust Relationship with Indian Tribes and Related Indian Law Principles, No. M-37045 (Jan. 18, 2017) ....................................................................................................................62

"Great nations, like great men, should keep their word."
*Fed. Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 142
(1960) (Black, J., dissenting).

## INTRODUCTION

More than 150 years ago, on September 17, 1851, eight tribal nations gathered on foothills of the east side of the Rocky Mountains at an old fur trade fort situated at the confluence of the Laramie and North Platte Rivers in what is now the State of Wyoming. The Cheyenne, Sioux, Arapaho, Crow, Assiniboine, Mandan, Hidatsa and Arikara Nations were there to negotiate a compromise: in exchange for guaranteeing the safe passage for emigrants crossing the Oregon Trail, the eight Nations asked the United States to ensure that those emigrants would not lay waste to the resources along the way. The emigrants had been crossing through territory that belonged to these Nations and were destroying the tall grass, taking and then polluting the water in the rivers, and hunting whatever game was available. A deal was struck to protect the Nations from "depredations" caused by outsiders and prevent outsiders' intrusion onto their lands. That deal remains enshrined in the Treaty of Fort Laramie with Sioux, 11 Stat. 749, 1851 WL 7655 (1851) ("1851 Fort Laramie Treaty"), now the "supreme Law of the Land."  U.S. Const. art. VI, § 2. In this treaty, the United States took upon

1

itself a solemn obligation to protect Indian lands and natural resources. The United States again accepted this responsibility in the Treaty with the Blackfeet. 11 Stat. 657 (1855) ("1855 Lame Bull Treaty").

In 1868, Lt. Gen. William Tecumseh Sherman and a number of his officers, collectively called "Peace Commissioners," went back to Fort Laramie. This time the problem was not a trail of emigrants but the Transcontinental Railroad. Sherman and his Commissioners met with three bands of the Great Sioux Nation and they entered into a new treaty. Treaty with the Sioux, 15 Stat. 635 (1868) ("1868 Fort Laramie Treaty").  The Sioux agreed not to interfere with the construction of the railroad through their lands or any settlements; the United States formally agreed, among other things, to keep outsiders off Sioux territory.

This case is about enforcing these Treaties.[1] The ancestors of the Plaintiffs Rosebud Sioux Tribe ("Rosebud") and Fort Belknap Indian Community ("Fort Belknap") (together "the Tribes") gave up enormous swaths of land they owned and controlled in order to protect their descendants from exactly the situation they face today: a modern wagon

---

[1] Herein, the 1851 Fort Laramie Treaty, the 1855 Lame Bull Treaty, and the 1868 Fort Laramie Treaty are collectively referred to as "the Treaties."

train — the Keystone XL Pipeline ("the Pipeline") — from crossing their lands, and destroying their water and cultural and natural resources along the way. The Tribes are now invoking their sacred inheritance.

Rather than honoring these legally binding obligations, the current Administration has chosen to blatantly violate them. In so doing, Defendants are also engaging in obvious gamesmanship in order to evade this Court's prior rulings. When this Court ruled that the State Department had violated federal statutes, the President simply purported to revoke the 2017 Permit and then issue a new permit under his own office. Presidential Permit, 84 Fed. Reg. 13,101 (Apr. 3, 2019) ("2019 Permit").  The intent is plain: when the President issues a permit, federal laws do not apply. But no President is above all law, and not even the President may violate a treaty.

To be sure, several claims in the Tribes' Amended Complaint, Dkt. 58, are no longer viable. Therefore, the Tribe's concede that their Eighth through Eleventh Claims for Relief, *Id*. ¶¶ 452-486, may now be dismissed as moot. They were specific to the 2017 Permit that has now deliberately been removed from the equation. The Tribes do not concede that the State Department Defendants can be dismissed. The case is now about what remains: the Treaties and the rights of the Tribes themselves.

3

Defendants set forth a series of arguments, some of which this Court has already ruled upon, and none of which pass muster. At this stage, the Court must accept as true the facts alleged in the Amended Complaint. Those facts show that the Tribes clearly have standing because the Pipeline would cross their lands (surface and mineral estates), their sacred sites and ceremonial grounds, and would threaten their only water supply with 35,700,000 gallons of tar sands crude every day. Defendants miscast the Plaintiffs' treaty claims as statutory claims, but it is the Treaties themselves that are the true authority, the "supreme Law of the Land," with the statutes merely providing a specific duty of care. Defendants then grasp for an unprecedented expansion of Presidential power beyond his actual Article II authority. The Constitution vests exclusive power over foreign commerce in Congress, not the President. Defendants assert other procedural claims such as improper venue, and misunderstand the nature of Indian lands. Each will be addressed in turn, but at its core, this case is about one thing: the Treaties. The United States must answer to the Tribes for violations of these Treaties and be instructed to honor them.

## BACKGROUND

I.   **The Tribes' Connections to Their Lands.**

The Tribes maintain historical, cultural, governmental, traditional, and spiritual ties to the regions that the Pipeline will cross. Their connections to these regions were documented over 150 years ago in treaties with the United States. But their connections to these regions stretch back much farther.

For example, the creation story for Rosebud and the Oceti Sakowin tells of the people emerging from the Black Hills in South Dakota. Craig Howe, *Homelands: Oceti Sakowin Nation*, Native Knowledge 360◦, Smithsonian, https://americanindian.si.edu/nk360/plains-belonging-homelands/oceti-sakowin.cshtml (last visited July 22, 2019). https://americanindian.si.edu/nk360/plains-belonging-homelands/oceti-sakowin.cshtml. The Black Hills, which are only a couple hundred miles from Rosebud, were once part of the Great Sioux Reservation established in the 1868 Fort Laramie Treaty. *United States v. Sioux Nation of Indians*, 448 U.S. 371, 374 (1980). The Gros Ventre and Assiniboine of Fort Belknap have a similar connection to their homeland. The Grose Ventre call themselves "AH-AH-NE-NIN" meaning the White Clay People. *History*, Fort Belknap

5

Indian Community, https://ftbelknap.org/history (last visited July 22, 2019). They believe that they were made from the White Clay that is found along the river bottoms in Fort Belknap territory. *Id.* The Tribes' connection to these lands is based on their histories and cultures, and it is clear the Pipeline will cross their territories. First Amend. Compl. ("Compl.") ¶¶ 87-97, 142-154 (Dkt. 58).

## II.     The Tribes' Claims are Based on the Treaties.

As sovereign nations, the Tribes' claims are grounded on treaty obligations undertaken by the United States in government-to-government negotiations. Defendants' assertions that the Tribes' claims are purely statutory is wrong. US at 14-17; TC at 17-18. The independent authority and substantive obligations imposed on the United States by the Treaties, as the "supreme Law of the Land," U.S. Const. art. VI, cl. 2, are informed by the United States' other statutory obligations. But the Treaties form the bases for those claims.

### III. The 2019 Permit Authorized the Entire Pipeline, not Just the 1.2 Miles Near the Border Crossing.

As before, Defendants assert that the 2019 Permit authorizes construction of the Pipeline only at the border.[2] U.S. Mem. in Supp. of Mot. to Dismiss, Dkt. 67 ("US") at 10; TransCanada's Mem. in Supp. of Mot. to Dismiss, Dkt. 65 ("TC") at 13. This erroneous premise underlies virtually every one of Defendants' arguments.

This Court has already found that the 2017 Permit applied to the entire Pipeline. It did so by referencing the 2012 and 2017 permit applications and the 2014 Final Supplemental Environmental Impact Statement for Keystone XL Project, (Jan. 2014) ("2014 EIS"), and because "[t]he entire pipeline remains interrelated," with construction of the downstream portions a "connected action" to the border facilities. *Indigenous Envtl. Network v. U.S. Dep't of State*, 317 F. Supp. 3d 1118, 1122-23 (D. Mont. 2018). Defendants offer no reason to analyze the 2019 Permit differently, and thus their argument again "proves unpersuasive." *Id.* at 1122.

---

[2] The Federal Defendants incorporate their entire arguments from the previous litigation on this issue. US at 2 n.1. As such, the Tribes incorporate this Court's previous ruling on this issue as well as the plaintiffs' arguments there.

Second, the 2019 Permit is clearly not limited to the border. The 2019 Permit defines "border facilities" to mean the 1.2 miles near the border, but does not limit construction to border facilities. 84 Fed. Reg. at 13,101. Instead, as before, it defines the scope of the permit by reference to the 2012 and 2017 permit applications, *id.* at 13,101-02, art. 1(2), and grants permission to construct, connect, operate and maintain Pipeline "facilities"—a term defined to encompass the entire Pipeline, including where it crosses tribal land. *Id*. at 13,101. Thus, the entire Pipeline must be analyzed pursuant to the treaties and the minimum standards of care the treaties require, as more fully discussed below.

## IV. The Pipeline will Cross Rosebud's Reservation.

Rosebud's reservation was created as a "permanent" homeland. 1868 Fort Laramie Treaty, art. 15, 15 Stat. 635 (noting their "permanent home"); Act of Mar. 2, 1889, 25 Stat. 888 § 2 (1889) (describing the reservation as "permanent"). Unlike other citizens of the United States, Rosebud's territory was meant to be their home forever.[3] Its sacred sites, ceremonial grounds, and connection to the territory make it a place it cannot simply leave. That

---

[3] This is true for Fort Belknap as well, but the Pipeline does not appear to cross Fort Belknap's reservation.

is one of the reasons the United States agreed to protect Rosebud and its natural resources from depredations. It is also one of the reasons Rosebud is deeply concerned about a Pipeline crossing its territory without its consent. If built, the Pipeline would transport up to 830,000 barrels (35,700,000 gallons) per day of heavy "tar sands," a highly toxic and carcinogenic crude oil. 2014 EIS at ES-1. Yet, neither the United States nor TransCanada has sought Rosebud's permission to place the Pipeline within its permanent homeland. Compl. ¶¶ 179-182.

TransCanada incorrectly asserts the Pipeline will not cross Rosebud's reservation. TC at 3, 15-16. Rosebud holds many types of land (including surface and mineral estates) that are still part of its reservation: contiguous trust lands in Todd County; allotments; and other trust lands in Tripp County. These lands are still part of its reservation as established in 1889. *See Yankton Sioux Tribe v. Podhradsky*, 606 F.3d 994, 1011 (8th Cir. 2010) (allotted lands are still part of the reservation and thus Indian Country pursuant to 18 U.S.C. § 1151(a)).[4] Furthermore, determining whether the surface and

---

[4] For purposes of Rosebud's jurisdiction, it does not matter whether its trust lands are "reservation" so long as they are Indian Country, which the trust lands here are. *Yankton Sioux Tribe*, 606 F.3d at 1006 (noting Tribes have jurisdiction over Indian Country, which includes allotments).

mineral estates the Pipeline crosses are held in trust for Rosebud is a federal question this Court can properly determine. *Brewer-Elliott Oil & Gas Co. v. United States*, 43 U.S. 60, 87 (1922).

There seems little dispute that the Pipeline would cross these lands. TransCanada submitted maps to the South Dakota Public Utilities Commission showing the Pipeline corridor crossing Rosebud surface and mineral estates, which are held in trust by the United States, and which are within the exterior boundaries of Rosebud's 1889 reservation. Compl. ¶¶ 166-178. The State Department maps likewise show the Pipeline corridor, access roads to be built or improved, and what appears to be the area of effect, crossing Rosebud surface and mineral estates held in trust. *Id*. ¶¶ 177-78. Therefore, protecting Rosebud from depredations and obtaining its consent is a necessary precondition for constructing the Pipeline.

### STANDARDS OF REVIEW

A Rule 12(b)(1) motion to dismiss for lack of jurisdiction may be either facial or factual. *Gatlin v. United States*, No. CV–15–92–H–BMM, 2015 WL 12780576, at *2 (D. Mont. Dec. 21, 2015) (citations omitted). Here, as before, Defendants really question whether the Tribes "have presented a cause of action." *Indigenous Envtl. Network v. U.S. Dep't of State*, No. CV–17–29–GF–

10

BMM, 2017 WL 5632435, at *3 (D. Mont. Nov. 22, 2017). Because of this, the Rule 12(b)(6) standard applies. *Id.*

"Jurisdictional dismissals in cases premised on federal-question jurisdiction are exceptional," and must satisfy *Bell v. Hood*, 327 U.S. 678 (1946). *Safe Air for Everyone v. Meyer,* 373 F.3d 1035, 1039 (9th Cir. 2004) (citation omitted). Under *Hood*, dismissal is only proper "where the alleged claim under the constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining federal jurisdiction or where such claim is wholly insubstantial and frivolous." 327 U.S. at 682-83; *Gonzalez v. Law Office of Allen Robert King*, 195 F. Supp. 3d 1118, 1124 (C.D. Cal. 2016).

Rule 12(b)(3) provides that a party may move to dismiss a case for "improper venue." A motion under this rule only authorizes dismissal when venue is "wrong" or "improper" in the forum in which it was brought. *Atl. Marine Const. Co. v W. Dist. of Texas*, 571 U.S. 49, 55–56 (2013).

When evaluating a Rule 12(b)(6) motion or a motion to dismiss for want of standing, the Court must take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party. *Wildearth Guardians v. Chao*, No. CV-18-110-GF-BMM, 2019 WL 2232371, at

11

*2 (D. Mont. May 23, 2019) (citation omitted); *Tawater v. Health Care Serv. Corp.*, No. CV 18-47-GF-BMM, 2018 WL 6310280, at *2 (D. Mont. Dec. 3, 2018) (citation omitted). Courts also presume that the general allegations in the complaint embrace those specific facts necessary to support the complaint. *Wildearth Guardians*, 2019 WL 2232371, at *2 (citation omitted). If the complaint plausibly states a claim for relief, it will survive a motion to dismiss. *Tawater*, 2018 WL 6310280, at *2. Federal courts generally view "with disfavor" Rule 12(b)(6) dismissals, and prefer that cases be tried on the proofs rather than the pleadings. *Id*. Such dismissals are "especially disfavored" where the plaintiff bases the complaint on "a novel legal theory that can best be assessed after factual development." *Wagner v. Summit Air Ambulance, LLC*, No. CR-17-57-BU-BMM, 2017 WL 4855391, at *2 (D. Mont. Oct. 26, 2017) (citation omitted).

## ARGUMENT

## I.  The Tribes Have Standing.

In analyzing standing, the Tribes are owed "special solicitude." *Mashantucket Pequot Tribe v. Town of Ledyard*, 722 F.3d 457, 463 (2d Cir. 2013) (citation omitted). By permitting the entire length of the Pipeline without the Tribes' consent and without complying with the treaty obligations to protect

12

the Tribes (as discussed below), the President has caused concrete injuries to the Tribes and created a substantial risk of future additional injuries. These injuries can be redressed by the Court by declaring the 2019 Permit unlawful, enjoining TransCanada from any construction, and enjoining the United States from implementing the 2019 Permit. Thus, the Tribes have standing. *See IEN*, 2017 WL 5632435, at *9 (setting forth the standing inquiry).

### A.   President Trump Injured the Tribes by Effectively Abrogating the Treaties and Approving the Pipeline Through Their Lands.

The Tribes have interests in protecting their treaty rights, in enforcing the United States' obligations to uphold those rights, and in tribal self-government. *Mashantucket Pequot Tribe*, 722 F.3d at 463; *Muckleshoot Indian Tribe v. Hall*, 698 F. Supp. 1504, 1510-11, 1516 (W.D. Wash. 1988) (United States has a duty to protect Indians' treaty rights); *cf. N. Arapaho Tribe v. LaCounte*, 215 F. Supp. 3d 987, 1000 (D. Mont. 2016) (harm to sovereignty is irreparable). Here, the approval of the Pipeline consistent with TransCanada's applications abrogates the treaty duty to protect the Tribes (as more fully discussed below) and harms Rosebud's ability to govern its lands. President Trump issued the 2019 Permit without seeking Rosebud's consent to cross Rosebud's lands as required by the Treaties and by federal

13

and tribal law, and this actual injury to tribal sovereignty has already occurred. Compl. ¶¶ 16, 149-154, 171-182. These injuries flow from the permit and TransCanada's application and are not speculative or conjectural.

**B.    President Trump's Action Endangers Tribal Territory, Sacred Lands, and Objects of Cultural and Historic Importance to the Tribes.**

For the purposes of standing, the Tribes must show merely "a 'substantial risk' that harm will occur." *Susan B. Anthony List v. Dreihaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 658 U.S. 398, 414 n.5 (2013); *In re Zappos.com, Inc.*, 888 F.3d 1020, 1026 (9th Cir. 2018). The Tribes' complaint, taken as true, shows there is a substantial risk that extensive harm will occur. Defendants do not challenge the existence of these injuries, but instead assert that the injuries do not flow from the 2019 Permit. As noted, this argument is unpersuasive. *IEN*, 317 F. Supp. 3d at 1122.

The harms for which the 2019 Permit creates a substantial risk include: the desecration and destruction of cultural, historic, and sacred sites, Compl. ¶¶ 97, 149-150; the endangerment of tribal members, especially women and children, *id.* ¶¶ 101-106; damage to hunting and fishing resources, as well as

the tribal health and economies associated with these activities, *id.* ¶ 118; the impairment of federally reserved tribal water rights and resources, *id.* ¶¶ 121-139; harm to tribal territory and natural resources in the inevitable event of Pipeline ruptures and spills, *id.* ¶¶ 140-141; and harm to the political integrity, economic stability, and health and welfare of the Tribes. *Id.* ¶¶ 86-154, 166-182.

TransCanada plans to assemble worker camps and pipe yards for the Pipeline as soon as possible, and plans an aggressive 2020 construction season. Appellants' Mot. to Dismiss at 15, *Indigenous Envtl. Network v. U.S. Dep't of State*, No. 18-36068 (9th Cir. Apr. 8, 2019) (Dkt. 35-1). Indeed, grading for road projects has already started,[5] and TransCanada's proposed road work crosses tribal land. Compl. ¶¶ 171-178. This means threats to tribal land, water, animals, cultural resources, and Rosebud's right to self-government are already materializing as pressing, non-speculative injuries, and certainly are a substantial risk.

---

[5] *See* Deb Holland, *Pre-construction Work Continues for South Dakota Pipeline*, Brookings Register (July 1, 2019), https://brookingsregister.com/article/pre-construction-work-continues-for-south-dakota-Pipeline.

### C.     The Tribes Have Suffered Procedural Harm.

To assess "procedural injury," the Court must determine whether the Treaties were established to protect Tribes' concrete interests, and whether the specific procedural violations alleged "actually harm, or present a material risk of harm to, such interests." *W. Org. of Res. Councils v. Bernhardt*, 362 F. Supp. 3d 900, 909 (D. Mont. 2019). Defendants, rightly, do not argue the Treaties were not created to protect the Tribes' concrete interests. And, as discussed below, the Treaties require the United States to comply with its minimum fiduciary duties. The procedural violations the Tribes allege (failure to prevent depredations and comply with minimum duties, etc.) present a material risk of harm to the Tribes' concrete interests sufficient for standing. *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 779 (9th Cir. 2006); Compl. ¶¶ 398-431.

### D.     Redressability

The Tribes address redressability below at Section II(C).

### II.    The Tribes Have Non-Statutory Review Causes of Action Against the President and the other Federal Defendants Because Issuance of the 2019 Permit Was Either Unconstitutional or *Ultra Vires*.

Sovereign immunity does not apply to suits alleging that an officer's actions were unconstitutional or beyond statutory authority. *Swan v. Clinton*,

100 F.3d 973, 981 (D.C. Cir. 1996); *League of Conservation Voters v. Trump* ("*LCV*"), 303 F. Supp. 3d 985, 993 (D. Alaska 2018). That is because "where the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions." *Swan,* 100 F.3d at 981 (citation omitted). Where *ultra vires* or unconstitutional action is involved, there is no sovereign immunity to be waived because it never attached in the first place. *U.S. Chamber of Commerce v. Reich*, 74 F. 3d 1322, 1329 (D.C. Cir. 1996); *LCV,* 303 F. Supp. 3d at 993.

The Defendants assert there is no waiver of sovereign immunity for claims against the President. Because the President's issuance of the 2019 Permit was *ultra vires* and unconstitutional, no waiver of sovereign immunity is necessary for the Tribes to bring causes of action against him or the Federal Defendants that act pursuant to the 2019 Permit.[6]

---

[6] The United States is correct in pointing out that under *Franklin v. Massachusetts*, 505 U.S. 788 (1992), the President is not covered by the APA. This is nevertheless irrelevant as the Tribes' are not bringing a claim under the APA against the President.

**A.     The President's Issuance of the 2019 Permit Was *Ultra Vires*, because It *De Facto* Abrogates the Tribes' Treaty Rights, Something He Has No Authority to Do.**

**1.     Only Congress Can Abrogate an Indian Treaty.**

The Supreme Court has made clear that only Congress can abrogate tribes' treaty rights. *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 203 (1999). The President cannot, even by executive order, abrogate a treaty right unless Congress has specifically empowered him to do so. *Id.* at 188-95. Defendants do not argue that any act of Congress abrogated either Tribes' treaty rights. Nor do the Treaties authorize the President to unilaterally abrogate the right to be protected against depredations and against unauthorized access to tribal lands.

**2.     In Issuing the 2019 Permit, the President Acted Outside His Authority by Violating the Tribes' Treaty Right to Protection from Depredations.**

Treaties are "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. In interpreting a treaty with a tribe, "courts must focus upon the historical context in which it was written and signed." *Wash. State Dep't of Licensing v. Cougar Den, Inc.*, 139 S. Ct. 1000, 1012 (2019); *see Jones v. United States*, 846 F.3d 1343, 1351 (Fed. Cir. 2017)). The Supreme Court has made clear that while courts should look to the parties' "choice of words," they should also

18

consider the "larger context that frames the Treaty," including its "history, purpose and negotiations." *Elk v. United States*, 87 Fed. Cl. 70, 79 (Fed. Cl. 2009) (citation omitted); *see United States v. Washington*, 853 F.3d 946, 963 (9th Cir. 2017).

It is well-settled that treaties are construed as "'they would naturally be understood by the Indians.'" *Herrera v. Wyoming*, 139 S. Ct. 1686, 1701 (2019) (citation omitted); *Washington*, 853 F.3d at 963. When courts determine the tribes' "understanding of written words," they "must be careful to avoid reasoning that holds strictly to our later-established understanding of those words." *Jones*, 846 F.3d at 1352. Due to the special relationship between the United States and the tribes, treaties "'must be interpreted in light of the parties' intentions, with any ambiguities resolved in favor of the Indians.'" *Herrera*, 139 S. Ct. at 1699 (citation omitted); *Elk*, 87 Fed. Cl. at 79 (citation omitted). Indeed, the "United States has a fiduciary duty and 'moral obligations of the highest responsibility and trust' to protect the Indians' treaty rights." *Muckleshoot Indian Tribe*, 698 F. Supp. at 1510-11, 1516 (citation omitted).

The 1851 Fort Laramie Treaty and the 1855 Lame Bull Treaty required the United States (including the President) to protect the Tribes' from

depredations.[7] That includes protecting their natural resources from waste. The President's approval of the Pipeline violated these treaties in two ways: by approving it through Rosebud's reservation (as depicted on TransCanada's maps and applications, and State Department's maps); and by approving it without complying with the minimum treaty standards of care.

The history, purpose, and negotiations of the treaties show that in entering into the treaty negotiations, the Tribes meant to: (1) protect their natural resources (water, grasslands, and game); and (2) keep people from crossing their lands. The approval of the Pipeline violates both of these provisions.

        **a.**        **History, Purpose, and Negotiation of the Treaties.[8]**

The discovery of gold in California in the late 1840s prompted a massive influx of emigrants through Indian Country. *Crow Tribe of Indians v.*

---

[7] The defendants characterize the Tribes' treaty claims as common law claims. US at 15. But, the Tribes' claims are based on the treaties. Compl. ¶¶ 379, 398-431.

[8] The Tribes' have set forth the factual history, purpose, and negotiations of the Treaties in their complaint. *See* Compl. ¶¶ 46-73. For purposes of this motion, that depiction is taken as true and construed in the light most favorable to the Tribes. *Tawater*, 2018 WL 6310280, at *2.

*United States,* 284 F.2d 361, 364-66 (Ct. Cl. 1960); *Indians of Ft. Berthold Indian Reservation v. United States,* 71 Ct. Cl. 308, 330 (Ct. Cl. 1930). This influx led to the destruction of timber, buffalo, and other natural resources tribes relied on for subsistence. *Crow Tribe,* 284 F.2d at 364-66. The United States was "anxious to make the way safe for the travelers." *Id.* at 365. The tribal nations looked "upon the intrusion of the large bodies of emigrants into their country, and particularly the consequent great destruction of buffalo, which is their almost sole reliance for subsistence, with great jealousy and discontent." *Id.* As Justice Blackmun described, the 1851 Fort Laramie Treaty "was precipitated by the depletion of game, timber, and forage by the constantly increasing number of settlers who crossed the lands of the Plains Indians on their way to California. Aggrieved by these *depredations*, the Indians had opposed that passage, sometimes by force." *Montana v. United States*, 450 U.S. 544, 571 (1981) (Blackmun, J., dissenting) (emphasis added).

The impetus for the 1851 Fort Laramie Treaty, from the United States' perspective, was to provide for peace and protection for western bound emigrants by, among other things, compensating the tribes for the destruction of their natural resources. Dep't of Interior, Annual Report of the Commissioner of Indian Affairs 16, 24 (1850) (Pls.' Ex. A); Burton S. Hill, *The*

21

*Great Indian Treaty Council of 1851*, 47 Neb. St. Hist. Soc'y 85, 98-99 (1966) (Pls.' Ex. B); Leroy R. Hafen & Francis M. Young, *Fort Laramie and the Pageant of the West, 1834-1890* 178, 187-88 (1938) (Pls.' Ex. C); *see Crow Tribe*, 151 Ct. Cl. at 287-88.

To tribal nations, the protection of their natural resources from waste was a central issue they wished to address in the 1851 Fort Laramie Treaty. Compl. ¶ 50. They were concerned about the vanishing buffalo, deer, and antelope, as well as the forage on which the wild game depended being rapidly depleted by non-Indians' livestock. *Id.* Keeping others from crossing their lands was a major concern.

Several tribal members attending the treaty council spoke to the disastrous impact of the emigrant trails through tribal lands. *Id*. ¶ 51. Big Yankton (Sioux), stated:

> Father, you tell us to behave ourselves on the roads and make peace. I am willing to shake hands and make peace with the whites and all the Indians. Your white people travel the roads and they have destroyed the grass, why do you not give them grass of their own. They have destroyed our grass and timber, and we can't hunt where we used to. . .

Adam B. Chambers, *Letters from the Editor: Treaty Ground near Ft. Laramie, 1851*, St. Louis Missouri Republican, Oct. 26, 1851 (Pls.' Ex. D). Some tribal

22

representatives specifically mentioned a need to protect their water. For example, Cut Nose, an Arapaho Chief, stated: "We have to live on these streams and in the hills, and I would be glad if the whites would pick out a place for themselves and not come into our grounds; but if they must pass through our country, they should give us game for what they drive off." Hafen & Young, *supra* at 190. In other words, do not come through our territory and destroy our natural resources and, if you do, compensate us for what you take or destroy.

Four years after the signing of the 1851 Fort Laramie Treaty, the United States government entered into the Lame Bull Treaty on October 17, 1855. The parties promised peaceful relations among the tribes, between the signatory tribes and other tribes, and between the tribes and the United States. *Id.* at art. 1, 2. Gros Ventre was a signatory to the 1855 Lame Bull Treaty. As with the 1851 Fort Laramie Treaty, Governor Isaac Stevens was charged with negotiating a peace between the tribes to secure safe passage for the railroad and white emigrants. Compl. ¶ 59. Ensuring peace and safe travel for the railroad, in the view of the government, rested on similar grounds as the 1851 Fort Laramie Treaty. *Id.* ¶ 60. One key provision of the 1855 Lame Bull Treaty was compensation for loss of game, grass, wood, and

23

other natural resources caused by non-Indian intrusion onto Indian lands. *Id.* ¶ 61.

The history, purpose, and negotiations of the treaties make it clear that the Tribes had two goals: (1) affirmatively protect our natural resources; and (2) and keep white settlers off their lands. The Pipeline is a modern day version of this westward expansion. TransCanada set a path through lands they are not entitled to waste and spoil, without regard to either Tribes' cultural, property, treaty rights, and resources. The United States has approved this depredation. The Tribes bargained against this very kind of violation over a hundred years ago and the United States' agreement to these terms was critical to the Tribes' approval.

### b. Language of the 1851 Fort Laramie and 1855 Lame Bull Treaties.

The Tribes' understanding and intent is reflected in the language of the Treaties. Article 3 of the 1851 Fort Laramie Treaty frames the government's affirmative obligation to protect tribal resources:

> [T]he United States bind themselves to protect the aforesaid Indian nations against the commission of *all depredations by the people of the said United States*, after the ratification of this treaty.

11 Stat. 749, 1851 WL 7655, art. 3 (emphasis added).

24

Article 7 of the 1855 Lame Bull Treaty provides:

> And the United States is hereby bound to protect said Indians against depredations and other unlawful acts which white men residing in or passing through their country may commit.

11. Stat. 657, art. 7.

Dictionaries contemporaneous with the signing of both treaties demonstrate that the term "depredation" had a broad scope: "a robbing, spoiling; voracity," "waste," and "the act of plundering; consumption; a taking away by any act of violence." *A Dictionary of the English Language*, 135 (7th ed. 1850) (Pls.' Ex. E); *An American Dictionary of the English Language*, 321 (1857) (Pls.' Ex. F) ("the act of plundering; a robbing; a pillaging or waste; consumption; a taking away by any act of violence. The sea often makes depredations on the land."). Common to the dictionary definitions is the notion of "waste."

Interpreting the term depredation in the context of Article 3 of the 1851 Fort Laramie Treaty clarifies its intended meaning and scope. The language in Article 3 is used expansively to include "*all* depredations[.]" 11 Stat. 749, 1851 WL 7655, art. 3 (emphasis added). In incorporating the word "all," the United States expressed a clear intent to take responsibility to protect against

25

any and all depredations inflicted on the tribes by "the people of the said United States." *Id*.

Owing to the special relationship between the United States and the tribes, "Indian treaties are to be interpreted liberally in favor of the Indians," with "any ambiguities . . . resolved in their favor." *Elk*, 87 Fed. Cl. at 78-79 (citation omitted); *see also Jones*, 846 F.3d at 1351. Interpreting Article 3 of the 1851 Fort Laramie Treaty and Article 7 of the 1855 Lame Bull Treaty in favor of the Tribes imports an obligation on the United States to protect the Tribes natural resources from "waste."

> **c.   To Protect the Tribes, the United States Must Enjoin any Pipeline Construction or Right-of-Way on the Tribes' Lands Without the Tribes' Consent, and must, at a Bare Minimum, Comply with NEPA and NHPA.**

Approving the Pipeline through Rosebud's territory (including its reservation as noted above) is itself a violation of the Treaties and the United States' obligation to protect the Tribes from depredations. At minimum, the President and the United States, to comply with the treaty obligation to protect Rosebud and Fort Belknap natural resources from waste, must comply with its minimum duty of care.

The Treaties are informed by the United States' other statutory obligations under the Administrative Procedure Act, 5 U.S.C. §§ 701-06 ("APA"), National Environmental Policy Act, 42 U.S.C. §§ 4321-4347 ("NEPA"), National Historic Preservation Act, 54 U.S.C. § 306108 ("NHPA"), and federal right-of-way and mineral statutes. 25 U.S.C. §§ 323-324, 396d. But, it is the Treaties that form the basis for those claims. The *substantive* provisions of the generally applicable statutes set forth the "minimum fiduciary duty." *Pit River Tribe*, 469 F.3d at 788. Defendants' attempt to circumvent this minimum duty by arguing that the technical requirements of the statutes do not apply here. US at 14-16 (APA, NEPA, and NHPA do not apply to President); TC at 17-18 (same). But, taken to its logical conclusion, Defendants' argument would allow the President to permit the polluting of the Tribes' water on their reservation with poisonous nuclear waste, or allow the revocation of hunting and fishing rights—all without violating the Treaties simply because some statutes may not apply to the President. The Courts have shown that this is not the law. *See Mille Lacs*, 526 U.S. 188-95 (President cannot violate treaty unless authorized by Congress to do so); *Pit River Tribe*, 469 F.3d at 788. That is why the *substantive* provisions of the generally applicable environmental statutes set the

27

minimum duty of care as required by the history, purpose, and language of the treaties.

*Gros Ventre Tribe v. United States*, 469 F.3d 801 (2006), is not to the contrary. There, the tribe sought a mandatory injunction to force the United States to manage property off the tribe's reservation. Here, the Tribes are seeking to maintain the status quo to protect the Tribes' treaty rights in the first instance. Unlike *Gros Ventre*, the Pipeline crosses reservation land and the United States has failed to comply with its minimum fiduciary duties. Compl. ¶¶ 166-178. And, as *Pit River* shows, whether the action is on or off the reservation, the minimum duties still apply. 469 F.3d at 772, 788 (noting the highlands were "not part of" the reservation and concluding the minimum duties were violated).

## B.   The Issuance of the 2019 Permit Usurps Congress' Exclusive and Plenary Power Under the Foreign Commerce Clause to Control Crude Pipelines.

"The President's power, if any, to [issue the 2019 Permit] must stem from either an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube v. Sawyer*, 343 U.S. 579, 585 (1952). Defendants argue that the issuance of the 2019 Permit is constitutional because (1) "the President's authority to issue the permit is rooted in his powers over foreign affairs and

28

as Commander in Chief" and (2) that "Congress has acquiesced to [his] long-standing practice" of issuing such permits. US at 24; TC at 22-22. To the contrary, the Constitution does not provide the President this inherent power, and Congress has not acquiesced in the issuance of the 2019 Permit.

### 1. Congress Possesses the Exclusive and Plenary Constitutional Power to Permit Cross-Border Crude Pipelines.

The importation and transportation of crude through pipelines from Canada into the United States is foreign commerce. The Constitution vests Congress with the "exclusive and plenary" power "[t]o regulate Commerce with foreign Nations." *United States v. Clark*, 435 F.3d 1100, 1109 (9th Cir. 2009) (citation omitted); U.S. Const. art I, § 8, cl. 3. Consequently, the President possesses no inherent constitutional power to regulate foreign commerce. *Barclays Bank PLC v. Franchise Tax Bd.*, 512 U.S. 298, 329 (1994) (citation omitted). Constituent to its power to regulate foreign commerce, "Congress is vested with the principal power to control the nation's borders." *E. Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1231 (9th Cir. 2018).[9]

---

[9] Withdrawn and superseded by *E. Bay Sanctuary v. Trump*, ___ F.3d ___, 2019 WL 3337122, at *1 (9th Cir. July 25, 2019), because it omitted the dissent. "The

The importation and transportation of crude through pipelines across the Nation's borders is quintessentially foreign commerce and therefore subject to the exclusive and plenary regulation of Congress. *See Alaska v. Brown*, 850 F. Supp. 821, 827 (D. Alaska 1994) (Congress's restriction of the export of crude oil transported through the Trans-Alaska Pipeline, a wholly *intrastate* pipeline, "operates well within the sphere of the foreign commerce clause"); *United States v. Ohio Oil, Co.*, 235 U.S. 548, 560 (1914) ("That the transportation [of crude oil through interstate Pipelines] is commerce among the states we think clear"); *accord United States v. 12 200-Foot Reels of Super 8mm. Film*, 413 U.S. 123, 126 (1973) (recognizing plenary power of Congress to regulate imports) (citation omitted)); *c.f. United States v. W. Union Tel. Co.* ("*W. Union II*"), 272 F. 893 (2d Cir. 1921), *rev'd as moot* 43 S. Ct. 91 (1922) (the power to permit or prohibit the landing of telegraph cables between foreign countries and America is in Congress).

The 2019 Permit approves the importation of crude (commerce), and therefore is subject to Congress's exclusive and plenary power over foreign

---

superseding order . . . includes the dissent and contains *no other changes*." *Id.* (emphasis added). The superseding opinion is not published as of filing, but is attached hereto as Plaintiffs' Exhibit H.

commerce. 2014 EIS at 1.3-1 (noting the "primary purpose" of the Pipeline is to transport crude oil from Canada to the gulf coast). The 2019 Permit was not a result of the President conducting foreign policy. Neither the Pipeline nor the 2019 Permit is a product of a bilateral agreement, treaty, or negotiation between the United States and Canada. It is therefore subject to Congress's exclusive and plenary power to regulate foreign commerce.

### 2.   The President Lacks Inherent Power to Permit the Pipeline.

None of the cases Defendants cite purporting to show that the President possesses inherent constitutional authority to issue the 2019 Permit constitutes binding precedent. *See United States v. Lewis*, No. CR 05-07-H-CCL, 2018 WL 4775504, at *1 (D. Mont. Apr. 17, 2018) (out-of-circuit district court cases are "neither binding precedent nor precedential"). Moreover, the conclusory nature and circular reasoning of these cases renders them unpersuasive.

### a.   *Sisseton-Wahpeton Oyate*

*Sisseton-Wahpeton Oyate v. United States Department of State*, 659 F. Supp. 2d 1071 (D.S.D. 2009), is inapplicable, as its central question was not whether the President had constitutional authority to issue a permit, but

whether issuing the permit was presidential or agency action. Moreover, *Sisseton-Wahpeton* misstates the holding of *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936), writing that the President has "*inherent* constitutional authority to act*" in the area of foreign affairs. *Sisseton-Wahpeton*, 659 F. Supp. 2d at 1078 n.5, 1081-82 (emphasis added). *Curtiss-Wright*, however, held "that *Congress may grant the President* substantial authority and discretion in the field of foreign affairs." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2089 (2015) (citing *Curtiss-Wright*, 299 U.S. at 315-29) (emphasis added). *Curtiss-Wright* does not support the conclusion that the President possesses *inherent* authority to issue permits for cross-border crude oil Pipelines.

### b.  *NRDC*

*Natural Resource Defense Council, Inc. v. United States Department of State* ("*NRDC*"), 658 F. Supp. 2d 105 (D. D.C. 2009), is equally problematic. The plaintiffs in *NRDC* did not challenge the constitutionality of the permit at issue. Nonetheless, the court's cited authorities do not support its conclusion about the President's inherent power.  As authority, the court cites to the United States' and TransCanada's briefs in support of their motions to dismiss. *Id.* (citing *NRDC*, No. 1:08-cv-01363-RJL (Dkts. 25, at 2-4; 26-1, at 11-

13)). These briefs cite authorities, many of which are cited by Defendants here, US at 3-4, that do not support the court's conclusion about the President's inherent power. Further, nearly all of the authorities cited pre-date the Supreme Court's holding in *Youngstown*, which established the modern "tripartite framework" by which courts must consider claims of presidential power. *Zivotofsky*, 135 U.S. at 2084.

Both briefs cite two international law digests, which were published prior to *Youngstown*, 343 U.S. 579, as documenting "the history of the issuance of Presidential Permits for border facilities." *See NRDC*, No. 1:08-cv-01363-RJL (Dkts. 25, at 3; 26-1 at 12). These digests, when examined closely, do not support the assertion that the President possesses inherent constitutional authority to permit cross-border pipelines.

The first digest discusses approving telegraph cables on the coast of the United States. *See* 4 Green Haywood Hackworth, *Digest of International Law*, § 350, 247-66 (1942); U.S. at 3 (Dkt. 67-1). The digest discusses at length *United States v. Western Union Telegraph Co.* ("*Western Union I*"), 272 F. 311 (S.D.N.Y. 1921) for support. *Id.* § 350, 249-51.

In *Western Union I*, the United States sought an injunction to prevent Western Union from landing a foreign telegraph cable without a license from

33

the State Department. Hackworth, *supra* § 350, 248-49. Central to the case was whether the President had inherent constitutional power to license and block the landing of the cable. *Western Union I*, 272 F. at 313. The court examined the President's foreign affairs and Commander in Chief powers, *id.* at 314-15; but weighed against Congress's commerce clause powers, the court found "the original power of the President" to license and block the cable "questionable." *Id*. at 318. While the court ultimately held that Congress had acquiesced in the President's practice of licensing such cables, *id.*, it denied the injunction, holding that Congress specifically approved this cable. *Id*. at 323.

On appeal, the Second Circuit affirmed Congress's exclusive and plenary power to regulate the landing of telegraph cables. *Western Union II*, 272 F. at 894. Together, these cases affirm *Congress*' inherent power to permit the landing of foreign cables; they do not support the conclusion that the President possesses inherent power to permit cross-border pipelines.

The digest also discusses the Kellogg Act, which Congress passed following *Western Union I* and *II*. Hackworth, *supra* § 360 251 (discussing 47 U.S.C. §§ 34-35). The Kellogg Act is a delegation of authority to the President.

The digest then details the subsequent history of licenses being issued pursuant to the Kellogg Act. *See* Hackworth, *supra* § 350, 252-56.

The second pre-*Youngstown* digest discusses a single Attorney General opinion from 1898 that concludes "'that the President has the power, *in the absence of legislative enactment*, to control the landing of foreign submarine cables.'" 2 John Bassett Moore, *A Digest of International Law*, § 227 (1906) (quoting 22 U.S. Op. Att'y Gen. 13 (1898)) (emphasis added) (Pls.' Ex. G). As discussed below, this Attorney General opinion concedes Congress' exclusive and plenary authority to regulate the landing of foreign cables.

The digests, and the authorities they discuss, do not support the conclusion that the President possesses *inherent* constitutional power to approve international telegraph cables, much less permit cross-border crude pipelines. Instead, they call into question the assertion that the President possesses this inherent power.

The *NRDC* briefs next incorrectly argue that two statutes evidence Congress's repeated affirmation of the President's broad authority to approve cross-border facilities. *See NRDC*, No. 1:08-cv-01363-RJL (Dkts. 25, at 3-4; 26-1, at 13 n.5). These statutes simply do not support this assertion. They argue that the Kellogg Act recognizes the President's inherent

35

authority. *NRDC*, No. 1:08-cv-01363-RJL (Dkt. 26-1, at 13 n.5). As noted, the Kellogg Act is a delegation of Congress's power. The briefs also argue that the International Bridge Act ("IBA") of 1972 recognizes the President's inherent authority. *NRDC*, No. 1:08-cv-01363-RJL (Dkt. 26-1, at 13 n.5). But again, the IBA is a congressional delegation: "*The consent of Congress is hereby granted* to the construction . . . of any bridge . . . which will connect the United States with any foreign county." 33 U.S.C. § 535) (emphasis added); *see Detroit Int'l Bridge Co. v. Can.*, 189 F. Supp. 3d 85, 97-98 (D.D.C. 2016) (recognizing that the IBA authorized the President to permit international bridges). Both the Kellogg Act and the IBA authorize the President to act within a specific sphere of foreign commerce. Neither statute supports the assertion that Congress has repeatedly affirmed the President's broad authority to permit cross-border facilities generally, and crude pipelines specifically.

The United States' *NRDC* brief also cites six Attorney General opinions for the proposition that President has the authority to permit cross-border facilities. *See NRDC*, No. 1:08-cv-01363-RJL (Dkt. 26-1, at 12-13). Attorney General opinions are not binding precedent, *See Mont. Wilderness Ass'n v. U.S. Forest Serv.*, 496 F. Supp. 880, 884 (D. Mont. 1980); *Price v. Akaka*, 3 F.3d

36

1220, 1225 (9th Cir. 1993). In addition, these Attorney General opinions do not support the conclusion that the President possesses inherent power to permit cross-border crude pipelines.

Three opinions, 22 U.S. Op. Att'y Gen. 514 (1899), 22 U.S. Op. Att'y Gen. 408 (1899), and 22 U.S. Op. Att'y Gen. 13 (1898), discuss the President's authority over foreign submarine telegraph cables. The opinions expressly recognize Congress's plenary authority to regulate such cables, but conclude that the President may regulate them in the absence of congressional action. *See* 22 U.S. Op. Atty. Gen. at 514 (the landing of foreign cables "is under the direct control of the Government, *to be exercised by Congress*, but in the absence of Congressional action to be regulated and controlled by the executive department of the Government" (emphasis added)); 22 U.S. Op. Atty. Gen. at 408-09; 22 U.S. Op. Atty. Gen. at 13. This conclusion about the President's power was explicitly rejected in *Youngstown*. 343 U.S. at 585-89. Furthermore, each of the opinions was written before *Western Union I* and *II*, and before the passage of the Kellogg Act.

One opinion, 24 U.S. Op. Att'y Gen. 100 (1902), concerns "conditions upon the operation of wireless telegraph systems which convey[] messages to or from the United States." *Id.* at 100. The opinion finds that "[s]uch

transmission is commerce." *Id.*; *id.* at 101. The opinion concludes that because the Constitution grants the federal government the power to regulate foreign commerce, the President possesses inherent power to regulate wireless telegraph systems. *Id.* This conclusion is contrary to *Youngstown*. *See also Clark*, 435 F.3d at 1109.

Another opinion, 30 U.S. Op. Att'y Gen. 217 (1913), concludes that the President may regulate the importation and exportation of electricity from and to Canada, "*in the absence of legislation by Congress.*" *Id.* at 222 (emphasis added). As discussed above, this opinion does not support the conclusion that the President possesses inherent power to permit crude pipelines and is out of step inconsistent with *Youngstown*.

The final opinion, 38 U.S. Op. Att'y Gen. 163 (1935), concerns whether the President can license the construction of a natural gas pipeline across the United States-Mexico border. The opinion concludes that the President can issue the license, but provides no analysis. *Id.* at 163-64. The opinion cites only the 1898 Attorney General opinion on the President's authority to license the landing of foreign cables. *See id.* at 164 (citing 22 U.S. Op. Atty.

Gen. 13, 27 (1898)). As discussed above, that opinion recognizes Congress's plenary power to regulate the landing of such cables.[10]

When closely examined, these Attorney General opinions do not support the asserted inherent power to permit cross-border facilities, and cross-border crude oil pipelines specifically. Rather, they recognize Congress' plenary authority and predate *Youngstown*.

*NRDC*'s authorities are unpersuasive and contradict the court's ultimate conclusion that the President possesses inherent power to permit cross-border crude pipelines.

### c.   *Sierra Club*

*Sierra Club v. Clinton*, 689 F. Supp. 2d 1147 (D. Minn. 2010), held that it "is well recognized" "that the President's authority to issue the border crossing permit comes by way of his constitutional authority over foreign affairs and authority as Commander and Chief." *Id*. at 1163. *Sierra Club* is the only case cited by Defendants in which the plaintiffs challenged the

---

[10] Three years after its publication, Congress passed the Natural Gas Act, which specifically authorized the President to license such natural gas pipelines. *See* 52 Stat. 821, § 1(b) (1938) (codified as amended at 15 U.S.C. § 171(b)).

constitutionality of a presidential permit and its holding is fundamentally flawed.

*Sierra Club* cites four Attorney General opinions and *NRDC* in support of its holding, all of which are discussed above. *Id.* *Sierra Club*'s holding is therefore just as problematic as *NRDC*'s. The court merely summarily dismisses the plaintiffs' arguments and cites the four Attorney General opinions and *NRDC* without analysis.

### d.   *White Earth*

Defendants next cite *White Earth Nation v. Kerry*, No. 14-4726 (MJD/LIB), 2015 WL 8483278 (D. Minn. Dec. 9, 2015), for the proposition that cross-border crude pipelines are "subject to the President's inherent constitutional authority concerning foreign affairs." *Id.* at *1. Significantly, the plaintiffs did not challenge the constitutionality of the permit at issue in *White Earth*. However, the court cites no authority for its conclusion about the President's inherent power. Insofar as the court relies on *NRDC* and *Sisseton-Wahpeton* to support its conclusion about the President's inherent power, that reliance is misplaced, as discussed above.

### e.     Non-Pipeline Cases

Defendants further claim that two other cases show that Congress has repeatedly affirmed the President's inherent power to permit cross-border facilities. Neither case supports Defendants' argument. First, *Green County Planning Board v. Federal Power Commission*, 528 F.2d 38 (2d Cir. 1975), concerns a Federal Power Commission ("FPC") permit to construct a transmission line across the United States-Canada border. While the court held that the power to permit the transmission line was "rooted in the President's power," its authorities are again problematic. *Id*. 46.

*Green County* relies on *United States v. La Compagnie Francaise des Cables Telegraphiques*. 77 F. 495 (S.D.N.Y. 1896). *La Compagnie* concerns the landing of foreign telegraph cables and directly refutes *Green County*'s holding, concluding: "it is certainly indisputable that [C]ongress has absolute authority over the subject." *Id*. at 495. *Green County* also cites two of the same Attorney Generally opinions discussed above, 30 U.S. Op. Atty. Gen. 217 and 22 U.S. Opp. Atty. Gen. 13. *Green County* is also distinguishable from this case, as the transmission line at issue was permitted following congressional legislation. While the FPC was considering the permit application for the transmission line, Congress passed the Energy Supply and Environmental

Coordination Act of 1975, directing the FPC to issue the permit. *Green Cnty.*, 528 F.2d at 42 (quoting 15 U.S.C. § 793(d)).

Finally, Defendants cite *Detroit International*, 189. F. Supp. 3d 85, which concerned a permit to construct an international bridge. There, the court rightly recognized that Congress possessed the exclusive and plenary power to permit cross-border bridges, *id.* at 93-96, and that Congress delegated to the President the authority to permit the bridge through the IBA. *Id.* at 96-99. Neither *Green County* nor *Detroit International* stand for the proposition that Congress has repeatedly affirmed the President's inherent power to permit cross-border crude oil pipelines.

Defendants' authorities are conclusory, circular, and unpersuasive, and actually show that the President lacks inherent authority over foreign commerce. They do not show that the President possesses inherent constitutional authority to issue the 2019 Permit.

### 3.    Congress has not Acquiesced in the Issuance of the 2019 Permit.

Defendants also argue that the President possesses the power to issue the 2019 Permit because Congress has acquiesced in the President's "long-standing practice" of issuing such permits. US at 24. They argue that because

Congress has not legislated in this field, it has acquiesced in the President's authority. Defendants, however, mischaracterize the law of congressional acquiescence and what "long-standing practice" Congress may have acquiesced in.

"Past practice does not, by itself, create power." *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981). However, "a systematic, *unbroken*, executive practice, *long pursued* to the knowledge of the Congress and never before questioned" may be upheld as constitutional. *Id*. (emphasis added, quotations and citation omitted); *Medellin v. Texas*, 552 U.S. 491, 532 (2008) (quoting *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 415 (2003) (presidential action must be "supported by a '*particularly longstanding* practice' of congressional acquiesce" (emphasis added)). Congress must have "acquiesced in th[e] *particular exercise* of Presidential authority." *Medellin*, 552 U.S. at 528 (emphasis added). Determining this "hinges on a consideration of all the circumstances which might shed light on the view of the Legislative Branch towards such action." *Dames & Moore*, 453 U.S. at 668-69.

Here, the President upended the established practice and issued the 2019 Permit unilaterally. For forty-nine years, from 1968 until 2017, permits

for crude pipelines across the Nation's borders were issued pursuant to the procedures and criteria established by two executive orders. In 1968, President Johnson issued Executive Order No. 11,423, 33 Fed. Reg. 11,741 (Aug. 20, 1968) ("EO 11423"). EO 11423 established the process by which the State Department receives, reviews, and issues or denies permits for cross-border crude oil Pipelines. *See id*. § 1(a)-(f); Compl. ¶¶ 276-280. This process remained unchanged for thirty-six years. In 2004, President Bush issued Executive Order No. 13,337, 69 Fed. Reg. 25,299 (Apr. 30, 2004) ("EO 13337"). EO 13337 largely affirmed the procedure established by EO 11423 and only slightly modifying the process. *See id*. § 1(i); Compl. ¶¶ 281-282. Overall, the process established by EO 11423 remained essentially unchanged by EO 13337.

Until 2017, these executive orders controlled the presidential permitting process. *See, e.g., Sierra Club*, 689 F. Supp. 2d at 1162-63; *White Earth Nation*, 2015 WL 8483278, at *2. The original Keystone Pipeline was permitted pursuant to these executive orders, *Sisseton-Wahpeton*, 659 F. Supp. 2d at 1074-75; *NRDC*, 658 F. Supp. 2d at 106-7, and TransCanada's first two permit applications for the Pipeline were received, reviewed, and denied pursuant to EO 13337. *See IEN*, 2017 WL 5632435, at *1-2.

44

In 2011, Congress expressed its approval of this process. While the State Department was reviewing TransCanada's second permit application for the Pipeline, Congress passed the Temporary Payroll Tax Cut Continuation Act ("TPTCCA"), which directed the President to "grant a permit *under* Executive Order No. 13337 . . . for the Keystone XL pipeline" within sixty days of the TPTCCA's enactment. Pub. L. No. 112-78, § 501(a), 125 Stat. 1280 (2011) (emphasis added). Congress also allowed the President to deny a permit pursuant to EO 13337. *Id*. § 501(b)(1). The TPTCCA did not acquiesce in the President's broad, unfettered authority to issue a permit. Instead, it specifically required the President to use the process established by EO 13337 to determine whether to issue a permit. The TPTCCA was, if anything, Congress's approval of the specific process established by EOs 13337 and 11423.

In 2017, President Trump changed this forty-nine-year-old process. Immediately after taking office, President Trump issued a memorandum inviting TransCanada to re-apply for a permit. Presidential Memorandum, 82 Fed. Reg. 8,663, § 2 (Jan. 24, 2017). This memorandum modified the procedures established by EO 13337 as they applied to TransCanada's permit application for the Pipeline. *See id*. § 3(a)(iv); *IEN*, 2017 WL 5632435,

at *5; Compl. ¶¶ 283-292. TransCanada submitted a new permit application, and the State Department issued the 2017 Permit less than two months later. *IEN*, 2017 WL 5632435, at *2.

While this Court's order holding unlawful and vacating the 2017 Permit was on appeal before the Ninth Circuit, President Trump again changed the process. In an effort to evade judicial review, President Trump issued a new memorandum revoking the 2017 Permit and unilaterally issuing the 2019 Permit. 84 Fed Reg. 13,101. The President did not follow the procedures established by EOs 13337 and 11423 when he unilaterally issued the 2019 Permit. Indeed, the 2019 Permit specifically states that it was issued "notwithstanding Executive Order 13337." *Id*.[11]

Congress has not acquiesced in the "particular exercise" of Presidential authority here: the unilateral issuance of the 2019 Permit without regard for EO 13337. President Trump's unilateral issuance of the 2019 Permit is not an "unbroken," "long-continued practice," known to and acquiesced in by Congress. *Dames & Moore v. Regan*, 453 U.S. at 686. Instead,

---

[11] Less than two weeks after issuing the 2019 Permit, President Trump again changed the process by issuing an executive order revoking EOs 11423 and 13337. *See* Exec. Order No. 13,867, 84 Fed. Reg. 15,491 (Apr. 10, 2019).

it conflicted with fifty years of past practice. Congress has therefore not acquiesced in the issuance of the 2019 Permit.

The President does not possess inherent constitutional power to issue the 2019 Permit, and Congress has not acquiesced in its issuance. The President's unilateral issuance of the 2019 Permit was a radical and unprecedented departure from fifty years of past practice and a blatant attempt to insulate his actions and the Pipeline form judicial review. As Justice Jackson cautioned in *Youngstown*, "Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." 343 U.S. at 638 (Jackson, J., concurring).

**C.   The Court Should Issue A Declaratory Judgment that the Permit Is Null and Void and Enjoin TransCanada and Federal Officers From Proceeding With the Pipeline.**

The 2019 Permit violates the Treaties and separation of powers and should therefore be declared null and void. All Defendants should be enjoined from further proceedings on the Pipeline. There is no hesitation in issuing a declaratory judgment that a President's action was illegal and ordering federal officials or third parties to perform their legal obligations while the President remains a party. *Clinton v. City of New York*, 524 U.S. 417,

433, n.22 (1998) (President's use of line item veto "would be redressed by declaratory judgment that the cancellations are invalid."); *Swan*, 100 F. 3d 973.[12] The cases cited by the United States for the proposition that declaratory relief cannot be granted against the President are either inapposite as being more intrusive on the President than here, or are against the weight of authority. US at 13-14. As the cases show, the President can be a party where his actions are declared illegal and relief can be directed against other federal officials. *See Sierra Club*, 524 U.S. at 433 n.22.

While the 2019 Permit is *ultra vires* as a depredation through the Tribes' territories without their consent and unconstitutional as a usurpation of Congress's foreign commerce power and must be enjoined altogether, it also violates the United States' minimum fiduciary duties as set forth in the Treaties. *Pit River Tribe*, 469 F.3d at 788 (United States must comply with minimum duties). While the laws that set forth the minimum duty do not specifically apply to the President, the permit is invalid if those laws are not

---

[12] *See also Hawaii v. Trump*, 859 F.3d 741 (9th Cir 2017), *dismissed as moot*, 138 S. Ct. 337 (2017) (injunction against immigration policy); *Reich*, 74 F.3d at 1328; *c.f. Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587 (D.C. Cir. 1974).

complied with and it is only through inferior federal defendants that that may be accomplished. *C.f. Sierra Club*, 689 F. Supp. 2d at 1163 (allowing NEPA claims to proceed against State Department despite finding the issuance of the permit presidential action); *accord IEN*, 2017 WL 5632435, at *6). Thus, even when the President cannot be directly named and even where the relevant federal officials are not before the court, they can be enjoined. *Swan,* 100 F.3d at 980; *LCV*, 303 F. Supp. 3d at 995.

## III.   TransCanada Must Comply with Tribal Law.

The Tribes' have plausibly stated a claim of jurisdiction over TransCanada and the Pipeline because: (1) the Pipeline will cross their territory; (2) TransCanada has consented to their jurisdiction; (3) the Pipeline threatens the political integrity, the economic security, and the health or welfare of the tribes; and (4) Rosebud has jurisdiction over right-of-way violations. *See Window Rock Unified Sch. Dist. v. Reeves*, 861 F.3d 894, 906 (9th Cir. 2017) (where tribal jurisdiction is at least colorable or plausible, exhaustion in the tribal forum is required). In its brief, TransCanada focused solely on whether the Pipeline crosses tribal territory. TC at 26-27.

Tribes possess inherent sovereign powers, including the authority to exclude from their territory. *Water Wheel Camp Recreation Area, Inc. v.*

49

*LaRance*, 642 F.3d 802, 808 (9th Cir. 2011). Indeed, Rosebud maintains the right to exclude within Articles 2 and 16 of the 1868 Fort Laramie Treaty. *Bennet Cnty. v. United States*, 394 F.2d 8, 10 (8th Cir. 1968). From a tribes' inherent sovereign powers flow lesser powers, including the power to regulate their territory. *Water Wheel,* at 808-09; *see Window Rock*, 861 F.3d at 898. Tribes also have authority to regulate when a person (or corporation) agrees to tribal jurisdiction, or their conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe. *Montana*, 450 U.S. at 565-66. Further, when there are sufficient contacts and activities directed at tribes so as not to offend traditional notions of fair play and substantial justice, tribal governments should be treated as all other governments rather than discriminated against. *See Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945). Rights-of-way violations also may be addressed by tribal nations and disputes may be resolved in tribal fora. 25 C.F.R. § 169.403.

Here, the Pipeline crosses Rosebud surface and mineral estates and will trespass onto those estates. Compl. ¶¶ 166-178. Rosebud maintains authority over its lands and minerals, the Pipeline that will cross and trespass onto its lands and minerals, and TransCanada through its inherent

authority and the right-of-way regulations. *Water Wheel*, 642 F.3d at 808; 25 C.F.R. § 169.403. As a result, TransCanada must comply with Rosebud law.

TransCanada has also consented to tribal jurisdiction. It "agreed to . . . follow all state, local, and *tribal* laws and regulations with respect to the construction and operation of the [Pipeline.]" Dep't of State, Record of Decision and National Interest Determination: TransCanada Keystone Pipeline, L.P. Application for Presidential Permit, Keystone XL Pipeline, at 30 (Mar. 23, 2017) (emphasis added) https://www.state.gov/wp-content/uploads/2019/02/Record-of-Decision-and-National-Interest-Determination.pdf. To obtain a South Dakota permit, TransCanada also must comply with "all applicable laws and regulations[.]" Ex. A to Final Decision and Order, *In the Matter of the Application by TransCanada Keystone Pipeline*, HP09-001 (S.D. P.U.C. June 29, 2010) (condition 1) https://puc.sd.gov/commission/orders/hydrocarbonPipeline/2010/hp09-001c.pdf. Given TransCanada's express agreement and requirement to abide by tribal laws and regulations, Rosebud and Fort Belknap both have jurisdiction over TransCanada and the Pipeline. *Montana*, 450 U.S. at 565-66.

Pipeline construction and a spill could have catastrophic consequences on Rosebud's water, land, spirituality, and people and threaten the overall

51

health and welfare of Rosebud and its members. Compl. ¶¶ 74-141, 432-441; *see Rincon Muchroom Corp. of Am. v. Mazzetti*, 490 Fed. App'x 11, 13 (9th Cir. 2012) ("We have held that both forest fires and contamination of a tribe's water quality are threats sufficient to sustain tribal jurisdiction."). The Pipeline could contaminate the water of the Missouri River, Ogalalla Aquifer, White River, and any groundwater near Rosebud land in Tripp County. Compl. ¶¶ 120-141. Rosebud has federally reserved water rights to these water sources. *Winters v. United States*, 207 U.S. 564 (1908) (reserved water rights). Construction of the Pipeline will destroy and trespass onto Rosebud surface and mineral estates, and any spill would contaminate Rosebud minerals. Compl. ¶¶ 107-119. Finally, the man camps to be built near Rosebud to support the Pipeline will have severe consequences for Rosebud women and children. Compl. ¶¶ 98-106.

Given all of these activities and potential effects directed toward, and contacts with, Rosebud, Rosebud's members, and Rosebud's lands, Rosebud jurisdiction is at least colorable and does not offend traditional notions of fair play and substantial justice. Rosebud has jurisdiction over its territory, TransCanada, and the Pipeline that crosses and threatens its territory.

To date, TransCanada has not followed the Tribes' laws and regulations with respect to the construction and operation of the Pipeline. Compl. ¶ 139. The Tribes have laws that are applicable to the Pipeline and TransCanada. *Id*. ¶ 237. The Tribes have plausibly shown they have jurisdiction. *Window Rock*, 861 F.3d at 906 (holding that, where tribal jurisdiction is at least colorable or plausible, exhaustion in the tribal forum is required).

## IV.   TransCanada Has Not Obtained Rosebud Consent.

In their Fifth Claim, Rosebud alleges violations of those Federal laws, enacted both by ratified treaty and by statute, that allow outsiders on Rosebud's lands only with Plaintiff Rosebud's consent. Defendants ask that this claim be dismissed for lack of jurisdiction and venue, but mostly argue that the Tribes have failed to state a claim.  Defendants are mistaken.

### A.   Plaintiffs have stated a claim against TransCanada.

#### 1.   Venue is Proper.

First, TransCanada argues that this Court lacks jurisdiction and is not a proper venue for these claims. TC at 25-26. TransCanada relies on Rule 12(b)(3) and 28 U.S.C. § 1391(e)(1) to support its venue argument. TC at 10, 17, 25. Pursuant to Rule 12(b)(3), the Court can only dismiss a case when

venue is "wrong" or "improper" in the forum in which it was brought. *Atl. Marine*, 571 U.S. at 55–56. "When one or more claims are closely related (*e.g.*, arise out of a common nucleus of operative facts), venue is proper as to all claims so long as venue is established for just one claim." *Serv. Women's Action Network v. Mattis*, 320 F. Supp. 3d 1082, 1089 (N.D. Cal. 2018); *Kaia Foods, Inc. v. Bellafiore*, 70 F. Supp. 3d 1178, 1183 (N.D. Cal. 2014).

Venue is proper in this Court regarding TransCanada. Because TransCanada has only argued venue is improper under 28 U.S.C. 1391(e), which only applies to federal defendants, it has waived any argument that venue is improper as to it. *King v. Russell*, 963 F.2d 1301, 1305 (9th Cir. 1992). Even if it had not waived venue as to it, venue is proper under 28 U.S.C. § 1391(b)(1) and (c)(2) because this District has personal jurisdiction over TransCanada.

Under § 1391, venue is proper where the defendant resides. *Atl. Marine*, 571 U.S. at, 55–56 (2013); 28 U.S.C. § 1391(b)(1). A corporate defendant is deemed to reside wherever it is subject to "personal jurisdiction." 28 U.S.C. § 1391(c). TransCanada has failed to raise the defense of personal jurisdiction in its Rule 12 motion, and has thus waived any argument that the court lacks personal jurisdiction or venue over it.

*Underberg v. Empl'rs Mut. Cas. Co.*, No. CV-15-112-BLG-CSO, 2016 WL 1466506, at *5 (D. Mont. Apr. 14, 2016). Even if it had, this Court has personal jurisdiction over TransCanada because of its substantial, systematic, and continuous contacts here. *Cataraha v. Elemental Prism, LLC*, No. CV-17-128-GF-BMM, 2018 WL 3448283, at *2 (D. Mont. July 17, 2018). TransCanada has been registered with the Montana Secretary of State since 2008.[13]  It has applied to build a Pipeline through Montana, it expects to employ an average of 3,700 Montana residents annually through the construction of its Pipeline through Montana, 2014 EIS at 4.10-17, and proposes to construct four temporary construction camps (which "typically house approximately 900 to 1,300 workers") in Montana to meet the housing needs for its construction personnel. *Id.* at 4.10-13.  Thus, this Court has general and specific jurisdiction over TransCanada. *Cataraha*, 2018 WL 3448283, at *2.

With regard to the Federal Defendants, they have not raised improper venue in their Rule 12 motion and thus waived that argument. "Like any other defendant, the United States (and its agencies) may waive improper

---

[13] *See Business Services*, Mont. Sec'y of State, http://sosmt.gov/business/ (search "TransCanada" in "Search your Business . . ."; select "NEXT"; select "Entity Name: TRANSCANADA KEYSTONE PIPELINE, LP 9L053270)).

venue by failing to make timely objection." *Phillips v. Rubin*, 76 F. Supp. 2d 1079, 1082 (D. Nev. 1999); *see* Rule 12(h).

Regardless, venue is proper here for all claims because a substantial part of the claims occurred, and will occur, here. A "substantial part of the events or omissions" does not mean that the events predominate or that the chosen district is the "best venue." *Underberg*, 2016 WL 1466506, at *4 (citations omitted). "The 'substantiality' requirement is 'intended to preserve the element of fairness so that a defendant is not haled into a remote district having no real relationship to the dispute.'" *Id*. This District has a clear relationship to the dispute. The 2019 Permit authorized the building of the entire Pipeline, to begin in Montana. The Pipeline would cross the United States-Canada border in Phillips County, Montana, within this District. TransCanada had to obtain a permit from Montana to build here, and the Pipeline must be built through Montana before it reaches South Dakota. Because it is a connected action, all of these things have to occur for TransCanada to also construct in South Dakota. TransCanada has also agreed to abide by all laws, including Fort Belknap's (and Montana's). Thus, a substantial part of the claims have arisen in Montana sufficient for venue purposes. *Underberg*, 2016 WL 1466506, at *7. Furthermore, TransCanada has

not raised improper venue as to every claim. As all the claims are "closely related," venue is proper for all claims in this District. *Mattis*, 320 F. Supp. 3d at 1089 (pendent venue).

### 2.   The Tribes' Fifth Claim Should not be Dismissed.

First, TransCanada generally misapprehends the Fifth Claim as merely asserting specific violations of right-of-way and minerals statutes. The Fifth Claim expressly asserts that the 1868 Fort Laramie Treaty prohibits unauthorized access onto Rosebud lands, Compl. ¶ 422; that TransCanada has not obtained permission to enter Rosebud's lands, *id.* ¶¶ 424, 427; and that "TransCanada ha[s] violated the 1868 Treaty of Fort Laramie." *Id.* ¶ 428. Rosebud may seek an injunction against a private party to prevent that private party from infringing its treaty rights. *See, e.g.*, *Lac du Flambeau Band of Lake Super. Chippewa Indians v. Stop Treaty Abuse-Wis., Inc.*, 759 F. Supp. 1339 (W.D. Wis. 1991). Thus, Rosebud's treaty claims and plea for declaratory and injunctive relief against TransCanada survives regardless of the right-of-way and mining statutes.

Second, with respect to rights of way, TransCanada acknowledges "the allegation is that [TransCanada] may construct Keystone XL facilities on property where the United States holds a mineral estate *or surface estate*

in trust for Rosebud." TC at 25 (emphasis added). Nevertheless, TransCanada argues that "the Indian Rights-of-Way Act does not apply to mineral estates," and "is therefore inapplicable to *some* of the Rosebud land identified in the Amended Complaint." *Id.* at 25-26 (emphasis added). TransCanada conveniently ignores specific allegations—some drawn from TransCanada's own maps—that the Pipeline route crosses not only Rosebud's mineral estates, *but also its surface estates*. Compl. ¶¶ 171, 174-76, 178; Dkt. 58-4 to 58-7. Thus, accepting the allegations in the Complaint as true, Plaintiffs have stated a plausible claim for declaratory judgment that construction of the Pipeline would require compliance with the Indian Rights-of-Way Act.

In addition, TransCanada baldly asserts that if it "were to build Keystone XL on a Rosebud surface estate without obtaining a right-of-way, that would not violate the Indian Rights-of-Way Act," but instead would be merely a trespass which for which the United States and/or the Indian trust beneficiaries could seek redress. TC at 26. "A party may be enjoined from committing certain acts without proper authorization from an authorized agency official." *United States v. Jenks*, 22 F.3d 1513, 1519 (10th Cir. 1994). In light of TransCanada's representations (belied by TransCanada's own maps)

that the Pipeline would not cross any tribal lands, Compl. ¶ 167, and TransCanada's assertions that it does not need to comply with that Act, TC at 25-26,[14] Plaintiffs have plausibly stated a claim sufficient for declaratory judgment and for an injunction barring any unlawful construction of the Pipeline and related facilities.

Finally, with respect to minerals, TransCanada never engages the Complaint nor analyses the law, but merely asserts that the relevant statutes and regulations do not apply. *Id.* at 24-25. In fact, the Complaint alleges that:

- the Pipeline would cross several tribal mineral estates, Compl. ¶¶ 170-78; Dkt. 58-4 to 58-7;

- "[t]he 2014 Final Supplemental EIS notes that the Pipeline would cross deposits of sand, gravel, clay, and stone," Compl. ¶ 111; and

---

[14] TransCanada acknowledges that Federal law requires that a Pipeline crossing navigable waters, federal lands, and Indian lands first needs agency approval. TC at 4. It is telling, however, that while TransCanada avers that it "is applying for a Section 408 permit for construction under the Missouri River," *id.* at 4 n.5, *and* that it "is applying for a right-of-way to cross federal land in Montana," *id.* at 4 n.6, it says nothing about seeking a right-of-way to cross Indian lands. *Id.* at 4 n.7.

- "rock ripping (the break up and removal of rock material with an excavator) could be necessary" in construction of the Pipeline. *Id.* ¶ 112.

TransCanada ignores the factual allegations and merely asserts that, because it proposes to build a Pipeline, it is not engaged in mining or mineral development. TC at 25. Courts have held, however, "that the term 'mineral development' has a broad meaning," which may encompass work associated with excavation of minerals to achieve other ends. *See generally United States v. Osage Wind, LLC*, 871 F.3d 1078 (10th Cir. 2017) (excavation of wind turbine footings and reuse of extracted rock constituted mining). Thus, Rosebud has stated a claim sufficient to seek declaratory judgment that TransCanada must comply with relevant minerals statutes and regulations. And, as with rights-of-way, TransCanada again baldly asserts that it may do as it pleases, subject only to enforcement if (and when) it breaks the law. In light of such assertions, Plaintiffs have plausibly stated a claim sufficient to seek an injunction barring any unlawful construction of the Pipeline and related facilities.

**B.    Plaintiffs have Stated a Claim Against the Federal Defendants.**

First, Federal Defendants misapprehend the nature of the fifth claim,[15] which first and foremost alleges violations of the 1868 Fort Laramie Treaty. Compl. ¶¶ 422, 428. The United States "solemnly agree[d]" more than 150 years ago that no unauthorized persons "shall ever be permitted" on Rosebud's lands. 1868 Fort Laramie Treaty at art. II. "It is the government's . . . responsibility to ensure that Indian treaty rights are given full effect." *Nw. Sea Farms, Inc. v. U.S. Army Corps of Eng'rs*, 931 F. Supp. 1515, 1520 (W.D. Wash. 1996). The Indian Rights-of-Way Act prescribes the process by which Federal Defendants may ensure that TransCanada secures the Tribe's consent before entering upon Tribal lands; however, Federal Defendants must comply with the 1868 Fort Laramie Treaty regardless of whether TransCanada ever formally petitions for a right of way.

Defendant Interior Department has acknowledged its responsibility to protect treaty rights, with its Solicitor observing that "[c]ourts have . . . recognized the ongoing enforceability of treaties."  Memorandum from U.S.

---

[15] Federal Defendants assert that this claim is "properly construed as [a] statutory claim[]."  US at 17.

Dep't of Interior Solicitor to Secretary on Reaffirmation of the United States'

Unique Trust Relationship with Indian Tribes and Related Indian Law

Principles, No. M-37045 at 14 (Jan. 18, 2017) (hereinafter "Solicitor's Opinion

M-37045")                 https://www.doi.gov/sites/doi.gov/files/uploads/m-

37045.pdf; *see also Herrera*, 139 S. Ct. 1686. And although a tribe seeking

money damages for a treaty violation may be limited to bringing that claim

via a statutory vehicle, "in those cases where tribes are not seeking damages,

but rather to halt or reverse a federal action or determination, courts have

developed what is known as 'the procedural trust responsibility' of federal

agencies to consider tribal treaty rights during permitting and other federal

determinations."  Solicitor's Opinion M-37045 at 21-22 (citations omitted).

That is what Rosebud seeks here: declaratory judgment that the United

States has a treaty obligation to protect Rosebud from any attempt by

TransCanada to enter Rosebud's lands (surface and mineral) without

Rosebud's consent, and (if necessary) an injunction requiring Federal

Defendants to fulfill their treaty obligation.

　　Second, specifically with regard to the President, Federal Defendants

argue that this Court lacks jurisdiction over the President. That argument is

addressed above. *See supra* at Section II(C). As previously mentioned, "[o]nly

Congress can modify or abrogate Indian treaty rights." *United States v. Eberhardt*, 789 F.2d 1354, 1361 (9th Cir. 1986). Moreover, the "responsibility to ensure that Indian treaty rights are given full effect," *Nw. Sea Farms*, 931 F. Supp. at 1520 (citing *Seminole Nation v. United States*, 316 U.S. 286, 296-97 (1942)), applies to "'any Federal government action' which relates to Indian Tribes." *Id.* at 1519-20 (quoting *Nance v. Envtl. Protection Agency*, 645 F.2d 701, 711 (9th Cir. 1981)). Thus, neither an agency or official, nor the President himself, may allow access to Rosebud's lands without Rosebud's permission.

## CONCLUSION

For the foregoing reasons, the Tribes respectfully request that the Court deny Defendants' Motions to Dismiss.

63

RESPECTFULLY SUBMITTED this 26th day of July, 2019.

/s/ Matthew L. Campbell
Matthew Campbell, *pro hac vice*

/s/ Wesley James Furlong
Wesley James Furlong (MT Bar No. 42771409)
NATIVE AMERICAN RIGHTS FUND

Matthew L. Campbell, *pro hac vice*
NATIVE AMERICAN RIGHTS FUND
1506 Broadway
Boulder, CO 80302
Ph. (303) 447-8760
Fax (303) 443-7776
mcampbell@narf.org

Natalie Landreth, *pro hac vice*
Wesley James Furlong
NATIVE AMERICAN RIGHTS FUND
745 West 4th Ave, Suite 502
Anchorage, AK 99501
Ph. (907) 276-0680
Fax (907) 276-2466
landreth@narf.org
wfurlong@narf.org

Daniel D. Lewerenz, *pro hac vice*
NATIVE AMERICAN RIGHTS FUND
1514 P Street N.W. (rear), Suite D
Washington, D.C. 20005
Ph. (202) 785-4166
Fax (202) 822-0068
lewerenz@narf.org

*Counsel for all Plaintiffs*

64

Daniel D. Belcourt (MT Bar No. 3914)
BELCOURT LAW, P.C.
120 Woodworth Avenue
Missoula, MT 59801
Ph. (406) 265-0934
Fax (406) 926-1041
danbelcourt@aol.com

Ronni M. Flannery (MT Bar No. 5890)
LAW OFFICE OF RONNI M. FLANNERY
936 South 2nd Street West
Missoula, MT 59801
Ph. (406) 214-5700
rflannery@bresnan.net

*Counsel for Plaintiff Fort Belknap Indian Community*

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing **Combined Response to Defendants' Motions to Dismiss** complies with the Court's Order dated April 24, 2019: (1) because the word count for this brief contains 12,742 words, excluding the parts of the brief exempted by Local Rule 7.1(d)(2); and (2) the typeface requirements of Local Rule 1.5 because it has been prepared in a proportionally spaced typeface using Word 2007, in 14-point Book Antiqua font.

*/s/ Wesley James Furlong*
Wesley James Furlong

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of July, 2019, I electronically filed the foregoing **Combined Response to Defendants' Motions to Dismiss** with the Clerk of the Court for the United States District Court for the District of Montana by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Wesley James Furlong*
Wesley James Furlong