MARK STEGER SMITH
Assistant U.S. Attorney
U.S. Attorney's Office
2601 Second Avenue North, Suite 3200
Billings, MT 59101
Ph: (406) 247-4667; Fax: (406) 657-6058
mark.smith3@usdoj.gov

LAWRENCE J. VANDYKE
Deputy Assistant Attorney General

LUTHER L. HAJEK (CO Bar 44303)
United States Department of Justice
Environment and Natural Resources Division
999 18th St., South Terrace, Suite 370
Denver, CO 80202
Ph: (303) 844-1376; Fax: (303) 844-1350
luke.hajek@usdoj.gov

*Attorneys for Federal Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| ROSEBUD SIOUX TRIBE, *et al*., <br><br> Plaintiffs, <br> v. <br><br> DONALD J. TRUMP, *et al.,* <br><br> Defendants, <br> and <br><br> TRANSCANADA KEYSTONE PIPELINE LP, *et al.*, <br><br> Defendant-Intervenors. | CV 18-118-GF-BMM <br><br><br> **DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT** |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

ARGUMENT ........................................................................................2

    I.    Plaintiffs Fail to Identify Any Viable Claims Against the
Agencies, and Therefore All of the Agency Claims Should Be
Dismissed ........................................................................2

        A.    All Claims Challenging the 2017 Permit Are Moot ..................2

        B.    Any Claims Challenging Future Agency Action Are Not
Ripe ........................................................................3

        C.    Plaintiffs' Fifth Claim Does Not Identify an Agency
Action ......................................................................3

    II.    The Claims Against the President Should Be Dismissed for Lack
of Jurisdiction and Failure to State a Claim ...........................4

        A.    Plaintiffs Lack Standing to Challenge the Cross-Border
Permit ......................................................................4

            1.    Plaintiffs Fail to Allege Any Injury Associated with
the Construction of Facilities in the 1.2-Mile Border
Segment ..............................................................4

            2.    The Claims Are Not Redressable Because the Court
Cannot Enjoin Action by the President ...........................6

        B.    The Statutory and Treaty Claims Against the President
Should Be Dismissed ....................................................8

            1.    Non-Statutory Review is Only Available in
Situations Where a Government Official Has
Clearly Acted in Excess of His Legal Authority ..............8

            2.    The President Cannot Have Exceeded His Authority
Under NEPA, the NHPA, and Federal Right-of-
Way and Mineral Statutes, Because those Statutes
Do Not Apply to the President ...................................9

3.      The Treaty Claims Rely on the Same Standards As
        Their Statutory Claims and Therefore Must Also Be
        Dismissed........................................................................10

4.      The Treaty Claims Should Be Dismissed for Failure
        to State a Claim Because the Permit Did Not
        Authorize Any Construction Across Tribal Land ..........11

C.      The Constitutional Claims Should be Dismissed for
        Failure to State a Claim............................................................13

1.      Congress Has Not Regulated Cross-Border
        Pipelines..........................................................................13

2.      In the Absence of Congressional Regulation of
        Cross-Border Pipeline Crossings, the President
        Clearly Has the Authority to Authorize a Border
        Crossing ..........................................................................14

3.      Congress Has Acquiesced to the President's
        Authority Over Cross-Border Pipelines .........................18

CONCLUSION .....................................................................................19

# TABLE OF AUTHORITIES

## Cases

*Alaska v. Brown*,
850 F. Supp. 821 (D. Alaska 1994) ..................................................................14

*Am. Ins. Ass'n v. Garamendi*,
539 U.S. 396 (2003) .........................................................................................14

*Chi. & S. Airlines, Inc. v. Waterman S.S. Corp.*,
333 U.S. 103 (1948) .........................................................................................14

*Clinton v. City of N.Y.*,
524 U.S. 417 (1998) ...........................................................................................7

*Dalton v. Specter*,
511 U.S. 462 (1994) ................................................................................. 8, 9, 11

*Dames & Moore v. Regan*,
453 U.S. 654 (1981) ................................................................................... 17, 18

*Foreign Cables*,
22 Op. Atty. Gen. 13 (Jan. 18, 1898) ..............................................................17

*Griffith v. Fed. Labor Relations Auth.*,
842 F.2d 487 (D.C. Cir. 1988) ...........................................................................9

*Gros Ventre Tribe v. United States*,
469 F.3d 801 (9th Cir. 2006) ............................................................................10

*IEN v. U.S. Dep't of State*,
317 F. Supp. 3d 1118 (D. Mont. 2018) ...........................................................4, 5

*Int'l Ass'n of Machinists & Aerospace Workers, Dist. Lodge 166, AFL-CIO v. Griffin*,
590 F. Supp. 2d 171 (D.D.C. 2008) ................................................................8, 9

*Larson v. Domestic & Foreign Commerce Corp.*,
337 U.S. 682 (1949) ...........................................................................................8

*Medellin v. Texas*,
552 U.S. 491 (2008) .........................................................................................18

*Morongo Band of Mission Indians v. FAA*,
161 F.3d 569 (9th Cir. 1998) ............................................................................10

*Nat. Res. Council v. U.S. Dep't of State*,
 658 F. Supp. 2d 105 (D.D.C. 2009) .......................................................15

*Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*,
 437 F.3d 1256 (D.C. Cir. 2006) ..................................................... 9, 10

*Sierra Club v. Clinton*,
 689 F. Supp. 2d 1147 (D. Minn. 2010) .................................. 7, 15, 19

*Summers v. Earth Island Inst.*,
 555 U.S. 488 (2009) ...............................................................................6

*Swan v. Clinton*,
 100 F.3d 973 (1996) ..............................................................................7

*United States v. Clark*,
 435 F.3d 1100 (9th Cir. 2009) ............................................................13

*United States v. Ohio Oil Co.*,
 234 U.S. 548 (1914) ............................................................................14

*United States v. W. Union Tel. Co.*,
 260 U.S. 754 (1922) ............................................................................16

*Youngstown Sheet & Tube Co. v. Sawyer*,
 343 U.S. 579 (1952) ..................................................................... 17, 18

*Zivotofsky v. Kerry*,
 135 S. Ct. 2076 (2015) ........................................................................14

**Constitutions**

U.S. Const. art. VI, cl. 2 ............................................................................11

**Statutes**

33 U.S.C. § 535b.........................................................................................16

47 U.S.C. § 35 .............................................................................................16

Pub. L. No. 112-78, § 501(b)(1)-(2), 125 Stat. 1289 (2011) ....................19

Pub. L. No. 112-78, 125 Stat. 1280 (2011)................................................19

**Regulations**

84 Fed. Reg. 13,101 (Mar. 29, 2019)...........................................................4

**Other Authorities**

Hackworth, *Digest of Int'l Law*, Vol. IV, § 350, pp. 247-56 (1942)......................15

## INTRODUCTION

Plaintiffs' claims should be dismissed in their entirety.  First, Plaintiffs have offered no basis for maintaining any of the claims against the agencies, and therefore those claims should all be dismissed.  Second, the claims against the President should be dismissed because they are based on the faulty premise that the President approved the entire 875-mile pipeline and exempted it from compliance with federal law.  This is a transparent fiction—the Permit clearly states that it approves only pipeline facilities in a 1.2-mile segment at the border of the United States and Canada, subject to TC Energy obtaining all requisite approvals for the pipeline.  Plaintiffs fundamentally misconstrue the permit, which merely authorizes a border crossing.

Because the President approved only the 1.2-mile border segment and Plaintiffs allege no injuries arising from the construction of pipeline facilities in that area, Plaintiffs lack standing.  Moreover, even if the statutory and tribal claims could be brought against the President—which they cannot be—those claims would fail for the same reason.  The President's *border* permit has not approved the construction of the pipeline across tribal land and has not exempted TC Energy from any laws that would apply should the pipeline cross tribal land.

Finally, even if the Court did reach the constitutional claims, Plaintiffs' arguments disregard the nearly 150-year history of Presidents exercising their

inherent constitutional authority to grant or deny the construction of facilities at the United States border in order to protect the territorial integrity of the United States. Plaintiffs' response is that our government has just been doing it wrong for a century and a half.  But this is a pretty audacious claim given that Congress has never questioned the President's authority over border-crossings and has not enacted legislation governing border-crossings for pipelines.  As between Plaintiffs' novel claim versus over a century of Presidential practice and Congressional acquiescence, this Court should side with the other two branches of government.

Accordingly, all of Plaintiffs' claims should be dismissed.

## ARGUMENT

### I.  Plaintiffs Fail to Identify Any Viable Claims Against the Agencies, and Therefore All of the Agency Claims Should Be Dismissed.

All of the claims against the agencies should be dismissed for lack of jurisdiction or failure to state a claim.

### A.  All Claims Challenging the 2017 Permit Are Moot.

Plaintiffs concede that the claims challenging the 2017 Permit are moot, and therefore the Eighth through Eleventh Claims should be dismissed.  *See* Combined Response to Defs.' Mots. to Dismiss ("Pls.' Opp.") at 3, ECF No. 74. Nevertheless, Plaintiffs state that they "do not concede that the State Department Defendants can be dismissed."  *Id.*  But in the remaining claims alleged against the

State Department, Plaintiffs fail to identify any reviewable action taken by the

agency with respect to the Permit or the Keystone XL Pipeline.  Accordingly, the

First, Third, Fourth, Fifth, and Seventh Claims should be dismissed as to the State

Department.

### B.    Any Claims Challenging Future Agency Action Are Not Ripe.

There is no basis for any claims challenging the U.S. Department of Interior

because the U.S. Bureau of Land Management ("BLM") has not yet issued a

decision regarding a right-of-way relating to the pipeline.  *See* Defs.' Mem. in

Supp. of Mot. to Dismiss Pls.' First Am. Compl. ("Defs.' Mem.") at 8-10, ECF No.

67.  Plaintiffs fail to respond to this argument; accordingly, all claims against the

U.S. Department of the Interior must be dismissed.

### C.    Plaintiffs' Fifth Claim Does Not Identify an Agency Action.

Plaintiffs argue that their Fifth Claim alleging violations of federal right-of-

way and mineral statutes states a claim against the federal agencies.  Pls.' Opp. at

61-63.  But in order to bring a claim under the APA, they must challenge a final

agency action.  *See* Defs.' Mem. at 9.  There is a process for approving a right-of-

way across tribal land, *see id.* at 20-21, but no such approval has been sought and

none has been authorized.  Other than the Permit, which does not authorize the

pipeline to cross tribal land, Plaintiffs identify no action taken by any agency that

would allow the pipeline to cross tribal land.  *See* Am. Compl. ¶¶ 421-431, ECF

No. 58.  Accordingly, to the extent the Fifth Claim alleges claims against the agencies, it must be dismissed.

## II.   The Claims Against the President Should Be Dismissed for Lack of Jurisdiction and Failure to State a Claim.

All of the claims against the President should be dismissed for lack of standing, as well as jurisdictional deficiencies and failure to state a claim.

### A.   Plaintiffs Lack Standing to Challenge the Cross-Border Permit.

Plaintiffs lack standing to challenge the Permit because they fail to allege any injury relating to the 1.2-mile border segment, and any such injuries would not be redressable.

#### 1.   Plaintiffs Fail to Allege Any Injury Associated with the Construction of Facilities in the 1.2-Mile Border Segment.

Plaintiffs do not even attempt to allege harms stemming from construction of pipeline facilities at the border of the United States.  *See* Pls.' Opp. at 12-16. Instead, for standing purposes, they rely on the proposition that the President approved the "entire length of the Pipeline."  *Id.* at 12.  That is not true; the President's *border crossing* Permit approved only the construction of pipeline facilities "at the international border of the United States and Canada."  Permit, 84 Fed. Reg. 13,101, 13,101 (Mar. 29, 2019); *see also* Defs.' Mem. at 11-12, 19-20. Plaintiffs rely on this Court's prior ruling in *IEN v. U.S. Department of State*, 317 F. Supp. 3d 1118 (D. Mont. 2018), *see* Pls.' Opp. at 7, 14, but that ruling was not

4

based on standing.  Instead, in that case, the Court found that the State

Department's issuance of a cross-border permit was related to actions by other

agencies regarding the pipeline for purposes of National Environmental Policy Act

("NEPA").  *See IEN*, 317 F. Supp. 3d at 1122-23.  That ruling has no bearing on

whether the Plaintiffs here have standing to challenge an action by the President, to

whom NEPA does not apply.

Plaintiffs also claim that the Permit contains language approving the whole

pipeline.  *See* Pls.' Opp. at 8.  They are mistaken.  Looking at the Permit's

definition of "Facilities" in isolation, Plaintiffs argue that the Permit approved

"facilities," which they interpret to mean the whole pipeline.  *Id.*  But Plaintiffs

ignore that the Permit "grant[ed] permission" for a specific type of facilities;

namely, "pipeline facilities *at the international border of the United States and*

*Canada*."  Permit at 1 (emphasis added).  Plaintiffs also cite one of the conditions

of the Permit, which requires compliance with the conditions in TC Energy's 2012

and 2017 applications.  *See* Pls.' Opp. at 8 (citing Permit art. 1(2)).  But as

explained in Defendants' opening brief, that is merely a condition of the Permit

and does not mean that the President approved the whole pipeline.  Permit art.

1(2); *see also* Defs.' Mem. at 20.  The only facilities authorized by the President

were the "Border facilities."  Permit art. 1(1).  For this reason, there is no truth to

Plaintiffs' assertion that the Permit authorizes construction of the pipeline "where

it crosses tribal land."  Pls.' Opp. 8.  The Permit approves no such thing and, in fact, makes clear that TC Energy is responsible for obtaining "any right-of-way grants or easements, permits, and other authorizations" that are necessary to construct and operate the pipeline.  Permit art. 6(1).

Finally, Plaintiffs' alleged procedural injuries, *see* Pls.' Opp. at 16, are insufficient to establish standing.  Plaintiffs do not allege that the President has failed to follow any procedures relating to the issuance of cross-border permits. Instead, the procedural requirements of NEPA and the National Historic Preservation Act ("NHPA") relate only to the federal agencies who are responsible for authorizing certain aspects of the pipeline.  Plaintiffs will have ample opportunity to challenge such authorizations if and when they occur.  Moreover, alleged procedural injuries alone are insufficient to establish standing.  *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("a procedural right *in vacuo*—is insufficient to create Article III standing").

### 2. The Claims Are Not Redressable Because the Court Cannot Enjoin Action by the President.

Out of respect for the separation of powers, the Court cannot enjoin the President's issuance of the Permit, and therefore Plaintiffs' claims are not redressable.  *See* Defs.' Mem. at 13-14.  Acknowledging that principle, Plaintiffs argue that redress is, nevertheless, available because the Court could issue a declaratory judgment against the President and enjoin subordinate agency officials.

6

*See* Pls.' Opp. at 47-48 (citing *Clinton v. City of New York*, 524 U.S. 417, 433 n.22 (1998)).  This case, however, "represents one of those rare instances where the bypass is closed, and only injunctive relief against the President himself will redress [Plaintiffs'] injury."  *Swan v. Clinton*, 100 F.3d 973, 979 (1996).  The Permit was issued solely by the President, *see* Permit at 1, and no subordinate officials were involved in its issuance and none are named in the lawsuit.  Therefore, in order to enjoin the Permit, the President would have to be enjoined.[1]

Plaintiffs suggest that their injuries could be remedied through an injunction against the agencies, but they fail to tether that argument to an injunction of any agency action related to this Permit.  *See* Pls.' Opp. at 48-49.  The agencies are responsible for different authorizations—*e.g.*, BLM's pending right-of-way authorization—which cannot be preemptively enjoined.  Moreover, Plaintiffs have not identified any actions by the agencies that violated any laws, and therefore there is no basis for enjoining them.  Clearly, the agencies are not responsible for the cross-border Permit, which was issued based solely on the President's inherent constitutional authority.

---

[1] This distinguishes this case from the prior *IEN* case and *Sierra Club v. Clinton*, 689 F. Supp. 2d 1147 (D. Minn. 2010), which were suits against State Department officials.

**B.    The Statutory and Treaty Claims Against the President Should Be Dismissed.**

The statutory and treaty claims against the President should be dismissed for lack of jurisdiction and failure to state a claim.  Plaintiffs argue that these claims are properly brought outside of the judicial review provisions of the APA under the doctrine of non-statutory, or *ultra vires*, review.  *See* Pls.' Opp. at 16-17.  But non-statutory review is inappropriate because Plaintiffs fail to show that the President exceeded his authority under any statute, and their arguments relating to violations of alleged duties owed to them under the treaties ultimately collapse into the same statutory standards.  Moreover, the claims fail to state a claim because, as a factual matter, Plaintiffs are simply incorrect that the President approved any activity on tribal land, *i.e.*, the Tribes' current reservation land or lands held in trust for the Tribes.  Instead, the President merely approved the construction and operation of facilities *at the border of the United States*.

**1.    Non-Statutory Review is Only Available in Situations Where a Government Official Has Clearly Acted in Excess of His Legal Authority.**

In order to proceed under a non-statutory review theory, Plaintiffs must demonstrate either a violation of a clear statutory mandate or the Constitution.  *See Dalton v. Specter*, 511 U.S. 462, 474-76 (1994); *see also Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949)).  Non-statutory review is "extremely limited [in] scope."  *Int'l Ass'n of Machinists & Aerospace Workers,*

*Dist. Lodge 166, AFL-CIO v. Griffin*, 590 F. Supp. 2d 171, 175 (D.D.C. 2008) (quoting *Griffith v. Fed. Labor Relations Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988).  In order to bring such a claim, Plaintiffs must show that the official acted "in excess of its delegated powers and contrary to a specific prohibition which is clear and mandatory."  *Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*, 437 F.3d 1256, 1263 (D.C. Cir. 2006) (citation omitted).

As discussed below, assuming that such a claim can be brought against the President, *see Dalton*, 511 U.S. at 474, Plaintiffs' statutory and treaty claims cannot proceed under a non-statutory review theory because Plaintiffs fail to allege any clear and mandatory directive that the President violated by issuing the Permit.

> ### 2.   The President Cannot Have Exceeded His Authority Under NEPA, the NHPA, and Federal Right-of-Way and Mineral Statutes, Because those Statutes Do Not Apply to the President.

Plaintiffs allege that, in issuing the Permit, the President violated NEPA, the NHPA, and federal right-of-way and mineral statutes.  *See*, *e.g.*, Am. Compl. ¶¶ 399-407, 411-417, 423-426.  As already demonstrated, these statutes do not apply to the President.  *See* Defs.' Mem. at 14-15.  In addition, non-statutory review against the President is unavailable here because denial of judicial review would not "wholly deprive [Plaintiffs] of a meaningful and adequate means of vindicating their statutory rights."  *Int'l Ass'n of Machinists & Aerospace Workers*, 590 F. Supp. 2d at 175.  Plaintiffs can adjudicate their claims pursuant to NEPA and other

environmental statutes in claims against relevant agencies, if and when those agencies issue reviewable final decisions.

### 3. The Treaty Claims Rely on the Same Standards As Their Statutory Claims and Therefore Must Also Be Dismissed.

Implicitly recognizing that the statutory claims against the President cannot proceed under any theory, Plaintiffs attempt to recast their claims as violations of rights owed to the Tribes under the treaties. *See* Pls.' Mem. at 18.  Plaintiffs recite the history of these treaties and offer interpretations of the treaties based on that history, *id.* at 19-26, but ultimately, they concede that the duties owed by the government under the treaties are defined by applicable environmental laws and regulations, including NEPA and the NHPA.  *See id.* at 26-28; *see also Gros Ventre Tribe v. United States*, 469 F.3d 801, 812 (9th Cir. 2006) (in evaluating duties owed under treaties, "we look to other generally applicable laws or regulations"); *Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 574 (9th Cir. 1998) (the duty owed by the United States to Indian tribes "is discharged by the agency's compliance with general regulations and statutes"); Defs.' Mem. at 22.  As discussed above, the generally applicable environmental laws referenced in Plaintiffs' Complaint do not apply to the President.  Therefore, those laws cannot provide the basis for any violation of law by the President, let alone one that is "clear and mandatory."  *Nat'l Air Traffic Controllers*, 437 F.3d at 1263.

Further, the treaty claims cannot proceed under a non-statutory review

theory as purported constitutional claims.  *See* Pls.' Mem. at 18.  Presumably,

Plaintiffs believe that reciting article VI, clause 2 of the Constitution converts their

claims into constitutional claims.  But that clause merely states, "This Constitution,

and the Laws of the United States which shall be made in Pursuance thereof; and

all Treaties made, or which shall be made, under the Authority of the United

States, shall be the supreme Law of the Land."  U.S. Const. art. VI, cl. 2.  Under

Plaintiffs' theory, any alleged violation of the "Laws of the United States" would

be a constitutional claim.  The Supreme Court, however, has expressly stated the

opposite.  *See Dalton*, 511 U.S. at 473-74 ("simply alleging that the President has

exceeded his statutory authority are not 'constitutional' claims, subject to judicial

review under the exception recognized in *Franklin*").  Accordingly, the treaty

claims are not constitutional claims and cannot proceed on that basis as non-

statutory claims.

> ### 4.    The Treaty Claims Should Be Dismissed for Failure to State a Claim Because the Permit Did Not Authorize Any Construction Across Tribal Land.

Even if there were an appropriate avenue for judicial review for Plaintiffs'

statutory and treaty claims against the President, and even if such claims were

cognizable as against the President, the claims should be dismissed for failure to

state a claim because the President did not approve construction of the pipeline

across tribal land.  Instead, the President only approved the construction of

facilities at the United States border, subject to TC Energy obtaining any

applicable easements and authorizations from federal and state authorities.  *See*

Permit at 1, art. 1, & art. 6.  Thus, the President did not violate any duties owed to

the Tribes under the treaties.

Plaintiffs claim that the President violated treaty obligations in two ways:

"by approving it through Rosebud's reservation (as depicted on TransCanada's

maps and applications, and State Department's maps); and by approving it without

complying with the minimum treaty standards of care."  Pls.' Opp. at 20.  In fact,

the President did neither of those things because he only approved the border

crossing.  The Permit authorizes only the construction and operation of pipeline

facilities "at the international border of the United States and Canada at Phillips

County," which are expressly defined to include only the section of the pipeline

from the border to "the first mainline shutoff valve in the United States located

approximately 1.2 miles from the international border."  Permit at 1.  Plaintiffs do

not allege that the border segment includes tribal land, and no right-of-way across

tribal land has been requested or approved.  *See* Defs.' Mem. at 20-21.

Further, the Permit does not exempt TC Energy from compliance with any

laws.  Quite the opposite, the Permit states repeatedly that TC Energy *must* obtain

applicable federal and state approvals in relation to the pipeline.  *See* Permit art.

1(2) (construction of the pipeline must be "consistent with applicable law, as

12

described in [TC Energy's] application"); art. 2 (TC Energy is "subject to inspection by . . . Federal, State, and local agencies"); art. 6(1) (TC Energy "is responsible for acquiring any right-of-way grants or easements, permits, and other authorizations as may become necessary or appropriate"); art 6(3) (TC Energy must maintain the border facilities "in compliance with applicable law"). Plaintiffs' hyperbolic argument that the President could authorize the pollution "of the Tribes' water on their reservation with poisonous nuclear waste," Pls.' Opp. at 27, has nothing to do with this case.  All environmental laws and regulations still apply to the construction of the pipeline, and the Permit does nothing to change that.

## C.   The Constitutional Claims Should be Dismissed for Failure to State a Claim.

Plaintiffs' constitutional claims should be dismissed because the President's authority to issue cross-border permits has been well-established for nearly 150 years, and Plaintiffs have made no showing to the contrary.

### 1.   Congress Has Not Regulated Cross-Border Pipelines.

Plaintiffs argue that Congress has the exclusive authority to regulate foreign commerce.  *See* Pls.' Opp. at 29 (citing *United States v. Clark*, 435 F.3d 1100, 1109 (9th Cir. 2009)).  Defendants do not dispute that Congress has authority to regulate foreign commerce, but Congress has not passed a law relating to the permitting of cross-border pipelines.  Plaintiffs cite cases showing that, in certain

13

instances, Congress has passed laws relating to domestic pipelines.  *See United States v. Ohio Oil Co.*, 234 U.S. 548, 559-62 (1914) (upholding an ICC order requiring the submission of a rate schedule for existing oil pipelines); *Alaska v. Brown*, 850 F. Supp. 821, 825-28 (D. Alaska 1994) (upholding a law prohibiting the export of crude oil transported through the Alaska Pipeline System unless certain findings by the President are approved by Congress).  But Congress has passed no legislation regarding the permitting of cross-border pipelines.

> **2.      In the Absence of Congressional Regulation of Cross-Border Pipeline Crossings, the President Clearly Has the Authority to Authorize a Border Crossing.**

The President's authority to grant or deny a border-crossing permit for an international pipeline is rooted, not in the Commerce Clause, but in the President's inherent authority as Commander-in-Chief and his foreign affairs power.  Defs.' Mem. at 23-24; *see*, *e.g.*, *American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003).  Although it is true that the President is not "free from Congress' lawmaking power in the field of international relations," *Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2090 (2015), there can be no question of the President's inherent constitutional authority over foreign affairs.  *See*, *e.g.*, *Chi. & S. Airlines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 109 (1948).  Plaintiffs cite no authority finding that the President lacks such authority.

Instead, Plaintiffs unsuccessfully attempt to explain away the cases

supporting the President's authority over border-crossing permits. The only instance in which the President's authority to issue a border-crossing permit for a pipeline was squarely addressed was in *Sierra Club v. Clinton*, 689 F. Supp. 2d 1147 (D. Minn. 2010). Addressing arguments similar to the ones now advanced by Plaintiffs, the Court found that the President's authority in this area was "well recognized" and dismissed the claim. *Id.* at 1163. Plaintiffs argue that the *Sierra Club* decision, and *Natural Resources Council v. U.S. Dep't of State*, 658 F. Supp. 2d 105 (D.D.C. 2009), were wrongly decided, but these arguments are to no avail.

First, they argue that the *Digest of International Law* excerpts cited in Defendants' brief, ECF Nos. 167-1 & 167-3, do not support the President's inherent authority to issue a border-crossing permit. *See* Pls' Opp. at 33-35. As an initial matter, Defendants' primary purpose in citing those digests was to show that, *in fact*, Presidents going back to President Grant or their delegated representatives have exercised the authority to grant or deny such border-crossing permits. Defs.' Mem. at 3-4. Plaintiffs cannot and do not dispute that. Moreover, the digests support the principle that, in the absence of action by Congress, Presidents have the inherent constitutional authority to grant or deny a border-crossing permit in order to preserve the territorial integrity of the United States. *See* Hackworth, *Digest of Int'l Law*, Vol. IV, § 350, pp. 247-56 (1942), ECF No. 67-1.

15

Plaintiffs misinterpret *United States v. Western Union Telegraph Co.*, 272 F.

311 (S.D.N.Y. 1921), *aff'd* 272 F. 893 (2d Cir. 1921), *rev'd* 260 U.S. 754 (1922).

The district court accepted the principle that, in the absence of an applicable

congressional enactment, the President could grant or deny a physical connection

to the United States.  *See* 272 F. at 318-19.  The court found, however, that the

landing of the cables at issue in the case was subject to the Post Roads Act,

governing the construction and operation of telegraph lines, and therefore Congress

had already provided the requisite consent for the landing of the cables.  *Id.* at 322-

23.  That distinguishes *Western Union* from the present case because there is no

statute that governs authorization for cross-border pipelines.

Second, Plaintiffs argue that the Kellogg Act, relating to international cables,

and the International Bridge Act, show that the President lacks authority over

cross-border pipelines.  *See* Pls.' Opp. at 34-36.  To the contrary, those statutes

show that, in the few instances where Congress has enacted laws relating to cross-

border permits, it has recognized the President's historic role in deciding whether

to grant such permits and preserved that role.  *See* 47 U.S.C. § 35 (The President

may grant or deny a permit for a submarine cable if "such action will assist in . . .

maintaining the rights or interests of the United States . . . or will promote the

security of the United States."); 33 U.S.C. § 535b ("No bridge may be constructed,

maintained, and operated as provided in section 535 of this title unless the

16

President has given his approval thereto.").  Thus, although these statutes address other types of border crossings, "both statutes [are] highly relevant in the looser sense of indicating congressional acceptance" of the President's authority over the permitting of border-crossing facilities.  *Dames & Moore v. Regan*, 453 U.S. 654, 677 (1981).

Third, they argue that the attorney general opinions regarding cross-border permits are unpersuasive because they recognize Congress's plenary authority over foreign commerce and pre-date *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).  *See* Pls. Opp. at 36-39.  In 1898, when faced with the landing of a foreign cable on the shores of the United States, the attorney general advised the Secretary of State "that the President has the power, in the absence of legislative enactment, to control the landing of foreign submarine cables."  22 Op. Atty. Gen. 13, 27 (Jan. 18, 1898).  The attorney general reasoned that the "preservation of our territorial integrity and the protection of our foreign interests is [e]ntrusted, in the first instance, to the President" based on his role as commander in chief and his authority over foreign affairs.  *Id.* at 25-26.  This reasoning is as sound today as it was over a hundred years ago and *Youngstown* did nothing to undermine it. Indeed, *Youngstown* supports this conclusion by explaining that "congressional inertia, indifference or quiescence may sometimes, at least as a practical matter, enable, if not invite, measures on independent presidential responsibility."  343

U.S. at 637 (Jackson, J. concurring).  As discussed below, Congress has, indeed, acquiesced to the President's authority over permitting for cross-border pipelines.

### 3. Congress Has Acquiesced to the President's Authority Over Cross-Border Pipelines.

Congress has long acquiesced to Presidents exercising their authority to approve border crossing permits of all types, especially in the context of cross-border pipelines.  *See* Defs.' Mem. at 3-4, 24-25.  This is, indeed, a prototypical example of a "systematic, unbroken, executive practice, long pursued to the knowledge of Congress and never before questioned."  *Dames & Moore*, 453 U.S. at 686 (quoting *Youngstown*, 343 U.S. at 610-11 (Frankfurter, J., concurring)). Plaintiffs argue that Congress has not "acquiesced in th[e] particular exercise of Presidential authority" at issue here, Pls.' Opp. at 43 (citing *Medellin v. Texas*, 552 U.S. 491, 528 (2008)), but that is exactly what Congress has done with respect to pipeline border-crossings.  Congress has never questioned the President's authority to authorize pipeline border-crossings.

Plaintiffs suggest that the Court should look, not at the long history of Presidents authorizing border-crossings going back nearly 150 years, but more narrowly at the process that Presidents have used over the past 50 years.  *See* Pls.' Opp. at 43-47.  Plaintiffs offer no authority to support their cramped view of constitutional law.  Ultimately, it makes no difference anyway because even over the past 50 years, Congress has acquiesced to the President's authority over border-

crossings for pipelines.  Plaintiffs point out that Presidents have unilaterally changed the process multiple times over that period, *see* Pls.' Opp. at 44—but that just shows that Presidents have, in fact, taken action with respect to border-crossings for pipelines without action by Congress.

The Temporary Payroll Tax Cut Continuation Act of 2011, Pub. L. No. 112-78, 125 Stat. 1280 (2011), provides no support for Plaintiffs' arguments.  In that Act, Congress preserved the President's authority, consistent with Executive Order 13,337, to make the final determination as to whether a permit for the Keystone XL Pipeline would "serve the national interest" and therefore should be granted. *Id.* § 501(b)(1)-(2), 125 Stat. at 1289-90.  Congress could, of course, have passed a law approving the Keystone XL Pipeline regardless of what the President determined, but it did not do so.

In sum, Congress has consistently recognized the role of the President in authorizing border-crossings for all types of facilities and has not interfered with the processes established by several Presidents regarding the authorization of cross-border permits for pipelines.  Therefore, Congress has acquiesced in the President's exercise of his inherent constitutional authority over cross-border pipelines.  *See Sierra Club*, 689 F. Supp. 2d at 1163.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that Plaintiffs'

claims be dismissed.

Respectfully submitted this 15th day of August, 2019,

LAWRENCE J. VANDYKE
Deputy Assistant Attorney General

*/s/ Luther L. Hajek*
LUTHER L. HAJEK (CO Bar 44303)
United States Department of Justice
Environment and Natural Resources Division
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
Ph: (303) 844-1376; Fax: (303) 844-1350
luke.hajek@usdoj.gov

*Attorneys for Federal Defendants*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(d)(2)(E), the foregoing brief is proportionately spaced, has a typeface of 14 points, and contains 4,497 words, excluding the tables, caption, signature, certificate of compliance, and certificate of service.

*/s/ Luther L. Hajek*
LUTHER L. HAJEK
U.S. Department of Justice

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 15, 2019, a copy of the foregoing

Defendants' Reply in Support of Motion to Dismiss Plaintiffs' First Amended

Complaint was served on all counsel of record via the Court's CM/ECF system.

<u>/s/ Luther L. Hajek</u>
LUTHER L. HAJEK
U.S. Department of Justice