**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION**

| | |
|---|---|
| ROSEBUD SIOUX TRIBE, et al., | **4:18-cv-00118-BMM** |
| Plaintiffs, | |
| vs. | **ORDER** |
| PRESIDENT DONALD J. TRUMP, et al., | |
| Defendants, | |
| and | |
| TRANSCANADA KEYSTONE PIPELINE, LP, a Delaware limited partnership, and TC ENERGY CORPORATION, a Canadian Public Company, | |
| Defendant-Intervenors. | |

**INTRODUCTION**

Rosebud Sioux Tribe ("Rosebud") and Fort Belknap Indian Community ("Fort Belknap") (collectively "Plaintiffs") brought this action against President Donald J. Trump and various government agencies and agents in their official capacities ("Federal Defendants"). Plaintiffs challenge President Trump's decision to issue a Presidential Permit in 2019 ("2019 Permit") to Defendant-Intervenors

TransCanada Keystone Pipeline, LP and TC Energy Corporation (collectively, "TC Energy") to construct a cross-border segment of the oil pipeline known as Keystone XL ("Keystone").

## BACKGROUND

Plaintiffs filed this action on September 10, 2018. (Doc. 1). Plaintiffs allege that Federal Defendants violated the 1851 Fort Laramie Treaty, the 1855 Lame Bull Treaty, the 1868 Treaty of Fort Laramie, the Foreign Commerce Clause of the United States Constitution, the Plaintiffs' inherent tribal sovereign powers, and various federal statutes and regulations when President Trump issued the 2019 Permit. (Docs. 1, 58).

The Court described the factual history that gave rise to this case in detail in a December 2019 Order in a related case. *See Indigenous Environmental Network v. Trump*, Doc. 73 at 2–14, No. CV-19-28-GF-BMM (D. Mont. Dec. 20, 2019). All Parties have filed motions since December 2019. TC Energy filed a Motion for Summary Judgment on January 24, 2020. (Doc. 96). Federal Defendants filed a Motion for Summary Judgment on February 25, 2020. (Doc. 108). Plaintiffs filed a Motion for Summary Judgment with respect to certain claims on February 25, 2020. (Doc. 113). Plaintiffs filed Motion for a Preliminary Injunction on March 2, 2020. (Doc. 119). And Plaintiffs filed a Motion for a Temporary Restraining Order on March 17, 2020. (Doc. 130).

2

This case presents novel and complex questions of constitutional law and statutory interpretation. The Court therefore sought supplemental briefing on certain issues. (Doc. 93). The Court held a motion hearing on April 16, 2020, to hear arguments on the supplemental briefing as well as motions pending at that time. This Order will resolve many of the pending motions before the Court and narrow the scope of the litigation. Certain issues will remain pending additional briefing.

## ANALYSIS

## I.   Scope of the 2019 Presidential Permit

The 2019 Permit grants TC Energy permission "to construct, connect, operate, and maintain pipeline facilities at the international border of the United States and Canada . . . for the import of oil from Canada to the United States." Authorizing TransCanada Keystone Pipeline, L.P., To Construct, Connect, Operate, and Maintain Pipeline Facilities at the International Boundary Between the United States and Canada, 84 Fed. Reg. 13,101, 13,101 (March 29, 2019). The Parties do not dispute that the 2019 Permit purportedly authorizes TC Energy to construct, connect, and maintain a 1.2-mile segment of pipeline that extends from the United States-Canada border up to and including the first mainline shut-off valve. (Doc. 95 at 2–4; Doc. 99 at 1–9; Doc. 101 at 1–4).

Plaintiffs assert that the 2019 Permit further authorizes TC Energy to construct and operate an additional 875 miles of pipeline in the United States. (Doc. 99 at 1–9). The Court sought additional briefing on "whether the permit authorizes only the 1.2-mile border facility" or "whether the permit authorizes the entire Keystone XL Pipeline project." (Doc. 93 at 1). Plaintiffs argued that the 2019 Permit purports to approve the "entire pipeline." (Doc. 99 at 2). Plaintiffs point to the plain text as well as the context of the pipeline permit application to justify their argument. *Id.* at 1–9. Plaintiffs finally contend that the "entire pipeline is one enterprise" and that "without the 2019 Permit" there would be no pipeline. *Id*. The Court disagrees with Plaintiffs' interpretation.

The 2019 Permit by its plain language applies only to the 1.2 miles from the United States-Canada border, up to and including, the first mainline shut-off valve. The first paragraph of the 2019 Permit grants permission to "construct, connect, operate, and maintain pipeline facilities *at the international border* of the United States and Canada at Phillips County, Montana." 84 Fed. Reg. at 13,101 (emphasis added). The text of this initial permission, as well as the remainder of the permit, relates to authorization of pipeline facilities at the border. The 2019 Permit goes on to define "Border facilities" to include "those parts of the Facilities consisting of a 36-inch diameter pipeline extending from the international border between the United States and Canada . . . *to and including the first mainline shut-off valve in*

*the United States located approximately 1.2 miles from the international border*." *Id.* (emphasis added). Each permit condition explicitly limits the "Border facilities" term only. *See id.* at 13,101–03.

The 2019 Permit defines a broader "Facilities" term as the "portion in the United States of the international pipeline project associated with the permittee's application for a Presidential permit . . . and any land, structures, installations, or equipment appurtenant thereto." *Id.* at 13,101. This broader term certainly encompasses the full Keystone project. The 2019 Permit uses the term "Facilities" only once -- to direct that the construction "of the Facilities (*not including the route*) shall be, in all material respects and as consistent with applicable law," as described in TC Energy's 2012 Application and 2017 Application for a Presidential Permit. *Id.* at 13,101–02 (emphasis added). This "Facilities" term purports to require TC Energy to comply with applicable laws throughout the Keystone project. It does not in itself authorize the full Keystone project.

The 2017 Application provides further evidence for this reading. TC Energy wrote in that application that it "requests a Presidential Permit" for "the specific border crossing facilities associated with the Proposed Keystone XL Project." The application describes "border crossing facilities" as the 1.2-mile segment that "extend[s] downstream from the United States border, in Phillips County, Montana up to and including the first pipeline isolation valve, located at Milepost 1.2."

5

TransCanada Keystone Pipeline, L.P., Application for Presidential Permit for Keystone XL Pipeline Project, at 6 (Jan. 26, 2017).

Recent history and practice further support the Court's limited reading of the 2019 Permit. Past presidential permits for border-crossing pipelines applied to the project from the border crossing, up to and including, the first shut-off valves. Examples include the permits for the Cochin Pipeline (authorizing 14.5 miles) and the Magellan Pipeline (authorizing 600 feet). *See* Presidential Permit for Kinder Morgan Cochin Pipeline (Renville County, ND facilities), 78 Fed. Reg. 73,582 (Dec. 6, 2013); Presidential Permit for Magellan Pipeline Company, L.P., 80 Fed. Reg. 45,697 (July 31, 2015).

Older examples prove less clear in their terms, but they similarly indicate a focus on border facilities and do not exempt projects from applicable laws. *See, e.g.*, Authorizing the Murphy Oil Corp. to Connect, Operate and Maintain a Pipeline at the International Boundary Line Between the United States and Canada, 31 Fed. Reg. 6,204 (Apr. 21, 1966) (conditioning the "effectiveness of this permit to authorize connection of the U.S. facilities at the international boundary line with the facilities located in Canada" to the company's compliance with Canadian, federal, state, and local law).

The 2019 Permit, though limited in its scope, places important conditions on Keystone. It requires all Facilities to be built "consistent with applicable law," and

6

that TC Energy acquire "any right-of-way grants or easements, permits, and other authorizations" necessary to build the Border facilities. 84 Fed. Reg. at 13,101–02. The 2019 Permit grants no exemptions to laws governing public land use or that may require environmental analysis before authorizing a pipeline project. Those public land use laws still apply to the Keystone XL project when it requires federal actions—including over federal lands in that first 1.2-mile segment.

TC Energy sought and received a right-of-way from the U.S. Bureau of Land Management ("BLM") for the 1.2-mile segment. *See* BLM, Record of Decision: Keystone XL Pipeline Project Decision to Grant Right-of-Way and Temporary Use Permit on Federally Administered Land, DOI-BLM-MT-C020-2020-0022-OTHER_NEPA (Jan. 22, 2020). BLM's decision to grant the right-of-way remains subject to other litigation in this Court. *See Bold All. v. U.S. Dep't of the Interior*, 4:20-cv-00059-BMM-JTJ (D. Mont.); *Assiniboine & Sioux Tribes of the Ford Peck Indian Rsrv. v. U.S. Dep't of the Interior*, 4:20-cv-00044-BMM-JTJ (D. Mont.).

## II.   Resolution of Select Pending Motions

The Court's analysis regarding the scope and content of the 2019 Permit resolves, in turn, several pending motions before the Court.

### a. Motions for Temporary Restraining Order and Preliminary Injunction

Plaintiffs filed a Motion for a Preliminary Injunction as well as a Motion for a Temporary Restraining Order. (Docs. 119, 130). A court may grant a preliminary injunction or temporary restraining order to preserve the status quo pending final determination of an action. *See Textile Unlimited, Inc. v. A..BMH & Co.*, 240 F.3d 781, 786 (9th Cir. 2001). The issuance of a preliminary injunction or temporary restraining order represent extraordinary remedies, that should not be awarded as a matter of right, but only "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 22 (2008).

A plaintiff who seeks a preliminary injunction or temporary restraining order must establish four elements: 1) that it likely will succeed on the merits; 2) that it likely will to suffer irreparable harm in the absence of preliminary relief; 3) that the balance of equities tips in its favor; and 4) that an injunction will serve the public interest. *See id.* at 20.

Courts in the Ninth Circuit apply a sliding scale approach to preliminary relief. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). The reviewing court must balance the elements "so that a stronger showing of one element may offset a weaker showing of another." *Id.* Even "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the

plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135. The public interest and the balance of the equities factors merge when the government stands as a party. *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder,* 556 U.S. 418, 435 (2009)).

### i. Success on the merits

Plaintiffs fail at this juncture to show that they likely will succeed on the merits. The Court retains serious questions regarding Plaintiffs' legal claims. Although the Court previously has ruled that Plaintiffs provide plausible claims that survive a Motion to Dismiss, (Doc. 92), the complex and novel legal issues raised in this dispute require further briefing for elucidation. The Court will seek further briefing on the constitutional issues involved in this case. This kind of legal uncertainty weighs heavily against granting preliminary injunctive relief. *All. for the Wild Rockies*, 632 F.3d at 1135 (clarifying that "serious questions" regarding legal merits can only be overcome when the balance of hardship "tips sharply" in plaintiffs' favor). Plaintiffs' treaty, mineral, and tribal jurisdiction claims are similarly suspect, particularly in light of the Court's above analysis that the 2019 Permit is limited to the 1.2-mile border crossing segment.

### ii.   Irreparable injury

Plaintiffs fail to show that they are likely to suffer irreparable injury in the absence of preliminary relief. Plaintiffs' filings blurred the lines between the impact of the 1.2-mile border-crossing segment of the pipeline and the impact of the full pipeline. For example, Plaintiffs allege that Keystone construction will injure cultural resources, mineral estates, water resources, and tribal sovereign and treaty interests. (Doc. 120 at 17–25). These alleged injuries appear to occur almost entirely outside the 1.2-mile border-crossing segment and would not arise from construction activities within the 1.2-mile border-crossing segment. Any alleged irreparable injuries caused by construction outside the 1.2-mile border-crossing segment go beyond the scope of the relief available because the permit only covers the border segment. The proper "scope of injunctive relief is dictated by the extent of the violation established." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). The Court must set aside those injuries for purposes of injunctive relief analysis at this point.

Plaintiffs claim two irreparable injuries within the 1.2-mile border-crossing segment: four identified cultural historical sites, other unidentified cultural historical sites, and "public health and safety threats" related to worker camps. (Doc. 131 at 11–18). Each of these claimed injuries can result directly from the construction and eventual operation of the border crossing. Plaintiffs have not

demonstrated, however, the likelihood, rather than mere possibility, of injury. *Winter*, 555 U.S. at 21 (directing that a plaintiff "must demonstrate a likelihood of irreparable injury—not just a possibility—in order to obtain preliminary relief."). It appears from the record that there are no cultural resources within the 1.2-mile border crossing segment. The 2008 literature study of cultural resources cited by Plaintiffs that identified four potential sites has since been contradicted by two in-person search studies. (Doc. 141 at 20–21; Doc. 143 at 6–7). Those studies found no such sites. The alleged harms from worker camps remain speculative. The 2019 Permit does not authorize worker camp planning, placement, and operation. Plaintiffs cannot enjoin activities based on irreparable injuries that occur outside the scope of the 2019 Permit. *Cf. Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1123 (9th Cir. 2005) ("The authority to enjoin development extends only so far as the Corps' permitting authority.").

### iii.   Balance of equities and public interest

Both sides in this dispute can and do make valid arguments for their side in the balance of equities and public interest. Plaintiffs point to the cultural, historical, and environmental harms relating to construction and eventual operation of Keystone. (Doc. 120 at 25–30; Doc. 131 at 18–21). TC Energy points to significant investment made in the project over the last decade, potential economic and tax revenue impacts, as well as current construction activities at the border. (Doc. 126

at 26–27). Federal Defendants point to national interests in supporting "energy security and maintaining strong bilateral relations with Canada." (Doc. 127 at 27). The weight of these factors remains unclear and fails to compel the granting of preliminary relief.

TC Energy filed several status reports that detail its plans and implementation of construction activities. (Docs. 87, 90, 94, 158). TC Energy represented to the Court that it began construction of the border-crossing segment of the pipeline on April 4, 2020. (Doc. 158-1 at 3). TC Energy further represented that it anticipated completing the construction of that segment in May 2020. (Doc. 158-1 at 4). Construction will slow or stop with the winter months. The facts on the ground suggest further ambiguity, and even potential mootness, when weighing the equities involved in preliminary relief.

Preliminary injunctive relief represents an extraordinary remedy. *Winter*, 555 U.S. at 22. Plaintiffs carry the burden to provide a "clear showing" that they are "entitled to such relief." *Id*. Plaintiffs have failed to meet their burden because serious merit questions remain, Plaintiffs have not shown irreparable harm, and the balance of equities and public interest provide ambiguous guidance. The Court will deny Plaintiffs' Renewed Motions for Preliminary Injunction and Temporary Restraining Orders (Docs. 119, 130) for the above reasons.

**b. Summary Judgment Motions**

A court should grant summary judgment where the movant demonstrates that no genuine dispute exists "as to any material fact" and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment remains appropriate for resolving a challenge to a federal agency's actions when review will be based primarily on the administrative record. *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 778 (9th Cir. 2006).

Three motions for summary judgment remain pending before the Court. TC Energy filed a Motion for Summary Judgment on all claims on January 24, 2020. (Doc. 96). Federal Defendants filed a Motion for Summary Judgment on February 25, 2020. (Doc. 108). Plaintiffs filed a Motion for Summary Judgment with respect to its constitutional, mineral, and tribal jurisdiction claims (Claims Two, Five, and Six) on February 25, 2020. (Doc. 113).

The Court's above determination that the 2019 Permit authorizes only the 1.2-mile border crossing segment makes summary judgment appropriate in part. Plaintiffs have asserted claims relating to mineral and tribal jurisdiction based on the 1851 Fort Laramie Treaty and the 1855 Lame Bull Treaty. (Doc. 114 at 19–33). Those claims only extent to tribal land that lie well outside the 1.2-mile border crossing segment, and so they are not implicated in this case centered on the 2019 Permit. *See Gros Ventre Tribe v. United States*, 469 F.3d 801, 813 (9th Cir. 2006)

("[T]he United States agreed to protect the Tribes from depredations that occurred only on tribal land."). The 2019 Permit grants no exemptions to laws governing public land use or tribal land use. Such laws still apply to the Keystone XL project—including over federal lands in that first 1.2-mile segment. The 2019 Permit does not authorize pipeline construction across tribal land, however, and so Plaintiffs' mineral and treaty claims fail. The Court will grant summary judgment in part for Federal Defendants and TC Energy on those claims, and, therefore, deny summary judgment in part for Plaintiffs on those claims. What remains of Plaintiffs' Motion for Summary Judgment is their claim based on the U.S. Constitution. That constitutional claim will be the subject of additional briefing detailed below.

Finally, Plaintiffs raised in their opposition to Federal Defendant's Motion for Summary Judgment that they sought to challenge an additional action by BLM. TC Energy sought and received a right-of-way permit from BLM for the 1.2-mile border-crossing segment as well as approximately 43 other miles of federal land. *See* U.S. Bureau of Land Management, Record of Decision: Keystone XL Pipeline Project Decision to Grant Right-of-Way and Temporary Use Permit on Federally Administered Land, DOI-BLM-MT-C020-2020-0022-OTHER_NEPA (Jan. 22, 2020). BLM issued their record of decision ("2020 ROD") regarding the Keystone right-of-way on January 22, 2020. *Id.* The 2020 ROD relies, in turn, on the

14

findings of a Final Supplemental Environmental Impact Statement for the

Keystone XL Project ("2019 FSEIS"), 84 Fed. Reg. 70,187, 70,188 (Dec. 20,

2019), in response to a previous Order by the Court. *See IEN v. U.S. Department of*

*State, et al.*, 347 F.Supp.3d 561 (D. Mont. 2018). Plaintiffs requested that the Court

"incorporate Interior's final agency action into the complaint by amendment under

Fed. R. Civ. P. 15(b). (Doc. 137 at 2 (citing *Desertrain v. City of L.A.*, 754 F.3d

1147 (9th Cir. 2014)).

The Court declines this collateral attempt to amend Plaintiffs' complaint by

incorporation. Rule 12(b) provides courts with the ability to treat a complaint as

amended at trial to allow for introduction of certain evidence or when an issue is

tried by consent of the opposing party. *See* Fed. R. Civ. P. 15(b). Neither situation

applies to this case. Such an amendment would unduly prejudice Federal

Defendants and cause undue delay in the proceedings with the development of a

new administrative record. Plaintiffs sought to add these new claims through an

opposition brief in the midst of summary judgment briefing, a month after they had

filed their own summary judgment motion on existing claims, and only a month

before the full set of summary judgment motions would be argued for final

disposition. This maneuver was procedurally problematic, but there remain other

options for Plaintiffs to challenge the 2020 ROD. The 2020 ROD is already the

subject of two other lawsuits before the Court. *See Bold All. v. U.S. Dep't of the*

*Interior*, 4:20-cv-00059-BMM-JTJ (D. Mont.); *Assiniboine & Sioux Tribes of the Ford Peck Indian Rsrv. v. U.S. Dep't of the Interior*, 4:20-cv-00044-BMM-JTJ (D. Mont.). Those cases remain in the early stages of litigations. Plaintiffs may seek to intervene in one of these two cases or may file a separate action that can be heard on similar schedule to these existing lawsuits. Denial of this motion will not cause undue burden or prejudice to Plaintiffs under these circumstances.

## III.   Additional Briefing on Authority for the 2017 Presidential Permit

Plaintiffs raised three claims in their Complaint: that President Trump's issuance of the 2019 Permit 1) violated the Property Clause of the U.S. Constitution; 2) violated the Commerce Clause of the U.S. Constitution; and 3) violated Executive Order 13,337. (Doc. 37 at 24, 27, 31). These claims implicate novel and complex separation of powers questions. The Court earlier sought supplemental briefing on separation of powers among other issues. (Doc. 93). The Court now seeks to narrow the constitutional analysis. The Court will require further briefing, however, in an effort to distinguish the exact contours of presidential and congressional authority over pipeline border-crossing permits.

### a.  The *Youngstown* Framework

The President wields significant authority, particularly in the "era of presidential administration." Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2246 (2001). This significant authority comes with critical

16

limitations intended to safeguard our constitutional system—particularly when the President takes unilateral action. *See Youngstown Sheet & Tube v. Sawyer*, 343 U.S. 579, 634 (1952) (Jackson, J., concurring) (cautioning the dangers of a strengthened executive on the "balanced power structure of our Republic"). These safeguards include the separation of powers between the coordinate branches, the qualified delegation of authority from Congress, and federalism. *See, e.g., Mistretta v. United States*, 488 U.S. 361, 380 (1989) (noting that the constitutional principle of separation of powers embodies "the central judgment of the Framers of the Constitution that, within our political scheme, the separation of governmental powers into three coordinate Branches is essential to the preservation of liberty" in order to preventing aggrandizement by one branch encroaching into the sphere of authority of another); *Buckley v. Valeo*, 424 U.S. 1, 122 (1976) (per curiam) ("The Framers regarded the checks and balances that they had built into the tripartite Federal Government as a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other.").

A court may determine whether a unilateral presidential action went beyond the bounds of the executive power and infringed on the enumerated powers of Congress. Even where the President has broad discretion over an issue, "that discretion is not boundless" and "may not transgress constitutional limitations." *Abourezk v. Reagan*, 785 F.2d 1043, 1061 (D.C. Cir. 1986). It remains "the duty of

the courts, in cases properly before them, to say where th[e] . . . constitutional boundaries lie." *Id.* Justice Jackson established a three-category framework to assess the constitutionality of an executive action. *See Youngstown Sheet & Tube*, 343 U.S. at 635–37 (Jackson, J., concurring).

In the first category, "[w]hen the President acts pursuant to an express or implied authorization [from Congress], his authority is at its maximum." *Id.* at 635. When Congress legislates to give the President authorization to act on a subject, the President personifies "the federal sovereignty," and his actions are presumptively valid. *Id.* at 636–37. Few cases apply this first category. In those cases that do exist, the U.S. Supreme Court tends to find both express and implied authorization as reinforcing factors placing the executive action into this category. *See, e.g.*, *Trump v. Hawaii*, 138 S. Ct. 2392, 2407–08 (2018); *Dames & Moore v. Regan*, 453 U.S. 670, 669 (1981).

In the second category, when the "President acts in absence of either a congressional grant or denial of authority" relying on "his own independent powers" then "congressional inertia, indifference or quiescence may sometimes, at least as a practical matter, enable, if not invite, measures on independent presidential responsibility." *Youngstown*, 343 U.S. at 637. Still fewer cases exist involving this second category of executive action. *See, e.g.*, *Zivotofsky v. Kerry*,

576 U.S. 1059, 1088–94 (2015); *United States v. Midwest Oil Co.*, 236 U.S. 459, 474 (1915).

In the third category, "[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb." *Youngstown*, 343 U.S. at 637. In such a case, Presidents may rely *only on* their own independent power, after "subtraction of such powers as Congress may have over the subject." *Id.* at 639. Several examples of this third category exist. *See, e.g.*, *Zivotofsky v. Kerry*, 576 U.S. 1059, 1088–94 (2015); *Medellín v. Texas*, 552 U.S. 491, 525–29 (2008).

The three *Youngstown* categories prove useful, but they serve only as guides. Executive actions "in any particular instance fall[] not neatly in one of three pigeonholes, but rather at some point along a spectrum running from explicit congressional authorization to explicit congressional prohibition." *Dames & Moore v. Regan*, 453 U.S. 670, 669 (1981). "[T]he great ordinances of the Constitution do not establish and divide fields of black and white." *Id.* at 669 (quoting *Springer v. Philippine Islands*, 277 U.S. 189, 209 (1928) (Holmes, J., dissenting).

In separation of powers cases, the U.S. Supreme Court "has often 'put significant weight upon historical practice.'" *Zivotofsky*, 135 S. Ct. at 2091 (quoting *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2559 (2014)). The history of the pipeline permitting process involved a string of executive actions. The

constitutionality of any particular executive action must be analyzed in its own

context, and each executive decision over the history of a particular policy may fall

at a unique point on the *Youngstown* framework spectrum.

The Supreme Court provided a model for historical analysis of a particular

power in *Zivotofsky*. Justice Anthony Kennedy systematically analyzed the history

of the legislative and executive contest over the power to recognize foreign

nations. *See Zivotofsky*, 576 U.S. at 23-28. Justice Kennedy meticulously

categorized a series of historical recognition decisions within the *Youngstown*

framework in order to contextualize the particular recognition decision before the

Supreme Court. *See id.* This model for separation of powers analysis proves useful

and applicable to the case before the Court today.

### b. Supplemental Briefing

The history of presidential permits for pipelines—and for Keystone in

particular—provides a new example of historical inter-branch conflict. This Court

previously sought additional briefing to inform its analysis of the separations of

powers questions implicated in this case. (Doc. 74). The Court now seeks

additional briefing with more specific direction.

The Court seeks briefing on the application of *Youngstown* to the timeline of

pipeline border-crossing permits. The Parties should assume that the Foreign

Commerce Clause, the Property Clause, and the various executive and legislative

powers relating to foreign affairs remain relevant to this analysis. (Doc. 73 at 21–34). The Parties should center analysis on border-crossing pipeline permits, *not border-crossing permits in general*.

1. Where on the *Youngstown* spectrum do each of the following individual executive actions lie:

   a. Issuance of pre-1968 cross-border pipeline permits;

   b. Issuance of Executive Order 11423, Providing for the Performance of Certain Functions Heretofore Performed by the President with Respect to Certain Facilities Constructed and Maintained on the Borders of the United States, Exec. Order 11423, 33 Fed. Reg. 11741 (Aug. 20, 1968);

   c. Executive Order 13,337, Issuance of Permits With Respect to Certain Energy-Related Facilities and Land Transportation Crossings on the International Boundaries of the United States, Exec. Order No. 13,337, 69 Fed. Reg. 25299 (April 30, 2004);

   d. State Department Denial of TC Energy's application following Congress' passage of the Temporary Payroll Tax Cut Continuation Act ("TPTCCA"), Pub. L. No. 112-78, 125 Stat. 1280 (December 23, 2011);

e. President Barack Obama's veto of the Keystone XL Pipeline

Approval Act. Veto Message to the Senate: S. 1, Keystone XL

Pipeline Approval Act, 2015 WL 758544 (2015); and

f. President Donald Trump's issuance of the 2019 Permit.

2. Address the following additional questions that will inform the Court's

*Youngstown* analysis:

a. Did TPTCCA endorse the EO 13,337 process generally?

b. Did TPTCCA endorse the EO 13,337 process only for Keystone?

c. Assuming TPTCCA endorsed the EO 13,337 process for Keystone,

how could TC Energy obtain a permit once President Obama denied

the permit?

d. How should the Court interpret the passage of the Keystone XL

Pipeline Approval Act?

## ORDER

Accordingly, **IT IS ORDERED** that:

- Plaintiffs' Motion for Preliminary Injunction (Doc. 119) is **DENIED**;

- Plaintiffs' Motion for Temporary Restraining Order (Doc. 130) is

   **DENIED**;

- TC Energy's and Federal Defendants' Motions for Summary Judgment (Docs. 96, 108) are **GRANTED IN PART** on Plaintiffs' Claims Five and Six;

- Plaintiffs' Motion for Summary Judgment (Doc. 113) is **DENIED IN PART** on Claims Five and Six;

- The Parties shall file simultaneous briefing, not to exceed 10,000 words, on the issues listed in Part III.b of this Order within 30 days of the issuance of this Order.

Dated the 16th day of October, 2020.

_____
Brian Morris, Chief District Judge
United States District Court