# United States Department of the Interior
# Bureau of Land Management

Environmental Impact Statement
DOI-BLM-MT-C020-2020-OTHER_NEPA
Case File Numbers: MTM-098191, TUP MTM-98191-01

January 22, 2020

**Record of Decision**
**Keystone XL Pipeline Project**
**Decision to Grant Right-of-Way**
**and Temporary Use Permit**
**on Federally-Administered Land**

Location: Montana

U.S. Department of the Interior
Bureau of Land Management
Montana/Dakotas State Office
Miles City Field Office
111 Garryowen
Miles City, MT 59101



BLM-00137

THIS PAGE INTENTIONALLY LEFT BLANK

BLM-00138

# TABLE OF CONTENTS

**1.0 Introduction** — 1
1.1 Background and Project Overview — 1

**2.0 The Decision** — 5
2.1 Terms, Conditions, Mitigation and Special Stipulations — 7
2.2 Monitoring and Enforcement — 8
2.3 Bonding — 9
2.4 Decommissioning — 9
2.5 Management Considerations — 10
    2.5.1 Greater Sage-grouse — 10
    2.5.2 Migratory Birds — 12
    2.5.3 Sensitive Soils — 12
    2.5.4 Vegetation Communities of Conservation Concern — 12
    2.5.5 Public Health and Safety — 12
    2.5.6 River and Stream Crossings — 13
    2.5.7 Climate — 13
    2.5.8 Potential Releases — 13
    2.5.9 Tribal Treaty Rights, Tribal Concerns and Environmental Justice — 14
    2.5.10 Co-Location — 15

**3.0 Alternatives** — 17
3.1 Alternatives Considered in Detail — 18
    3.1.1 No Action Alternative — 18
    3.1.2 Environmentally Preferred Alternative — 18
3.2 Alternatives Considered and Eliminated — 19

**4.0 Public Involvement, Consultation and Coordination** — 19
4.1 Public Involvement — 19
4.2 Consultation Under Section 7 of the Endangered Species Act — 21
4.3 Consultation Under Section 106 of the National Historic Preservation Act — 22
4.4 Government-to-Government Tribal Consultation — 24

**5.0 Final Agency Action** — 25

**List of Record of Decision Appendices** — 27

BLM-00139

THIS PAGE INTENTIONALLY LEFT BLANK

BLM-00140

## LIST OF ACRONYMS

| | |
|---|---|
| ACHP | Advisory Council on Historic Preservation |
| ACS | American Community Survey |
| ATWA | Additional temporary workspace areas |
| ARMP | Approved Resource Management Plan |
| BLM | Bureau of Land Management |
| CEQ | Council on Environmental Quality |
| CFR | Code of Federal Regulations |
| CIC | Construction Inspection Contractor |
| CWA | Clean Water Act |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FLPMA | Federal Land Policy and Management Act of 1976 |
| FR | *Federal Register* |
| GHG | Greenhouse Gas |
| HDD | Horizontal Directional Drilling |
| Keystone | TransCanada Keystone Pipeline, LP |
| MDEQ | Montana Department of Environmental Quality |
| MFSA | Montana Major Facilities Siting Act |
| MLA | Mineral Leasing Act of 1920, as amended |
| NEPA | National Environmental Policy Act |
| NOA | Notice of Availability |
| NOI | Notice of Intent |
| NRHP | National Register of Historic Places |
| NTP | Notice to Proceed |
| PHMSA | Pipeline Hazardous Materials Safety Administration |
| POD | Plan of Development |
| PHMA | Greater Sage-grouse Priority Management Area |
| Project | Keystone XL Pipeline Project |
| PRPA | Paleontological Resources Protection Act of 2009 |
| ROW | Right-of-way |
| SHPO | State Historic Preservation Office |
| SPCC | Spill Prevention Control and Countermeasure |
| TUP | Temporary-use permit |
| TWA | Temporary workspace area |

BLM-00141

| U.S. | United States |
| U.S.C. | United States Code |
| USACE | U.S. Army Corps of Engineers |
| USDOI | U.S. Department of the Interior |
| USFWS | U.S. Fish and Wildlife Service |
| WCSB | Western Canadian Sedimentary Basin |

BLM-00142

# RECORD OF DECISION

## 1.0 INTRODUCTION

This Record of Decision (ROD) documents the Bureau of Land Management's (BLM) decision to grant a right-of-way (ROW) and temporary use permit (TUP), pursuant to the Mineral Leasing Act (MLA), 30 U.S.C. § 185, and BLM's regulations implementing the MLA, 43 C.F.R. § 2880, *et seq.*, to cross 44.4 miles of federal land managed by BLM and 1.88 miles of federal land managed by the U.S. Army Corps of Engineers (USACE) in Montana, in connection with the larger, proposed Keystone XL pipeline project.

In September 2008, TransCanada Keystone Pipeline, L.P. (Keystone) filed an initial Presidential Permit application with the Secretary of State requesting authorization to construct, operate, maintain, and (eventually) decommission the Keystone XL Project to transport crude oil across the U.S./Canada border near Morgan, Montana.  Keystone also submitted to BLM a ROW application to cross federal lands in Montana (managed by BLM and USACE).  The Department of State, as lead federal agency, initiated an environmental impact statement to address the initial Presidential Permit application.  The Department of State requested that BLM serve as a cooperating agency for the National Environmental Policy Act (NEPA) in 2008.  The BLM has continued to serve as a cooperating agency since 2008 and is utilizing this NEPA documentation in issuing this decision on Keystone's proposed ROW to cross federal lands in Montana.

Consistent with 40 CFR 1501.6, the BLM is adopting, and relying on, the environmental analyses and documentation prepared in partnership with the Department of State, pursuant to NEPA, 42 U.S.C. § 4321, *et seq.*  The BLM has conducted an independent review of the Department of State's 2011 Final EIS, 2014 Final SEIS, and 2019 Final SEIS and concluded that the Department of State has addressed the BLM's comments and suggestions.  As further documented in this ROD, BLM's decision also conforms to and complies with all applicable environmental laws and regulations, including, but not limited to, the Federal Land Policy and Management Act, 43 U.S.C. § 1701, *et seq.*, Endangered Species Act, 16 U.S.C. § 1531, *et seq.*, and the National Historic Preservation Act, 54 U.S.C. § 306108.  The USACE, also a cooperating agency, concurs with the adoption of the Department of State's NEPA documentation and BLM's issuance of the ROW and TUP under the MLA, for 1.88 miles of land managed by the USACE, consistent with 43 CFR § 2884.26, and the USACE's "Policy and Procedural Guidance for Processing Requests to Alter U.S. Army Corps of Engineers Civil Works Project Pursuant to [33 U.S.C. §] 408."

## 1.1 BACKGROUND AND PROJECT OVERVIEW

Keystone proposes to construct, operate, maintain, and (eventually) decommission the Keystone XL Project to transport crude oil across the U.S./Canada border near Morgan, Montana, to Steele City, Nebraska; and then from Cushing, Oklahoma, to locations along the Texas Gulf of Mexico.  Keystone's interests and objectives for the Project are to provide the national energy infrastructure pipeline to transport Western Canadian Sedimentary Basin (WCSB) crude oil from the U.S. border with Canada to existing pipeline facilities near Steele City, Nebraska.  The proposed pipeline would connect to the existing Keystone Cushing Extension pipeline, already in place, which extends from Steele City, Nebraska, to Cushing,

1

BLM-00143

Oklahoma. In total, the proposed Project would consist of approximately 1,209 miles of new, 36-inch-diameter pipeline, with approximately 327 miles of pipeline in Canada and approximately 882 miles in the United States. The proposed Project would cross the international border between Saskatchewan, Canada, and the United States near Morgan, Montana, and would include a pipeline route in Montana, South Dakota and Nebraska. The Project would also provide transport capacity for domestically produced crude oils (e.g., from the Bakken Shale Formation and Mid-Continent Formation) that would be on-loaded to the pipeline facilities in Montana and Oklahoma, respectively. Ultimate disposition of crude oil and any of the refined products would be determined by market demand.

After publication of the 2011 Final EIS for the Project, the Department of State denied the Presidential Permit application for the Keystone XL pipeline in January 2012. In April 2012, Keystone proposed a new alignment in Nebraska with the goal of avoiding the Sand Hills Region and subsequently filed a new application for a Presidential Permit in May 2012. After subsequent reviews by the Department of State, including publication of the 2014 Final Supplement EIS, the Department of State denied the Presidential Permit application in November 2015. In January 2017, Keystone refiled their application for a Presidential Permit with the Department of State, ultimately leading up to the issuance of a Presidential Permit for the Keystone XL pipeline in March 2019 (refer to Table 1-1. Summary of Actions Related to the Keystone XL Pipeline, Final SEIS).

Prior to its application to the Department of State, Keystone filed a ROW application with BLM in March 2008, under Section 28 of the MLA (30 U.S.C. § 185), Keystone also submitted its draft Plan of Development (POD) detailing the plans to construct, operate, maintain and (eventually) decommission the facilities, improvements, and structures within the ROW, which, if approved, would be made part of the ROD, and attached to the BLM ROW grant and TUP as a comprehensive compliance document for approved use of the ROW. The only federal lands involved in the Project are BLM and USACE administered lands in the State of Montana.

The ROW application was revised by Keystone in September 2012 and submitted to BLM to reflect changes in the Project description. After the November 2015 Presidential Permit denial, Keystone withdrew its ROW application with the BLM in February 2016.

In February 2017, Keystone filed an updated POD with the BLM and requested that BLM reinitiate processing of their ROW application. Upon further adjustments to the Project, Keystone submitted an updated POD to BLM, which reflects the most recent data on the Project, updated mitigation and conservation measures, and clarifies minor route adjustments, which were all within existing cultural survey boundaries.

The Project generally requires permission for a 110-feet width of temporary use construction area for the pipeline and temporary use space for work areas. After construction, the Project would be reduced to and require a 50-foot-wide long-term pipeline ROW through Montana on federal lands. The proposed pipeline in Montana would include 44.4 miles located on federal land administered by the BLM in the Miles City, Glasgow, and Malta Field Offices and 1.88 miles of federal land administered by USACE near Fort Peck Dam (refer to Appendix B – Maps). In total, the long-term ROW issued by BLM for the pipeline on federal land in Montana would occupy approximately 5 percent of the proposed pipeline Project length in the U.S. In addition, intermediate mainline valves would be placed along the pipeline at locations on federal lands necessary to maintain adequate flow through the pipeline. The intermediate mainline valves are located as dictated by the hydraulic characteristics of the pipeline and as required by federal regulations with the intent to provide for public safety and environmental protection as

BLM-00144

part of pipeline integrity management practices. There are two intermediate main line valves located on federally administered lands; one located on BLM administered lands and the other on USACE administered lands.

To facilitate the Project, temporary (to be reclaimed) and long-term roads are needed to provide adequate access for construction and maintenance of the pipeline and related facilities. Use of temporary areas can be utilized to support MLA ROWs (MLA, 30 U.S.C. § 185). No temporary work camps or ware yards are located on federal lands as part of this Project. Long-term roads on federal lands in Montana are part of the MLA ROW.

The Department of State is the lead federal agency for the 2011 Environmental Impact Statement (EIS), the 2014 Final Supplemental EIS (2014 Final SEIS) and the 2019 Final Supplemental EIS (2019 Final SEIS). The BLM and USACE are cooperating agencies involved in the preparation of the environmental documents (40 CFR 1501.6). The proposed route alignment in Montana considered in the 2014 Final SEIS reflects route modifications and other mitigation measures in order to avoid sensitive water crossings made in response to BLM and Montana Department of Environmental Quality (MDEQ) comments during the preparation of the 2014 Final SEIS (refer to Section 2.1 of the 2014 Final Supplemental EIS). The BLM also considered the requirements of the MLA, including Section 28(p) regarding consideration of co-location with existing ROWs on federal land to the extent practicable (refer to Section 2.5.10 of this decision for further information on co-location).

In 2017, a border crossing permit was issued by the Under Secretary of State for Political Affairs to Keystone, consistent with the authority and direction granted by the President. Several environmental and Native American non-profits challenged that decision in the U.S. District Court for the District of Montana, in part, on the basis of failing to satisfy the requirements of NEPA. On August 15, 2018, the U.S. District Court ordered the Department of State to analyze the impacts of the Mainline Alternative Route (MAR) through Nebraska. On November 8, 2018, the court identified only a few additional deficiencies in the Department of State's 2014 Final SEIS with respect to its consideration of the effects of current oil prices, cumulative effects of greenhouse gas emissions, and cultural resources and accidental release modeling. The court remanded the decision back to the Department of State to correct these NEPA deficiencies and update the analysis. The court also rejected several challenges to the Department of State's compliance with the Endangered Species Act (ESA), except that it did find that the Department of State and the U.S. Fish and Wildlife Service must account for new information related to impacts from the MAR and potential oil spills. To address these deficiencies, the Department of State initiated supplemental NEPA, in coordination with the cooperating agencies.

Then, on March 29, 2019, the President issued a Presidential Permit authorizing construction, connection, maintenance and operation of the Project at the U.S.-Canadian border subject to Keystone obtaining all necessary rights-of-way and other approvals. There is no longer any action for the Secretary of State to take with respect to the Project. The Department of State, however, completed the 2019 Final SEIS on December 20, 2019, addressing all of the NEPA deficiencies identified in the U.S. District Court's November 8, 2018, decision, because work on the supplement was initiated by the Department of State prior to the March 2019 Presidential Permit and because the Department of State committed to the U.S. District Court that it would address the NEPA deficiencies.

The 2019 Final SEIS supplements the 2014 Keystone XL Final SEIS to address all of the deficiencies identified by the U.S. District Court, and consider the direct, indirect and cumulative impacts related to changes in the Project since 2014 and incorporates the following updated

3

information and new studies, for which BLM is taking into consideration, with regard to the entire Project:

• Update to the market analysis considering the effects of current market conditions and the viability of the proposed Keystone XL Project (including consideration of a variety of global market factors such as supply, demand, and the price of oil per barrel (Section 1.4 of the 2019 FSEIS)).

• Analysis of the MAR, including existing resources, the potential for environmental impacts, and identification of any potential mitigation measures to address environmental impacts. The Nebraska Public Service Commission (Nebraska PSC) approved the MAR on November 20, 2017 and on August 23, 2019, the Nebraska Supreme Court upheld that decision.

• New information related to the Keystone XL Project, including studies conducted regarding the proposed Keystone XL pipeline's crossing of the Missouri River (a site-specific risk assessment conducted for the Missouri River crossing and the USACE Missouri River scour analysis), sensitive species surveys and agency data, and findings of the cultural surveys completed since 2014.

• Revised methodology and analysis for greenhouse gas emissions using recently published lifecycle greenhouse gas emissions studies for WCSB and other crude oils as well as the Greenhouse Gases, Regulated Emissions, and Energy Use in Transportation (GREET) Model, and reevaluation of projected cumulative emissions using updated crude oil production and consumption estimates (e.g., U.S. Energy Information Administration (EIA), Canadian Association of Petroleum Producers [CAPP], and Canada National Energy Board [CNEB] projections). The analysis also considers recent climate change reports including the U.S. Global Change Research Program's Fourth National Climate Assessment and the Intergovernmental Panel on Climate Change (IPCC) Special Report on Global Warming of $1.5$oC.

• Revised methodology for accidental releases, including updated modeling to account for industry- and Keystone-specific incident history since 2014, the latest findings and research related to oil spills, an updated analysis of potential for impacts from overland spills to sensitive resources along the entire alignment, and an updated analysis of potential for impacts to downstream receptors from the pipeline along connected hydraulic pathways.

• Additional supporting analysis of electrical power infrastructure required to support pipeline operations, including existing resources, the potential environmental effects, and identification of any potential mitigation measures to address the adverse environmental effects.

The 2019 Final SEIS analyzed the potential impacts of the proposed Project (see Section 2.4 for a description of the proposed Project) including effects for potential construction, operations and maintenance of the proposed Project under the Proposed Action discussion and a No Action Alternative, where Keystone would not construct the proposed Project. Further, the 2019 Final SEIS incorporates by reference the 2011 Keystone XL Final EIS and the 2014 Keystone XL Final SEIS and previous analysis prepared by and incorporated into the Department of State's documentation relating to its compliance with NEPA. For BLM's purposes, the proposed ROW on federal land and its alternatives are considered in the 2011 EIS and 2014 Final SEIS; the

4

BLM-00146

proposed use of federal land did not change between the 2014 Final SEIS and the 2019 Final SEIS.

BLM will consider other ROW applications under Title V of the Federal Land Policy and Management Act, 43 U.S.C. § 1761, which were filed by other applicants, for transmission and distribution lines for the proposed electrical power lines associated with Pump Stations 9 and 10 of the proposed Project in Montana.  Although BLM is evaluating these ROW applications in separate environmental assessments (EAs), the potential environmental effects of these FLPMA ROWs are analyzed as connected actions in Chapter 6, Electrical Power Infrastructure, and Chapter 7, Cumulative Impacts of the 2019 Final SEIS.  These projects require future decision, pursuant to FLPMA, NEPA, and other related authorities.

In summary, the BLM- and USACE-administered federal lands involved in the project include approximately 777 acres of federal lands in Montana (this consists of 486 acres of land required for a temporary use permit (TUP) – i.e. additional temporary workspace and temporary access roads– and 291 acres of land required under a long-term MLA ROW grant for the pipeline and access roads).  The BLM considered Keystone's ROW application in accordance with its multiple-use mandate and applicable land use plans.  The BLM also considered the requirements of Section 28 of the MLA, including the requirements relating to environmental protection and co-location with existing ROWs.  The ROW decision also required USACE permission under Section 14 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 408, to make alterations to federal property administered by the USACE, provided the USACE determines the proposed alteration will not be injurious to the public interest and will not impair the usefulness of a Civil Works project.

## 2.0 THE DECISION

Consistent with 40 CFR 1506.3(c), the BLM, as a cooperating agency, is adopting the Department of State's environmental analysis in, the 2011 Keystone Final EIS, the 2014 Keystone XL Final SEIS, and the 2019 Final SEIS as well as other information considered or included with those documents.  This Record of Decision is based on the 2011 Final EIS, the 2014 Final SEIS, the 2019 Final SEIS, the 2020 Final POD, and a thorough review of supporting information/documents and current data relevant to federally-administered lands, including consideration of the requirements of Section 28 of the MLA.

After extensive environmental analysis of the Project and alternatives, consideration of public comments, consultation, and applicable pertinent federal laws and policies, and with concurrence from USACE, under 33 U.S.C. § 408, and the MLA provisions of 43 CFR 2884.26, it is the BLM's decision to approve the MLA ROW grant to Keystone for a 50-foot-wide, long-term MLA ROW and to approve a TUP, associated with temporary access roads and work areas for construction, on lands administered by the BLM and USACE in Montana, as further detailed below.

Section 28 of the MLA authorizes the BLM to issue the MLA ROW and TUP and offer a grant to TransCanada Keystone Pipeline, LP for the pipeline and associated facilities. The MLA also provides the BLM with authority to grant ROWs and TUPs on federal lands administered by more than one federal agency for the transport of oil and gas or other mineral resources. Additionally, the Energy Policy Act of 2005, which recognized the need to improve domestic energy production, develop renewable energy resources, and enhance the infrastructure (e.g., pipelines) for collection and distribution of energy resources across the Nation, encourages the use of public land for energy-related facilities.  The BLM is charged with analyzing applications

BLM-00147

for authorizing utility and transportation systems on federal land, and for incorporating USACE resource concerns and/or special stipulations into this decision.

After a thorough review of the analysis, BLM has determined that all practicable means to avoid, minimize, mitigate, and, if required, compensate (in accordance with the provisions of bureau policy) for unavoidable impacts of the route selected for the Project, have been considered (and adopted as part of this decision) in the Final EIS, Final SEIS and Final Supplemental EIS, and, as further refined in the POD. Specifically, and limited to federal lands administered by BLM and USACE in Montana, and with concurrence from the USACE, it is the BLM's decision to:

1.  Grant a ROW authorizing the construction, operation, maintenance and eventual decommissioning of a 36-inch-diameter steel pipeline for the transport of crude oil. The long-term ROW will be 50 feet in width, approximately 46 miles long and will encumber approximately 281 total acres of federally-administered land by BLM and USACE. The term of the ROW will be 30 years with the right of renewal, consistent with Section 28(n) of the MLA, 30 U.S.C. § 185(n).

2.  Grant a ROW authorizing the development of long-term access roads to support operation and maintenance of the pipeline and related facilities during the ROW term. The long-term ROW for access roads will be up to 30-feet-wide, totaling 2.84 miles long, encumbering approximately 10 acres of federally administered land. The term of the ROW will be 30 years with the right of renewal.

3.  Grant a TUP for 60-foot-wide temporary workspace areas (TWAs) (30 feet on either side of the long-term MLA ROW) for construction of the pipeline and snow removal, along approximately 46 miles of the length of the long-term pipeline ROW and encompassing 324 acres of federal lands. The term of the TUP for TWAs will be up to three (3) years and renewable as determined by the Authorized Officer.

4.  Grant a TUP authorizing the use of additional temporary workspace areas (ATWA) for construction workspace where special construction techniques are to be used. The ATWAs will encompass approximately 122 total acres of federal lands. The ATWAs are in addition to the aforementioned 60-foot-wide TUP for construction of the pipeline. The term of the TUP for ATWA will be up to three (3) years and renewable as determined by the Authorized Officer.

5.  Grant a TUP for temporary access roads 30-feet-wide, 11.06 total miles long, and containing approximately 39 total acres of federal lands. The term of the TUP for temporary access roads will be up to three (3) years and renewable as determined by the Authorized Officer.

The Final POD addresses actions for the federal lands in Montana (refer to Section 2.1 below). The attached Final POD is approved, subject to the conditions set forth in this ROD and includes applicant-proposed and committed design features, environmental protection plan, and mitigation and monitoring measures to avoid and/or minimize resource impacts. These mitigation measures initially described in the 2011 FEIS were refined in the 2014 Final SEIS and the 2019 Final SEIS, and are incorporated into the Environmental Protection Plan contained in the Final POD and attached to this decision. The Final POD also includes specific measures and procedures associated with the 2013 Programmatic Agreement, reflecting compliance with Section 106 of the NHPA (refer to Section 2.1).

BLM-00148

The subject MLA ROW grant and TUP will be granted by the BLM, with concurrence from USACE, under the authority of the MLA, as amended and supplemented (30 U.S.C. § 185 et seq.) (refer to Appendix A - Legal Descriptions (which delineates BLM-administered lands and USACE-project lands)). The purpose of the TUPs is to allow for adequate space to navigate activities necessary for construction of the project and facilitate temporary access for construction activities. The specific use of the TUPs is described above, and will not be utilized for workcamps or pipe-yards on the federal land portions.

While the entire Keystone Project consists of approximately 882 miles in the United States, with the vast majority of the route crossing non-federal lands, this decision pertains to and only affects federal lands in the Project area administered by the BLM and USACE in Montana. No federal lands are crossed by the Project outside of Montana. Legal descriptions for the portions of BLM-administered lands in the Malta, Glasgow, and Miles City field offices and the USACE-administered land associated with Fort Peck Dam are included as Appendix A of this decision. However, in accordance with the MLA and 40 CFR 1508.7 and 1508.8 (CEQ NEPA Regulations), direct, indirect and cumulative effects beyond the federal lands in Montana were disclosed and considered as part of BLM's decision.

The route alignment selected as the agency-preferred route is the pipeline route analyzed in the 2014 Final SEIS (referred to as the "Proposed Project" route in the 2014 Final SEIS), and incorporates required applicant-committed design features and mitigation measures (Final POD, Appendix C)) and Special Stipulations (Appendix F, F.1 to this decision). In accordance with Section 28(p) of the MLA, BLM examined co-location opportunities for the proposed route and is requiring a portion of the pipeline on federal lands in Montana to be co-located (refer to Section 2.10 below).

This decision does not authorize Keystone to commence construction of any Project facilities or proceed with other ground-disturbing activities in connection with the Project on federal lands until Keystone receives written Notice(s) to Proceed (NTP) from BLM. In accordance with 43 CFR 2886.10, the BLM will not issue any NTPs for the Project until the BLM Authorized Officer determines that the Applicant has met, to BLM's satisfaction, all applicable ROW grant stipulations, terms, and conditions.

This ROD and the approved ROW grant will include requirements outlined in this decision and terms and conditions that are based on the: (i) 2011 FSEIS, (ii) 2014 Final SEIS, (iii) 2019 Final SEIS, (iv) the supporting documents appended to the subject NEPA, (v) the final BA and BO and USFWS Concurrence, (vi) the 2013 Cultural PA, providing for compliance with Section 106 of the NHPA, (vii) applicable management direction in the HiLine and Miles City Approved Resource Management Plans (ARMPs), and (vii) other federal regulations. Additionally, the applicant must obtain or meet all necessary approvals and/or permitting requirements.

## 2.1 TERMS, CONDITIONS, MITIGATION AND SPECIAL STIPULATIONS

The BLM identified and developed mitigation and monitoring measures for the Project through NEPA to avoid, minimize and/or reduce the risk of impacts to the human and natural environment, and are included in the Final POD (Appendix C). Conservation Measures for species, including Greater Sage-grouse, are included in the Final POD and incorporated into this decision. In addition, and to reduce the risk of accidental releases, as well as mitigations that reduce the consequences/impacts of a spill, should such an event occur, Keystone has agreed to incorporate mitigation measures in the design, construction and operation of the

BLM-00149

Project, and will comply with USACE stipulations for the Missouri River Crossing (USACE Stipulations, Appendix F.1 this decision).

Mitigation, design features and stipulations included within the Final POD and incorporated as part of this decision are binding upon the grant holder and their assigns. BLM has also identified, and is requiring as a condition of the ROW grant, Special Stipulations (Appendix F of this decision), that are in addition to measures identified in Keystone's Final POD and that also address largely administrative stipulations such as bond requirements and strict liability. Appendix F.1 of this ROD includes special stipulations provided by USACE regarding the Missouri River crossing and Corps project lands. The Final POD includes Bureau of Reclamation crossing criteria, to be adhered to by Keystone, to avoid and minimize impacts to Reclamation's pre-existing easements.

Species-specific conservation measures, developed through the NEPA process and carried forward for consideration by the USFWS in the BA (Appendix D to this decision), for species applicable to federal lands in Montana are incorporated into the Final POD and will be adhered to by the applicant as part of this decision (refer to Sections 2.5.1 and 4.2 of this decision). The conservation measures for Greater Sage-grouse, coordinated through the state of Montana, require compensatory mitigation, to which Keystone voluntarily agreed to, through the state plan to address impacts to Greater Sage-grouse.

Measures that satisfy the requirements set forth in the 2013 PA, developed in compliance with the NHPA, are included in the Final POD and will be adhered to as part of this decision. The 2013 PA (Appendix E to this decision) was developed and negotiated pursuant to the NHPA, 54 U.S.C. § 306108, by the Department of State (lead federal agency), BLM, the Montana SHPO, the ACHP and other consulting parties, and was executed in 2013 and is incorporated into this ROD.

All standard terms, conditions and stipulations (43 CFR Part 2880) will be adhered to as part of this decision. Noncompliance with the terms, conditions, special stipulations and mitigation will be grounds for an immediate, temporary suspension of activities, leading up to, and, if necessary, termination of the ROW grant, if it constitutes a threat to public health and safety or the environment, consistent with 43 CFR 2886.16. The Project is subject to the MLA ROW Grant and TUP terms and conditions established under 43 CFR 2885 and any future changes to those regulations.

Any change in the proposed use of federal lands to accommodate the project must be approved by the Authorized Officer prior to being implemented.

## 2.2 MONITORING AND ENFORCEMENT

Keystone will be responsible for monitoring the reclamation and stabilization of the pipeline and road ROWs, temporary access roads, and construction work areas, as described in the 2014 Final EIS and Appendix G, *Construction Mitigation and Reclamation Plan;* and Appendix R, *Construction Reclamation Plans and Documentation,* Special Stipulations (Appendix F and F.1 to this decision), and as outlined in the Final POD.

Keystone also will fund an independent compliance inspection contractor (CIC), to be approved by the BLM, to represent the BLM during the construction and reclamation phases of the Project on federal lands. The CIC will report directly to the BLM. The primary role and responsibility of

BLM-00150

the CIC is to support the BLM by providing constant monitoring to ensure compliance with all terms, conditions, and stipulations of the MLA ROW grant, TUP, Final POD, and other permits, approvals and regulatory requirements.

## 2.3 BONDING

In accordance with 43 CFR 2885.11 and 2886.14, Keystone will post a performance bond in the amount of $84,065,960 to ensure adequate adherence to all terms and conditions. The bond will apply to the following:

1.  Restoration and reclamation of disturbed areas and other requirements relative to the construction phase of the Project. Upon completion, or partial completion of construction-related reclamation requirements, the BLM Authorized Officer may reduce the amount of the bond.

2.  Liability for damages or injuries resulting from releases or discharges of hazardous materials.

3.  All cultural resources post-fieldwork costs associated with implementing the approved treatment plans, implementing the Unanticipated Discoveries Plan, or other mitigation activities in support of the Programmatic Agreement. Such costs may include, but are not limited to fieldwork; post-field analysis, research, and final report preparation; interim and summary report preparation; and curation of project documentation and artifacts collected (except for Native American Graves Protection and Repatriation Act-related human remains and cultural artifacts) in a curation facility approved by the Department of the Interior (USDOI) and long-term administrative costs associated with reporting on condition assessments.

The bond may be released as specific tasks are completed and accepted by the BLM (see Decommissioning, Section 2.4). This bond must be maintained in effect until temporary improvements used during construction are removed, and restoration and reclamation of the ROW on federal lands have been successfully completed and accepted by the BLM Authorized Officer.

## 2.4 DECOMMISSIONING

The U.S. Department of Transportation's Pipeline Hazardous Material Safety Administration (PHMSA) has requirements that apply to the decommissioning of crude oil pipelines in 49 CFR 195.402(c)(10) and in 49 CFR 195.59 and 195.402. These regulations require that, for hazardous liquid pipelines, the procedural manuals for operations, maintenance, and emergencies must include procedures for abandonment, including safe disconnection from an operating pipeline system, purging of combustibles, and sealing abandoned facilities left in place to minimize safety and environmental hazards (49 CFR 195.402). Further, these regulations require that for each abandoned onshore pipeline facility that crosses over, under, or through a commercially navigable waterway, the last operator of that facility must file a report upon abandonment of that facility. The report must contain all reasonably available information related to the facility, including information in the possession of a third party. The report must contain the location, size, date, method of abandonment, and a certification that the facility has been abandoned in accordance with all applicable laws. Upon termination of the ROW, the facilities on federal land will be decommissioned in accordance with the decommission plan provided by Keystone with additional review and approval by the BLM Authorized Officer.

BLM-00151

## 2.5 MANAGEMENT CONSIDERATIONS

The analysis, prepared consistent with NEPA (42 U.S.C. § 4321 et seq.) and presented in the 2011 Final EIS, 2014 Final SEIS, 2019 Final SEIS, and supporting documentation, meets BLM's purpose and need and discloses impacts. There have been no re-alignments or modifications of the proposed MLA ROW on federal land in Montana since the 2014 Final SEIS. The 2019 Final SEIS primarily analyzes the impacts associated with the MAR in Nebraska (which does not cross federal lands) as a new alternative. The 2019 Final SEIS also supplements the 2014 Keystone XL Final SEIS by providing additional analysis and/or updates regarding the effects of current oil prices, cumulative effects of greenhouse gas emissions, cultural resources and accidental release modeling, consistent with the direction in the U.S. District Court for the District of Montana's November 8, 2018, decision. The 2019 Final SEIS also documents and considers additional cultural resource surveys that have been completed on BLM lands in Montana since publication of the 2014 Final SEIS. Finally, the BLM conducted an in-depth review of the federal actions associated with the proposed Project and connected actions in the analysis to evaluate anticipated effects of the Project on federally protected and candidate species and federally designated critical habitat. Pursuant to Section 7 of the Endangered Species Act, BLM prepared a Biological Assessment (BA), which updates the December 2012 *Final Biological Assessment for the Keystone XL Project* (Department 2012a). Accordingly, BLM has considered the issues and analysis referenced in the NEPA documents in consideration of management issues and issuing this decision on Keystone's application for MLA ROW on federal lands in Montana.

The BLM consideration for responding to this ROW application stems from the overarching policy and direction contained in the Mineral Leasing Act, and the Bureau's multiple-use mission, including for the use of exploration for oil and gas or other mineral resources and for its transportation across federally administered land, which for this Project includes BLM and USACE administered lands in Montana. The BLM is further guided by the Energy Policy Act of 2005, which recognized the need to improve domestic-energy production, develop renewable energy resources, and enhance the infrastructure for collection and distribution of energy resources across the nation. To this end, the BLM is charged with analyzing applications for authorizing utility and transportation systems on federal land, and for incorporating USACE resource concerns and/or special stipulations into this decision.

Additionally, the Project is in conformance and consistent with achieving the goals and objectives established for the management of the resources on BLM-administered lands in the Project area that are established by BLM ARMPs. The ARMPs include the HiLine ARMP and the Miles City ARMP, as amended. The Keystone Pipeline proposal was included in the 2015 ARMP/EISs as a reasonably foreseeable project under the cumulative impacts discussion.

The range of issues summarized and analyzed in the 2011 Final EIS, 2014 Final SEIS and 2019 Final SEIS were derived from the scoping process, public involvement and agency coordination. These issues were used to identify, refine, and evaluate the proposed activities, and to direct the level of detail needed for each of the environmental resource studies completed for the EISs and associated documents appended to those analyses.

From the inclusive list of issues identified in scoping as well as subsequent public involvement (refer to the 2014 Final SEIS, Volume 4 and Volume 5; and Appendix A of the 2019 Final SEIS), many issues are addressed by design features of the Project (e.g., co-location) or were found not to be substantive through the effects analysis conducted for the Project. In addition to the issues identified in the 2011 FEIS, 2014 Final SEIS and 2019 Final SEIS that were relevant to

BLM-00152

the federal action, BLM and USACE conducted a thorough review of Keystone's Final POD and considered all relevant data applicable to the federal lands associated with the Project. Resource concerns and issues identified as relevant to federal lands associated with the Project include Greater Sage-grouse and their habitat, raptors and other migratory birds, sensitive soils, vegetation communities of conservation concern, public health and safety, river and stream crossings, scour analysis and horizontal directional drilling of the pipeline route associated with the Fort Peck Project, tribal treaty rights, and climate, as addressed in the 2019 Final SEIS and summarized below.

### 2.5.1  Greater Sage-grouse

The Keystone XL pipeline crosses Greater Sage-grouse habitat on both federal and non-federal lands in Montana (and non-federal lands in South Dakota).  The BLM, however, worked with the proponent and state wildlife agencies in Montana to develop conservation measures for greater sage-grouse (a BLM special status species) for BLM federal lands.  Keystone included the conservation measures incorporated in the April 2017 Greater Sage-Grouse Conservation Plan for the Project, which is included in the Final POD (Appendix C of this decision).

The 2017 Greater Sage-Grouse Conservation Plan summarizes all sage-grouse avoidance, minimization, and mitigation measures across federal and non-federal lands in Montana and South Dakota for the Project.  On BLM lands, the project crosses lands managed by the HiLine District Office and the Miles City Field Office. Both of these offices revised their respective management frameworks as described in the ARMPs that were finalized in 2015 (BLM 2015, 2015a).  The BLM Miles City and HiLine ARMPs require that the percentage of surface disturbance associated with projects located in Greater Sage-grouse Priority Habitat Management Areas (PHMA) not exceed five percent of a project area.  As described in the Conservation Plan, surface disturbance associated with this project in each PHMA traversed by the pipeline was determined to be under the five percent disturbance cap.

As detailed in the Conservation Plan, the project incorporates the following components to avoid, minimize, and mitigate residual effects to Greater Sage-grouse habitat:

- **Lek-Specific Conservation Buffers:** The Plan considers landscape features and habitat around active leks to specify time-of-day and time-of-year restrictions to minimize impacts to sage-grouse during construction.
- **Sage-Grouse Habitat Restoration:** The Conservation Plan includes sage-grouse habitat restoration parameters to reduce long-term adverse impacts such as ROW invasion by cheatgrass or long-term loss of sagebrush.  The Plan describes specific construction and reclamation procedures to restore native grasses, forbs, and shrubs within all sagebrush habitat crossed by the Project.
- **Restoration Monitoring:** The Plan describes monitoring protocols to ensure successful restoration of sage-grouse habitat, including metrics for sagebrush cover, sagebrush density, and sample size and monitoring parameters.
- **Compensatory Mitigation.** The Plan describes compensatory mitigation for residual direct, indirect, or cumulative impacts to sage-grouse following avoidance and minimization measures.  On September 14, 2018, the Montana Sage-Grouse Oversight Team (MSGOT) approved a decision to accept a financial contribution from Keystone for compensatory mitigation, and to award the funds through stewardship account grants as directed by the Conservation Plan. As described in the Plan, Keystone has voluntarily agreed to make an in-lieu fee payment to the Montana Sage-Grouse Habitat Conservation Program Stewardship Account, subject to the following stipulations:

11

BLM-00153

- The compensatory mitigation funds must be spent in counties where the impact occurs (i.e., Phillips, Valley, McCone, Garfield, Prairie, or Fallon County);
- Selected project(s) must include habitat preservation, restoration, enhancement, and/or creation; and
- Selected project(s) would directly and indirectly benefit sage-grouse populations that are impacted by the project.

The BLM will confirm the funds are deposited in the Montana Sage-Grouse Habitat Conservation Program Stewardship Account prior to the notice to proceed (NTP) being issued.

### 2.5.2 Migratory Birds

To reduce potential construction and operations impacts, procedures outlined in Appendix G, *Construction, Mitigation, and Reclamation Plan,* of the 2014 Final SEIS includes development of a Migratory Bird Treaty Act Conservation Plan. The plan was developed in consultation with the USFWS consistent with the Migratory Bird Treaty Act and the Bald and Golden Eagle Protection Act and Executive Order 13186 by providing avoidance and mitigation measures in the states where the Project will be constructed, operated, and maintained (Appendix O of the POD). Keystone has incorporated this conservation plan in the Final POD to apply to federal lands in Montana.

### 2.5.3 Sensitive Soils

Sensitive soils are defined as soils that are highly erodible (i.e., by wind or water); prone to compaction; shallow, stony, droughty, or hydric; or having low reclamation potential. Keystone will implement the soil protection measures, identified in Appendix G, *Construction, Mitigation, and Reclamation Plan,* of the 2014 Final Supplemental EIS and in the Final POD, to minimize or mitigate potential impacts to sensitive soils during construction. Post-construction monitoring to demonstrate achievement of the reclamation standards specified in the Final POD also is required.

### 2.5.4 Vegetation Communities of Conservation Concern

Native vegetation communities of conservation concern will be crossed by the Project in each state (including native mixed shrub rangelands in Montana) that will be difficult to reclaim due to exposure of fragile soils to wind and water erosion. Keystone developed specific construction and reclamation methods in consultation with local, state, and federal agencies and local experts to ensure that sagebrush and native grasses are restored to rangelands in Montana. These procedures are outlined in Appendix G, *Construction, Mitigation, and Reclamation Plan,* of the 2014 Final SEIS, as well as the Final POD.

### 2.5.5 Public Health and Safety

For the overall safety of the Project, the Department of State and PHMSA (the primary federal regulatory agency responsible for ensuring pipeline safety) developed 57 Project-specific special conditions for design, construction, operation and maintenance, and monitoring in addition to existing PHMSA regulatory requirements (refer to Appendix U, *PHMSA Special Conditions,* in the 2014 Final EIS and Appendix B, *Potential Releases and Pipeline Safety,* in the 2014 Final SEIS). In consultation with the PHMSA in the development of the analysis, the incorporation of the special conditions will result in a project that will have a degree of safety greater than any typically constructed domestic oil pipeline system along the entire length of the

BLM-00154

pipeline (that is the degree of safety along the entire pipeline will be comparable to that required in only high-consequence areas as defined in PHMSA regulations).

Additional pipeline system safety measures are included in Appendix I, *Spill Prevention Control and Countermeasures Plan and Emergency Response* Plan, and Appendix Z, *Compiled Mitigation Measures*, of the 2014 Final SEIS.

## 2.5.6  River and Stream Crossings

Through the process of reviewing Keystone's application for a Certification of Compliance under the MFSA in Montana, the MDEQ coordinated with the Department of State and Keystone to avoid or realign stream crossings where feasible and to develop procedures (including a horizontal directional drilling (HDD) method) that Keystone incorporated into design and construction of the crossings to minimize impacts, as well as site-specific mitigation measures. The procedures and measures identified are conditions of the Certification of Compliance issued by MDEQ in March 2012 and are included in Appendix N, *Supplemental Information for Compliance with MEPA*, in the 2014 Final SEIS. Procedures and measures for the protection of water bodies are included in Appendix D, *Waterbody Crossing Tables and Required Crossing Criteria*; Appendix I, *Spill Prevention Control and Countermeasures Plan and Emergency Response* Plan; and Appendix Z, *Compiled Mitigation Measures* of the 2014 Final SEIS. Keystone must adhere to the USACE Stipulations (Appendix F.1 of this decision) to protect water resources and project facilities at the Missouri River crossing in Montana, and as considered in the 2014 and 2019 Final SEISs.  Keystone must also obtain any other required permits, pursuant to the Clean Water Act and other requirements.

## 2.5.7  Climate

Updated analysis included in the 2019 Final SEIS shows that conditions during the construction period are not anticipated to differ substantially from current conditions.  The analysis data and methods also address the district court's decision to correct and expand information regarding climate change and greenhouse gas emissions.  Greenhouse gas (GHG) emissions from the Project would contribute incrementally to global climate change in combination with all other global sources of emissions.  The GHG emission impacts are additive as these gases accumulate in the atmosphere; impacts would likely be long-term because of the long atmospheric lifetimes of most GHGs. The analysis concludes emissions associated with the construction and operation of the Project are only one source of relevant GHG emissions (refer to Section 4.14 and Appendix U, *Lifecycle Greenhouse Gas Emissions of Petroleum Products from WCSB Oil Sands Crudes Compared with Reference Crudes*, of the 2014 Final SEIS and Section 7.4.9 of the 2019 Final EIS).  Further, the reasonably foreseeable direct and indirect GHG emission totals have been calculated, and the calculated amount does not change across alternatives because the Project is not expected to significantly affect the rate of extraction of oil sands, and is also unlikely to directly result in significant change in production in oil sands crudes in Canada.

## 2.5.8  Potential Releases

The 2019 Final SEIS included a chapter specifically to analyze an updated/revised methodology for accidental releases and to discuss potential impacts in the event of an accidental spill. Chapter 5 of the 2019 Final SEIS reviewed the pipeline mileage and accident data from USDOT and PHMSA databases.  The updated modeling reflects the most current approach to assessing the potential for impacts related to spills from crude oil pipelines.  The 2014 and 2019 Final SEISs considered impacts from a potential spill.  Based on concerns expressed by the

BLM-00155

Fort Peck Tribes and responsive to other comments, the 2019 Final SEIS's updated spill model and analysis addressed and disclosed impacts to hunting and fishing rights and subsistence/gathering should a future spill or release occur. The updated modeling and analysis addressed downstream impacts to water quality and specifically addressed agriculture intakes and the intake for the Assiniboine Sioux Rural Water Supply System (ASRWSS). The ASRWSS is approximately 57 miles downstream from the Missouri River crossing (Project).

The updated analysis used the results of modeling data from a "worst-case" analysis of a release on the Missouri River and information from other major oil spills to develop a maximum reasonable transport distance from a spill of about 40 miles and analyzed downstream effects from a spill, including evaluation of surface water intakes extending 40 river-miles downstream (Section 4.6 of the 2019 FSEIS). The 40 river-mile range was determined to be a maximum reasonable distance in the 2019 analysis for reviewing potential downstream effects. While it is acknowledged that oil sheens and oil globules from two releases in Montana were observed at greater downstream distances than the 40 river-mile ROI assessed within the 2019 FSEIS, there are distinct circumstances and differences in the characteristics of releases compared to other water releases (i.e., Laurel, Montana (2011) and Glendive, Montana (2015)). These differences include pipeline design, construction techniques, the depth of the pipeline beneath the waterway, etc., as well as different product type (i.e., light crude oil versus dilbit). The 'worse-case' discharge scenario would have a probability of occurring once in 2,230,000 years. The analysis calculated the distance the released crude oil might travel within 6 hours, which is the maximum response time in high-volume areas stipulated by federal pipeline safety regulations in Title 49 CFR Part 194 (49 CFR 194). The analysis indicated the downstream transport distance ranged from approximately 0.3 mile (at very low flow) to a maximum worst-case scenario of 33 miles (using record 2011 historic flood conditions). At a distance of 40 river-miles downstream from a (worst-case) spill, it is typically be expected that response resources contain the majority of the spill before it gets beyond that distance, and in most instances, resource impacts primarily occur within the 40 river-mile ROI (Section 5.2 of the 2910 FSEIS)

The Final POD includes a *Spill Prevention, Control, and Countermeasures (SPCC) Plan and Public Version Emergency Response Plan* (Appendix G of the POD). Measures included in the SPCC address a variety of topics such as training, site security, materials storage and handling, tanks, containers, spill control and countermeasures, etc. In addition to the SPCC Plan, design features and techniques to mitigate and minimize impacts for water crossings included in the Final POD, the USACE has also provided special stipulations (Appendix F.1 to this decision) to address the Missouri River water crossing to mitigate and/or minimize impacts to their project facility, avoid or minimize risk for spills and potential impacts to water quality.

### 2.5.9  Tribal Treaty Rights, Tribal Concerns and Environmental Justice

Starting in 2009, meetings were held with agencies and tribes concerning the Keystone XL Pipeline. A PA was developed and signed in 2011 (this was amended in 2013) to take into account the effects of the Keystone XL Project on historic properties listed in or eligible for listing in the NRHP, consistent with the requirements of the NHPA. Implementation of the 2013 PA is ongoing, and will continue, for the Keystone XL Project along the proposed pipeline route and along new transmission lines to avoid, if possible, or mitigate adverse effects on historic properties. Also refer to Section 4.3 Consultation and section 4.4 Government-to-Government Tribal Consultation, below for further information).

BLM-00156

Of concern to tribes, in particular the Fort Peck Tribes, is the potential impacts to hunting and fishing rights and subsistence and impacts to water should a spill or release occur. As discussed and analyzed in the 2014 Final SEIS and in Chapter 5 of the 2019 Final SEIS, potential accidental releases into surface water could result in impacts to vegetation, wildlife and fisheries. Impacts to the ASRWSS and agriculture intakes was also considered in the 2014 and 2019 Final SEISs. Based on the maximum reasonable distance for downstream transport, resulting impacts would be up to 40 river miles from the release point. The potential loss of access to subsistence resources would require individuals dependent on these resources to hunt, gather, harvest and fish elsewhere until such time as the site of an accidental release is remediated. The ASRWSS is about 57 miles downriver from the Missouri water crossing; the projected maximum reasonable downriver transport of material from a potential spill/release is about 40 river miles. Mitigation and design features identified in the Final POD are designed to minimize and detect such releases and/or spills. The applicant, Keystone, would be liable for all costs associated with restoration, including damages to natural resources and loss of subsistence use of these resources should an accidental release occur and affect surface water.

Potential impacts to minority and low-income populations (from the increase in construction workers and noise, dust, etc.) would be temporary and scattered throughout the length of the pipeline, and not be concentrated in any specific area. Therefore, construction activities would not result in disproportionately high and adverse impacts on environmental justice populations within the Project area.

### 2.5.10  Co-Location

In accordance with the MLA, 30 U.S.C. § 185(p), the BLM considered co-location of the route on federal land in Montana early in the project, in coordination with the Montana DEQ, pursuant to the MFSA. Section 28(p) of the MLA provides that "[i]n order to minimize adverse environmental impacts and the proliferation of separate rights-of-way across Federal lands, the utilization of rights-of-way in common shall be required to the extent practical" (30 U.S.C. § 185(p)). As documented in the 2011 FEIS, 2014 Final SEIS, and the 2019 Final SEIS, and for the purposes of complying with Section 28(p) of the MLA, the BLM considered and analyzed Keystone's ROW application for possible route alternatives/alignments that would result in co-location with existing ROWs on federal lands. The BLM's analysis and finding (summarized in more detail below) focused only on reviewing existing ROW data on federal lands to identify a route that would maximize co-location with other existing ROWs on federal lands because the BLM's authority is only over those portions of the Project that involve the use of federal land. In comparing alternative routes that would co-locate on federal lands, the BLM also examined whether alternatives were practical, meaning that a ROW alternative is suitable for achieving the purpose of the project and would succeed in achieving that purpose. Based on the nature and scattered land pattern of federal lands in Montana relative to Keystone's MLA ROW application, there were very few opportunities to co-locate with other, existing ROWs. The primary opportunity for co-location was with the Northern Border Pipeline (NBP). As summarized below, the BLM analysis supports a finding that the only existing/available and practical means of co-locating the Keystone pipeline on federal lands in Montana is the preferred alternative, which co-locates 25 miles of the northern portion of the ROW with the existing NBP. There were no opportunities (based on ROW data on federal lands) or other practical alternatives to co-locate the remaining portion of 21 miles on federal lands in Montana.

As documented in the 2011 FEIS, the alternatives analysis included an extensive screening process that first considered a range of categories of potential alternatives which specifically

BLM-00157

included the no action alternative, System Alternatives (i.e., the use of other, existing pipeline systems or methods of transport, and major alternative routes/route variations, alignment or co-location opportunities (2011 FEIS at ES-10 to 11, Section 4.0; *see also* 2011 FEIS, Appendix I at I-8 to I-15). The purpose of the screening process was to identify potential alignment alternatives for the entire pipeline Project that were economical and technically practical, overall feasible relative to the purpose of the proposed project, and that provide an overall environmental advantage over the proposed route, and eliminate from further consideration those alternatives failing to satisfy this criteria (2011 FEIS at 4-38). Screening considered avoiding sensitive environmental/resource areas, as well as maximizing co-location opportunities (2011 FEIS, Appendix I at Section I-2.3.1). Using a set of weighted environmental factors and geographic information system data, a model-generated routes to be further identified, relative to the screening criteria which included both areas to be avoided or used minimally (i.e., crossings of large waterbodies, highly developed urban areas, etc.) as well as areas "preferred" (i.e., public lands, existing utility and/or transportation corridors (use of or parallel to), lands which could be returned to their original condition, etc.) (2011 FEIS, Appendix I at Section I-2.3.1). The model also screened for "excluded areas" such as wilderness areas, state parks, and national parks. Appendix I of the 2011 FEIS provided additional discussion and analysis of the alternative screening process specifically for alternatives in Montana, including the use of federal lands, because of the requirement under Montana state law for Keystone to obtain a certificate from Montana DEQ to site pipelines within the state (*See* 2011 FEIS at Section 4.3.7).

Through this screening process, the FEIS identified 10 route alternatives as economically and technically practicable, but the agencies eliminated from further consideration seven of these alternatives as unable to feasibly meet the purpose of the project and having major environmental issues (2011 FEIS, Appendix I at 2.3.2). Although some of these 10 alternatives included opportunities to co-locate portions of Keystone's ROW on federal lands in Montana, the seven eliminated failed to achieve the purpose of the project or otherwise failed to satisfy the identified criteria. For example, the Express-Platte Alternative 1 would have offered co-location on three times as much federal land as the proposed route. This route alternative veers substantially west of the border crossing near the Port of Morgan and would be approximately 234 miles longer than the proposed Project route and have a greater area of impact and affect more areas of key resources (2011 FEIS at 4-44, Table 4.3.3-1). In addition to the consideration of effects resulting from the screening/analysis of the alternative routes, the agencies coordinating on this project determined that the alternatives did not offer an overall environmental advantage over the proposed route. Additionally, the FEIS identified route variations and minor realignments of the proposed pipeline route in order to address specific environmental resource concerns, land use conflicts or in response to landowner concerns (2011 FSEIS, Section 4.3 and Appendix I (I-2.4.1.3).

As contemplated in the 2011 FEIS, the three viable alternatives analyzed in the FEIS offered an opportunity to co-locate the proposed pipeline with an existing ROW on federal land in Montana. For example, the alternative utilizing the entire northern stretch of the NBP pipeline would require crossing through Fort Peck Indian Reservation. Because the MLA definition of federal land excludes tribal land, BLM is not obligated to consider such segment as a practical alternative for purposes of the analysis in Section 28(p) of the MLA. The proposed KXL pipeline route does co-locate with the existing NBP ROW from northern border crossing in Montana on federal lands until the NBP veers east and crosses the Fort Peck Indian Reservation. To the extent practicable, the KXL pipeline route parallels the NBP ROW at the northern border crossing in Montana on federal lands (2011 Draft EIS, Appendix I, Section 1-2.3); 2014 Final SEIS, Section 2.2.5)). The KXL pipeline route parallels the NBP for approximately 25 miles,

16

north of the Missouri River (with width distances varying from 845 feet to overlapping, depending on located site conditions) until the NBP veers to an easterly route (where it then enters and crosses through Fort Peck Indian Reservation), thus eliminating any additional opportunity for co-location on federal lands. This route represents the greatest opportunity for co-location of the pipeline on federal land in Montana.

The alternatives analysis, and screening process, did consider opportunities to co-locate the proposed Keystone pipeline on federal lands in Montana. The BLM also reviewed existing ROW data on public lands, which is significant to the question of co-location on federal land in Montana because there are very limited opportunities to co-locate the proposed ROW on federal lands due to the nature of federal lands in Montana. First, BLM lands in the northeastern and eastern part of Montana represent fragmented land patterns with smaller, dis-contiguous parcels. Unlike other areas or federal land management agencies in the state, BLM lands considered in this area for this project resemble a broken, scattered land ownership pattern, intermingled with state and private lands. This land pattern is due largely in part to the complex settlement/homesteading history and railroad land grants (Miles City FEIS/RMP, p.3-116). The scattered land patterns constrains many management options for surface uses. Specifically in eastern Montana, south of the Missouri River, the scattered land pattern consists of approximately 4,536 tracts of public land in 1,194 townships and over 40,000 sections (Miles City FEIS/RMP, pp. 3-118-119. Second, there are simply very few to no existing pipeline ROWs utilizing federal lands in the northeastern and eastern part of Montana and no designated ROW corridors in these areas. A review of existing ROWs, using a BLM lands ROW geodatabase, confirmed that no co-location opportunities exist for the proposed pipeline (2019 Final SEIS, pp. 7.6-7).

As summarized above, the BLM considered all reasonable opportunities to co-locate those portions of the KXL pipeline proposed on federal land in Montana and determined there was an opportunity to co-locate with the NBP for 25 miles on federal land. The remainder of the route across federal lands does not have any co-location opportunities because there are no existing utility corridors on the scattered federal land tracts (2011 FEIS, Appendix I, Table I-2.3-3 and Table I-2.3.-4). The analysis of alternatives considered in detail do not change the route across BLM lands. Because of the nature of the scattered public lands and lack of gathering systems, BLM has determined that, where co-location is practicable, BLM is requiring it. No new co-location opportunities on public land segments are practicable (2019 Final SEIS, pp. 7.6-7).

## 3.0 ALTERNATIVES

The alternatives analysis in the 2011 Final EIS and 2014 Final SEIS relied on information provided to agencies in the Presidential Permit application, BLM ROW applications, and MFSA applications (including supplemental submittals); information and suggestions provided during scoping for the EIS and during the public comment period on the Draft EIS and Draft Supplemental EIS; and information obtained through research and analyses conducted by the Department of State. The route alignment crossing federal lands in Montana has not substantially changed and is reflected and analyzed in the 2014 Final SEIS, with only minor modifications (micro-alignments, but within the ROW corridor) reflected in the 2017 revised application from Keystone. The action alternative considered in the 2019 Final SEIS largely reflects the MAR in Nebraska.

The 2014 Final Supplemental EIS considers three categories of alternatives, consistent with NEPA, including the (1) No Action Alternative, (2) major pipeline route alternatives, and (3) other alternatives considered but eliminated from detailed analysis.

BLM-00159

## 3.1 ALTERNATIVES CONSIDERED IN DETAIL

Consistent with NEPA, preliminary pipeline route alternatives to the Project alignment proposed by Keystone were screened to evaluate whether an alternative would be considered in detail in the 2011 FEIS and 2014 Final Supplemental EIS. Two phases of screening were conducted (discussed in Section 2.2.5.1 of the Final SEIS). From this screening, the 2011 Steele City Alternative and the I-90 Corridor Alternative were identified as reasonable alternatives to the Project alignment proposed by Keystone for inclusion and evaluation in the Final Supplemental EIS.  For purposes of the 2019 Final SEIS, the MAR in Nebraska was addressed in detail.

### 3.1.1 No Action Alternative

The No Action Alternative analysis in the 2011 FEIS and 2014 Final Supplemental EIS considers what likely would happen if the Presidential Permit is denied by the Department of State and the Project is not otherwise implemented. It includes the status quo baseline, which serves as a benchmark against which other alternatives are evaluated. Under the status quo baseline, the Project would not be constructed and the resulting direct, indirect, and cumulative impacts described in the 2014 Final Supplemental EIS for federal lands; (2019 Final SEIS for all lands, including MAR) would not occur. The status quo baseline is a snapshot of crude oil production and delivery systems at current levels (i.e., no change at all) irrespective of likely alternative transport scenarios to transport WCSB and Bakken crude.

The 2019 Final SEIS includes analysis of three alternative transport scenarios under the No Action Alternative that, based on the findings of the market analysis included in the 2019 Final SEIS, are believed to meet the Project's purpose (i.e., providing WCSB and Bakken crude oil to meet refinery demand in the Gulf Coast area) if the Presidential Permit for the Project were denied, or if the pipeline were otherwise not constructed. The alternative transport scenarios analyzed include the following:

- Rail and pipeline scenario
- Rail and tanker scenario
- Rail direct to the Gulf Coast scenario

The analysis presented in the 2014 and 2019 Final SEISs evaluates anticipated physical disturbance, GHG emissions, and potential releases under each of these alternative transport scenarios.

### 3.1.2 Environmentally Preferred Alternative

In an EIS, the alternative or alternatives that are considered to be environmentally preferable are identified (40 CFR 1505.2(b)). The environmentally preferred alternative in an EIS for a ROW grant is the alternative route that, on balance, appears to have the lowest overall impact on the natural, human, and cultural environment, including resource uses.

The project route proposed by Keystone for federal lands in Montana and analyzed in the 2014 Final EIS (2019 Final SEIS for the MAR), incorporates required design features and mitigation (referred to as the Proposed Project in the 2014 and 2019 Final SEISs and Final POD). The route on federal lands in Montana has not changed since the 2014 Final SEIS and is the same route analyzed by the U.S. District Court for the District of Montana.  The proposed project route considered opportunities for co-location on federal lands and in fact is co-located with NBP for approximately 25 miles in Montana.  This route was the Agency Preferred Alternative and environmentally preferred alternative route. The BLM has determined that all practicable means

18

to avoid or minimize environmental effects of the Proposed Project have been analyzed in the 2011 Final EIS, 2014 and 2019 Final SEISs and adopted into the Final POD. This determination is based on review of data supplied for the Project, including scoping; field investigations; literature research; alternatives analysis; and coordination and consultation with other federal, tribal, state, and local agencies and members of the public. Further, throughout the application-permitting process, the Department of State and the BLM used information obtained from interaction with interested parties and data from resource surveys to make refinements to Keystone's proposed centerline to avoid or mitigate adverse effects, which will continue to be guided and required by the PA as necessary.

## 3.2 ALTERNATIVES CONSIDERED AND ELIMINATED

Using a two-phase screening process (discussed in Appendix I of the 2011 FEIS and Section 2.2.5.1 of the 2014 Final SEIS), several preliminary pipeline route alternatives to the Project alignment proposed by Keystone were considered and eliminated from detailed analysis in the 2019 Final SEIS, including the following:

- Western Alternative (to Cushing)
- Express-Platte Alternative
- Steele City Segment-A1A Alternative
- Keystone Corridor Alternative
  - Option 1: Proposed Border Crossing (near Morgan, Montana)
  - Option 2: Existing Keystone Pipeline Border Crossing (at Pembina, North Dakota)

Figure 2.2.5-1 (Section 2.2.5) in the 2014 Final SEIS and 2019 Final SEIS (MAR route) presents the major alternative routes considered. In addition, alternative pipeline designs and alternative sites for above-ground facilities also were considered and eliminated. These alternatives were eliminated because they did not meet the Project's purpose and need, were similar in effects to existing alternative (i.e., they were minor route variations), or they were not feasible due to safety and/or security reasons (e.g., above-ground pipelines).  The analysis and extensive screening processes considered co-location of the Keystone pipeline with 10 route alternatives. Based on environmental factors to avoid sensitive resources and areas and minimize impacts, 7 of the alternative alignments were dismissed from detailed analysis (refer to Section 2.5.10 of this decision and 2011 FEIS, Appendix I).

## 4.0 PUBLIC INVOLVEMENT, CONSULTATION AND COORDINATION

## 4.1 PUBLIC INVOLVEMENT

Extensive public scoping and outreach was conducted throughout the Project history.  On January 28, 2009, the Department of State issued a Notice of Intent (NOI) (75 FR 5020) to prepare an EIS to disclose potential impacts from the Proposed Action and alternatives. The NOI informed the public about the Proposed Action, announced plans for scoping meetings, invited public participation in the scoping process, and solicited public comments for consideration in establishing the scope and content of the EIS. The NOI was published in the *Federal Register* (FR) and distributed to the following:

- Landowners along the proposed route
- Federal, state, and local agencies
- Municipalities and counties

BLM-00161

- American Indian tribes
- Elected officials
- Non-governmental organizations
- Media
- Interested individuals

The scoping period originally was planned from January 28 to March 16, 2009. However, an amended NOI (75 CFR 12172) published on March 23, 2009 extended the scoping period until April 15, 2009.

The Department of State held 20 separate scoping meetings in the vicinity of the proposed route to give the public the opportunity to provide comments regarding the scope of the EIS. Representatives of the BLM supported the scoping meetings in Montana.

On April 30, 2010, the Department of State published the Draft EIS, which was developed consistent with the scoping process required under NEPA, the CEQ regulations for implementing the provisions of NEPA under 40 CFR 1500, and the Department of State regulations for implementing NEPA under 22 CFR 161.  The Notice of Availability (NOA) (75 FR 20653) for the Draft EIS included notice of public comment meetings, provided information regarding the Draft EIS, and requested the submission of all comments by May 31, 2010. In response to requests from several organizations, on April 30, 2010, the Department of State extended the public comment period on the Draft EIS until June 16, 2010 (75 FR 22890). During that period, the Department of State received additional requests to extend the review period and, in response, the Department of State again extended the public comment period, until July 2, 2010 (75 FR 33883). The public comment meetings were held in May 2010 to solicit both verbal and written comments on the Draft EIS. The meetings were held in the vicinity of the proposed route and corresponded with the locations of the scoping meetings. Representatives of the BLM attended the public meetings in Montana. In addition to the public review process, the Department of State conducted agency consultations to identify issues to be addressed in the analysis. From June 2010 through April 2011 the Department of State participated in interagency teleconferences and meetings and corresponded with concerned agencies.

A Supplemental Draft EIS was issued for public review and the NOA was published in the *Federal Register* in April 2011 (75 FR 20653). In addition to the public review process, the Department of State continued to conduct agency consultations after the Supplemental Draft EIS was published to identify issues to be addressed in the Final EIS. From April 2011 through July 2011, the Department of State participated in interagency teleconferences and meetings and corresponded with affected agencies.

Portions of the 2011 Final EIS were revised in response to comments received on the Draft and Supplemental Draft EISs and as a result of updated information that became available after the issuance of the Supplemental Draft EIS. The Final EIS was issued on August 26, 2011 (75 FR 21939), and EPA published the NOA in the *Federal Register* on September 2, 2011 (75 FR 22689). After publication of the Final EIS, and as part of the National Interest Determination process, the Department of State held nine meetings in six U.S. states, as well as in Washington, D.C.

In response to Keystone's amended application for a Presidential Permit (May 2012) the Department of State published an NOI to prepare a Supplemental EIS and to solicit public comments on the scope and content of the Supplemental EIS in the *Federal Register* (75 FR 14803). The NOI informed the public about the Proposed Action, invited public participation in the scoping process, and solicited public comments for consideration in establishing the scope

20

BLM-00162

and content of the Supplemental EIS. The scoping period extended from June 15 to July 30, 2012. Approximately 406,700 comment submittals were received

An NOA for the Draft Supplemental EIS was published in the *Federal Register* on March 8, 2013 (75 FR 15012) commencing a 45-day public comment period, which ended April 22, 2013. Notices were also distributed to participating federal and state agencies, elected officials, media organizations, Indian tribes, private landowners, and other interested parties. A public meeting was held in Grand Island, Nebraska, on April 18, 2013.

In total, the Department of State received 1,513,249 e-mails, letters, cards, e-comments, and instances of public testimony (i.e., comment submissions) during the public comment period for the Draft Supplemental EIS. All submissions were evaluated and addressed, as appropriate in the 2014 Final Supplemental EIS. All comments were made available publicly on the Regulations.gov website under Docket DOS-2013-0011. A summary of public involvement activities and summary comments on environmental issues from the public are included in Section 1.9 and Appendix A of the 2011 Final EIS and Section 1.8 and Volumes 5 and 6 of the 2014 Final Supplemental EIS.

On January 31, 2014, the Final Supplemental EIS was released. The document responded to the comments received on the Draft Supplemental EIS (e.g., regarding water, land, cultural resources, wildlife, endangered species, climate change, oil prices, and transportation costs). Also, on February 5, 2014, a *Federal Register* notice (75 FR 6984) announced the availability of the Final Supplemental EIS and a 30-day public comment period regarding the National Interest Determination for the Presidential Permit application. By March 7, 2014, the date the comment period closed, approximately 2.5 million comment submittals had been received.

As described in the Introduction and Background of this decision, based on considering updated information and to analyze the MAR, the Department of State initiated another Supplemental EIS in 2018. In addition to prior public and agency involvement, the Department of State encouraged public participation in the environmental review process. A Notice of Intent was published in the *Federal Register* on December 3, 2018 (83 FR 62398), informing agencies and members of the public of its intent to prepare a Supplemental EIS. The Department published a Notice of Availability in the *Federal Register* (84 FR 53215) on October 4, 2019 to announce the availability of the Keystone XL Draft SEIS and to solicit public comments over a 45-day period, and to announce a public meeting in Billings, Montana which was held on October 29, 2019. During the public comment period, agencies, tribal governments, non-governmental organizations, and members of the public submitted either handwritten comments, electronic comments (through regulations.gov), e-mailed comments, or provided verbal comments to a stenographer (during the public meeting). The *Federal Register* Notice of Availability for the 2019 Final Supplemental EIS was published on December 20, 2019 (84 FR 70187).

## 4.2 Consultation Under Section 7 of the Endangered Species Act

There is an extensive consultation history with regard to the Keystone Pipeline project. Starting in April 2008, consultation with the USFWS was initiated, with BLM and state agencies requested to identify species and habitat of concern. Early in the project, Keystone developed field survey protocols, identified targeted survey areas and developed survey schedules, based on that information, and submitted for agency reviews. Agency review and approval of survey protocols began in 2008. After extensive consultation and coordination, the Department of State and USFWS concluded Section 7 consultation with regard to the proposed Project at the time. However, after the 2019 Presidential Permit was issued for the border crossing, the

BLM-00163

Department of State no longer had action to take (Section 1.2, Consultation History 2019 Biological Assessment). In September 2019, the BLM, in consultation and coordination with the USFWS, prepared a BA to evaluate the Project's potential effects of the proposed federal action on 10 federally listed species, and designated critical habitat.

The BLM determined and the USFWS concurred that the federal action *"may affect but is not likely to adversely affect"* the endangered black-footed ferret (Mustela nigripes), interior least tern (Sterna antillarum), whooping crane, pallid sturgeon (Scaphirhynchus albus), and topeka shiner (Notropis topeka); and the threatened piping plover (Charadrius melodus), rufa red knot (Calidris canutus rufa), and western prairie fringed orchid (Platanthera praeclara). BLM determined that the three remaining federally listed species evaluated (the American burying beetle (Nicrophorus americanus), topeka shiner (Notropis topeka) and Western prairie fringed orchid (Platanthera praeclara)) species and habitats are not present within Montana.

Additionally, the BLM determined the federal action *"may affect"* the threatened Northern long-eared bat (Myotis septentrionalis), but relied on the USFWS's January 5, 2016, Programmatic Biological Opinion on Final 4(d) Rule for the Northern Long-Eared Bat and Activities Excepted from Take Prohibitions to fulfill its Section 7(a)(2) consultation obligation. The USFWS determined Federal agencies appropriately utilized the framework within the Programmatic Biological Opinion for the NLEB.

While American burying beetle is not present on federal lands in Montana, the USFWS issued a biological opinion (BO) on the effects of the Project to the federally endangered American burying beetle, which includes conservation measures developed during the formal consultation process. The USFWS concluded in the BO that the Project is not likely to jeopardize the continued existence of the American burying beetle. The BO and transmittal letter with Service concurrences and all conservation measures committed to are included in Appendix D.

## 4.3 CONSULTATION UNDER SECTION 106 OF THE NATIONAL HISTORIC PRESERVATION ACT

Section 106 of the National Historic Preservation Act (NHPA) (54 U.S.C. § 306108) requires federal agencies to take into account the effect of their undertakings on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register of Historic Places (NRHP), which includes historic properties listed on, or eligible for the NRHP. The Advisory Council on Historic Preservation's (ACHP) regulations implementing Section 106 (36 CFR Part 800) define how federal agencies meet their statutory responsibilities as required under the law.

The Section 106 process seeks to accommodate historic preservation concerns with the needs of Federal undertakings through consultation among the agency official and other parties with an interest in the effects of the undertaking on historic properties (36 CFR 800.1). These parties include the ACHP, SHPOs, American Indian tribes, tribal historic preservation officers, state and other federal agencies, and individuals or organizations with a demonstrated interest in the undertaking due to their legal or economic relation to the undertaking or affected properties, or their concern with the effects of undertakings on historic properties (36 CFR 800.2).

Beginning in 2008, BLM in concert with the Department of State, as the lead federal agency for NHPA compliance, consulted with American Indian tribes, SHPOs, and other federal, state and local agencies under Section 106 of the NHPA. Consistent with 36 CFR 800.14(b)(3), in 2011, the Department of State and the consulting parties developed and executed a Programmatic Agreement (PA) (Appendix E) to establish an alternative procedure for compliance with the

BLM-00164

requirements of Section 106, including recognition of the need for phased compliance for the identification and evaluation of historic properties and the resolution of any identified adverse effects to such properties. The PA included a Tribal Monitoring Plan, an Unanticipated Discoveries Plan and a Historic Trails and Archaeological Monitoring Plan.  The BLM has, and will continue, to abide by and implement the stipulations and commitments in the PA in consideration of this decision in order to take into account the effect of the undertaking on historic properties and to ensure actions consistent with Section 106 of the NHPA.

Upon receiving the 2012 amended application for Presidential Permit and consistent with the NHPA, the 2011 PA was amended in 2013.  The parties continue to comply with the stipulations in the 2013 amended PA, which remains in effect until December 2020. Signatory parties to this amended agreement are the Department of State (as lead federal agency), ACHP, BLM, USACE, U.S. Bureau of Reclamation, National Park Service, Western Area Power Administration, Rural Utilities Service, Natural Resources Conservation Service, Farm Service Agency, Bureau of Indian Affairs, and SHPOs of Montana, South Dakota, Nebraska, and Kansas. Invited signatories included the Montana Department of Natural Resources and Conservation, MDEQ, and Keystone. Indian tribes that participated in consultation were asked in 2013 to sign as Concurring Parties, consistent with 36 CFR 800.2(c)(2) and 800.6(c)(3). However, no Tribes signed as Concurring Parties.

Pursuant to the stipulations outlined in the amended Programmatic Agreement (refer to Appendix E, *Programmatic Agreement and Record of Consultation,* of the Final Supplemental EIS), Keystone is required to complete cultural resources surveys on all areas that potentially will be affected by the Project, make recommendations on NRHP eligibility, provide information on potential effects of the Project, and provide adequate mitigation in consultation with the Department of State, BLM, USACE, and other federal agencies, state agencies, and Indian tribes.  The BLM, in working with the Department of State, and as stipulated in the PA, conducted additional coordination and consultation on sites identified in the 2014 Final SEIS. The 2019 Final SEIS updated incomplete or unavailable information (2019 Final SEIS, Section 3.2.1.6 -- *Cultural Resources Investigations since the 2014 Keystone XL Final SEIS* and Table 3.2-2).  In addition to updating information from 2014 analysis, a supplemental Class III inventory was conducted in July-August 2019.  BLM will continue to work with the State Department and consulting parties in accordance with the stipulations in the PA for federal lands in Montana.

Construction will not be allowed to commence on any areas of the Project until these stipulations are met. The amended Programmatic Agreement, therefore, will ensure that appropriate consultation procedures are followed and that cultural resources surveys and site-specific avoidance strategies and/or mitigation will be completed prior to construction. These avoidance strategies will be developed and implemented as outlined in the Programmatic Agreement in concert with the appropriate SHPO, Native American Community or Tribe (if applicable) and other federal or state agency. If unanticipated cultural materials or human remains are encountered during the construction phase of the Project, Keystone will implement Unanticipated Discovery Plans pursuant to the amended Programmatic Agreement.

The PA covers compliance with Section 106 of the NHPA with respect to BLM's decision relating to those portions of federal land in Montana that relate to the ROW grant and TUP permit contemplated in this ROD.  BLM actively participated with the Department of State in cultural resource inventories and a re-survey effort in 2019.  The findings of the 2019 re-survey effort in Montana, including federal lands, are included in the 2019 Final SEIS and considered in Section 4.9 of the 2019 FSEIS regarding the potential adverse effects on historic properties.

BLM-00165

The cultural resource inventory is on-going for the Project in order to comply with the stipulation in the PA that requires the Department of State, along with signatories including BLM, to make a reasonable and good faith effort to identify and evaluate historic properties within the Project ROW on federal lands in Montana.  The BLM will continue to coordinate with the Department of State in efforts to comply with the PA.  The BLM Special Stipulations and the Final POD includes mitigation to avoid or minimize impacts to historic properties as well as tribal areas of concern.

The BLM participated in several Section 106 Consultations, most recently to include meeting with Little Shell Tribe of Chippewa Indians (June 26, 2019) regarding their concerns about potential impacts to cultural sites.  The Little Shell Tribe participated in the 2019 re-survey efforts and has been invited by the Department of State to participate in the mitigation/avoidance discussions.  The PA may be amended in the future with the addition of other potential federal agencies and tribes as the Project develops.  In November 2019, the BLM also attended a Consultation with Fort Peck Tribes (November 2019) along with the USACE.

The BLM has been responsive to concerns expressed by the tribes, as well as participated in the 2019 cultural re-survey effort which identified additional sites within the ROW.  BLM will continue to work with the Tribes and Department of State on appropriate mitigation and avoidance strategies, in accordance with the PA.

## 4.4 GOVERNMENT-TO-GOVERNMENT TRIBAL CONSULTATION

Upon receiving the amended application for Presidential Permit in 2012, the Department of State as the lead federal agency, conducted additional government-to-government consultation consistent with Section 106 of the NHPA in conjunction with the 2011 Final EIS, 2014 and 2019 Final SEISs for the Project. The Department of State reached out directly to 84 Indian tribes throughout the U.S. with potential interest in the cultural resources potentially affected by the Project. Of the 84 Indian tribes, 67 tribes notified the Department of State that they would like to consult or were undecided as to whether they would become consulting parties.

The Department of State continued to engage in consultation with interested parties on the Final SEISs, the Project in general, and cultural resources, consistent with Section 106 of the NHPA and other regulations, with identified consulting parties.  As documented and detailed in Appendix E, *Programmatic Agreement and Record of Consultation*, of the 2014 Final Supplemental EIS, the Department of State held face-to-face meetings with tribal members, documented extensive telephone conversation records and email transmissions, and exchanged numerous letters with the Tribes in regards to issues identified during this process. Table 3.9-1 and Appendix A of the 2019 Final SEIS describes details relating to tribal meetings, letters, government-to-government consultation, field work, etc., since 2014.   The BLM accompanied Department of State at the June 26, 2019 Tribal consultation with the Little Shell Tribe of Chippewa Indians of Montana (Table 3.9-2).  In addition to these efforts, USACE, along with BLM, met with Fort Peck Tribal Chair and members in November 2019 to address concerns related to the Project.

Based on concerns expressed, the Department of State performed supplemental Class III inventory of the project with representation from four tribes in the summer of 2019 and engaged in a Traditional Cultural study of numerous site locations in Montana with members of the Fort Peck Tribes. These additional surveys provided more information regarding the diverse cultural landscape crossed by the Project and its associated infrastructure developments. The additional

BLM-00166

surveys found multiple locations identified by Tribal members and are considered as areas of Tribal interest.

In addition to mitigation and special stipulations identified as part of this decision, consultation with Tribes is ongoing and site-specific avoidance strategies and/or mitigation will be completed prior to construction (if warranted). Based on the supplemental inventory and on-going efforts to meet with tribes, participate in government-to-government consultation, and in following the stipulations found in the PA. The Department of State's reasonable efforts meet federal obligations relating to government-to-government consultation for the ROW grant and TUP on federal lands in Montana.

The Department of State, with BLM participation, performed supplemental Class III inventory of the project with representation from four tribes in the summer of 2019 and engaged in a Traditional Cultural study of numerous site locations in Montana with members of the Fort Peck Tribe. These additional surveys provided more information regarding the diverse cultural landscape crossed by the Project and its associated infrastructure developments. The additional surveys found multiple locations identified by Tribal members and are considered as areas of Tribal interest. Consultation with Tribes is ongoing and site-specific avoidance strategies and/or mitigation will be completed prior to construction (if warranted). The Department of State's reasonable efforts meet federal obligations relating to government-to-government consultation for the ROW grant and TUP on federal lands in Montana. Responsive to tribal concerns, the BLM has requested areas of tribal interest and tribal monitoring areas be identified for BLM-managed lands (by milepost and/or Site number), and is reflected in Appendix R of the Final POD.

The BLM, as a cooperating agency, has participated and attended numerous government-to-government tribal consultations and meetings, and will continue to coordinate with the Department of State in consultation efforts. The Department of State, along with BLM and other agencies, conducted extensive consultation and outreach throughout the course of this project.

## 5.0 FINAL AGENCY ACTION

I recommend approval of the Mineral Leasing Act ROW under MTM-098191 and TUP MTM-98191-01 to TransCanada Keystone Pipeline, L.P., subject to the terms, conditions, stipulations, Final Plan of Development, and environmental protection measures developed or adopted by the U.S. Department of the Interior and the U.S. Army Corps of Engineers and identified in this Record of Decision, including information, appendices, the POD developed by Keystone, and associated NEPA and supporting documents available at https://go.usa.gov/xdacn.

John Mehlhoff
State Director, Montana/Dakotas State Office
Bureau of Land Management

BLM-00167

I hereby approve the recommendation by the BLM State Director of Montana/Dakotas, to approve a Mineral Leasing Act ROW grant under MTM-098191 and TUP MTM-98191-01 to TransCanada Keystone Pipeline, L.P., subject to the terms, conditions, stipulations, Final Plan of Development, and environmental protection measures developed or adopted by the U.S. Department of the Interior and the U.S. Army Corps of Engineers and identified in this Record of Decision, including information, appendices, the Plan of Development developed by Keystone, and associated NEPA and supporting documents available at https://go.usa.gov/xdacn. My approval of this decision constitutes the final decision of the Department of the Interior and, in accordance with the regulations at 43 CFR §§ 4.331(b), 4.410(a)(3), is not subject to appeal under Departmental regulations at 43 CFR 4.

Approved by:

David L. Bernhardt
Secretary of the Interior

This decision constitutes the final decision of the Department of the Interior and is effective immediately.

BLM-00168

## LIST OF RECORD OF DECISION APPENDICES

Appendix A – Legal Descriptions
Appendix B – Maps
Appendix C – Keystone XL Pipeline Final Plan of Development (POD)
Appendix D – Biological Assessment, USFWS Biological Opinion and Concurrence Documents
Appendix E – Programmatic Agreement for the Keystone XL Pipeline Project
Appendix F – BLM Special Stipulations for the Right-of-Way Grant
Appendix F1 - US Army Corps of Engineers Special Stipulations

BLM-00169