Bureau of Land Management

FEB 0 7 2020

Montana State Office
Billings, Montana

FORM 2800-14
(August 1985)

Issuing Office
Miles City Field Office

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
RIGHT-OF-WAY GRANT MTM-98191
TEMPORARY USE PERMIT MTM-98191-01

1. A right-of-way (ROW) and temporary use permit (TUP) are hereby granted pursuant to Section 28 of the Mineral Leasing Act of 1920, as amended (30 U.S.C. 185).

2. Nature of Interest:

a. By this instrument, the holder:

TransCanada Keystone Pipeline, LP
700 Louisiana Street
Houston, TX  77002

receives a right to construct, operate, maintain and terminate a 36-inch diameter steel crude oil transmission pipeline and related facilities on Federal lands described in Exhibit A (ROW) and Exhibit A-1 (TUP).

The right-of-way includes the following facilities:

b. 1. The pipeline right-of-way granted herein is 50 feet wide, 46.33 miles (244,603.48 feet) long, and consists of 281.02 acres, more or less.

2. The access road right-of-way granted herein is 30 feet wide, 2.84 miles (15,006.88 feet) long, and consists of 10.05 acres, more or less. ***Total for right-of-way is 291.07 acres.***

The Temporary Use Permit (TUP) includes the following facilities:

1. A TUP for temporary workspace permitted herein consists of 324.30 acres, more or less.

2. A TUP for additional temporary workspace permitted herein for waterbody crossings, wetland crossings, road crossings, truck turnarounds, staging areas, etc. are parcels of variable widths and consists of 122.79 acres, more or less.

3. A TUP for temporary access roads permitted here is 30 feet wide, 11.06 miles (58,363.41 feet) long, and consists of 39.76 acres, more or less. ***Total for temporary use permit is 486.85 acres.***

BLM-00003

c.  This right-of-way grant instrument shall terminate on December 31, 2049, unless, prior thereto, it is relinquished, abandoned, terminated, or modified pursuant to the terms and conditions of this instrument or of any applicable Federal law or regulation.

The TUP authorized herein shall terminate three years from the effective date of this instrument.

d.  These instruments may be renewed.  If renewed, the right-of-way and temporary use permit shall be subject to the regulations existing at the time of renewal and any other terms and conditions that the authorized officer deems necessary to protect the public interest.

e.  Notwithstanding the expiration of these instruments or any renewal thereof, early relinquishment, abandonment, or termination, the provisions of these instruments, to the extent applicable, shall continue in effect and shall be binding on the holder, its successors, or assigns, until they have fully satisfied the obligations and/or liabilities accruing herein before or on account of the expiration, or prior termination, of the grant and temporary use permit.

3.  Rental:

For and in consideration of the rights granted, the holder agrees to pay the Bureau of Land Management fair market value rental as determined by the authorized officer unless specifically exempted from such payment by regulation.  Provided, however, that the rental may be adjusted by the authorized officer, whenever necessary, to reflect changes in the fair market rental value as determined by the application of sound business management principles, and so far as practicable and feasible, in accordance with comparable commercial practices.

4.  Terms and Conditions:

a.  This grant and permit are issued subject to the holder's compliance with all applicable regulations contained in Title 43 Code of Federal Regulations part 2800 and 2880.

b.  Upon grant termination by the authorized officer, all improvements shall be removed from the public lands within 90 days, or otherwise disposed of as provided in paragraph (4)(d) or as directed by the authorized officer.

c.  Each grant issued for a term of 20 years or more, shall at a minimum be reviewed by the authorized officer at the end of the 20th year and at regular intervals thereafter not to exceed 10 years. Provided, however, that a right-of-way or permit granted herein may be reviewed at any time deemed necessary by the authorized officer.

d.  The legal descriptions are in Exhibit A (ROW) and Exhibit A-1 (TUP), special

stipulations in Exhibit B, Corps of Engineers special terms and conditions in Exhibit C and the Corps of Engineers Real Estate Contracting Officer's decision in Exhibit D attached hereto, are incorporated into and made a part of this grant and permit as fully and effectively as if they were set forth herein in their entirety.

e.  Failure of the holder to comply with applicable law or any provision of this right-of-way grant or permit shall constitute grounds for suspension or termination thereof.

f.  The holder shall perform all operations in a good and workmanlike manner so as to ensure protection of the environment and the health and safety of the public.

BLM-00005

IN WITNESS WHEREOF, the undersigned agrees to the terms and conditions of this right-of-way grant MTM-98191 and temporary use permit MTM-98191-01.

(Signature of Holder)

Director  Keystone XL : US Liquids Project
(Title)

02-05-2020
(Date)

(Signature of Authorized Officer)

Associate State Director
(Title)

02/07/2020
(Effective Date of Grant/TUP)

BLM-00006

# EXHIBIT "A"
# Legal Descriptions
# Right-of-way MTM-98191

## Pipeline Right-of-Way:

Principal Meridian, Montana
T. 37 N., R. 32 E.,
   sec. 5, lots 2 and 3, S1/2NE1/4, and E1/2SE1/4;
   sec. 10, SW1/4SW1/4;
   sec. 25, SW1/4SW1/4.
T. 36 N., R. 33 E.,
   sec. 9, W1/2SW1/4;
   sec. 22, SW1/4NW1/4, N1/2SW1/4, and W1/2SE1/4;
   sec. 26, N1/2SW1/4, SE1/4SW1/4, and SW1/4SE1/4.
T. 34 N., R. 34 E.,
   sec. 12, SW1/4NE1/4.
T. 35 N., R. 34 E.,
   sec. 27, SW1/4NE1/4 and NW1/4SE1/4.
T. 36 N., R. 34 E.,
   sec. 31, lot 4.
T. 33 N., R. 35 E.,
   sec. 1, SW1/4NW1/4, N1/2SW1/4, SE1/4SW1/4, and SW1/4SE1/4;
   sec. 12, N1/2NE1/4 and SE1/4NE1/4.
T. 34 N., R. 35 E.,
   sec. 21, NE1/4SW1/4.
T. 33 N., R. 36 E.,
   sec. 7, lots 2 and 3 and E1/2SW1/4;
   sec. 17, SW1/4NW1/4, SW1/4, and SW1/4SE1/4;
   sec. 18, E1/2NE1/4;
   sec. 20, NW1/4NE1/4 and NE1/4NW1/4;
   sec. 21, NW1/4SW1/4;
   sec. 27, NW1/4SW1/4;
   sec. 28, W1/2NE1/4, SE1/4NE1/4, NE1/4NW1/4, and NE1/4SE1/4.
T. 32 N., R. 37 E.,
   sec. 8, N1/2NW1/4 and SE1/4NW1/4;
   sec. 22, SE1/4NW1/4, NE1/4SW1/4, NW1/4SE1/4, and S1/2SE1/4;
   sec. 26, SW1/4SE1/4;
   sec. 27, N1/2NE1/4 and SE1/4NE1/4;
   sec. 35, N1/2NE1/4 and SE1/4NE1/4.
T. 30 N., R. 38 E.,
   sec. 1, W1/2SE1/4 and SE1/4SE1/4;
   sec. 12, E1/2NE1/4.

T. 31 N., R. 38 E.,
    sec. 6, lots 5 thru 7 and E1/2SW1/4;
    sec. 7, NW1/4NE1/4, S1/2NE1/4, NE1/4NW1/4, and NE1/4SE1/4;
    sec. 8, W1/2SW1/4 and SE1/4SW1/4;
    sec. 17, NW1/4NE1/4, S1/2NE1/4, NE1/4NW1/4, and NE1/4SE1/4;
    sec. 21, W1/2NE1/4, E1/2NW1/4, N1/2SE1/4, and SE1/4SE1/4;
    sec. 27, N1/2NW1/4, SE1/4NW1/4, and E1/2SE1/4;
    sec. 34, NE1/4NE1/4;
    sec. 35, NE1/4SW1/4 and SE1/4SE1/4.
T. 29 N., R. 39 E.,
    sec. 1, lots 1 and 2.
T. 30 N., R. 39 E.,
    sec. 7, lots 2 and 3, E1/2SW1/4, and SW1/4SE1/4;
    sec. 17, SW1/4NE1/4, W1/2NW1/4, SE1/4NW1/4, and W1/2SE1/4;
    sec. 18, N1/2NE1/4;
    sec. 21, N1/2SW1/4 and SE1/4SW1/4;
    sec. 27, SW1/4NW1/4, N1/2SW1/4, and SE1/4SW1/4;
    sec. 35, N1/2SW1/4.
T. 29 N., R. 40 E.,
    sec. 6, lots 3 and 4, S1/2NE1/4, and SE1/4NW1/4.
T. 26 N., R. 42 E.,
    sec. 4, lot 4, SW1/4NW1/4, W1/2SW1/4, and SE1/4SW1/4; █████
    sec. 9, W1/2NE1/4, SE1/4NE1/4, and NE1/4NW1/4;
    sec. 10, SW1/4NW1/4, W1/2SW1/4, and SE1/4SW1/4;
    sec. 15, SE1/4SW1/4;
    sec. 22, W1/2NE1/4, NE1/4NW1/4, and W1/2SE1/4;
    sec. 26, N1/2SW1/4, SE1/4SW1/4, and SW1/4SE1/4;
    sec. 27, N1/2NE1/4;
    sec. 35, N1/2NE1/4 and SE1/4NE1/4.
T. 27 N., R. 42 E.,
    sec. 32, lot 5 and SE1/4NE1/4; █████
    sec. 33, lot 7 and NW1/4SW1/4. █████
T. 25 N., R. 43 E.,
    sec. 7, SW1/4NE1/4 and NW1/4SE1/4;
    sec. 27, SW1/4NE1/4.
T. 24 N., R. 44 E.,
    sec. 5, lot 2;
    sec. 8, NE1/4NE1/4;
    sec. 15, W1/2SW1/4 and SE1/4SW1/4;
    sec. 22, NE1/4SE1/4;
    sec. 26, SE1/4NE1/4 and E1/2SE1/4;
    sec. 35, NE1/4NE1/4.
T. 23 N., R. 45 E.,
    sec. 5, S1/2SW1/4;
    sec. 8, NE1/4NW1/4 and SW1/4SE1/4;

sec. 17, N1/2NE1/4 and SE1/4NE1/4;
sec. 21, NE1/4NW1/4;
sec. 27, W1/2NE1/4, NE1/4NW1/4, and NE1/4SE1/4.
T. 22 N., R. 46 E.,
sec. 21, NW1/4SW1/4;
sec. 34, S1/2NE1/4 and SE1/4NW1/4.
T 11 N., R. 55 E.,
sec. 4, lot 2, S1/2NE1/4, and NE1/4SE1/4;
sec. 10, NE1/4 and NE1/4NW1/4;
sec. 11, N1/2SW1/4, SE1/4SW1/4, and SW1/4SE1/4;
sec.13, S1/2NW1/4, N1/2SW1/4, W1/2SE1/4, and SE1/4SE1/4;
sec. 14, N1/2NE1/4 and SE1/4NE1/4;
sec. 24, NE1/4NE1/4.
T. 11 N., R. 56 E.,
sec. 19, lot 1, N1/2NE1/4, SE1/4NE1/4, NE1/4NW1/4, and NE1/4SE1/4;
sec. 20, N1/2SW1/4, SE1/4SW1/4, and SW1/4SE1/4;
sec. 28, W1/2SW1/4;
sec. 29, W1/2NE1/4, SE1/4NE1/4, and NE1/4SE1/4;
sec. 33, SW1/4NE1/4, N1/2NW1/4, SE1/4NW1/4, N1/2SE1/4, and SE1/4SE1/4.
T. 9 N., R. 57 E.,
sec. 14, SW1/4NW1/4, N1/2SW1/4, and SE1/4SW1/4;
sec. 24, W1/2SW1/4 and SE1/4SW1/4.
T. 8 N., R. 58 E.,
sec. 14, NE1/4NE1/4.
T. 7 N., R. 59 E.,
sec. 22, NE1/4SW1/4, W1/2SE1/4, and SE1/4SE1/4.
T. 6 N., R. 60 E.,
sec. 20, SW1/4NE1/4 and NE1/4NW1/4.
T. 3 N., R. 61 E.,
sec. 15, E1/2SE1/4.

**Breakdown by ROW for Pipeline:**

BLM   = 50 feet X 234,679.84 feet = 269.65 acres = 44.45 miles
ACOE = 50 feet X    9,923.64 feet =  11.37 acres =  1.88 miles
Total  = 50 feet X 244,603.48 feet = 281.02 Acres = 46.33 miles

BLM-00009

## Access Road Right-of-way:

Principal Meridian, Montana
T. 31 N., R. 37 E.,
    sec. 1, SE1/4NW1/4 and NE1/4SW1/4;
T. 26 N., R. 42 E.,
    sec. 4, lots 2 thru 5, E1/2SE1/4, SW1/4SE1/4, and accretion to lots 2 and 3; [ACOE]
    sec. 9, NW1/4NE1/4 and N1/2NW1/4.
T. 23 N., R. 45 E.,
    sec. 14, NW1/4SW1/4;
    sec. 15, NE1/4SE1/4;
    sec. 23, NE1/4NE1/4.

**Breakdown by ROW for Long Term Roads:**

**BLM** = 30 feet X  8,558.79 feet =    5.67 acres =  1.62 miles
**ACOE** = 30 feet X   6,448.09 feet =    4.38 acres =  1.22 miles
**Total**   = 30 feet X 15,006.88 feet = 10.05 acres =  2.84 miles

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

**Breakdown of Long Term Right-of-way:**
**Permanent Pipeline Right-of-way**        =  281.02 acres
**Permanent Access Road Right-of-way  =    10.05 acres**
                        **Total Right-of-way  =  291.07 acres**

# EXHIBIT "A-1"
## Temporary Legal Descriptions
## Temporary Use Permit (TUP) MTM-98191-01

## TUP for Temporary Workspace:

Principal Meridian, Montana
T. 37 N., R. 32 E.,
   sec. 5, lots 2 and 3, S1/2NE1/4, and E1/2SE1/4;
   sec. 10, SW1/4SW1/4;
   sec. 25, SW1/4SW1/4.
T. 36 N., R. 33 E.,
   sec. 9, W1/2SW1/4;
   sec. 22, SW1/4NW1/4, N1/2SW1/4, SE1/4SW1/4, and W1/2SE1/4;
   sec. 26, N1/2SW1/4, SE1/4SW1/4, and S1/2SE1/4.
T. 34 N., R. 34 E.,
   sec. 12, SW1/4NE1/4.
T. 35 N., R. 34 E.,
   sec. 27, SW1/4NE1/4 and NW1/4SE1/4.
T. 36 N., R. 34 E.,
   sec. 31, lot 4.
T. 33 N., R. 35 E.,
   sec. 1, SW1/4NW1/4, N1/2SW1/4, SE1/4SW1/4, and SW1/4SE1/4;
   sec. 12, N1/2NE1/4 and SE1/4NE1/4.
T. 34 N., R. 35 E.,
   sec. 21, NE1/4SW1/4.
T. 33 N., R. 36 E.,
   sec. 7, lots 2 and 3 and E1/2SW1/4;
   sec. 17, SW1/4NW1/4, SW1/4, and SW1/4SE1/4;
   sec. 18, E1/2NE1/4;
   sec. 20, NW1/4NE1/4 and NE1/4NW1/4;
   sec. 21, NW1/4SW1/4;
   sec. 27, NW1/4SW1/4;
   sec. 28, W1/2NE1/4, SE1/4NE1/4, NE1/4NW1/4, and NE1/4SE1/4.
T. 32 N., R. 37 E.,
   sec. 8, N1/2NW1/4 and SE1/4NW1/4;
   sec. 22, SE1/4NW1/4, E1/2SW1/4, NW1/4SE1/4, and S1/2SE1/4;
   sec. 26, SW1/4SE1/4;
   sec. 27, N1/2NE1/4 and SE1/4NE1/4;
   sec. 35, N1/2NE1/4, SE1/4NE1/4.
T. 30 N., R. 38 E.,
   sec. 1, W1/2SE1/4 and SE1/4SE1/4;
   sec. 12, E1/2NE1/4.
T. 31 N., R. 38 E.,

sec. 6, lots 5 thru 7 and E1/2SW1/4;
sec. 7, W1/2NE1/4, SE1/4NE1/4, NE1/4NW1/4, and NE1/4SE1/4;
sec. 8, W1/2SW1/4 and SE1/4SW1/4;
sec. 17, NW1/4NE1/4, S1/2NE1/4, NE1/4NW1/4, and NE1/4SE1/4;
sec. 21, W1/2NE1/4, E1/2NW1/4, N1/2SE1/4, and SE1/4SE1/4;
sec. 27, N1/2NW1/4, SE1/4NW1/4, and E1/2SE1/4;
sec. 34, NE1/4NE1/4;
sec. 35, NE1/4SW1/4 and SE1/4SE1/4.
T. 29 N., R. 39 E.,
sec. 1, lots 1 and 2.
T. 30 N., R. 39 E.,
sec. 7, lots 2 and 3, E1/2SW1/4, and SW1/4SE1/4;
sec. 17, SW1/4NE1/4, W1/2NW1/4, SE1/4NW1/4, and W1/2SE1/4;
sec. 18, N1/2NE1/4;
sec. 21, N1/2SW1/4 and SE1/4SW1/4;
sec. 27, SW1/4NW1/4, N1/2SW1/4, and SE1/4SW1/4;
sec. 35, N1/2SW1/4.
T. 29 N., R. 40 E.,
sec. 6, lots 3 and 4, S1/2NE1/4, and SE1/4NW1/4.
T. 26 N., R. 42 E.,
sec. 4, lot 4, SW1/4NW1/4, W1/2SW1/4, and SE1/4SW1/4; ████
sec. 9, W1/2NE1/4, SE1/4NE1/4, NE1/4NW1/4, and NE1/4SE1/4;
sec. 10, SW1/4NW1/4, W1/2SW1/4, and SE1/4SW1/4;
sec. 15, SE1/4SW1/4;
sec. 22, W1/2NE1/4, NE1/4NW1/4, W1/2SE1/4, and SE1/4SE1/4;
sec. 26, N1/2SW1/4, SE1/4SW1/4, and SW1/4SE1/4;
sec. 27, N1/2NE1/4;
sec. 35, N1/2NE1/4 and SE1/4NE1/4.
T. 27 N., R. 42 E.,
sec. 32, lot 5 and SE1/4NE1/4; ████
sec. 33, lot 7 and NW1/4SW1/4. ████
T. 25 N., R. 43 E.,
sec. 7, SW1/4NE1/4 and NW1/4SE1/4;
sec. 27, SW1/4NE1/4.
T. 24 N., R. 44 E.,
sec. 5, lot 2;
sec. 8, NE1/4NE1/4;
sec. 15, W1/2SW1/4 and SE1/4SW1/4;
sec. 22, NE1/4SE1/4;
sec. 25, SW1/4SW1/4;
sec. 26, SE1/4NE1/4 and E1/2SE1/4;
sec. 35, NE1/4NE1/4.
T. 23 N., R. 45 E.,
sec. 5, S1/2SW1/4;
sec. 8, NE1/4NW1/4 and SW1/4SE1/4;

sec. 17, N1/2NE1/4 and SE1/4NE1/4;
sec. 21, NE1/4NW1/4;
sec. 27, W1/2NE1/4, NE1/4NW1/4, and NE1/4SE1/4.
T. 22 N., R. 46 E.,
sec. 21, NW1/4SW1/4;
sec. 34, S1/2NE1/4 and SE1/4NW1/4.
T 11 N., R. 55 E.,
sec. 4, lot 2, S1/2NE1/4, and NE1/4SE1/4;
sec. 10, NE1/4 and NE1/4NW1/4;
sec. 11, N1/2SW1/4, SE1/4SW1/4, and SW1/4SE1/4;
sec.13, S1/2NW1/4, N1/2SW1/4, W1/2SE1/4, and SE1/4SE1/4;
sec. 14, N1/2NE1/4 and SE1/4NE1/4;
sec. 24, NE1/4NE1/4.
T. 11 N., R. 56 E.,
sec. 18, lot 4;
sec. 19, lot 1, N1/2NE1/4, SE1/4NE1/4, NE1/4NW1/4, and NE1/4SE1/4;
sec. 20, N1/2SW1/4, SE1/4SW1/4, and SW1/4SE1/4;
sec. 28, W1/2SW1/4;
sec. 29, W1/2NE1/4, SE1/4NE1/4, and E1/2SE1/4;
sec. 33, SW1/4NE1/4, N1/2NW1/4, SE1/4NW1/4, N1/2SE1/4, and SE1/4SE1/4.
T. 9 N., R. 57 E.,
sec. 14, SW1/4NW1/4, N1/2SW1/4, and SE1/4SW1/4;
sec. 24, W1/2SW1/4 and SE1/4SW1/4.
T. 8 N., R. 58 E.,
sec. 14, NE1/4NE1/4.
T. 7 N., R. 59 E.,
sec. 22, NE1/4SW1/4, W1/2SE1/4, and SE1/4SE1/4.
T. 6 N., R. 60 E.,
sec. 20, SW1/4NE1/4 and NE1/4NW1/4.
T. 3 N., R. 61 E.,
sec. 15, E1/2SE1/4.

## Breakdown of TUP for Temporary Workspace Areas

BLM   = 60 feet X 234,679.84 feet = 312.08 acres
ACOE = 60 feet X    9,923.63 feet =  12.22 acres
Total  = 60 feet X 244,603.48 feet = 324.30 acres

BLM-00013

## TUP for Additional Temporary Workspace:

Principal Meridian, Montana
T. 37 N., R. 32 E.,
    sec. 5, lots 2 and 3, S1/2NE1/4, and NE1/4SE1/4;
    sec. 10, SW1/4SW1/4;
    sec. 25, SW1/4SW1/4.
T. 36 N., R. 33 E.,
    sec. 9, W1/2SW1/4 and SE1/4SW1/4;
    sec. 22, SW1/4NW1/4, N1/2SW1/4, SE1/4SW1/4, and SW1/4SE1/4;
    sec. 26, E1/2SW1/4 and SW1/4SE1/4.
T. 34 N., R. 34 E.,
    sec. 12, SW1/4NE1/4.
T. 33 N., R. 35 E.,
    sec. 1, SW1/4NW1/4, NW1/4SW1/4, E1/2SW1/4, and SW1/4SE1/4;
    sec. 12, N1/2NE1/4 and SE1/4NE1/4.
T. 33 N., R. 36 E.,
    sec. 7, lots 2 and 3 and E1/2SW1/4;
    sec. 17, SW1/4NW1/4, SW1/4, and SW1/4SE1/4;
    sec. 18, E1/2NE1/4;
    sec. 21, NW1/4SW1/4;
    sec. 27, W1/2SW1/4;
    sec. 28, W1/2NE1/4, SE1/4NE1/4, NE1/4NW1/4, and E1/2SE1/4.
T. 32 N., R. 37 E.,
    sec. 8, SE1/4NW1/4 and N1/2NW1/4;
    sec. 22, SE1/4NW1/4, NE1/4SW1/4, NW1/4SE1/4, and SW1/4SE1/4;
    sec. 26, SW1/4SE1/4;
    sec. 27, N1/2NE1/4 and SE1/4NE1/4;
    sec. 35, N1/2NE1/4 and SE1/4NE1/4.
T. 30 N., R. 38 E.,
    sec. 1, W1/2SE1/4 and SE1/4SE1/4;
    sec. 12, E1/2NE1/4.
T. 31 N., R. 38 E.,
    sec. 6, lots 5 thru 7 and SE1/4SW1/4;
    sec. 7, SE1/4NE1/4, W1/2NE1/4, NE1/4NW1/4 and NE1/4SE1/4;
    sec. 8, W1/2SW1/4 and SE1/4SW1/4;
    sec. 17, NW1/4NE1/4, S1/2NE1/4, NE1/4NW1/4, and NE1/4SE1/4;
    sec. 21, W1/2NE1/4, E1/2NW1/4, N1/2SE1/4, and SE1/4SE1/4;
    sec. 27, N1/2NW1/4, SE1/4NW1/4, and E1/2SE1/4;
    sec. 34, NE1/4NE1/4;
    sec. 35, NE1/4SW1/4 and SE1/4SE1/4.
T. 29 N., R. 39 E.,
    sec. 1, lots 1 and 2.
T. 30 N., R. 39 E.,
    sec. 7, lots 2 and 3, E1/2SW1/4, and SW1/4SE1/4;

sec. 17, SW1/4NE1/4, W1/2NW1/4, SE1/4NW1/4, and W1/2SE1/4;
sec. 18, N1/2NE1/4;
sec. 21, N1/2SW1/4 and SE1/4SW1/4;
sec. 27, SW1/4NW1/4, N1/2SW1/4, and SE1/4SW1/4;
sec. 35, N1/2SW1/4.
T. 29 N., R. 40 E.,
sec. 6, lots 3 and 4, S1/2NE1/4, and SE1/4NW1/4 .
T. 26 N., R. 42 E.,
sec. 4, lot 4, SW1/4NW1/4, W1/2SW1/4, and SE1/4SW1/4; ▊▊▊▊
sec. 9, NW1/4NE1/4, NE1/4NW1/4, and NE1/4SE1/4;
sec. 10, SW1/4NW1/4, NW1/4SW1/4, and SE1/4SW1/4;
sec. 15, SE1/4SW1/4;
sec. 22, SW1/4NE1/4, NE1/4NW1/4, W1/2SE1/4, and SE1/4SE1/4;
sec. 26, N1/2SW1/4, SE1/4SW1/4, and SW1/4SE1/4;
sec. 27, NE1/4NE1/4;
sec. 35, N1/2NE1/4 and SE1/4NE1/4.
T. 27 N., R. 42 E.,
sec. 32, lot 5; ▊▊▊▊
sec. 33, lot 7 and NW1/4SW1/4. ▊▊▊▊
T. 25 N., R. 43 E.,
sec. 7, SW1/4NE1/4 and NW1/4SE1/4;
sec. 27, SW1/4NE1/4.
T. 24 N., R. 44 E.,
sec. 5, lot 2;
sec. 15, W1/2SW1/4 and SE1/4SW1/4;
sec. 25, SW1/4SW1/4;
sec. 26, SE1/4NE1/4 and E1/2SE1/4;
sec. 35, NE1/4NE1/4.
T. 23 N., R. 45 E.,
sec. 5, S1/2SW1/4;
sec. 8, NE1/4NW1/4 and S1/2SE1/4;
sec. 17, N1/2NE1/4 and SE1/4NE1/4;
sec. 21, NE1/4NW1/4;
sec. 27, W1/2NE1/4, NE1/4NW1/4, and NE1/4SE1/4.
T. 22 N., R. 46 E.,
sec. 21, NW1/4SW1/4;
sec. 34, S1/2NE1/4 and SE1/4NW1/4.
T. 11 N., R. 55 E.,
sec. 4, lot 2,  S1/2NE1/4, and NE1/4SE1/4;
sec. 10, NE1/4 and NE1/4NW1/4;
sec. 11, N1/2SW1/4, SE1/4SW1/4, and SW1/4SE1/4;
sec. 13, SW1/4NW1/4, NE1/4SW1/4, W1/2SE1/4, and SE1/4SE1/4;
sec. 14, N1/2NE1/4 and SE1/4NE1/4;
sec. 24, NE1/4NE1/4.
T. 11 N., R. 56 E.,

sec. 19, lot 1, N1/2NE1/4, SE1/4NE1/4, N1/2NW1/4, and NE1/4SE1/4;
sec. 20, N1/2SW1/4, SE1/4SW1/4, and SW1/4SE1/4;
sec. 28, W1/2SW1/4;
sec. 29, W1/2NE1/4, SE1/4NE1/4, and NE1/4SE1/4;
sec. 33, SW1/4NE1/4, N1/2NW1/4, SE1/4NW1/4, N1/2SE1/4, and SE1/4SE1/4.
T 9 N., R. 57 E.,
sec. 14, SW1/4NW1/4, N1/2SW1/4, and SE1/4SW1/4;
sec. 24, W1/2SW1/4 and SE1/4SW1/4.
T. 8 N., R. 58 E.,
sec. 14, NE1/4NE1/4.
T. 7 N., R. 59 E.,
sec. 22, NE1/4SW1/4, W1/2SE1/4, and SE1/4SE1/4.
T. 6 N., R. 60 E.,
sec. 20, SW1/4NE1/4 and NE1/4NW1/4.
T. 3 N., R. 61 E.,
sec. 15, E1/2SE1/4.

## Breakdown of TUP for Additional Temporary Workspace Areas:

BLM   = Variable widths X 124,996.72 feet = 111.97 acres
ACOE  = Variable widths X    9,901.43 feet =  10.82 acres
Total   = Variable widths X 134,898.15 feet = 122.79 acres

## **TUP for Temporary Access Roads:**

Principal Meridian, Montana
T. 37 N., R. 32 E.,
  sec. 5, lots 2 and 3, S1/2NE1/4 and E1/2SE1/4.
T. 35 N., R. 33 E.,
  sec. 12, SE1/4SE1/4;
  sec. 13, N1/2NE1/4.
T. 34 N., R. 34 E.,
  sec. 2, lot 4;
  sec. 12, SW1/4NE1/4.
T. 33 N., R. 35 E.,
  sec. 1, NE1/4SW1/4 and S1/2SW1/4;
  sec. 11, NE1/4NE1/4;
  sec. 12, NW1/4NW1/4.
T. 33 N., R. 36 E.,
  sec. 28, SE1/4NE1/4 and E1/2SE1/4;
  sec. 33, NE1/4NE1/4;
  sec. 34, W1/2NW1/4 and SE1/4NW1/4.
T. 32 N., R. 37 E.,
  sec. 7, NE1/4SW1/4;
  sec. 8, SE1/4SW1/4.
T. 30 N., R. 38 E.,
  sec. 2, W1/2SE1/4;
  sec. 4, NE1/4SE1/4;
  sec. 9, NE1/4SW1/4 and NW1/4SE1/4.
T. 31 N., R. 38 E.,
  sec. 7, NE1/4SE1/4 and S1/2SE1/4;
  sec. 8, NW1/4SW1/4;
  sec. 18, NW1/4NE1/4;
  sec. 21, E1/2SE1/4;
  sec. 26, S1/2SW1/4;
  sec. 28, NE1/4NE1/4, S1/2NE1/4, and W1/2SE1/4;
  sec. 33, NW1/4NE1/4;
  sec. 35, E1/2SW1/4.
T. 30 N., R. 39 E.,
  sec. 27, S1/2SW1/4.
T. 26 N., R. 42 E.,
  sec. 4, lots 2 and 3 and accretion to lots 2 and 3. ▓▓▓▓
T. 27 N., R. 42 E.,
  sec. 32, lot 5; ▓▓▓▓
  sec. 33, lot 6, N1/2SW1/4, and accretion to lots 6 and 7. ▓▓▓▓
T. 23 N., R. 45 E.,
  sec. 8, SW1/4SE1/4;

sec. 17, N1/2NE1/4.
T. 21 N., R. 46 E.,
   sec. 5, lot 1 and S1/2NE1/4.
T. 2 N., R. 61 E.,
   sec. 24, S1/2SW1/4.

**Breakdown of TUP for Temporary Access Road:**

BLM  = 30 feet X 53,361.64 feet =  36.51 acres
<u>ACOE = 30 feet X  5,001.77 feet =   3.25 acres</u>
Total  = 30 feet X 58,363.41 feet = 39.76 acres
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Breakdown for TUP:**
**Temporary Workspace Areas**          = 324.30 acres
**Additional Temporary Workspace Areas = 122.79 acres**
**<u>Temporary Access Roads</u>**          **=  39.76 acres**
                          **Total TUP = 486.85 acres**

BLM-00018

# Exhibit B
## Special Stipulations
## MTM-98191
## MTM-98191-01

*NOTE: Specific Standard and/or Special Stipulations may be removed, depending on the information provided in the Final POD.*

1.  The Holder shall not be permitted to use the granted areas for the proposed project until they have acquired all necessary Federal, State, or local permits, licenses, easements, etc. on Federal, State and/or private lands crossed by the project.

2.  Any surface disturbing activity, additional construction, or use that is not in accord with the approved POD shall not be initiated without the prior written approval of the Authorized Officer. A copy of the complete ROW grant, including all stipulations and approved POD, shall be made available on the ROW area during construction, operation, and decommissioning. Noncompliance with the above will be grounds for immediate temporary suspension of activities if it constitutes a threat to public health or safety or the environment.

3.  The Holder shall not initiate any construction or other surface disturbing activities on the right-of-way without the prior written authorization of the Authorized Officer (AO). Such authorization shall be a written Notice to Proceed (NTP) issued by the AO. The AO may suspend or terminate in whole, or in part, any NTP which has been issued when, in his judgement, unforeseen conditions arise which result in the approved terms and conditions being inadequate to protect the public health and safety or to protect the environment. Other actions requiring NTPs may be identified as the final design and construction, reclamation/stabilization plans for the Keystone XL Pipeline Project are completed.

    a.  **Final Plan of Development (POD):** The Final POD covers elements of construction and mitigation that are applicable everywhere on the project. In January 2020, the Holder submitted the updated Final POD, which is attached as Appendix B to the Record of Decision for the Keystone XL Pipeline Project. While the Project-wide POD contains generalized details of all Project components, including Project overview map, construction engineering and design need to be completed as well as field surveys for environmental mitigation requirements. As such, prior to issuance of a NTP, the Holder shall submit for BLM approval a POD that provides a detailed description of the approved pipeline and related facilities project. Plans that avoid, minimize, and mitigate environmental impacts will be incorporated into the POD as appendices, and will address a range of practices from reclamation to spill prevention

and fire prevention. The various appendices will include information that will guide construction, operations, and maintenance.

b. **Construction Spread PODs:** Construction Spread PODs will tier from the Project-wide POD, meaning that the criteria and practices identified in the Project-wide POD are explicitly required project-wide and are not repeated in the Construction Spread PODs. The number and location of Construction Spread PODs will be determined after a construction contractor is selected by the Proponents and specific construction plans prepared. The Construction Spread PODs typically contain plan and profile maps and drawings, identify spatial and temporal environmental restrictions, document the location of all required measures, and contain other Project details. Each Construction Spread POD will be subject to review and acceptance by the BLM. When accepted, a NTP will allow the ROW Holder to use the public lands covered by that POD within the Terms and Conditions of the ROW grant.

c. **Special Status Species Plans:** Preconstruction surveys are required for the Special Status Species identified in the Final EIS/Supplemental EIS. The results of these surveys may identify the need for conservation and or mitigation plans. The BLM will notify the ROW Grant Holder if a species plan is determined necessary and the right to use the associated granted area will be withheld until the species plan is finalized. A NTP will be issued for each species plan area.

d. **Sage-grouse Mitigation Plan:** The Holder will comply with all provisions of the "2017 Greater Sage-Grouse Conservation Plan." The Sage-Grouse Conservation Plan summarizes how the mitigation plan was developed in order to avoid and minimize impacts to sage-grouse and sage-grouse habitat. The plan describes the compensatory mitigation values for residual effects across federal and non-federal lands in Montana and South Dakota. On federal land, which is found only in Montana, the Project would be defined relative to the right-of-way grant which would be authorized under the Mineral Leasing Act for the construction, operation, and maintenance of the entire pipeline project footprint on federal land exclusive of transmission lines which would be separately approved under third-party right-of-way grants. The Sage-Grouse Conservation Plan shall be approved by the BLM through the Record of Decision for the ROW/TUP Grant and is attached as Appendix M to the Final POD.

e. **Sage-grouse Conservation Buffers:** The April 2017 Sage-Grouse Conservation Plan includes buffers around active sage-grouse leks that incorporate landscape features and habitat with time-of-day and time-of-year restrictions to minimize

impacts to sage-grouse. Holder shall abide by all buffer and timing restrictions identified in the Conservation Plan (pages 6 – 13 and Attachment 2 of the Conservation Plan).

f. **Sage-Grouse Compensatory Mitigation Fund**: The April 2017 Conservation Plan was voluntarily negotiated between TransCanada Keystone Pipeline LP (Keystone) and entities with the State of Montana and the Montana Bureau of Land Management (BLM), and directs mitigation funds for residual effects on federal and non-federal lands to the State of Montana's Greater Sage Grouse Stewardship Fund (Fund). The Fund's underlying purpose is to "maintain, enhance, restore, expand, or benefit sage-grouse habitat and populations." Keystone shall deposit mitigation funds into the Stewardship Account prior to the NTP being issued. Mitigation funds are to be used within three years and must be spent in counties where the impact occurs (i.e., Phillips, Valley, McCone, Prairie, Garfield or Fallon County). Selected project(s) must include habitat preservation, restoration, enhancement, and/or creation, and directly and indirectly benefit sage-grouse populations that are impacted by the project. On September 14, 2018, the Montana Sage-Grouse Oversight Team (MSGOT) considered and accepted the Keystone mitigation funds as a financial contribution into the Stewardship Account as directed by the Conservation Plan. The MT Sage Grouse Conservation Program will allocate the money to sage-grouse conservation efforts in Valley, McCone, Prairie, Garfield or Fallon Counties in Montana consistent with the terms identified in the Conservation Plan.

g. **Sage-Grouse Habitat Restoration**: The 2017 Sage-Grouse Conservation Plan identifies Sage-grouse habitat restoration, as well as overall reclamation for the Project, is an important aspect of the minimization measures the Project will implement to reduce long-term adverse impacts. Keystone developed specific construction and reclamation procedures to restore native grasses, forbs, and shrubs within all sagebrush habitat that will be crossed by the Project, as well as specific procedures for restoring other native grasslands separate from non-native pastures. Keystone shall complete all restoration and restoration monitoring activities as described in the Conservation Plan, including Attachments 3 and 4 to the Conservation Plan.

h. **Migratory Bird Habitat Conservation Plan**: A Migratory Bird Treaty Act Conservation Plan developed by the Holder and US Fish and Wildlife Service will focus on conservation and or mitigation techniques for migratory birds and associated habitat.  There may be more plans submitted by the Proponents, covering different

portions of the project area.  The BLM reviews all plan(s), and, when acceptable, accepts the plan(s) and issues a NTP for the respective portions of the project area. Upon acceptance by the BLM, the Holder is responsible for following the plan.

i.  **National Historic Trails Treatment Plan:** Guided by the procedures and requirements of the Programmatic Agreement for the Keystone XL Pipeline Project, a Historic Properties Treatment Plan (HPTP) for Lewis and Clark National Historic Trails and contributing landscapes will be prepared due to the linear nature of the trails and the expanse of the associated landscapes.  A NTP will be issued upon acceptance of the HPTP for Lewis and Clark National Historic Trails.

j.  **Historic Property Treatment Plans associated with the Programmatic Agreement:** The Programmatic Agreement for the Keystone XL Pipeline Project identifies processes and procedures to determine if historic properties are eligible for the National Register of Historic Places and if these properties would be adversely affected by the project's construction and/or operation.  The Programmatic Agreement requires the preparation of Historic Property Treatment Plans for eligible resources that are determined to be adversely affected by the project.  Identification of cultural resources in the project area is ongoing, including National Register eligibility and effects determinations.  The number and location of historic properties requiring a Historic Properties Treatment Plan is unknown at this time.  The BLM will notify the Holder when a Historic Properties Treatment Plan is determined necessary and the right to use that granted area is withheld until the Historic Properties Treatment Plan is finalized in accordance with the Programmatic Agreement procedures and requirements.  A NTP will be issued for each Historic Properties Treatment Plan area.

k.  **Areas of Tribal Concern and Monitoring:** Multiple locations have been identified by Tribes which are not defined as "Historic Properties" but may be considered as areas of Tribal interest, further consultation with Tribes is ongoing and site specific avoidance strategies and/or mitigation  will be completed prior to construction (if warranted). The right to use the granted area is withheld until consultation efforts are completed as determined by the agency responsible for the identified area of Tribal interest. Areas identified by Tribes for monitoring during construction have been identified and are supplied in Appendix R of the Plan Of Development.

4.  The Holder will arrange and schedule a preconstruction conference(s) with the BLM Authorized Officer prior to the Holder's commencing construction and/or surface disturbing activities on the ROW or specific construction phase of the ROW.  The Holder and/or his

representative(s) will attend this conference. The Holder's contractor, or agents involved with construction and/or any surface disturbing activities associated with the ROW, will also attend this conference to review the stipulations of the authorization, including the POD, as applicable. The Holder shall notify the Authorized Officer of the schedule for any preconstruction conference at least 30 calendar days in advance of the preconstruction conference. Preconstruction conferences are required for each construction spread and will involve BLM field offices located in the construction spread area.

5. The Holder shall designate a representative(s) who shall have the authority to act upon and implement instructions from the Authorized Officer. The Holder's representative shall be available for communication with the Authorized Officer within a reasonable time when construction or other surface disturbing activities are underway.

6. The Holder shall comply and implement conservation measures for federally listed species contained within the U.S Fish and Wildlife Service (USFWS) transmittal letter of concurrence, dated December 23, 2019 (see Appendix U, of the Final POD, pp 3-22 of the Concurrence letter). The holder shall monitor the progress of actions and the impact on species and provide annual reports to the BLM by December 31st to be transmitted to the USFWS. The report will include a summary of completed project activities and conservation measures implemented that year under BLM and USACE jurisdictions. Annual reporting will continue until project activities under respective federal jurisdictions have been completed. (see Appendix U, pg. 40 of the Biological Opinion) Failure to comply with these requirements shall be cause for suspension or termination of the ROW grant.

7. The Holder shall comply with the Programmatic Agreement titled, "Programmatic Agreement for the Keystone XL Pipeline Project" signed and executed by all parties and effective on December 16, 2013.

8. Construction sites shall be maintained in a sanitary condition at all times; waste materials at those sites shall be disposed of promptly in an appropriate waste disposal site. 'Waste' means all discarded matter including, but not limited to, human waste, trash, garbage, refuse, oil drums, petroleum products, ashes, and equipment. A litter policing program shall be implemented by the Holder which covers all roads and sites associated with the ROW.

9. The Holder will be liable for all fire suppression costs resulting from fires caused during construction or operations. The Holder shall comply with all guidelines and restrictions imposed by agency fire control officials.

10. The Holder shall fund in accordance with 43 CFR 2885.23 a third-party Compliance and Inspection Program [contract(s)] as deemed necessary by the Authorized Officer to ensure compliance with the terms, conditions, and stipulations of this ROW grant and applicable laws and regulations.

11. The Holder shall not initiate any construction or other surface disturbing activities as a minor change to the ROW or Final POD without prior written approval of the Authorized Officer, or his delegate. Such authorization shall be a written Change of Condition or Variance. Each Change of Condition/Variance shall authorize construction or use only as therein expressly stated and only for the particular location and use therein described. All changes of Condition/Variances are subject to such terms and conditions as deemed necessary by the Authorized Officer at the time of approval. Approved changes authorize construction or use only as therein expressly stated and only for the particular location, phase, area, or use described. The Authorized Officer may by written notice suspend or terminate in whole or in part any change of condition/variance which has been approved, when in the Authorized Officer's judgment, unforeseen conditions arise which result in the approved terms and conditions being inadequate to protect the public health and safety or to protect the environment.

12. Construction-related traffic shall be restricted to routes approved by the authorized officer. New access roads or cross-county vehicle travel will not be permitted unless prior written approval is given by the authorized officer. Authorized roads used by the Holder shall be rehabilitated or maintained when construction activities are complete as approved by the authorized officer.

13. No non-emergency construction or maintenance activities shall be performed during periods when the soil is too wet to adequately support construction equipment. If such equipment creates ruts in excess of four inches (4") deep with a 110-foot length, the soil shall be deemed too wet to adequately support construction equipment. Ruts created during construction shall be rehabilitated to at least the condition that existed prior to construction.

14. Pursuant to the Native American Graves Protection and Repatriation Act (NAGPRA) 43 CFR 10, the Holder of this authorization must immediately notify the Authorized Officer, by telephone, with written confirmation, immediately upon the discovery of human remains, funerary items, sacred objects, or objects of cultural patrimony. Further, pursuant to 43 CFR 10.4 (c) and (d), the Holder must stop activities in the vicinity of the discovery and take applicable measures to protect it until written notification to proceed is issued by the Authorized Officer in accordance with the NAGPRA Plan of Action Appendix of the Historic Properties Treatment Plan is included in the Final POD. The BLM Authorized Officer will determine avoidance, protection or mitigation measures in consultation with the

Holder, Montana SHPO, and affected Tribes. Costs associated with the discovery, evaluation, protection or mitigation of the discovery shall be the responsibility of the Holder.

15. Any cultural resources (historic or prehistoric site or object) discovered by the Holder, or any persons working on the Holder's behalf on Federal land shall be immediately reported to the Authorized Officer. Holder shall suspend all operations in the immediate area of such discovery and take applicable measures to protect it until written authorization to proceed is issued by the Authorized Officer in accordance with the Inadvertent Discovery section of the Historic Properties Treatment Plan included in the Final POD. Costs associated with the discovery, evaluation, protection or mitigation of the discovery shall be the responsibility of the Holder.

16. The Holder shall comply with the construction practices and mitigating measures established by 33 CFR 323.4, which sets forth the parameters of the "nationwide permit" required by Section 404 of the Clean Water Act. If the proposed action exceeds the parameters of the nationwide permit, the Holder shall obtain an individual permit from the appropriate office of the Army Corps of Engineers and provide the Authorized Officer with a copy of the same. Failure to comply with this requirement shall be cause for suspension or termination of the ROW grant.

17. The authorized officer may suspend or terminate in whole, or in part, any notice to proceed which has been issued when, in his judgment, unforeseen conditions arise which result in the approved terms and conditions being inadequate to protect the public health and safety or to protect the environment.

18. The holder shall not initiate any construction or other surface disturbing activities on the right-of-way without the prior written authorization of the authorized officer. Such authorization shall be a written notice to proceed issued by the authorized officer. Any notice to proceed shall authorize construction or use only as therein expressly stated and only for the particular location or use therein described.

19. Use of pesticides shall comply with the applicable Federal and state laws. Pesticides shall be used only in accordance with their registered uses and within the limitations imposed by the Secretary of the Interior. Prior to the use of pesticides, the holder shall obtain from the authorized officer written approval of a plan showing the type and quantity of material to be used, pest(s) to be controlled, method of application, location of storage and disposal of containers, and any other information deemed necessary by the authorized officer. Emergency use of pesticides shall be approved in writing by the authorized officer prior to such use.

20. The holder shall be responsible for noxious weed control on disturbed areas within the footprint of the project including temporary and long term pipeline right-of-way, temporary workspace, ATWS, temporary and long term access roads. The holder is responsible for consultation with the authorized officer and/or local authorities for acceptable weed control methods (within limits imposed in the grant stipulations). See Table 1-2 and Noxious Weed Management Plan, Appendix L, in the Final POD.

21. The holder shall protect all survey monuments found within the right-of-way. Survey monuments include, but are not limited to, General Land Office and Bureau of Land Management Cadastral Survey Corners, reference corners, witness points, U.S. Coastal and Geodetic benchmarks and triangulation stations, military control monuments, and recognizable civil (both public and private) survey monuments. In the event of obliteration or disturbance of any of the above, the holder shall immediately report the incident, in writing, to the authorized officer and the respective installing authority if known. Where General Land Office or Bureau of Land Management right-of-way monuments or references are obliterated during operations, the holder shall secure the services of a registered land surveyor or a Bureau cadastral surveyor to restore the disturbed monuments and references using surveying procedures found in the Manual of Surveying Instructions for the Survey of the Public Lands in the United States, latest edition. The holder shall record such survey in the appropriate county and send a copy to the authorized officer. If the Bureau cadastral surveyors or other Federal surveyors are used to restore the disturbed survey monument, the holder shall be responsible for the survey cost.

22. The holder of this right-of-way grant or the holder's successor in interest shall comply with Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) and the regulations of the Secretary of the Interior issued pursuant thereto.

23. The holder shall not use frozen soil, soil mixed with snow, or saturated soil during backfilling. Topsoil spreading shall not be done when the ground or topsoil is frozen or wet.

24. The holder shall conduct all activities associated with the construction, operation, and termination of the right-of-way within the authorized limits of the right-of-way.

25. All above-ground structures not subject to safety requirements shall be painted by the holder to blend with the natural color of the landscape. The paint used shall be a color which simulates "Standard Environmental Colors" designated by the Rocky Mountain Five-State Interagency Committee. The color selected for this pipeline is Covert Green.

26. The holder shall be liable for damage or injury to the United States to the extent provided by 43 CFR Sec. 2886.13. The holder shall be held to a standard of strict liability for damage or injury to the United States resulting from fire or soil movement (including landslides and

BLM-00026

slumps as well as wind and water-caused movement of particles) caused or substantially aggravated by any of the following within the right-of-way or permit area:

(1) Activities of the holder including, but not limited to construction, operation, maintenance, and termination of the facility.

(2) Activities of other parties including, but not limited to:

        a.  Land clearing and logging.
        b.  Earth-disturbing and earth-moving work.
        c.  Blasting.
        d.  Vandalism and sabotage.
        e.  Acts of God.

The ROW holder is strictly liable for any activity or facility associated with their ROW area that the BLM determines presents a foreseeable hazard or risk of damage or injury (ie. oil spills, water contamination) to the United States.  In accordance with strict liability regulations at 43 CFR 2886.13(b)(3), the updated maximum amount for Calendar Year 2020 is $2,709,000.  The BLM will update this amount each year to account for "changes in the Consumer Price Index for All Urban Consumers, U.S. City Average as of July of each year" (43 CFR 2886.13(b)(3)) in which the ROW holder is strictly liable for any activity or facility associated currently with their ROW area.

This section shall not impose strict liability for damage or injury resulting primarily from an act of war or from the negligent acts or omissions of the United States.

27. The holder shall provide a bond in the amount of **$84,065,960** to be maintained until restoration of disturbed areas and other requirements relative to the construction phase of the project have been accepted by the authorized officer.  Upon completion, or partial completion of these construction related requirements, the authorized officer may terminate or reduce the amount of the bond.

The holder agrees that all monies deposited with the authorized officer as security for holder's performance of the terms and conditions of this grant may, upon failure on the holder's  part to fulfill any of the requirements herein set forth or made a part hereof, be retained by the United States to be applied as far as may be needed to the satisfaction of the holder's obligations assumed hereunder, without prejudice whatever to any other rights and remedies of the United States.

28. The holder(s) shall comply with all applicable Federal laws and regulations existing or hereafter enacted or promulgated.  In any event, the holder(s) shall comply with the Toxic Substances Control Act of 1976, as amended (15 U.S.C. 2601, et seq.) with regard to any toxic substances that are used, generated by or stored on the right-of-way or on facilities

BLM-00027

authorized under this right-of-way grant. (See 40 CFR, Part 702-799 and especially, provisions on polychlorinated biphenyls, 40 CFR 761.1-761.193)  Additionally, any release of toxic substances (leaks, spills, etc.) in excess of the reportable quantity established by 40 CFR, Part 117 shall be reported as required by the Comprehensive Environmental Response, Compensation and Liability Act of 1980, Section 102b.  A copy of any report required or requested by any Federal agency or State government as a result of a reportable release or spill of any toxic substances shall be furnished to the authorized officer concurrent with the filing of the reports to the involved Federal agency or State government.

29. The holder agrees to indemnify the United States against any liability arising from the release of any hazardous substance or hazardous waste (as these terms are defined in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. 9601, et seq. or the Resource Conservation and Recovery Act of 1976, 42 U.S.C. 6901 et seq.) on the right-of-way (unless the release or threatened release is wholly unrelated to the right-of-way holder's activity on the right-of-way).  This agreement applies without regard to whether a release is caused by the holder, its agent, or unrelated third parties.

30. For the purpose of determining joint maintenance responsibilities, the holder shall make road use plans known to all other authorized users of the road.  Holder shall provide the authorized officer, within 30 days from the date of the grant, with the names and addresses of all parties notified, dates of notification, and method of notification.  Failure of the holder to share proportionate maintenance costs on the common use access road in dollars, equipment, materials, or manpower with other authorized users may be adequate grounds to terminate the right-of-way grant.  The determination as to whether this has occurred and the decision to terminate shall rest with the authorized officer.  Upon request, the authorized officer shall be provided with copies of any maintenance agreement entered into.

31. The holder shall coordinate with the parties holding authorized rights on the adjacent and affected lands (such as the grazing permittee/lessee and other right-of-way holders).

32. In the event that the (federal) public land underlying the right-of-way (ROW) encompassed in this grant, or a portion thereof, is conveyed out of Federal ownership and administration of the ROW or the land underlying the ROW is not being reserved to the United States in the patent/deed and/or the ROW is not within a ROW corridor being reserved to the United States in the patent/deed, the United States waives any right it has to administer the ROW, or portion thereof, within the conveyed land under Federal laws, statutes, and regulations, including the regulations at 43 CFR Part [2880], including any rights to have the holder apply to BLM for amendments, modifications, or assignments and for BLM to approve or recognize such amendments, modifications, or assignments. At the time of conveyance, the patentee/grantee, and their successors and assigns, shall succeed to the interests of the United States in all matters relating to the right-of-way, or portion thereof, within the conveyed land

and shall be subject to applicable State and local government laws, statutes, and ordinances. After conveyance, any disputes concerning compliance with the use and the terms and conditions of the ROW shall be considered a civil matter between the patentee/grantee and the ROW Holder.

33. Within 60 days after placing the pipeline in service, the holder will submit to the AO, as-built drawings and GIS shapefile or facilities and a certification of completed construction verifying that the facility has been constructed (and tested) in accordance with the design, plans, specifications, and applicable laws and regulations.

34. The BLM requires that Keystone XL incorporate Pipeline and Hazardous Materials Safety Administration (PHMSA) specific conditions identified in the Final EIS as part of its Keystone XL Pipeline Final POD for compliance with the Mineral Leasing Act ROW grant. The 57 PHMSA Special Conditions identified in Appendix U of the Final Environmental Impact Statement for the Keystone XL Pipeline are attached as conditions to the MLA grant (MTM-98191) issued by BLM to TransCanada Keystone Pipeline, LP ("Keystone"). The conditions are required to construct and operate the Keystone XL Pipeline ("Keystone XL" or the "pipeline"). BLM will require Keystone to include all its written design, construction, and operating and maintenance plans and procedures as identified in the Special Conditions (Document version February 10, 2011) in the Final POD as part of the ROW Grant.

35. The holder will adhere to the requirements provided in the Bureau of Reclamation Required Crossing Criteria for Reclamation Facilities for the TransCanada Keystone XL Pipeline dated April 2013, in consultation with Reclamation and the associated operating entity, as site specific crossing designs and construction plans are finalized and agreed upon through written concurrence with Reclamation in accordance with 43 CFR 429. The required crossing criteria are included in the Final Plan of Development for the Keystone XL Pipeline Project as Appendix M and herein made part of the ROW grant. Additional consultation with Reclamation and associated operating entities is required for any facility crossings utilizing the United States 1890 Canal Act Reservations for ditches and canals that are or may be identified during construction.

# Exhibit B
## BLM Special Stipulations
## MTM-98191
## MTM-98191-01
### Supplement 1

As requested, the Bureau of Land Management (BLM) has reviewed certain special stipulations found in Exhibit B of the offered right-of-way (ROW) grant MTM-98191 and temporary use permit (TUP) MTM-98191-01 for the Keystone XL Pipeline Project.  In response to the request, the BLM reviewed stipulation numbers 1, 13, and 23 for purposes of providing additional language to clarify the intended compliance and/or enforcement for each respective stipulation.

Each stipulation is cited with added language for clarification provided below as requested.

1.  The Holder shall not be permitted to use the granted areas for the proposed project until they have acquired all necessary Federal, State, or local permits, licenses, easements, etc. on Federal, State and/or private lands crossed by the project.

> 1.  Added language for clarification: The Holder shall not be issued a Notice to Proceed with activities on federal land parcels granted for the proposed project in Montana until they have acquired all necessary Federal, State, or local permits … on Federal, State and/or private land in the specified/segmented area of the project which is under review by the Grantor (i.e., the granted lands in Montana).

13.  No non-emergency construction or maintenance activities shall be performed during periods when the soil is too wet to adequately support construction equipment.  If such equipment creates ruts in excess of four inches (4") deep with a 110-foot length, the soil shall be deemed too wet to adequately support construction equipment.  Ruts created during construction shall be rehabilitated to at least the condition that existed prior to construction.

> 13. Added language for clarification: In order to prevent rutting and excessive damage to vegetation outside of wetlands, the Holder shall not perform construction activities during periods of high soil moisture when construction vehicles will cause rutting deeper than four (4) inches on a) areas where topsoil is not stripped and removed from the construction ROW for the pipeline or other associated facilities or, b) areas where excessive soil mixing is occurring or would occur as a result of the rutting.

23.  The holder shall not use frozen soil, soil mixed with snow, or saturated soil during back-filling. Topsoil spreading shall not be done when the ground or topsoil is frozen or wet.

> 23.  Added language for clarification: The holder shall not use frozen soil, soil mixed with snow, or saturated soil during back-filling. Topsoil spreading shall not be done when the ground or topsoil is frozen or *saturated* (one word change).

**Exhibit C**
**US Army Corps of Engineers - Omaha District**
**Standard Terms and Conditions**
**33 USC 408 (Section 14 of the Rivers and Harbors Act of 1899, as amended)**

## LIMITS OF THE AUTHORIZATION

1. This permission only authorizes you Keystone, the requester, to undertake the activity described herein under the authority provided in Section 14 of the Rivers and Harbors Act of 1899, as amended (33 USC 408). This permission does not obviate the need to obtain other federal, state, or local authorizations required by law. This permission does not grant any property rights or exclusive privileges, and you must have appropriate real estate instruments in place prior to construction and/or installation.

2. The time limit for completing the work authorized on USACE lands ends on September 30, 2023 _ If you find that you need more time to complete the authorized activity, submit your request for a time extension to this office for consideration at least one month before the above date is reached.

3. Without prior written approval of the USACE, you must neither transfer nor assign this permission nor sublet the premises or any part thereof, nor grant any interest, privilege or license whatsoever in connection with this permission. Failure to comply with this condition will constitute noncompliance for which the permission may be revoked immediately by USACE.

4. The requester understands and agrees that, if future operations by the United States require the removal, relocation, or other alteration of the work herein authorized, or if, in the opinion of the Secretary of the Army or an authorized representative, said work will cause unreasonable conditions and/or obstruction of USACE project authorized design, the requester will be required upon due notice from the USACE, to remove, relocate, or alter the structural work or obstructions caused thereby, without expense to the United States. No claim can be made against the United States on account of any such removal or alteration.

## INDEMNIFICATION AND HOLD HARMLESS

5. The United States will in no case be libel for:
   a. Any damage or injury to the structures or work authorized by the permission that may be caused or result from future operations undertaken by the United States, and no claim or right to compensation will accrue from any damage; or
   b. Damage claims associated with any future modification, suspension, revocation of this permission.

6. The United States will not be responsible for damages or injuries which may arise from or be incident to the construction, maintenance, and use of the project requested by you, nor for damages to the property or injuries to your officers, agents, servants, or employees, or others who may be on your premises or project work areas or the federal project(s) rights-of-way. By accepting this permission, you hereby agree to fully defend, **indemnify,** and **hold harmless** the United States and USACE from any and all such claims, subject to any

Keystone XL Pipeline Project

**Standard Terms and Conditions**
**33 USC 408 (Section 14 of the Rivers and Harbors Act of 1899, as amended)**

limitations in law.

7. Any damage to the water resources development project or other portions of any federal project(s) resulting from your activities must be repaired at your expense.

## REEVALUATION OF PERMISSION

8. The determination that the activity authorized by this permission would not impair the usefulness of the federal project and would not be injurious to the public interest was made in reliance on the information you provided.

9. This office, at its sole discretion, may reevaluate its decision to issue this permission at any time circumstances warrant, which may result in a determination that it is appropriate or necessary to modify or revoke this permission. Circumstances that could require a reevaluation include, but are not limited to, the following:
    a. you fail to comply with the terms and conditions of this permission;
    b. the information provided in support of your application for permission proves to have been inaccurate or incomplete; or
    c. significant new information surfaces which this office did not consider in reaching the original decision that the activity would not impair the usefulness of the water resources development project and would not be injurious to the public interest.

## CONDUCT OF WORK UNDER THIS PERMISSION

10. You are responsible for implementing any requirements for mitigation, reasonable and prudent alternatives, or other conditions or requirements imposed as a result of environmental compliance.

11. Work/usage allowed under this permission must proceed in a manner that avoids interference with the inspection, operation, and maintenance of the federal project.

12. In the event of any deficiency in the design or construction of the of the requested activity, you are solely responsible for taking remedial action to correct the deficiency.

13. The right is reserved to the USACE to enter the premises at any time and for any purpose necessary or convenient in connection with the government purposes, to make inspections, to operate and/or to make any other use of the lands as may be necessary in connection with government purposes, and you will have no claim for damages on account thereof against the United States of any officer, agent or employee thereof.

14. You must provide copies of pertinent design, construction, and/or usage submittals/documents. USACE may request that survey and photographic documentation of the alteration work and the impacted project area be provided before, during, and after construction and/or installation.

15. You may be required to perform an inspection of the federal project with the USACE, prior to your use of the structure, to document existing conditions.

Keystone XL Pipeline Project

**Standard Terms and
Conditions Pursuant to
33 USC 408 (Section 14 of the Rivers and Harbors Act of 1899, as amended)**

16. USACE shall not be responsible for the technical sufficiency of the alteration design nor for the construction and/or installation work.

ADDITIONAL SPECIAL CONDITIONS

17. Please add the following conditions to the ROW grant:

    a. All environmental commitments in the Environmental Impact Statement, Record of Decision, and Plan of Development submitted by Keystone and all conservation recommendations in the Biological Opinion as applicable and are hereby incorporated by reference.

    b. The pipeline will be maintained and operated per ASME B31.4, 49 CFR 195, API 1104, and related codes.

    c. Keystone must adhere to the requirements outlined in 40 CFR 89, 40 CFR 90, and 40 CFR 112.

    d. Copies of the SPCC plans and MTDEQ permits (i.e. SWPPP) must be provided to the Corps Environmental Compliance Coordinators prior to beginning construction activities.

    e. Cathodic Protection will be operated and maintained per applicable codes and Keystone's Operations and Maintenance Manual. Wall thickness testing will be performed within 3 years of pipeline operation. Future In-line inspections will be conducted consistent with 49 CFR 195.452 (G)(3). The periodic in-line inspection will be performed in-lieu of periodic hydro tests. Copies of the inspection report must be sent to the Fort Peck Project Office within 90 days of the date it was submitted to PHMSA.

    f. The Drilling Fluid Management Plan/Horizontal Directional Drilling Plan must be submitted and approved to the Corps prior to the construction of the pipeline. Any HDD drill cuttings/mud shall be containerized and transported to an approved disposal facility off Corps property.

    g. All plans not final at the time the Environmental Impact Statement is complete will be submitted to the Corps for review and the incorporation of Corps comments prior to submittal to PHMSA.

    h. These plans include, but are not limited to the;
        1. Geographical Response Plan
        2. Operations and Maintenance Manual
        3. Risk Assessment (Integrity Management Plan)
        4. Spill Models (Using the National Hydrography Dataset by the USGS)

    i. Any plans that have been updated in condition "d" and "f" and "h" must be sent to USACE Environmental Compliance Coordinator at the Omaha District

Keystone XL Pipeline Project

BLM-00033

**Standard Terms and
Conditions Pursuant to
33 USC 408 (Section 14 of the Rivers and Harbors Act of 1899, as
amended)**

and the Fort Peck Project Office within 90 days of finalizing the updates.

j. Must provide as-built drawings as they become available for the crossing at Fort Peck to the Corps Section 408 Coordinator Omaha District Office and the Operations Project Manager Fort Peck Project, but no longer than 18 months of the completion of pipeline construction.

k. Commitment for Training Exercises:
   1. Must conduct full scale 'open water and full-scale winter/ice exercises at Fort Peck Project. The full-scale exercises will occur once every 3 years (triennial cycle). The first exercise will occur within the first 3 years after the pipeline becomes operational. These exercises should be on alternating schedules (i.e. open water exercise at Fort Peck Reservoir during the first triennial cycle, followed by winter exercise on the Missouri River during the following triennial cycle, etc.)
   2. To facilitate Corps staff involvement, Keystone must notify the Corps Environmental Compliance Coordinators at the Omaha District Office and the Fort Peck Project Office at least ninety (90) days prior to initiation of the training exercises. Keystone must also solicit the participation of key stakeholders (federal, state, local, and Tribal) in these exercises.

l. Installation of an underflow dam in the event of a release on Bear Creek is required to reduce the risk of contamination into the Fort Peck Reservoir.

m. No hydrostatic test water is allowed to be withdrawn from the reservoir of Fort Peck Lake. Hydrostatic test water should be tested for heavy metals and petroleum, oils, and lubricants prior to discharging onto Corps property. Copies of the analytical results must be provided to the Corps Environmental Compliance Coordinators. Best management practices must be implemented to control erosion.

n. A minimum of 80% success rate at the end of 5 growing seasons must occur to meet the mitigation requirements. This must occur within all temporarily disturbed areas. Keystone must use the following recommended procedures and seed mix outlined in the Fort Peck Project reclamation plan.

o. Keystone is required to enter into a surface damage agreement with the Corps Fort Peck Project Office prior to the operation of the pipeline. The agreement will provide for the mitigation of tree and vegetation loss due to the project in the amount and in the manner more specifically described in the Vegetation Restitution Report dated November 2017.

p. 2014 FSEIS Appendix E, Amended Programmatic Agreement and Record of Consultation stipulations will continue to be carried out, including but not limited to requirements during construction and unanticipated discovery of human remains.

q. The south valve station on Corps land must be built above the 500-year floodplain.

# Exhibit D

**Keystone XL Pipeline**
**Real Estate Contracting Officer Decision Concerning**
**Bureau of Land Management Proposed ROW Grant**
**Associated with the Use of Army Lands at the Fort Peck Lake Project, Montana**
**Terms & Conditions**

I have reviewed the proposed Right of Way Grant (MTM-98191) and Temporary Use Permit (MTM-98191-01) to be granted by the Bureau of Land Management (BLM) to TransCanada Keystone Pipeline, LP (TransCanada) pursuant to Section 28 of the Mineral Leasing Act of 1920, as amended (30 U.S.C. 185), and concur with the Grant and Permit across property under the control of the Corps of Engineers (USACE) at the Fort Peck Lake Project, Montana, subject to the following Terms and Conditions:

1. **BLM will:**

   - Provide documentation to USACE confirming receipt of annual payments from TransCanada (for Army portion, overseen by USACE) and confirming deposit in appropriate Treasury account.

   - Comply with the terms of the Mineral Leasing Act requiring annual payment of monetary consideration.

   - Review and address the applicability of Executive Order 13658 (regarding minimum federal wage requirements) and EO 13706 (regarding sick leave for federal contractors). If determined applicable, BLM will include appropriate language in the ROW grant.

2. **BLM will include in the Right-of-Way Grant the following conditions:**

   a. **Late Payments:**

"Any payments due under the terms of this Grant must be paid on or before the date they are due in order to avoid the mandat01y sanctions imposed by the Debt Collection Act of 1982, as amended (31 U.S.C. Section 3717). This statute requires the imposition of an interest charge for the late payment of debts owed to the United States; an administrative charge to cover the costs of processing and handling delinquent debts; and the assessment of an additional penalty charge on any portion of a debt that is more than 90 days past due."

   b. **Notices:**

"With regard to the Federal Lands located at the Fort Peck Project, Montana, all correspondence and notices to be given pursuant to this grant shall be in writing and addressed, if to the Holder, to Trans Canada Keystone XL Pipeline, LP, 717 Texas Street, Houston, TX 77002-2761, and, if to the Corps of Engineers, to the U. S. Anny Engineer District, Omaha, Attention: Chief, Real Estate Division, 1616 Capitol Avenue, Omaha, NE 68102, or as may from time to time otherwise be directed by the parties. Notices shall be mailed by certified mail, postage prepaid, return receipt requested, addressed to the addresses above. The effective date of the notice shall be the earlier of the actual date of receipt or the date the addressee is notified of the attempted delivery of the certified mail, whether or not the addressee actually accepts delivery."

BLM-00036

c. **Condition of Premises:**

"The Holder acknowledges that it has inspected the premises, knows its condition, and understands that the same is granted without any representations or warranties whatsoever and without any obligation on the part of the United States."

d. **Environmental Condition of Property**

"An environmental condition of property documenting the known history of the Fort Peck Montana Project property with regard to the storage, release or disposal of hazardous substances thereon, is attached hereto and made a part hereof as EXHIBIT "A". Upon expiration, revocation or termination of this Grant, another environmental condition of property shall be prepared which will document the environmental condition of the property at that time. A comparison of the two surveys will assist the Authorized Officer in determining any environmental restoration requirements. Any such requirements will be completed by the Holder in accordance with the restoration requirements herein.

e. **Transfers and Assignments:**

"Without prior written approval by the Authorized Officer and the Department of the Army, Real Estate Contracting Officer, Omaha District, the Holder shall neither transfer nor assign this Grant or any part thereof nor grant any interest, privilege or license whatsoever in connection with this Grant. The provisions and conditions of this Grant shall extend to and be binding upon and shall inure to the benefit of the representatives, successors and assigns of the Holder."

f. **Disclaimer:**

"That it is understood that this instrument is effective only insofar as the rights of the United States in the said property are concerned, and that the Holder shall obtain such permission as may be necessary on account of any other existing rights. It is understood that the granting of this Right-of-Way does not eliminate the necessity of obtaining any Department of the Army pe1mit which may be required pursuant to the provisions of Section 10 of the Rivers and Harbors Act of March 3, 1899 (30 Stat. 1151; 33 U.S.C. § 403), Section 404 of the Clean Water Act (33 U.S.C. § 1344), or any other pe1mit or license which may be required by Federal, state or local statute in connection with the use of the premises. The grant of this Right-of-Way pursuant to 30 U.S.C. § 185 shall grant no immunity from the operation of the Federal antitrust laws."

g. **Other Agency Agreements:**

"It is understood that the provision of the Grant shall not abrogate or interfere with any agreements or commitments made or entered into between the Holder and any other agency of the United States with regard to financial aid to the Holder in connection with the installation. operation. or maintenance of said pipeline."

BLM-00037

**h.   Relocation of Facilities:**

"In the event all or any p01tion of the Premises occupied by said Facilities at the Fort Peck Project, Montana, shall be needed by the Depa1tment of the Army, or in the event the existence of said Facilities shall be considered detrimental to governmental activities, the Holder shall, from time to time, upon notice to do so, and as often as so notified, promptly seek authorization from the Federal Energy Regulatory Commission, or other applicable entity, to remove said Facilities, or p01tion thereof, to such other location or locations as may be designated by the Department of the Army. And in the event said Facilities shall not be removed or relocated within ninety (90) days after any aforesaid notice, the Department of the Army, after receipt of required approvals, may cause the same to be done at the expense of the Holder."

**i.   Hazardous Waste or Fuel Spill:**

"In accordance with 43 CFR 2880, § 2885.11 (b)(12), the Holder shall certify its compliance with all requirements of the Emergency Planning and Community Right to Know Act of 1986, 42 U.S.C. 11001 et seq.

1/21/20

Date

RICKL.NOEL
Chief Civil Branch, Real Estate Division
Real Estate Contracting Officer

3

BLM-00038